# In The Matter Of:

*Jeanne Degan   v.*
*Goldwell of New England, Inc.*

---

*Renee G. Shakour*
*Vol. 1, October 7, 2004*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File SHAKOUR.V1, 167 Pages*
*Min-U-Script® File ID: 2106277433*

**Word Index included with this Min-U-Script®**

Page 10

[1] **Q:** Is that a B.A. or B.S.?
[2] **A:** I don't know.
[3] **Q:** After graduating from Menlo College, what
[4] was your first full-time job?
[5] **A:** I worked at Price Club.
[6] **Q:** Is that a retail store?
[7] **A:** No. It's a wholesale — it's like a
[8] custom — it's like a Costco or BJs.
[9] **Q:** How long did you work there?
[10] **A:** I don't know.
[11] **Q:** Approximate.
[12] **A:** Approximately a year or two.
[13] **Q:** What was your position there?
[14] **A:** Membership manager.
[15] **Q:** What were your duties and responsibilities
[16] as a membership manager?
[17] **A:** I took care of signing up customers.
[18] **Q:** Anything else?
[19] **A:** I'm sure there were other duties included,
[20] but —
[21] **Q:** None you can recall at this time?
[22] **A:** Correct.
[23] **Q:** What was your next job?
[24] **A:** I came to work at R.G. Shakour.

Page 11

[1] **Q:** What's your middle name?
[2] **A:** Gabrielle.
[3] **Q:** Is that the "G" in R.G. Shakour?
[4] **A:** No.
[5] **Q:** What does the "G" in R.G. Shakour stand
[6] for?
[7] **A:** Gabriel, which would be my grandfather.
[8] **Q:** Now, when did you start at R.G. Shakour?
[9] **A:** Approximately — after I left Price Club.
[10] **Q:** So was that approximately '92 or '93?
[11] **A:** Approximately.
[12] **Q:** And at some point did you get married to a
[13] Jon Shakour?
[14] **A:** No.
[15] **Q:** Are you married?
[16] **A:** No.
[17] **Q:** Who is Jon Shakour? And let me ask you
[18] this: Is there a John spelled J-o-h-n Shakour?
[19] **A:** No.
[20] **Q:** There's only a J-o-n Shakour?
[21] **A:** Correct.
[22] **MR. POWERS:** We can go off the record.
[23]   (Discussion off the record)
[24] **Q:** So there's a J-o-n, Jon Shakour?

Page 12

[1] **A:** Correct.
[2] **Q:** And what relationship to you does Jon
[3] Shakour have?
[4] **A:** He's my father.
[5] **Q:** So was your father, Jon Shakour, the
[6] founder of R.G. Shakour?
[7] **A:** No.
[8] **Q:** Who was the founder?
[9] **A:** My grandfather, Ralph Gabrielle Shakour.
[10] **Q:** And do you know when — I'll just say R.G.
[11] Shakour — founded the company approximately?
[12] **A:** Approximately 80 to 85 years ago, again,
[13] approximately.
[14] **Q:** And is Jon Shakour a 100 percent owner of
[15] R.G. Shakour?
[16] **A:** No.
[17] **Q:** Can you tell me who else has an ownership
[18] interest in R.G. Shakour and, if you know, what
[19] percentage?
[20] **A:** I have a percentage, Renee Shakour; my
[21] sister has a percentage, Nicole Shakour-Shacot; and
[22] my mother has a percentage, Maryann Shakour.
[23] **Q:** And what's your percentage?
[24] **A:** I don't know.

Page 13

[1] **Q:** Do you know Jon Shakour's percentage?
[2] **A:** No.
[3] **Q:** Do you know Maryann's percentage?
[4] **A:** No.
[5] **Q:** Is it fair to say that the Shakour family
[6] in general owns 100 percent of R.G. Shakour?
[7] **A:** I don't know.
[8] **Q:** Do you know of any non-family member who
[9] has any ownership in R.G. Shakour?
[10] **A:** To the best of my knowledge, no.
[11] **Q:** What position does Jon Shakour hold in R.G.
[12] Shakour?
[13] **A:** He's the owner of R.G. Shakour.
[14] **Q:** Any other position, such as president,
[15] treasurer, vice-president, secretary?
[16] **A:** I don't know.
[17] **Q:** What's your job title at R.G. Shakour?
[18] **A:** Vice-president.
[19] **Q:** Does Nicole Shakour have a title?
[20] **A:** Vice-president.
[21] **Q:** And how about your mother?
[22] **A:** No title.
[23] **Q:** To your knowledge, is R.G. Shakour
[24] incorporated in Massachusetts?

Page 14

[1]  A: I don't know.
[2]  Q: Other than the R.G. Shakour offices in
[3] Westboro, does R.G. Shakour have offices anywhere
[4] else?
[5]  A: No.
[6]  Q: At the present time, approximately how many
[7] people does R.G. Shakour employ?
[8]  A: Approximately 90.
[9]  Q: And approximately how many of those are
[10] full-time employees?
[11]  A: I don't know.
[12]  Q: Now, is Jon Shakour a fifty percent owner
[13] of Goldwell of New England?
[14]  A: I don't know.
[15]  Q: What are your present duties and
[16] responsibilities at R.G. Shakour?
[17]  A: I oversee the day-to-day operation.
[18]  Q: And what are Jon Shakour's duties?
[19]  A: He oversees all the financial aspects of
[20] R.G. Shakour and oversees myself.
[21]  Q: And how about Nicole, what duties and
[22] responsibilities does she have?
[23]  A: She works in the credit department.
[24]  Q: Now, when you say your duties and

Page 15

[1] responsibilities are to oversee the day-to-day
[2] operations, what do you mean by that?
[3]  A: I oversee purchasing. I oversee all
[4] aspects of R.G. Shakour.
[5]  Q: Who is in charge of the personnel or HR
[6] functions at R.G. Shakour?
[7]  A: Carrie Smith.
[8]  Q: And what's her job title, do you know?
[9]  A: HR manager.
[10]  Q: Does she report to you?
[11]  MR. SIGEL: Excuse me. Carrie with a "C,"
[12] just so you know, Carrie.
[13]  MR. POWERS: Okay. Thanks.
[14]  Q: Do you supervise or oversee Carrie Smith's
[15] work?
[16]  A: Yes.
[17]  Q: She reports to you?
[18]  A: Yes.
[19]  Q: By the way, is there an organizational
[20] chart in existence showing the organization of R.G.
[21] Shakour?
[22]  A: I don't know.
[23]  Q: Have you ever seen one?
[24]  A: Yes, at some point.

Page 16

[1]  Q: When was the last time you saw it?
[2]  A: I don't know.
[3]  Q: Who, to your knowledge, is in charge of
[4] seeing to it that R.G. Shakour is insured?
[5]  A: Jon Shakour.
[6]  Q: Do you know if R.G. Shakour has a general
[7] liability insurance policy?
[8]  A: I don't know.
[9]  Q: Can you tell me what the relationship is
[10] between R.G. Shakour and Goldwell of New England?
[11]  A: We are sister companies.
[12]  Q: What do you mean by that?
[13]  A: Can I talk to Jonathan for a minute or not
[14] in the middle of the question?
[15]  Q: Not in the middle of the question.
[16]  A: We do some activities together.
[17]  Q: Do you want to talk to him now?
[18]  A: No.
[19]  Q: What activities?
[20]  A: The New England Beauty Expo, some training
[21] events.
[22]  Q: Anything else?
[23]  A: No, not to my recollection, no.
[24]  Q: Do R.G. Shakour and Goldwell share any

Page 17

[1] employees?
[2]  A: No.
[3]  Q: Have they ever shared employees?
[4]  A: Yes.
[5]  Q: When was the last time R.G. Shakour and
[6] Goldwell shared employees?
[7]  A: I can't remember.
[8]  Q: Do you recall the names of any employees
[9] that were shared by Goldwell and Shakour?
[10]  A: Yes, Jeanne Hogan, Claire Parkhurst.
[11]  Q: Anyone else?
[12]  A: Not to my recollection.
[13]  Q: What was Claire Parkhurst's job title or
[14] function?
[15]  A: ARTec brand manager.
[16]  Q: And when, to your knowledge, was the last
[17] time that Claire Parkhurst worked for either Shakour
[18] or Goldwell?
[19]  A: I don't know.
[20]  Q: Can you give me a rough idea when you last
[21] worked with her at all?
[22]  A: Years ago.
[23]  Q: Was she an ARTec brand manager before
[24] Jeanne Hogan or after Jeanne Hogan?

Page 18

[1] **A:** I don't know specifically.
[2] **Q:** Could you look at Plaintiff Depo Exhibit
[3] 15. It's probably the last document in your pile.
[4] And could you turn to Page 4 of that document.
[5] That's probably the second —
[6] **A:** This one?
[7] **Q:** Yes. Just so you'll understand what this
[8] is, these are Answers to Interrogatories provided to
[9] us by Goldwell, and if you look at the last page,
[10] they were signed by Mary Garneau and Jonathan Sigel.
[11] **A:** (Examines document) Okay.
[12] **Q:** Now, on Page 4 — if you look at Response
[13] No. 6, second paragraph.
[14] **A:** Okay.
[15] **Q:** It states, on the fourth line, "Fifty
[16] percent of Goldwell is owned by John Foundas. The
[17] other fifty percent is owned by Jon Shakour, who is
[18] the owner of 100 percent of R.G. Shakour."
[19] **A:** Okay.
[20] **Q:** Let's break that down. Does that refresh
[21] your memory that Jon Shakour is a fifty percent
[22] owner of Goldwell?
[23] **A:** I don't know.
[24] **Q:** Do you have any reason to believe that that

Page 19

[1] statement is not true?
[2] **A:** No.
[3] **Q:** Do you meet on a regular basis with your
[4] father about the R.G. Shakour business?
[5] **A:** Yes.
[6] **Q:** Has he ever told you that he had any
[7] proprietary or monetary interest in Goldwell?
[8] **A:** Yes.
[9] **Q:** What did he say about that?
[10] **A:** I don't recall.
[11] **Q:** You don't recall anything, just that he
[12] talked about having an interest?
[13] **A:** Correct.
[14] **Q:** So did you understand — or do you
[15] understand now that your father does have some kind
[16] of financial ownership in Goldwell of New England?
[17] **A:** Correct.
[18] **Q:** You just don't know what percentage his
[19] interest is?
[20] **A:** Yes.
[21] **Q:** And going back to 2001, did you know at
[22] that time that your father had a proprietary or
[23] monetary interest in Goldwell?
[24] **A:** I don't know when.

Page 20

[1] **Q:** When do you first remember your father
[2] indicating to you or telling you that he had some
[3] kind of ownership in Goldwell?
[4] **A:** I don't know a specific date.
[5] **Q:** Approximate time period.
[6] **A:** I don't know.
[7] **Q:** In the last three years what, if anything,
[8] has your father told you about his financial or
[9] ownership interest in Goldwell?
[10] **A:** Specifically, I don't know.
[11] **Q:** Generally.
[12] **A:** That he has an interest in Goldwell.
[13] **Q:** Did you ever ask him how much, "What
[14] percentage of Goldwell do you own"?
[15] **A:** No.
[16] **Q:** And he never told you?
[17] **A:** No.
[18] **MR. SIGEL:** Objection.
[19] **Q:** And no one has ever told you what
[20] percentage your father owned in Goldwell?
[21] **A:** No.
[22] **Q:** And you never asked?
[23] **A:** It's not my business.
[24] **Q:** Well, R.G. Shakour is your business.

Page 21

[1] That's okay, we'll move on.
[2] When Claire Parkhurst worked as an ARTec
[3] brand manager, to your knowledge, did R.G. Shakour
[4] pay a portion of her salary or commission?
[5] **A:** Yes.
[6] **Q:** Do you know what percentage?
[7] **A:** No.
[8] **Q:** Was it a percentage of salary, percentage
[9] of commission or percentage of both?
[10] **A:** I don't know.
[11] **Q:** Did Claire Parkhurst report to you?
[12] **A:** Yes.
[13] **Q:** When Jeanne Hogan worked as an ARTec brand
[14] manager, did R.G. Shakour pay a percentage of her
[15] salary and/or commission?
[16] **A:** Specifically, I don't know.
[17] **Q:** Well, I didn't ask you at this time the
[18] percentage. I'm simply asking a general question.
[19] Did R.G. Shakour pay a portion of Jeanne Hogan's
[20] either salary or commission?
[21] **A:** I don't know.
[22] **Q:** Jeanne Hogan reported to you, didn't she?
[23] **A:** Sometimes. Let me rephrase that.
[24] Partially.

Page 22

[1] **Q:** Wouldn't it be in part your decision
[2] whether or not R.G. Shakour would pay any portion of
[3] Jeanne Hogan's compensation?
[4] **A:** Can I back up?
[5] **Q:** Sure.
[6] **A:** While Claire Parkhurst was working for R.G.
[7] Shakour, I — we were paying Claire Parkhurst some
[8] of her salary or commission — or I'm not quite
[9] specific, and Goldwell was paying Jeanne Hogan's
[10] type of package at that time.
[11] **Q:** And then did that change at some point?
[12] **A:** Yes, when Claire Parkhurst was no longer
[13] with R.G. Shakour.
[14] **Q:** And how did it change?
[15] **A:** Jeanne Hogan fulfilled both positions.
[16] **Q:** Both positions being what?
[17] **A:** The brand manager for R.G. Shakour and for
[18] Goldwell.
[19] **Q:** Was that the ARTec brand manager for R.G.
[20] Shakour and Goldwell?
[21] **A:** Yes.
[22] **Q:** Now, at some point did Ms. Hogan and Ms.
[23] Parkhurst split a geographic area?
[24] **A:** Yes.

Page 23

[1] **Q:** And what geographic area did Claire
[2] Parkhurst service?
[3] **A:** Specifically, I don't know.
[4] **Q:** Was it part of the New England region?
[5] **A:** Yes.
[6] **Q:** Did Ms. Parkhurst service any region
[7] outside of New England?
[8] **A:** No.
[9] **Q:** So is it fair to say that at some point
[10] Ms. Hogan and Ms. Parkhurst together serviced the
[11] entire New England region?
[12] **A:** Correct.
[13] **Q:** And that region was split in some manner?
[14] **A:** Correct.
[15] **Q:** But you don't recall at this time what that
[16] manner was?
[17] **A:** Correct.
[18] **Q:** And then at some point Ms. Parkhurst left
[19] the employ of either Shakour or Goldwell; is that
[20] correct?
[21] **A:** Miss Parkhurst was an employee of Shakour.
[22] **Q:** And then when Ms. Parkhurst left the employ
[23] of Shakour, Jeanne Hogan took over Ms. Parkhurst's
[24] geographic area?

Page 24

[1] **A:** Correct.
[2] **Q:** And at that time serviced the entire New
[3] England region?
[4] **A:** Yes.
[5] **Q:** As the ARTec brand manager?
[6] **A:** Yes.
[7] **Q:** And do you know approximately when that
[8] was?
[9] **A:** No.
[10] **Q:** So was it after Ms. Parkhurst left the
[11] employ of R.G. Shakour that R.G. Shakour began
[12] paying a portion of Jeanne Hogan's earnings?
[13] **A:** I don't know. Can I take a break for a
[14] minute?
[15] **Q:** Sure.
[16]     (Recess taken)
[17]          BY MR. POWERS:
[18] **A:** Can I go back?
[19] **Q:** Yes, correct anything you want.
[20] **A:** When it came to paying — there's a
[21] question that has to — I don't know how to quite
[22] put it. There was a question about us paying moneys
[23] to Jeanne.
[24] **Q:** Yes. The question, I think, was, "Did R.G.

Page 25

[1] Shakour pay any portion of the compensation of
[2] either Jeanne Hogan or Parkhurst?" I think you
[3] talked about Parkhurst.
[4] **A:** Yes, but I want to go back and say as far
[5] as Jeanne Hogan goes, we reimbursed Goldwell.
[6] Goldwell paid Jeanne Hogan. So we reimbursed
[7] Goldwell.
[8] **Q:** And then Shakour reimbursed Goldwell for a
[9] portion of her salary and commission or just
[10] commission?
[11] **A:** I don't know what the financial package
[12] was, but we reimbursed Goldwell some portion of Miss
[13] Hogan's —
[14] **Q:** Compensation?
[15] **A:** Correct.
[16] **Q:** Who negotiated the amount that Shakour
[17] would reimburse Goldwell for with regard to Ms.
[18] Hogan's compensation?
[19] **A:** Myself, John Foundas, Mary Garneau and
[20] ARTec.
[21] **Q:** And Mr. Foundas and Mary Garneau were
[22] Goldwell employees, correct?
[23] **A:** Correct.
[24] **Q:** So is it fair to say that the person who

Page 30

[1] **A:** We were sister companies as far as we all
[2] were concerned.
[3] **Q:** Back in '92, '93?
[4] **A:** Correct.
[5] **Q:** And, again, sister companies — I'm not
[6] sure what that means. So if you could tell me back
[7] in '92, '93, what was the sister company
[8] relationship? What did you do together?
[9] **A:** As I stated before, we did some educations
[10] together. We worked on shows together. That's all
[11] I can recall.
[12] **Q:** When you say that Goldwell and R.G. Shakour
[13] worked on shows together, can you describe for me or
[14] tell me what you mean by that?
[15] **A:** We had some shared events.
[16] **Q:** And what do you mean by that?
[17] **A:** Educational events for our teams. I can
[18] remember a show that we did together.
[19] **Q:** What does it mean to do a show together?
[20] **A:** To jointly sell tickets together, to put on
[21] a common cause, like a show.
[22] **Q:** Maybe I don't know because I don't know the
[23] business. So if you could tell me what a show is.
[24] **A:** A show is where we'll bring in motivational

Page 31

[1] people to enhance a salon's business, have it at a
[2] joint location.
[3] **Q:** Would the joint location be at some kind of
[4] beauty salon or someplace else?
[5] **A:** One I can remember was at a hotel.
[6] **Q:** Would you also have educational events at
[7] beauty salons?
[8] **A:** I don't recall any at salons. Possibly.
[9] **Q:** And from '92 to the present — or at the
[10] time that you started at R.G. Shakour to the
[11] present, how many events has Shakour and Goldwell
[12] done together?
[13] **A:** I don't know.
[14] **Q:** Approximately?
[15] **A:** I don't know.
[16] **Q:** Are you the person who on the Shakour side
[17] is in charge of those events?
[18] **A:** I would be involved in them, yes.
[19] **Q:** Who would be in charge of them?
[20] **A:** I would probably be in charge of them.
[21] **Q:** So based on your knowledge as the person
[22] who was in charge of the events, approximately how
[23] many events have been held jointly by Shakour and
[24] Goldwell since you joined Shakour?

Page 32

[1] **MR. SIGEL:** Objection.
[2] **A:** I don't know.
[3] **Q:** Can you give me a rough idea?
[4] **A:** I don't want to guess.
[5] **Q:** How many a year, approximately?
[6] **A:** We do the New England Beauty Expo together
[7] each year, and the one show that I can remember, and
[8] other than that, I don't want to guess.
[9] **Q:** You don't want to guess. You don't recall
[10] any other shows or events?
[11] **A:** I don't know.
[12] **Q:** Let me ask a more specific question. Other
[13] than the New England Beauty Show and the one other
[14] that you can recall, do you recall any other events
[15] that both Shakour and Goldwell did together?
[16] **A:** I don't recall.
[17] **Q:** So you don't have a memory of anything
[18] else?
[19] **A:** I don't know.
[20] **Q:** Well, I'm just trying to get to a final
[21] answer, and the final answer is whether or not
[22] you've exhausted your memory whether or not there's
[23] anything else you can recall. Is there nothing else
[24] you can recall other than what you've already

Page 33

[1] testified to regarding the number of events?
[2] **A:** I don't know how many events we've done
[3] together.
[4] **Q:** But my question was a little more specific
[5] than that. You've mentioned two events, and I'm
[6] asking you, do you have a memory of Shakour and
[7] Goldwell doing any other events together other than
[8] the two you've already testified to?
[9] **A:** I don't know.
[10] **Q:** Is the answer, "I don't recall any other
[11] events"?
[12] **A:** No, I don't know.
[13] **Q:** You don't know what?
[14] **A:** I don't know if we've done any other events
[15] together.
[16] **Q:** When you talk about the New England Beauty
[17] Expo, where is that normally held?
[18] **A:** At the World Trade Center in Boston.
[19] **Q:** And when you say that Shakour and Goldwell
[20] did the event together, what did they actually do
[21] together?
[22] **A:** We do some functions together. So let me
[23] rephrase that from earlier. We do some functions of
[24] the New England Beauty Expo together.

Page 42

[1] **A:** Yes.
[2] **Q:** All or some of the five?
[3] **A:** Some.
[4] **Q:** Who presently works on ARTec products?
[5] **A:** Well, it's under the L'Oreal umbrella.
[6] They're not technically ARTec. They work for
[7] L'Oreal.
[8] **Q:** Who works for L'Oreal now?
[9] **A:** Amy Beckwith and Terry Weisman-Flip.
[10] **Q:** And are Ms. Beckwith and Flip employees of
[11] Shakour?
[12] **A:** Correct.
[13] **Q:** Does Shakour pay 100 percent of their
[14] compensation?
[15] **A:** No.
[16] **Q:** What percentage of their compensation does
[17] Shakour pay?
[18] **A:** Approximately?
[19] **Q:** Yes.
[20] **A:** Fifty percent.
[21] **Q:** Each of them?
[22] **A:** Yes.
[23] **Q:** And who pays the rest?
[24] **A:** L'Oreal.

Page 43

[1] **Q:** Does Goldwell pay any of their
[2] compensation?
[3] **A:** No.
[4] **Q:** Does Shakour reimburse L'Oreal for any part
[5] of Beckwith's or Flip's compensation?
[6] **A:** I don't understand.
[7] **Q:** Is there any money that is exchanged
[8] between Shakour and Goldwell with regard to Beckwith
[9] and Flip's services?
[10] **A:** No.
[11] **Q:** Are there presently any employees of
[12] Shakour that are compensated partly by Shakour and
[13] partly by Goldwell?
[14] **A:** Can you say that again?
[15] **Q:** Are there any employees of Shakour that are
[16] presently compensated partly by Shakour and partly
[17] by Goldwell?
[18] **A:** Not that I'm aware of.
[19] **Q:** Are there any employees that you're aware
[20] of of Goldwell that are compensated partly by
[21] Shakour and partly by Goldwell?
[22] **A:** Not that I'm aware of.
[23] **Q:** Does, to your knowledge, Shakour pay or
[24] reimburse Goldwell for the services provided by any

Page 44

[1] of Goldwell's employees?
[2] **A:** Currently?
[3] **Q:** Yes.
[4] **A:** Not that I'm aware of.
[5] **Q:** When was the last time that there was ever
[6] a situation where an employee of Goldwell — or I'm
[7] sorry. Strike that.
[8]    Tell me the last time that Shakour paid
[9] Goldwell for services provided by a Goldwell
[10] employee to Shakour.
[11] **A:** To the best of my recollection, it was
[12] Jeanne Hogan and — it was Jeanne Hogan.
[13] **Q:** Can you explain to me why Shakour paid
[14] Goldwell for a portion of Jeanne Hogan's services?
[15] **A:** Can you repeat the question?
[16] **Q:** Yes. Maybe I'll rephrase the question.
[17] I'm just trying to figure out from you if
[18] you know why Shakour paid Goldwell a certain amount
[19] of money for the services provided by Jeanne Hogan.
[20] **A:** Because she worked with some of our account
[21] executives in our salons.
[22] **Q:** So if I understand you, you're saying that
[23] Jeanne, although an employee of Goldwell, worked
[24] with ARTec employees, correct?

Page 45

[1]    **MR. SIGEL:** Objection. You said "ARTec
[2] employees."
[3]    **MR. POWERS:** I'm sorry.
[4] **Q:** Worked with Shakour employees.
[5] **A:** Correct.
[6] **Q:** And what did she do with Shakour employees?
[7] **A:** She performed various duties.
[8] **Q:** Such as?
[9] **A:** Doing classes, going out on sales calls,
[10] coordinating events, overseeing the paperwork for
[11] the ARTec employees. That would be their
[12] subcontractors. I'm sure there were other things
[13] that she did.
[14] **Q:** Could you look at Exhibit 1.
[15] **A:** This one?
[16] **Q:** It's titled "Exhibit 1, Plaintiff's Exhibit
[17] 1."
[18] **A:** (Examines document) Yes.
[19] **Q:** If you could look at that and tell me if
[20] you can recall if any of these employees ever
[21] provided services to R.G. Shakour.
[22] **A:** (Examines document) Not to my knowledge,
[23] no.
[24] **Q:** Who is David Bakey, B-a-k-e-y?

Page 50

[1] Q: Well, do you recall you or your company
[2] ever setting sales goals for Jeanne Hogan?
[3] A: Yes.
[4] Q: And how would you do that?
[5] A: Off the top of my head, I don't remember.
[6] Q: And when you say that you or your company
[7] set sales goals, was it you who was responsible for
[8] setting the sales goals for Jeanne Hogan?
[9] A: I'm not sure.
[10] Q: And when you mentioned sales goals of
[11] Jeanne Hogan, was it, in fact, the sales conducted
[12] by those who Jeanne Hogan — the account managers
[13] who Jeanne Hogan oversaw?
[14] A: Specifically, I don't remember. Usually
[15] our sales goals are based on a particular brand.
[16] Q: So it would be the sales of the ARTec
[17] brand?
[18] A: Most likely.
[19] Q: From the time that Jeanne Hogan's
[20] compensation was in part paid by Shakour, were you
[21] the main person at Shakour that oversaw Jeanne
[22] Hogan?
[23] A: Can you say that again, please?
[24] Q: Yes. From the time that Shakour began

Page 51

[1] contributing to Jeanne Hogan's compensation until
[2] the end of her employment, were you the person who
[3] was most responsible for overseeing Jeanne Hogan's
[4] duties as it related to Shakour or ARTec?
[5] A: Yes.
[6] Q: Was there anyone else at Shakour that was
[7] responsible for overseeing Jeanne Hogan?
[8] A: I don't recall.
[9] Q: And do you know who at Goldwell was
[10] responsible — primarily responsible for overseeing
[11] Jeanne Hogan?
[12] A: Primarily Cheryl Holladay.
[13] Q: And Cheryl Holladay during the time that
[14] she was overseeing Jeanne Hogan was the director of
[15] education at Goldwell?
[16] A: Correct.
[17] Q: Did you ever write a memo or a letter or
[18] put anything in writing to Ms. Holladay about Jeanne
[19] Hogan's performance?
[20] A: I don't recall.
[21] Q: You don't recall ever doing that?
[22] A: No, I don't recall — excuse me. Let me
[23] back up. I don't recall — I don't remember.
[24] Q: So you don't have a present memory of ever

Page 52

[1] sending anything in writing to Ms. Holladay about
[2] Jeanne Hogan's performance?
[3] A: I may have.
[4] Q: I'm not asking whether you may have. I'm
[5] asking if you have a present memory of ever doing
[6] that, and the answer to that is either yes or no.
[7] A: I don't have a present memory.
[8] Q: Do you have a present memory of ever
[9] sending a memo or providing a memo or writing a memo
[10] to Mary Garneau about the performance of Jeanne
[11] Hogan?
[12] A: Possibly.
[13] Q: Do you have a present memory of ever
[14] writing any kind of memo to Mary Garneau criticizing
[15] Jeanne Hogan's performance?
[16] A: I currently — I don't have a present
[17] memory.
[18] Q: And I think we have an agreement that
[19] approximately April of 2000 was the period of time
[20] that Shakour began contributing to Jeanne Hogan's
[21] compensation, correct?
[22] A: Correct.
[23] Q: And in April of 2000, do you recall what
[24] Jeanne Hogan's work schedule was?

Page 53

[1] A: No.
[2] Q: Do you know how many days she was on the
[3] road, how many days she was at home, how many days
[4] she was at the office?
[5] A: No. Currently, no. It was four years ago.
[6] I don't know.
[7] Q: Do you recall that from April 2000 to the
[8] end of her employment, that at least for a period of
[9] time she worked at home on Fridays?
[10] A: Most brand managers have some type of an
[11] office day one day a week.
[12] Q: And is that office day usually for brand
[13] managers Friday?
[14] A: Sometimes.
[15] Q: Is Friday one of the busiest days in the
[16] salon business?
[17] A: Correct.
[18] Q: So that's when the salons have the most
[19] customers, correct?
[20] A: In general, yes.
[21] Q: So is it fair to say that that's not the
[22] best time for either account executives or brand
[23] managers to go visiting the salons?
[24] A: It depends.

Page 66

[1] **Q:** Well, Jeanne Hogan was terminated on
[2] December 27th, '01. Does that give you a —
[3] **A:** I would assume it would have had to have
[4] been before then.
[5] **Q:** That's a pretty good assumption, but I'm
[6] trying to pin it down a little closer than that.
[7] **A:** I won't guess.
[8] **Q:** Well, you've looked at Exhibit 10, which is
[9] the document criticizing her performance, Plaintiff
[10] Exhibit 10, blue 10.
[11] **A:** (Examines document) Right.
[12] **Q:** Now, that's dated 10/22/01. So October
[13] 22nd, '01.
[14] **A:** Okay.
[15] **Q:** Does that give you a frame of reference as
[16] to approximately when you had this conversation with
[17] Foundas?
[18] **A:** No, because sales had been going down for a
[19] while.
[20] **Q:** When did you first notice that sales —
[21] you're talking about ARTec sales?
[22] **A:** Correct.
[23] **Q:** — that ARTec sales were declining?
[24] **A:** I can't remember the date.

Page 67

[1] **Q:** Can you give me an approximation?
[2] **A:** No.
[3] **Q:** Other than Plaintiff Depo Exhibit 10, is
[4] there anything in writing that you can recall in
[5] which you or anyone at Shakour brought to the
[6] attention of anyone at Goldwell that the sales
[7] numbers were declining?
[8] **MR. SIGEL:** Objection.
[9] **A:** We would talk about that often and I don't
[10] have specific dates.
[11] **Q:** I didn't ask you when you talked about it.
[12] My question was directed at, are you aware of any
[13] document in which you or anyone else at Shakour
[14] wrote to or sent to anyone at Goldwell a memo or
[15] anything in writing setting forth concerns that
[16] Shakour had about ARTec sales slipping?
[17] **A:** We had a monthly document that we produced
[18] for ARTec every month, which I've seen in here or
[19] somewhere.
[20] **Q:** But those are the, basically, spread
[21] sheets, correct?
[22] **A:** Correct.
[23] **Q:** Showing sales?
[24] **A:** Right.

Page 68

[1] **Q:** But I'm asking you if you or, to your
[2] knowledge, anyone else at Shakour sent a memo to
[3] anyone at Goldwell indicating concerns that Shakour
[4] had regarding slipping sales of ARTec product.
[5] **A:** I don't remember any documents other than
[6] the monthly sales reports that we all got.
[7] **THE WITNESS:** Are we going to take a break?
[8] What time are we breaking for lunch?
[9]    (Discussion off the record)
[10]    (Luncheon recess taken
[11] from 12:13 p.m. to 1:04 p.m.)

Page 69

[1]    **AFTERNOON SESSION**
[2]    **BY MR. POWERS:**
[3] **Q:** Could you take a look at Plaintiff Depo
[4] Exhibit 3.
[5] **A:** (Examines document)
[6] **Q:** Could you identify that document?
[7] **A:** Looks like a memo that I sent to Mary.
[8] **Q:** Mary Garneau?
[9] **A:** Yes.
[10] **Q:** And that's a memo dated 7/17/2000?
[11] **A:** Correct.
[12] **Q:** And it's regarding Jeanne Hogan?
[13] **A:** Yes.
[14] **Q:** And there's a handwritten "RS" beside your
[15] name. Is that —
[16] **A:** Yep.
[17] **Q:** Did you write that?
[18] **A:** Yes.
[19] **Q:** Is that your way of signing things?
[20] **A:** Usually, yes.
[21] **Q:** And this is regarding the payment to Jeanne
[22] Hogan of a quarterly bonus, correct?
[23] **A:** Correct.
[24] **Q:** And do you see the next couple of documents

Page 78

[1] **MR. SIGEL:** No. The third page.
[2] **A:** Oh, sorry. Yep.
[3] **Q:** And this is, again, under the general title
[4] of "Responsibilities include," and it says, "Create
[5] a calendar that will be reviewed by Renee and
[6] Cheryl." Was the contemplation of you that Jeanne
[7] Hogan would create a calendar on a regular basis of
[8] what she would be doing and where she would be going
[9] and that would be reviewed by you?
[10] **A:** Correct.
[11] **Q:** And did she do that?
[12] **A:** I'm sure she submitted it monthly.
[13] **Q:** And what would it include?
[14] **A:** Who she was working with, if she was to
[15] attend meetings, what she was doing.
[16] **Q:** So whenever she was out visiting the
[17] locations, it would be notated in the calendar?
[18] That was the contemplation, at least?
[19] **A:** Right.
[20] **Q:** If you look above that, the first line of
[21] Page 3, it says, "Oversee Claire Parkhurst's new
[22] position with R.G. Shakour/Goldwell." Do you see
[23] that?
[24] **A:** Yes.

Page 79

[1] **Q:** Now, is that in the document because Claire
[2] Parkhurst was employed partly by Goldwell and partly
[3] by Shakour?
[4] **A:** I don't know — excuse me. I don't
[5] remember.
[6] **Q:** If you could go to the next page, Page 4 of
[7] Plaintiff Depo Exhibit 3.
[8] **A:** (Examines document)
[9] **Q:** Can you tell me what that is?
[10] **A:** This is a monthly report that was — I need
[11] a magnifying glass.
[12] **Q:** Would you like to borrow my magnifying
[13] glasses?
[14] **A:** (Examines document) ARTec sales.
[15] **Q:** Account?
[16] **A:** Sales account executive only for Jeanne,
[17] Jeanne's goals.
[18] **Q:** And is this the type of document that was
[19] produced on a monthly basis by Shakour?
[20] **A:** Yes — well, our sales were produced by
[21] Shakour.
[22] **Q:** So it would just be the ARTec sales?
[23] **A:** And we would be given the Goldwell sales to
[24] fill in.

Page 80

[1] **Q:** But this is a document that's actually
[2] generated by Shakour?
[3] **A:** Yes, we did this monthly.
[4] **Q:** And did you also send a copy of the monthly
[5] report to Goldwell?
[6] **A:** Yes.
[7] **Q:** And who would you send it to?
[8] **A:** I don't want to guess. I don't know.
[9] **Q:** And just considering this memo in general,
[10] is it correct to say that, at least according to
[11] this memo —
[12] **A:** This one?
[13] **MR. SIGEL:** Are you referring to the first
[14] page?
[15] **MR. POWERS:** Plaintiff's Depo Exhibit 3.
[16] **Q:** — that in the quarter that this memo
[17] pertains to, Jeanne Hogan exceeded her sales?
[18] **A:** Yes, for April, May and June.
[19] **Q:** Of 2000?
[20] **A:** Correct.
[21] **Q:** And that's why she was being given a bonus?
[22] **A:** Correct.
[23] **Q:** Could you now turn to Plaintiff Exhibit 4.
[24] **A:** (Examines document)

Page 81

[1] **Q:** And could you identify that document, first
[2] page of Plaintiff Exhibit 4?
[3] **A:** It's a memo to Mary Garneau about Jeanne
[4] meeting her goal for the fourth quarter — third
[5] quarter, sorry.
[6] **Q:** And was this a memo generated by you?
[7] **A:** Looks that way.
[8] **Q:** And can you tell me in terms of the
[9] financial quarters that R.G. Shakour went by, did it
[10] go by the calendar year or did it go by something
[11] else?
[12] **A:** Calendar year.
[13] **Q:** So the first quarter would be the first
[14] three months of the year?
[15] **A:** Yes.
[16] **Q:** January, February, March, okay.
[17] So the third quarter of 2000 would be July,
[18] August, September of 2000?
[19] **A:** Correct.
[20] **Q:** And does this memo indicate that in the
[21] third quarter of 2000, Jeanne Hogan exceeded her
[22] sales quota?
[23] **A:** Yes.
[24] **Q:** And could you identify the second page of

Page 82

[1] Plaintiff Depo Exhibit 4?
[2]   A: (Examines document) It looks like the same
[3] report from the other one, but a little bit clearer.
[4]   Q: So is this the sales report for the third
[5] quarter of 2000 as it pertains to Jeanne Hogan and
[6] ARTec sales?
[7]   A: Yes.
[8]   Q: Now, explain this to me, because I don't
[9] understand. Is the ARTec brand manager responsible
[10] for the sale of ARTec products for both Shakour and
[11] Goldwell.
[12]   A: Could you be clearer?
[13]   Q: I'm not sure if I can be clearer because
[14] I'm trying to understand the situation. The reason
[15] I raise the question is — I'm looking at Plaintiff
[16] Exhibit 4, the second page, and it seems to break
[17] down sales, R.G. Shakour sales, Goldwell sales, and
[18] that's why, in my mind, it raises the question. I'm
[19] asking you if you can clarify that question. Was
[20] Jeanne Hogan in 2000 selling ARTec products for both
[21] Shakour and Goldwell?
[22]   A: I don't know.
[23]   Q: Do you see the second page of Exhibit 4?
[24]   A: (Examines document)

Page 83

[1]   Q: No. That's Exhibit 3, I believe.
[2]   A: No. It's 4. This one, yep. Okay.
[3]   Q: The first little graph says "R.G. Shakour
[4] sales" and the second little graph says "Goldwell
[5] sales"?
[6]   A: Correct.
[7]   Q: So that's why I'm asking you the question.
[8] Was Jeanne Hogan responsible for both sales of ARTec
[9] products for Shakour and Goldwell?
[10]   A: In 2000? Yes.
[11]   Q: And in 2000 was Goldwell selling different
[12] ARTec products than Shakour or the same products?
[13]   A: The same products.
[14]   Q: So when a sale of ARTec product in Jeanne
[15] Hogan's territory was made, how was it determined
[16] whether that would be credited to Shakour or
[17] Goldwell?
[18]   A: There was a system that determined whether
[19] it was a Goldwell account or a Shakour account.
[20]   Q: So basically it was the system who
[21] originally acquired the account?
[22]   A: I don't understand.
[23]   Q: Well, let's define accounts, then. In your
[24] mind, what was an account? Was an account a

Page 84

[1] particular salon?
[2]   A: Yes.
[3]   Q: So whether the sale was credited to Shakour
[4] or Goldwell, was that dependent on whether Goldwell
[5] originally acquired that salon as an account or
[6] whether Shakour did?
[7]   A: Yes.
[8]   Q: Now I understand. And could you please
[9] turn to the third page on Plaintiff Exhibit 4.
[10]   A: (Examines document)
[11]   Q: And just generally describe what that
[12] document is.
[13]   A: It looks like the same report as
[14] Plaintiff's No. 3, a sales report.
[15]   Q: Generated by Shakour?
[16]   A: Yes.
[17]   Q: That one, right. Okay. Thank you.
[18] Was there a document generated at sometime
[19] that set forth the sales quota for Jeanne Hogan?
[20]   A: I don't recall.
[21]   Q: Well, if you look at, for instance,
[22] Plaintiff Exhibit 4, it says Jeanne Hogan has met
[23] her goal for the third quarter. Was there a
[24] document that set forth what Jeanne Hogan's goal was

Page 85

[1] for the third quarter of 2000?
[2]   A: I don't know.
[3]   Q: In the year 2000, would not you have been
[4] one of the people responsible for determining what
[5] the sales goal was for Jeanne Hogan in terms of the
[6] sales of ARTec products?
[7]   A: Yes.
[8]   Q: But you don't recall whether you ever put
[9] in writing or whether it was put in writing what
[10] Jeanne Hogan's sales goals were?
[11]   A: I don't know.
[12]   Q: Whatever the sales goals were, did they
[13] change or remain the same from 2000 to 2001?
[14]   A: I don't know.
[15]   Q: You have no memory of whether they remained
[16] the same or changed?
[17]   A: I have no memory at this time.
[18]   Q: Did Shakour continue to generate sales
[19] reports such as are part of Plaintiff Exhibit 4
[20] throughout 2001?
[21]   A: I don't know.
[22]   Q: Would there be any reason why Shakour would
[23] stop issuing sales reports for 2001?
[24]   A: If ARTec didn't require them any more.

Page 86

[1] **Q:** Well, wouldn't Shakour be interested in
[2] knowing what their sales numbers were?
[3] **A:** Yes.
[4] **Q:** Do you ever recall telling anyone not to
[5] keep sales reports in 2001?
[6] **A:** No.
[7] **Q:** Could you turn to Exhibit 5, Plaintiff Depo
[8] Exhibit 5.
[9] **A:** (Examines document) Okay.
[10] **Q:** Could you identify that document?
[11] **A:** It appears to be a memo I sent to Mary.
[12] **Q:** Indicating that Jeanne Hogan had earned her
[13] bonus for the fourth quarter for 2000, correct?
[14] **A:** For the fourth quarter, correct.
[15] **Q:** Of 2000?
[16] **A:** Yes.
[17] **Q:** So that would have been October, November,
[18] December 2000, correct?
[19]      And the way that Jeanne Hogan would earn
[20] her bonus would be to meet or exceed her sales
[21] quota, correct?
[22] **A:** Correct.
[23] **Q:** So is it fair to say that in the fourth
[24] quarter of 2000, Jeanne Hogan met or exceeded her

Page 87

[1] sales quota for ARTec products?
[2] **A:** Yes.
[3] **Q:** Could you now turn to Plaintiff Depo
[4] Exhibit 6.
[5] **A:** (Examines document) Okay.
[6] **Q:** Do you know who Alicia Fuce is?
[7] **A:** Yes.
[8] **Q:** And as of 04/22/01 was she an employee of
[9] R.G. Shakour?
[10] **A:** I would assume, yes.
[11] **Q:** And what was her position?
[12] **A:** She coordinated figures.
[13] **Q:** Sales figures?
[14] **A:** Sales figures, yes.
[15] **Q:** Do you know what her title was?
[16] **A:** Sales analyst.
[17] Do you mind if we close the shade? It's a
[18] little hot on me.
[19] **Q:** That's fine. It does get warm in here.
[20] At sometime on or about April of 2000, did
[21] you ask Ms. Fuce to send Mary Garneau an updated job
[22] description of Jeanne Hogan's position?
[23] **MR. SIGEL:** Objection. To clarify, you
[24] said "April 2000." You mean 2001?

Page 88

[1] **MR. POWERS:** 2001, I'm sorry, yes.
[2] **A:** I don't recall.
[3] **Q:** Could you take a look at the second page of
[4] Plaintiff Depo Exhibit 6 and the third page. Why
[5] don't you look at the third page first. Is that
[6] your signature on the third page?
[7] **A:** (Examines document) Yes.
[8] **Q:** Again, it refers to you as "president." Is
[9] there any reason why there's two documents now that
[10] both refer to you as "president," yet you claim that
[11] you're vice-president?
[12] **A:** No.
[13] **Q:** Have you ever been president of R.G.
[14] Shakour?
[15] **A:** No.
[16] **Q:** Is this document, that is Pages 2 and 3 of
[17] Plaintiff Depo Exhibit 6, is that a document you
[18] generated?
[19] **A:** Can I read it?
[20] **Q:** Sure.
[21] **A:** (Examines document) Okay.
[22] **Q:** So is that document, Page 2 and 3 of
[23] Exhibit 6, a document that you generated?
[24] **A:** Yes.

Page 89

[1] **Q:** And this is an updated description of
[2] Jeanne Hogan's position, correct?
[3] **A:** As of April something, 2001, yes.
[4] **Q:** Now, the salary was increased from $42,000
[5] to $45,000 on or about the time of this memo; is
[6] that correct?
[7] **A:** It looks correct, yes.
[8] **Q:** Do you know why Jeanne Hogan's salary was
[9] increased?
[10] **A:** From meeting her goals and a standard
[11] increase.
[12] **Q:** Could you go to the last page of Plaintiff
[13] Depo Exhibit 6, and can you tell me what that
[14] document is.
[15] **A:** (Examines document) Jeanne Hogan's goals
[16] 2000 versus 2001.
[17] **Q:** Where does it say that?
[18] **MR. SIGEL:** On top.
[19] **A:** (Indicating) There. It's not as blurry as
[20] the rest.
[21] **Q:** So, according to this document, what are
[22] Jeanne Hogan's goals in 2001? Where are they
[23] located, is that the second and third and fourth bar
[24] graph?

Page 122

[1] **A:** Because she reported to me as well, Jeanne.
[2] **Q:** Any other reason?
[3] **A:** No.
[4] **Q:** Now, if we look at Plaintiff Depo Exhibit
[5] 10, that talks about a problem with paperwork?
[6] **A:** Okay.
[7] **Q:** To your knowledge, is that a reference to
[8] the August 31st, 2001 letter from Bakey?
[9] **A:** Correct.
[10] **Q:** And nothing else?
[11] **A:** I don't know.
[12] **Q:** You don't know of anything else?
[13] **A:** I don't recall.
[14] **Q:** Now, at the time of the meeting of October
[15] 22nd, '01, weren't you provided with a copy of
[16] Plaintiff Depo Exhibit 9, which is the doctor's
[17] letter?
[18] **A:** I don't recall.
[19] **Q:** Before you and the other people at Goldwell
[20] met with Jeanne Hogan, did you meet without Jeanne
[21] Hogan on that day as well to discuss what you were
[22] going to do at the meeting?
[23] **A:** Yes.
[24] **Q:** And who did you meet with?

Page 123

[1] **A:** Roughly, it would be the people that were
[2] at the meeting, which was Mary, Lori, Cheryl, and
[3] Jeanne, roughly.
[4] **Q:** But you met without Jeanne first, correct?
[5] **A:** Yes.
[6] **Q:** And what did you discuss at that meeting
[7] without Jeanne Hogan present?
[8] **A:** The issues with the paperwork.
[9] **Q:** And did you also discuss the issue about
[10] Fridays?
[11] **A:** Yes, because she needed to come down to the
[12] office on Fridays, some Fridays.
[13] **Q:** And in that conversation, the pre-Jeanne
[14] Hogan meeting conversation, did anyone bring up the
[15] fact that Jeanne Hogan was at least claiming that
[16] she needed to take time off on Fridays to go to
[17] therapy?
[18] **A:** I don't recall.
[19] **Q:** Was there any talk in that meeting about
[20] the fact that Jeanne Hogan was alleging that she had
[21] some kind of physical problem?
[22] **A:** I don't recall. I recall requesting her to
[23] come to the — or somebody requesting her to come to
[24] the office to clear up the paperwork issue.

Page 124

[1] **Q:** So is it your position that at the time of
[2] the meeting of 10/22/01, that you didn't have a clue
[3] from anyone that Jeanne Hogan was alleging that she
[4] had some kind of injury or physical problem?
[5] **A:** She told me on the phone that she had —
[6] she was going to therapy.
[7] **Q:** And did she tell you on the phone that she
[8] was going to therapy on Fridays?
[9] **A:** Well, that's why she didn't want to come
[10] down.
[11] **Q:** So in the pre-Jeanne Hogan meeting, so the
[12] meeting you had with the Goldwell people before you
[13] actually meet with Jeanne Hogan on the 22nd, do you
[14] ever raise the issue of whether or not Jeanne Hogan
[15] has supplied any medical documentation documenting
[16] the fact that she needed to go to therapy?
[17] **A:** No.
[18] **Q:** During this pre-Jeanne Hogan meeting with
[19] the Goldwell people, was there any discussion about
[20] what kind of accommodation could be made to Jeanne
[21] Hogan because of a physical problem she might have?
[22] **A:** I don't recall.
[23] **Q:** You don't recall any conversation about
[24] that?

Page 125

[1] **A:** I recall that we discussed the paperwork
[2] issue and how she needed to come down so that we
[3] could continue to have correct paperwork.
[4] **Q:** But you don't recall any discussion about
[5] what, if any, accommodations could be made to
[6] Jeanne's schedule?
[7] **A:** No.
[8] **Q:** Because of her physical or alleged physical
[9] condition?
[10] **A:** I don't know.
[11] **Q:** You don't recall anything like that?
[12] **A:** I don't recall.
[13] **Q:** In this pre-Jeanne Hogan meeting with the
[14] Goldwell people, is there anything else that you can
[15] recall being said by anyone at that meeting that you
[16] haven't already told me about?
[17] **A:** Not that I recall.
[18] **Q:** The meeting where everyone attended, Jeanne
[19] Hogan and the Goldwell people and you, where did
[20] that meeting take place, what room? Was it like a
[21] conference room at the Goldwell offices?
[22] **A:** I don't recall.
[23] **Q:** You don't recall where the meeting
[24] occurred?

Page 130

[1] A: ARTec.
[2] Q: And what relationship did she have to
[3] Shakour or Goldwell?
[4] A: She would come in and do sales meetings,
[5] talk to us about promotions, things of that nature.
[6] Q: At any time in 2001, did you ever talk to
[7] Ms. Bruton about Jeanne Hogan's performance?
[8] A: I don't recall.
[9] Q: Did you ever praise Jeanne Hogan's
[10] performance to Miss. Bruton during '01?
[11] A: Most likely.
[12] Q: Why do you say "most likely"?
[13] A: Because I can't recall a specific event of
[14] me talking with her, but —
[15] Q: But it would be likely that if you talked
[16] to Bruton, you would compliment Jeanne Hogan's
[17] performance?
[18] A: I can't recall a specific event, but I'm
[19] sure that I told her that Jeanne does a good job.
[20] Q: Did you ever tell Miss Bruton that you
[21] hoped Jeanne Hogan did not leave the company?
[22] A: I can't recall.
[23] Q: Could you turn to Plaintiff Depo Exhibit
[24] 11, blue 11. It's a letter dated November 9, 2001.

Page 131

[1] A: (Examines document)
[2] Q: Have you ever seen that document before?
[3] A: I can't recall.
[4] Q: Do you recall Mary Garneau ever telling you
[5] that Jeanne Hogan had requested FMLA forms?
[6] A: Yes, she told me.
[7] Q: Did she tell you that in or about November
[8] 9th, 2001?
[9] A: I don't know when it was.
[10] Q: What did Garneau tell you about that?
[11] A: That she had applied for FMLA.
[12] Q: That Jeanne Hogan had applied?
[13] A: Yes.
[14] Q: And what, if anything, did you say?
[15] A: I don't recall.
[16] Q: Other than telling you that Jeanne Hogan
[17] had applied for FMLA or asked for FMLA forms, what
[18] else, if anything, did Mary Garneau tell you?
[19] A: I don't recall.
[20] Q: Did you ever have a conversation with Mary
[21] Garneau in which she told you that Jeanne Hogan was
[22] going to seek FMLA leave so that she could take
[23] Fridays off?
[24] A: I don't recall.

Page 132

[1] Q: Did Mary Garneau or anyone else ever tell
[2] you what, if anything, Jeanne Hogan was seeking by
[3] applying for FMLA leave?
[4] A: Can you repeat that?
[5] Q: Yes. Did Mary Garneau or anyone else tell
[6] you what, if anything, Jeanne Hogan was seeking by
[7] requesting FMLA leave?
[8] A: No.
[9] Q: Did anyone tell you whether Jeanne Hogan
[10] was asking for leave for any period of time?
[11] A: I don't know.
[12] Q: What was your understanding of FMLA leave
[13] at the time?
[14] A: Can you repeat the question?
[15] Q: Yes. What was your understanding of what
[16] FMLA leave was at the time of October, November
[17] 2001?
[18] A: Family Medical Leave Act, that's what it
[19] was, and she was applying for it.
[20] Q: And did you understand that under certain
[21] circumstances, an employer has to provide up to 12
[22] weeks of leave to an employee?
[23] A: Yes, I know that.
[24] MR. POWERS: Off the record.

Page 133

[1] (Recess taken)
[2] BY MR. POWERS:
[3] Q: Did you participate in any meetings in
[4] which it was discussed whether or not to terminate
[5] Jeanne Hogan?
[6] A: I was involved in a discussion about — if
[7] the position should be eliminated.
[8] Q: And was that a meeting or telephone
[9] conversation?
[10] A: I don't think it was a meeting. It was a
[11] discussion.
[12] Q: Well, okay. But was it a discussion held
[13] in person or by telephone?
[14] A: In person.
[15] Q: And was that at the Goldwell offices?
[16] A: Yes.
[17] Q: And who was in attendance other than you?
[18] A: My father, John Foundas, and I don't know
[19] if Mary was there or not.
[20] Q: How about Cheryl Holladay?
[21] A: I can't recall.
[22] Q: Could you look at Plaintiff's Depo Exhibit
[23] 14.
[24] A: (Examines document) Okay.

Page 138

[1] at the time of Jeanne Hogan's termination, she was
[2] the only ARTec brand manager who was working the New
[3] England region; is that correct?
[4]    A: For Shakour/Goldwell?
[5]    Q: For R.G. Shakour or Goldwell.
[6]    A: Yes.
[7]    Q: Were there other ARTec brand managers
[8] working in other parts of the country as of December
[9] 2001?
[10]   A: I don't know.
[11]   Q: Did you or did anyone, to your knowledge,
[12] at any meeting look at whether or not ARTec sales in
[13] other parts of the country were increasing or
[14] decreasing?
[15]   A: I don't recall.
[16]   Q: Can you tell me who Leland Hertz is or was?
[17]   A: He was the co-owner of ARTec.
[18]   Q: Did he ever tell you that he thought Jeanne
[19] Hogan was doing a good job?
[20]   A: I can't recall.
[21]   Q: Did Mr. Hertz ever indicate to you that he
[22] wanted to offer Jeanne Hogan a job at ARTec?
[23]   A: Not to my knowledge.
[24]   Q: Did you ever tell Jeanne Hogan that Mr.

Page 139

[1] Hertz was considering offering her a job at ARTec?
[2]    A: No.
[3]    Q: Did you ever tell Jeanne Hogan that Hertz
[4] had expressed an interest in hiring her to work for
[5] ARTec?
[6]    A: No.
[7]    Q: Did you ever tell anyone that Mr. Hertz had
[8] expressed an interest in hiring Jeanne Hogan for
[9] ARTec?
[10]   A: No.
[11]   Q: At any time did you tell Jeanne Hogan that
[12] you believed that the ARTec figures were flat; there
[13] was no increase in sales?
[14]   A: I can't recall.
[15]   Q: Do you recall in your presence anyone
[16] telling Jeanne Hogan that the ARTec sales figures
[17] were flat or there was no increase in sales?
[18]   A: I can't recall.
[19]   Q: Do you recall at any time having a
[20] conversation with Jeanne Hogan, either alone or with
[21] others, in which Jeanne Hogan was asked what, if
[22] anything, she thought could be done to increase the
[23] ARTec sales figures?
[24]   A: I can't recall.

Page 140

[1]    Q: You don't recall that question ever being
[2] asked?
[3]    A: No.
[4]    Q: On the Shakour side, after Jeanne Hogan was
[5] terminated, who, if anyone, performed the duties for
[6] Shakour that Jeanne Hogan had been performing?
[7]    A: They weren't the same duties.
[8]    Q: Well, there were certain duties that Jeanne
[9] Hogan performed for Shakour; is that correct?
[10]   A: Correct.
[11]   Q: Were any of those duties assumed by other
[12] people?
[13]   A: Yes.
[14]   Q: And by whom and what duties?
[15]   A: To the best of my recollection, Lori Via
[16] Piano did the payroll; Lisa Kelley, our director of
[17] education, taught some classes; the ARTec educators
[18] out in the field continued to do what they were
[19] doing, which was teaching classes; and Deb Wilson,
[20] who was Lisa's assistant, who is also a hairdresser,
[21] taught some classes; and Alicia continued to produce
[22] the numbers. Other than that, I can't recall.
[23]   Q: Did ARTec continue placing product with
[24] Goldwell after Jeanne Hogan's termination?

Page 141

[1]    A: I don't understand the question.
[2]    Q: Well, I guess the question is, did — well,
[3] let me change the question.
[4]       Did Shakour continue to distribute ARTec
[5] products after Jeanne Hogan's termination?
[6]    A: Sell products to salons?
[7]    Q: Yes.
[8]    A: Yes.
[9]    Q: To your knowledge, did Goldwell also?
[10]   A: Yes.
[11]   Q: And does Shakour continue to distribute
[12] ARTec products to the present time?
[13]   A: ARTec is owned by L'Oreal.
[14]   Q: Right. Let me rephrase the question, then.
[15] Until ARTec was sold to L'Oreal, did Shakour
[16] continue to distribute ARTec products?
[17]   A: Yes.
[18]   Q: And after ARTec was sold to L'Oreal, was
[19] the product name changed?
[20]   A: Yes, it was ARTec by L'Oreal Professional
[21] something.
[22]   Q: And after ARTec was sold to L'Oreal and the
[23] product became ARTec by L'Oreal, did Shakour
[24] continue to distribute the product?

## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
## AND EEOC
## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974.                                                     Page 1/2

| | |
|---|---|
| Enter Charge Number: FEPA: | MOST RECENT OR CONTINUING DISCRIMINATION VIOLATION DATE: 12/27/01 |
| EEOC: | FILING DATE: |
| NAME (Indicate Mr., Ms., or Mrs.)<br>Ms. Jeanne Degan-Hogan | HOME TELEPHONE NO. (Include area code)<br>603-664-1092 |
| STREET ADDRESS<br>27 Mallego Road | |
| CITY, STATE, ZIP CODE<br>Barrington, NH 03825 | COUNTY<br>New Hampshire |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below):**

| | |
|---|---|
| NAME<br>Goldwell of N.E., Inc. | NUMBER OF EMPLOYEES/MEMBERS<br>100+ |
| STREET ADDRESS<br>375 Hopping Brook Road | TELEPHONE NO. (Include Area Code)<br>1-800-633-0099 |
| CITY, STATE, ZIP CODE<br>Holliston, MA 01746 | |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below):**

| | |
|---|---|
| NAME | NUMBER OF EMPLOYEES/MEMBERS |
| STREET ADDRESS | TELEPHONE NO. (Include Area Code) |
| CITY, STATE, ZIP | |

**CAUSE OF DISCRIMINATION BASED ON:**
RACE [ ]   COLOR [ ]   SEX [ ]   PREGNANCY (SEX) [ ]   SEXUAL ORIENTATION [ ]   AGE [ ]

SEXUAL HARASSMENT [ ]   RELIGION [ ]   NATIONAL ORIGIN [ ]

DISABILITY/HANDICAP/LONG-TERM MEDICAL CONDITION [ ]   RETALIATION [ ]

OTHER (Specify):

The Particulars Are As Follows:

### Please see attached Complaint

[**X**] I also want this charge filed with the EEOC.

I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

_____

I swear or affirm subject to the pains and penalties of perjury that I have read the above charge and that it is true to the best of my knowledge, information and belief.

_/s/ Jeanne Degn-Hogan_
Signature of Complainant

SWORN TO AND SUBSCRIBED BEFORE ME THIS 26th DAY OF March, 2002

NOTARY PUBLIC: _Karen L. Blum_

MY COMMISSION EXPIRES: _June 9, 2004_


                                          Respectfully submitted,

                                          The Complainant,
                                          By her attorneys,

                                          _/s/ Kevin G. Powers_
                                          KEVIN G. POWERS
                                          BBO #405020
                                          ROBERT S. MANTELL
                                          BBO #559715
                                          Rodgers, Powers & Schwartz LLP
                                          18 Tremont Street
                                          Boston, Massachusetts 02108
                                          (617) 742-7010

# ATTACHMENT A

1) I began working for Goldwell of New England on or about August 31st, 1998. During all relevant times I held the position of the Artec Brand Manager.

2) On June 15th, 1999 I was injured in a job related accident.

3) I made a Workers Compensation claim for the work related injury, my medical treatment has been paid for by the Workers Compensation Insurer.

4) I sustained a work related injury, but I remained capable of performing the essential functions of the job, with accommodation and I am therefore a Qualified Handicapped person pursuant to MGL ch. 152 S 75B(1).

5) The only accommodation I sought from the company is that it allow me to attend a physical therapy session on Fridays and on Fridays work from my home office. This accommodation was for the purpose of saving me from driving after my physical therapy.

6) I provided my employer with medical documentation supporting the fact that I had a physical injury, was functional, but and that I needed the minor accommodation of being allowed to attend physical therapy on Fridays and then work the rest of Friday at my home office.

7) After my doctor faxed a letter to my employer recommending physical therapy and Friday home office work I was treated differently and in and inferior manner by my employer.

8) On or about November 16, 2001 my physician faxed FMLA forms to my employer.

9) My employer claimed to want a second medical opinion and sought to set up an examination of me but was unable to find a doctor of their choosing that would render a second opinion.

10) On December 27, 2001 I was told that my position was dissolved.

11) I believe and therefore allege that my termination was perceptual and that the real reason for my termination was the fact that I was a handicapped and the fact that I had requested a reasonable accommodation and had requested FMLA leave. I further allege that my employer has violated M.G.L. ch 151b and the Family Medical Leave Act.

*Def's Proposal*

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

Boston                                                          DOCKET NO. 02BEM01435

| | |
|---|---|
| JEANNE DEGAN-HOGAN, ) | |
| ) | |
| Complainant, ) | |
| ) | **CONFIDENTIALITY AGREEMENT** |
| v. ) | **CONCERNING INFORMATION** |
| ) | **AND DOCUMENTS** |
| GOLDWELL OF NEW ENGLAND, ) | |
| INC., ) | |
| ) | |
| Respondent. ) | |

The parties to the above-captioned action agree and stipulate as follows:

1. In response to the parties' requests for discovery (including but not limited to interrogatories, requests for production of documents, depositions), the parties will produce certain documents and information which may contain or include (1) confidential and private information about employees or former employees of Goldwell of New England, Inc. ("Goldwell") and R.G. Shakour, Inc. ("Shakour"); (2) confidential and proprietary information about Goldwell's and/or Shakour's business and/or finances, and (3) personal information about Complainant.

2. Such confidential information, whether contained or referred to in documents or testimony, may be designated by the parties, or any of them, to be "Confidential" information protected by this Agreement.

3. Any document or information designated "Confidential" pursuant to paragraph 2 of this Agreement may be used by the parties only for the purposes of this litigation (or a Civil Action regarding claims which have been or could have been raised in this litigation) and may not be used for any other purpose, and may not be disclosed to any person other than the parties,

{J:\CLIENTS\emp\071780\0100\hogan\00379071.DOC;1}