disregard" as to whether their decision violated the statute. In view of the several FMLA-related exchanges between Plaintiff and Defendants in the Fall/Winter of 2001, it is clear that all parties were aware Plaintiff had invoked the provisions of the FMLA; nevertheless, it is settled law that Defendants' mere knowledge that Plaintiff had invoked those provisions is wholly insufficient to establish a "willful" violation. See, e.g., Hillstrom, 354 F.3d at 33 (noting with approval that the United States Supreme Court has rejected a test "that asked only whether the employer knew the Act 'was in the picture'"); Hanger v. Lake County, 390 F.3d 579, 584 (8th Cir. 2004)(same). Accordingly, no reasonable juror could find that Defendants willfully violated the FMLA.

Courts have repeatedly entered summary judgment where, as here, there was no evidence to suggest "willfulness" that would rescue an otherwise untimely complaint. See, e.g., Hillstrom, 354 F.3d at 34 ("Even assuming, without deciding, that there is sufficient evidence that Best Western decided to alter slightly [plaintiff's] employment conditions because he took medical leave under the FMLA, there is no evidence that this constituted a 'willful' violation of the statute and thus no genuine question of material fact on the dispute"); Porter v. New York University School of Law, 392 F.3d 530, 531-532 (2nd Cir. 2004); Hangar, 290 F.3d at 584. Therefore, summary judgment in Defendants' favor should enter on Count III of Plaintiff's Amended Complaint.

**B.   Plaintiff's FMLA Claims Fail Because Plaintiff Cannot Demonstrate That She Was Denied a Requested Leave.**

Even assuming *arguendo* that Plaintiff could rescue her untimely complaint by proving "willful" conduct, her claim would fail because she cannot demonstrate that she was denied any requested FMLA leave. In November 2001, Plaintiff (for the first time) requested "reduced schedule" FMLA Leave in the form of a 4-day workweek. (*Ex.8*) To the extent Plaintiff claims that she was denied the requested FMLA leave, her claim fails. The undisputed facts follow:

---

order to save a complaint that failed to allege conduct constituting the level of unfairness required for M.G.L. c. 93A claim); Zimmerman v. U.S., 171 F.Supp.2d 281, 284-285 (S.D.N.Y. 2001).

04-11024-RWZ                                    11

1. On or about November 30, 2001, Plaintiff submitted a "Certification of Health Care Provider" which stated both that: (1) Plaintiff should be on a "4 day work week"; and (2) the only limitation on Plaintiff's ability to perform the essential functions of the position was to "limit *driving* to 4 days per week." (*Ex. 9*)

2. On December 6, 2001, Defendants requested Plaintiff to obtain a second medical opinion regarding the medical necessity of working a 4-day week.[4] (*Ex. 10*) Defendants expressly informed Plaintiff that she was permitted to work a 4-day week pending receipt of the second medical opinion.[5] (*Ex. 10*)("Pending our receipt of the Health Care Provider form enclosed herein, you are provisionally entitled to take the requested FMLA intermittent leave").

3. Even though Defendants doubted the validity of Plaintiff's certification and requested a second opinion, they permitted her to take every Friday off from November 30, 2001 until her separation from employment on December 27, 2001.[6] To the extent Plaintiff worked on any Fridays during that period, such work was Plaintiff's *voluntary choice* and was *not required* by Defendants:

    a. Friday, December 14, 2001: Plaintiff admitted at her deposition that she was not required to work on December 14, 2001 but voluntarily chose to do so. (*Ex. 1*, Degen Dep. 222) (Q: But you weren't required to work on that Friday, right? A: No.").

    b. Friday, December 21, 2001. Plaintiff admitted at her deposition that she was not required to work on December 21, 2001 and understood that day to be part of her FMLA reduced

---

[4] Even though Plaintiff submitted a certification form that suggested she was limited to a four-day workweek, Plaintiff admitted at her deposition that she was not so limited. (*Ex. 1*, Degen Dep. at 218)("Q: So you weren't really restricted [from] performing any work on that fifth day, right? A: Correct.")

[5] Plaintiff has claimed that she did not understand that she could take the FMLA leave pending receipt of the second opinion. This claim is disingenuous, unsupportable and directly contradicted by the express language of *Exhibit 10*. Moreover, Plaintiff testified at her deposition as follows:
Question:   Didn't Ms. Garneau sit down and explain in detail that you would be, in December, you could take those Fridays off, that your FMLA was granted pending the outcome of the medical certification issue?
Answer:   Yes.
(*Ex. 1*, Degen Dep. at 220.)

[6] Although Plaintiff's medical certification did not indicate that the weekly "day off" needed to be on Friday, Defendants complied with Plaintiff's request and allowed her not to work on Fridays:
Question:   … this medical certification did not indicate that you would need to take the leave on Fridays, right?
Answer:   Correct.
Question:   But Goldwell let you do that anyway, didn't they?
Answer:   Yes.
(*Ex. 1*, Degen Dep. 219.)

leave. (*Ex.1*, Degen Dep. at 222-23.)

c. <u>Friday, December 28, 2001</u>. Plaintiff admitted at her deposition that she was not required to work on December 28, 2001 and understood that day to be part of her FMLA reduced leave. (*Ex.1*, Degen Dep. at 222-23.)

The undisputed facts demonstrate that, despite their doubts regarding Plaintiff's medical certification, Defendants *permitted Plaintiff to take the requested leave* for the remainder of her employment. Accordingly, Plaintiff's claim that she was denied FMLA leave fails as a matter of law.

C. <u>**Plaintiff's FMLA Claims Fail As A Matter Of Law Because Plaintiff Cannot Demonstrate A Causal Link Between Her Request for FMLA Leave And The Termination Of Her Employment.**</u>

Plaintiff apparently claims that Defendants terminated her employment: (1) for the purpose of interfering with her rights under the FMLA (i.e., discrimination); and/or (2) because she exercised her rights under the FMLA (i.e., retaliation). *Amended Complaint* ¶¶ 38, 51, 52. In order to prevail on either of these claims, Plaintiff must demonstrate a causal connection between her request for FMLA leave and Defendants' decision to terminate her employment.[7] See <u>Hodgens</u>, 144 F.3d at 161; <u>Marrero v. Goya of P.R.</u>, 304 F.3d 7, 22 (1st Cir. 2002); <u>Tate v. Dept. of Mental Health</u>, 419 Mass. 356, 364 (1995). Plaintiff cannot adduce evidence of such a causal connection.

1. <u>*Defendants Have Presented Substantial Evidence Of A Legitimate Business Reason For The Elimination of Plaintiff's Position.*</u>

Defendants have presented substantial undisputed evidence of a legitimate, business reason for the termination of Plaintiff's employment having nothing whatsoever to do with Plaintiff's request for FMLA leave. Specifically, Defendants have presented substantial evidence that sales of ARTec products had leveled-off and that Defendants, therefore, could not justify the expense of maintaining an ARTec Brand Manager (i.e., Plaintiff's position). The undisputed facts are as follows:

---

[7] This demonstration must be made at both the first stage (*prima facie* case) and at the third stage (pretext/causation) of the <u>McDonnell-Douglas</u> framework.

- ARTec sales had leveled-off and, indeed, the companies did not meet ARTec's established goals for May through November 2001. (*Garneau Affidavit* ¶ 4.)(*Bartfield Affidavit* ¶ 4.)(*Ex.3*, Foundas Dep. at 94-95.) In addition, Defendants had difficulty obtaining payment from ARTec and, in or about August 2001, ARTec's payments to Defendants were in arrears by approximately $60,000. (*Garneau Affidavit* ¶ 5.)(*Ex.1*, Degen Dep. at 182.)

- In or about August 2001 Defendants began discussing elimination of the ARTec Brand Manager position. (*Ex.3*, Foundas Dep. at 32.)(*Garneau Affidvit* ¶ 6.)

- Renee Shakour testified unequivocally at her deposition that ARTec's lack of growth was the only reason for the termination decision:

    Question:   … can you tell me all the reasons talked about at the meeting as to why [Plaintiff] should be terminated …?
    Answer:     … we discussed sales not increasing. So it didn't make much sense to have a brand manager if sales weren't on the rise. So we eliminated the position.
    Question:   Was that the sole reason why the position was eliminated…?
    Answer:     Correct.

    (*Ex.2*, Shakour Dep. at 135-36.)

- John Foundas testified unequivocally at his deposition that ARTec's lack of growth was the only reason for the termination decision:

    Question:   Tell me each and every reason why you decided to terminate [Plaintiff].
    Answer:     Sales were flat, [we] did not want to invest any more money.
    Question:   Anything else?
    Answer:     No.

    (*Ex.3*, Foundas Dep. at 79.)

The undisputed evidence presented above wholly supports Defendants' legitimate, non-retaliatory reason for the decision to eliminate Plaintiff's position.

    2. ***Plaintiff Cannot Demonstrate Pretext or A Causal Connection Between Her Request For FMLA Leave And The Termination of Her Employment.***

        a. *Defendants' Request For A Second Medical Opinion Does Not Give Rise To An Inference Of Pretext Or Causation.*

Express provisions of the regulations interpreting the FMLA permit an employer to request a

second medical opinion. 29 C.F.R. 825.307(a)(2). Here, Plaintiff's medical certification was confusing and contradictory on its face and reasonably warranted a second opinion.[8] Indeed, Plaintiff admitted at her deposition that Defendants' request for a second opinion was legitimate:

> Question: And Goldwell requested a second medical opinion?
> Answer: Correct.
> \* \* \*
> Question: So they wanted to get another opinion to determine whether Dr. Sleazak's medical certification was valid or not?
> Answer: Correct.
> Question: Do you think that was legitimate?
> Answer: Yes.

(*Ex.1*, Degen Dep. at 218-19.) Accordingly, Defendants' request for a second medical opinion does not give rise to an inference of pretext or causation.

      b.    *The Timing Of Plaintiff's Termination Does Not Give Rise To An Inference Of Pretext Or Causation.*

It is undisputed that the termination of Plaintiff's employment occurred approximately one month after her request for FMLA leave. Standing alone (as it does here), the mere fact that one event followed another is insufficient to demonstrate causation. See Dube v. Middlesex Corp., 59 Mass.App.Ct. 734, 741 n.3 (2003)("Ordinarily, one event following another is not, by itself, sufficient evidence of causality to establish a prima facie case of unlawful retaliation, particularly where, as here, the two events are separated by months, not days"); see also Mole v. University of Massachusetts, 442 Mass. 582, 595 (2004); MacCormack v. Boston Edison Co., 423 Mass. 652, 662 n. 11 (1996); Prader v. Leading Edge Prods., Inc., 39 Mass.App.Ct. 616, 617 (1996); Flanagan-Uusitalo v. D.T. Industries, Inc., 190 F.Supp.2d 105, 117 (D.Mass. 2001). Thus, the timing of Plaintiff's termination does not give rise to an inference of pretext or causation.

      c.    *Alleged Comments Regarding "Liability" Do Not Give Rise To An Inference Of Pretext Or Causation.*

Plaintiff's Amended Complaint states that Plaintiff was referenced by Defendants as a

---

[8] Among other things, the certification was internally inconsistent as to whether Plaintiff was limited in

"liability." Plaintiff's allegations are misleading and disingenuous because they quote the term "liability" completely out of the context in which it was used.

When Mary Garneau, Goldwell's Controller, first learned in October 2001 that Plaintiff was receiving therapy that bore upon her driving activities, Ms. Garneau instructed Plaintiff to provide medical documentation regarding any work restrictions as soon as possible. (*Garneau Affidavit* ¶ 9.) Ms. Garneau expressed concern that such documentation was needed to ensure that Plaintiff did not engage in work that would violate the alleged medical restrictions. (*Id.*) In the context of those conversations, Ms. Garneau stated that Plaintiff's working outside of medical restrictions could result in injury to Plaintiff and, therefore, "liability" to Defendants. (*Id.*) Plaintiff cannot present any credible evidence to place the term "liability" into a context suggesting discrimination or retaliation.

Moreover, the alleged comment was made by Mary Garneau – a non-decisionmaker. A stray comment by a non-decisionmaker does not constitute evidence of discriminatory or retaliatory animus. See e.g. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 34-36 (1st Cir. 2001).

        d.    *Plaintiff's Claim of Pretext/Causation Is Belied By Defendants' Offer of Subsequent Employment.*

After the decision to eliminate Plaintiff's position was made, Defendants offered Plaintiff the opportunity to work as a part-time educator for the Companies.[9] (*Ex.2*, Shakour Dep. at 146)(*Ex.1*, Degen Dep. at 238-239.) Though Plaintiff declined Defendants' offer, Defendants' making of the offer is strong evidence dispelling any inference of discriminatory/retaliatory animus. See Rattigan v. Copley Plaza Hotel Ltd. Partnership, 21 M.D.L.R. 68, 72 (1999)(*Ex. 15.*)(Hearing Officer found that the employer would not have made such efforts to retain plaintiff as an employee "if its plan was to force him out of his job, or to terminate him").

---

her ability to drive on a fifth workday or her ability to work at all on a fifth workday.
[9]    Plaintiff has contradicted herself on several occasions, claiming first in a submission to the MCAD that the offered position "meant a maximum of 3 days of work a year" and then testified at her deposition that the position "meant only one day of work a year." (*Ex.1*, Degen Dep. at 238-239.) The amount of work

  e. *Plaintiff's Claim of Causation is Belied By the Fact That Defendants Did Not Replace Plaintiff.*

Although Plaintiff makes the unsupported allegation that she was "replaced" in the position of ARTec Brand Manager, all record evidence demonstrates to the contrary. See *Amended Complaint* ¶ 26. Indeed, Plaintiff's allegation is soundly contradicted by the sworn testimony of witnesses who testified during discovery. These witnesses testified that the ARTec Brand Manager position was not filled after Plaintiff's termination.

1. <u>David Hallgren</u>: Plaintiff has alleged that David Hallgren, a Vice President of Sales and Operations hired *after* Plaintiff's separation from employment, informed her that he hired an ARTec Brand Manager. (*Ex.1*, Degen Dep. at 22.) However, at his sworn deposition, Mr. Hallgren testified that he hired Lisa Leal as an Urban Territory Sales Manager (not a Brand Manager), though he believed the companies wanted an ARTec Brand Manager "in the future." (*Ex.12*, Hallgren Dep. at 80, 82, 104-105.) Hallgren testified that ARTec sales had been decreasing prior to his hire and that there were not sufficient resources to hire a full-time ARTec Brand Manager. (*Ex.12*, Hallgren Dep. at 60-61.)

2. <u>Susan Pugh</u>: Plaintiff has alleged that Susan Pugh informed her that David Hallgren had hired an ARTec Brand Manager. (*Ex.1*, Degen Dep. at 26.) However, at her sworn deposition, Ms. Pugh testified unequivocally to the contrary:

   | Question: | … isn't it fair to say that after [Plaintiff] left her employment and for the remainder of your employment [with Defendants] … neither Goldwell or Shakour actually hired an ARTec Brand Manager? |
   |---|---|
   | Answer: | That is correct. |
   | | \* \* \* |
   | Question: | … did you ever tell anyone that Mr. Halgren hired a Brand Manager? |
   | Answer: | Oh no, no. … |

   (*Ex.13*, Pugh Dep. at 101-02 and 105.)

3. <u>Lisa Kelly</u>: At her sworn deposition, Lisa Kelly testified that, as of her own separation from employment at Shakour in March 2002, an ARTec Brand Manager had not been hired:

---

actually entailed is not material. Plaintiff admits that she was offered work and cannot present any evidence to demonstrate that this offer was illusory.

> Question: During the remainder of your tenure at Shakour, was a brand manager for ARTec hired?
> Answer: No, no. They were still juggling between two, three people doing all of those tasks.

(*Ex.14*, Kelly Dep. at 105.)

4. <u>Mary Garneau</u>: The affidavit of Ms. Garneau includes the following statement: "Following the elimination of the ARTec Brand Manager position by Goldwell and Shakour in December 2001, neither Goldwell nor Shakour reinstated the position or hired any individual to perform the ARTec Brand Manager position." (*Garneau Affidavit* ¶ 8.)

5. <u>Andrew Bartfield</u>: The affidavit of Mr. Bartfield, Vice President of Education for ARTec, includes the following statement: "Following the elimination of the ARTec Brand Manager position by Goldwell and Shakour in December 2001, ARTec did not request or require that Goldwell or Shakour reinstate the ARTec Brand Manager position or hire anyone to perform the position. Furthermore, I am not aware of Goldwell or Shakour reinstating the position or hiring any individual to perform the ARTec Brand Manager position." (*Bartfield Aff.* ¶ 6.)

Plaintiff can present no evidence whatsoever to demonstrate that Plaintiff was replaced in the ARTec Brand Manager position.[10] To the contrary, when asked at her deposition whether a replacement was hired, Plaintiff responded "I don't know." (*Ex.1*, Degen Dep. at 21.)

As discussed above, Defendants have presented a legitimate business reason for the termination of Plaintiff's employment. Plaintiff cannot present any evidence whatever casting doubt on that legitimate business reason or suggesting that her termination was motivated by an alleged request for FMLA leave. Accordingly, Plaintiff's claim of FMLA discrimination and/or retaliation fails, and judgment in Defendants' favor should enter on Count III of the Amended Complaint.

---

[10] Assuming *arguendo* Plaintiff could demonstrate that her duties were absorbed by other existing employees of Goldwell and/or Shakour, such showing is insufficient to show that she was "replaced" and does not give rise to any inference of pretext or causation. Where a plaintiff's position is eliminated, like in a reduction-in-force case, the employee is not deemed to have been "replaced" when "another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." LeBlanc v. Great American Ins. Co., 6 F.3d 836, 846 (1st Cir. 1993); see also Shenker v. Lockheed Sanders Inc., 919 F.Supp. 55, 60 (D.Mass. 1996)("In the context of a reduction-in-force, the re-delegation must involve more than a decision to discontinue certain

### III. COUNT I OF PLAINTIFF'S AMENDED COMPLAINT (As That Count Alleges A Discriminatory Failure to Accommodate) FAILS BECAUSE PLAINTIFF CANNOT DEMONSTRATE A PRIMA FACIE CASE OF FAILURE TO ACCOMMODATE.[11]

In order to establish a prima facie case of failure to accommodate, Plaintiff must demonstrate that: (1) she is a qualified individual with a handicap under the applicable statute; (2) Defendants, despite knowing of her physical or mental limitations, did not reasonably accommodate those limitations; and (3) Defendants' failure to do so affected the terms, conditions or privileges of Plaintiff's employment. See Flanagan-Uusitalo, 190 F.Supp.2d at 115; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 263-64 (1st Cir. 1999). Failure to demonstrate any *one* of these elements is fatal to Plaintiff's claim. See Beal v. Bd. of Selectmen of Hingham, 419 Mass. 535, 544 (1995). Here, Plaintiff cannot demonstrate *any* element of the prima facie case, and Defendants are, therefore, entitled to summary judgment on her claim.

#### A.  Plaintiff Is Not "Handicapped" Within The Meaning Of Chapter 151B.

The first element of the prima facie case requires Plaintiff to demonstrate that she is a "qualified individual with a handicap"; that is, Plaintiff must demonstrate that she suffers an impairment and is "substantially limited in a major life activity." See Rennie v. United Parcel Service, 139 F.Supp.2d 159, 166 (D.Mass. 2001). Even assuming for the purposes of this Motion only that Plaintiff can establish that she suffered an impairment, Plaintiff cannot demonstrate that she was "substantially limited in a major life activity."

##### 1.  *Plaintiff's Claim That She Is A "Handicapped Person" Because She Was Substantially Limited In The Major Life Activity Of "Driving" Fails As A Matter Of Law.*

It is settled law that not every impairment qualifies as a protected disability. City of New

---

functions, the assignment of another employee to perform the plaintiff's duties in addition to prior duties, or the redistribution among other existing employees already performing related work.")
[11] Unlike Plaintiff's other claims, her "failure to accommodate" claim does not require Plaintiff to prove discriminatory intent. Therefore, the McDonnell-Douglas paradigm does not apply to this claim.

Bedford v. Massachusetts Comm'n Against Discrimination, 440 Mass. 450, 462 (2003); Lebron-Torres v. Whitehall Laboratories, 251 F.3d 236, 239 (1st Cir. 2001). An impairment will constitute a "handicap" only if it substantially limits a "major life activity." Major life activities may include activities such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

Plaintiff's Amended Complaint contends that "Plaintiff's neck and back injuries interfered with the major life activity of driving long hours for more than four consecutive days." *Amended Complaint* ¶ 31. It is generally settled law that "driving" is not a major life activity. See Bryant v. Caritas Norwood Hospital, 345 F.Supp.2d 155, 165-166 (D.Mass. 2004); Felix v. New York City Transit Authority, 324 F.3d 102, 106 (2d Cir. 2003); Chenoweth v. Hillsborough County, 250 F.3d 1328, 1329-1330 (11th Cir. 2001); Colwell v. Suffolk County Police Dept., 158 F.3d 635, 643 (2d. Cir. 1998); see also Dube, 59 Mass.App.Ct. at 736-737 (plaintiff limited in ability to drive a truck did not present evidence than "any" major life activities were substantially limited). Accordingly, *as a matter of law*, Plaintiff's alleged substantial limitation on her ability to drive does not constitute a "handicap" within the meaning of the law.

2.  **_Plaintiff Was Not "Substantially Limited" In Any Activity._** [12]

The following undisputed facts demonstrate that Plaintiff was not "substantially limited" in any activity (much less a major life activity) from October to December 2001:

1.  It is undisputed that Plaintiff told Mary Garneau in October 2001 that she adhered to the "guideline" of generally driving 1.5 hours per day but that she was not "restricted" at that time. Indeed, Plaintiff testified vehemently at her deposition that she was not "restricted":

    | | |
    |---|---|
    | Answer: | [Ms. Garneau] asked me if there were any work restrictions … And I said no. She asked me what I was driving at this point in the car. I told her one and a half hours to two hours a day from one destination to the other. One and a half hours was at a comfort zone, but I was able to do my job. |
    | Question: | So you told her you didn't have medical restrictions? |

---

[12] Plaintiff's Amended Complaint alleges *only* that she was substantially limited in her ability to drive. Plaintiff should be held to this single theory.

04-11024-RWZ                              20