UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JEANNE DEGAN, | ) | CIVIL ACTION NO. 04CV11024 RWZ |
|  | ) |  |
| Plaintiff, | ) | Jonathan R. Sigel |
|  | ) | BBO# 559850 |
| v. | ) |  |
|  | ) |  |
| GOLDWELL OF NEW ENGLAND, | ) |  |
| INC. and R.G. SHAKOUR, INC., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## AFFIDAVIT OF MARY GARNEAU

I, Mary Garneau, on oath depose and state as follows:

1.     I am employed as General Manager at Goldwell of New England, Inc. ("Goldwell"). I have been employed in that capacity since March 2003. From March 1990 to March 2003, I was employed as Controller at Goldwell.

2.     In my capacity as Controller, I was responsible for overseeing documentation regarding ARTec products during the calendar year 2001. During that period I was aware of the sales performance of Goldwell and R.G. Shakour, Inc. ("Shakour"), and I reviewed administrative documentation with Ms. Jeanne Degen; Ms. Degen was employed as the ARTec Brand Manager for Goldwell and Shakour during the calendar year 2001. I have personal knowledge of the following facts.

3.     I have reviewed documents, which were kept in the usual course of business of Goldwell and Shakour, pertaining to total sales of ARTec brand products by both companies. My review of those records reveals data that, for the purposes of this litigation, has been recorded in the spreadsheet attached to this Affidavit as Attachment A. The data listed in Attachment A includes: (1) total actual sales of ARTec products by Goldwell and Shakour in the calendar year 2001; and (2) goals that were established by ARTec for total sales of ARTec products by Goldwell and Shakour for the calendar year 2001.

4.     I was aware in calendar year 2001 that: (a) from May until November 2001, sales of ARTec products by Goldwell and Shakour experienced a lack of growth; and (b) from May until November 2001 combined Goldwell and Shakour sales were far below the sales goals that had been established by ARTec.

5.     In August 2001, Goldwell and Shakour received communication from ARTec's Director of Education, David Bakey, indicating that documentation which was submitted to ARTec by Ms. Degen had been "falsified." Following this communication, ARTec informed

Goldwell and Shakour that it intended to withhold $14,000 in monies owed to Goldwell and Shakour as a result of the unsatisfactory documentation. ARTec owed approximately $60,000 to Goldwell and Shakour at or about this time.

6.    In or about August 2001, John Foundas informed me that he was concerned with the lack of growth in ARTec sales and the significant cost of providing product education and employing an ARTec Brand Manager. He also stated that he was considering eliminating the ARTec Brand Manager position.

7.    In mid-December 2001, Mr. Foundas informed me that he had decided to eliminate the ARTec Brand Manager position. For that reason, and that reason alone, Ms. Degen's employment was terminated on December 27, 2001.

8.    Following the elimination of the ARTec Brand Manager position by Goldwell and Shakour in December 2001, neither Goldwell nor Shakour reinstated the position or hired any individual to perform the ARTec Brand Manager position.

9.    In October 2001, following a request that Ms. Degen report to Goldwell's Holliston office on Friday, October 5, 2001, I learned from Ms. Degen that she was receiving therapy for alleged back and/or neck pain that bore upon her driving activities. I informed Ms. Degen that Goldwell was unaware that she was receiving therapy and that there was no documentation of any medical restrictions in her file. I instructed Ms. Degen to get a medical appointment as soon as possible and to provide Goldwell with medical documentation regarding any work limitations. I expressed concern that if Goldwell directed or allowed Ms. Degen to perform an activity (e.g., driving) which she was medically restricted from performing and such activity resulted in injury to Ms. Degen, then Goldwell could be liable for directing/permitting such activity; I was concerned about protecting both the Company and Ms. Degen, and I stated that we were aware of such "liability" and, therefore, needed the medical documentation as soon as possible. I did not state that Ms. Degen was "a liability."

10.    In November 2002, I received a copy of a decision rendered by the Compensation Appeals Board of the State of New Hampshire regarding Jeanne Degen. A true and accurate copy of that decision is attached hereto as Attachment B.

Signed under the pains and penalties of perjury this  8TH  day of July 2005.

Mary Garneau
General Manager
Goldwell of New England, Inc.

2

# EXHIBIT A

| Year | January | February | March | April | May | June | July | August | September | October | November |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual Sales 2001 | $134,135 | $109,370 | $118,106 | $127,663 | $156,599 | $152,957 | $126,771 | $127,102 | $132,585 | $133,431 | $127,680 |
| Goals for 2001 | $116,838 | $119,362 | $134,931 | $121,390 | $216,054 | $176,207 | $180,924 | $180,326 | $161,547 | $154,576 | $193,985 |

Attachment A

# EXHIBIT B



# State of New Hampshire

State Office Park South
95 Pleasant Street
Concord, NH 03301
603/271-3176
TDD Access: Relay NH
1-800-735-2964
FAX: 603/271-6149

## COMPENSATION APPEALS BOARD

November 15, 2002

## DECISION OF THE WORKERS' COMPENSATION APPEAL BOARD

### JEANNE DEGEN-HOGAN

### V.

### GOLDWELL OF NEW ENGLAND, INC.

### DOCKET # 2002-C-0666

| | |
|---|---|
| **APPEARANCES:** | The claimant, Jeanne Degen-Hogan appeared *pro se*. Attorney James Owers represented the interests of the employer, Goldwell of New England, Inc., through its insurer, CNA. |
| **ISSUES:** | RSA 281-A: 23 – Medical, Hospital and Remedial Care |
| **WITNESSES:** | The claimant, Jeanne Degen-Hogan |
| **HEARING:** | A hearing of appeal was held *de novo* at the New Hampshire Department of Labor, Concord, New Hampshire, on October 21, 2002. |
| **PANEL:** | The panel was composed of Joseph Dickinson, Esq., George Wells, and Anne Eaton. |
| **BACKGROUND:** | This is an appeal of a lower level decision from the Department of Labor dated May 21, 2002. The medical bills in dispute include medical massage services provided by Adagio Spa, prescription medications, and acupuncture and trigger point injection services provided by North East Pain Management during the period August 2001 through April 25, 2002. |

**FINDINGS:**  The claimant is a 43 year old woman who was employed as an Account Executive by Goldwell of New England from August 1998 to December 2001. On June 15, 1999, the claimant sustained a neck injury in a work-related automobile accident in Augusta, Maine when the car the claimant was traveling in was hit from behind. The claimant did not seek treatment that day, preferring to contact her own

Jeanne Degen-Hogan v.Goldwell of New England, Inc.
Docket# 2002-C-0666
Page 2

physician, Dr. Arbuckle, when she returned home to New Hampshire. The claimant had previously treated with Dr. Arbuckle in 1996 for low back and buttock pain.

Three days after her 6/15/99 work injury, the claimant saw Dr. Arbuckle who found that the claimant had most of her pain in the base of her neck, with no numbness, tingling or radicular symptoms. Dr. Arbuckle prescribed a 12 day course of Medrol and prescribed Vicodin to help the claimant sleep at night. For the next three months, the claimant was in contact with Dr. Arbuckle by telephone, requesting a referral for physical therapy and massage as well as refills for her Vicodin prescription. The claimant returned to see Dr. Arbuckle on 10/22/99 and again on January 7, 2000. In January, the claimant also had complaints of back pain radiating into her right leg. Dr. Arbuckle continued her therapy, massage and Vicodin, although there is no evidence in the records from the Adagio Spa that the claimant received massage treatment between 12/29/99 and 3/3/00.

In March 2000, the claimant was seen by Dr. Arbuckle's associate, Dr. Ettleson, who noted "The massage really seems to help her out. She has a terrible job for someone with her problems in which she's in the car most of the week." On May 15, 2000, Dr. Ettleson attributed the claimant's increased neck stiffness to increased driving and noted that he thought her right leg symptoms were "discogenic" although there were "no hard neurologic findings here." By December 2000, the claimant and Dr. Ettelson were concerned about the claimant's reliance on pain medication and referred the claimant to Dr. Slezak at Northeast Pain Consultants for alternative treatment. The claimant has not seen Dr. Ettelson since.

Dr. Slezak's examination record of January 5, 2001 notes "trigger points cervical." His treatment plan included a trial of medical acupuncture; trigger point injections; counseling with Rob Hoyt, MS to "control psychological aspects of her pain;" Tylenol #3 with a weaning schedule; and Clonidine and Sonata for withdrawal symptoms and insomnia. On February 23, 2001, Dr. Slezak noted that the claimant continued to improve, was completely off opioids, and that the claimant had a trigger point area next to her shoulder blade. In May Dr. Slezak wrote to the carrier "The treatment is related to her injury on job sustained on 6/15/99. This treatment plan has not changed. She has done remarkable progress with the current therapy and stays very functional. Therefore I intend to continue with the therapeutic plan." By August 2001, Dr. Slezak's and Rob Hoyt's records begin to report new symptoms and areas of concern.

Dr. Slezak's note of 8/10/01 states "I have not seen her for 2 months. She developed leg [sic] upper extremity pain about a month ago. The pain radiated down 50% of the circumference of her arm to 3rd digit." Hoyt's note of 8/16/01 refers to the claimant's fear of a person with severe PTSD, while Hoyt's notes of 9/27/01 and 10/11/01 refer to the claimant's PTSD. Hoyt's report of the claimant's presenting issue on 10/11/01 is

Jeanne Degen-Hogan v. Goldwell of New England, Inc.
Docket# 2002-C-0666
Page 3

"My work place is really giving me a hard time, I am being scapegoated, my PTSD is flaring up big time, I am stressed, I need to approach my boss, I need to move on to the next spot." The claimant testified that the workers' compensation carrier was billed for only three sessions of hypnotherapy with Robert Hoyt, and that her sessions with him beyond that point were for personal issues, unrelated to the work injury.

Dr. Slezak's 10/19/01 note reports that the claimant is quite stressed and that her divorce hearing conflicts with the date for the MRI that Dr. Slezak had ordered to further investigate her new arm symptoms. Dr. Slezak went on to write, "The acupuncture has worked well for her and still does, making her more functional and she was able to her [sic] off the narcotic pain killers. Unfortunately recent problems with her neck and left arm seem to have more dense underlying pathology."

The MRI study dated 10/30/01 found multilevel degenerative disc disease within the cervical spine and osteophytic spurring, most significantly at C5-6 with a right paracentral disc protrusion or herniation.

In November 2001, the claimant was examined at the request of the carrier by Dr. Hawkins. Dr. Hawkins' report notes the claimant's history of a motor vehicle accident in 1983, following which the claimant made a full recovery, as well as the treatment in 1996 with Dr. Arbuckle for back pain. Dr. Hawkins refers to Dr. Arbuckle's 1996 finding that "She clearly has a disc injury and has injured this before." Dr. Hawkins concluded that the claimant had a significant pre-existing degenerative disc problem which was aggravated by the 6/15/99 injury, and that further medical treatment would be related to the underlying degenerative disc disease, not the June 1999 work injury.

In December 2001, Dr. Slezak referred the claimant to a neurologist, Dr. Black, for assessment of her left arm pain. Dr. Black's note concluded, "Although it is difficult to attribute all of Jeanne's symptoms to a particular nerve root it seems likely that the degenerative disease in her cervical spine is the etiology for at least some of her arm symptoms."

## DISCUSSION AND CONCLUSIONS

The claimant is a 43 year old woman with a history of spinal injuries including a motor vehicle accident in 1983 and low back symptoms without a clear precipitating event in 1996. Following both events, the claimant recovered and returned to full activities. She sustained a work-related injury in a car accident on June 15, 1999. Three days later, the claimant was seen by Dr. Arbuckle, who had treated the claimant for her 1996 back symptoms. Dr. Arbuckle reported that the claimant's pain was in the base of her neck and prescribed a course of Medrol, pain medication, physical therapy and massage. The

Jeanne Degen-Hogan v. Goldwell of New England, Inc.
Docket# 2002-C-0666
Page 4

claimant continued to work throughout this time, and returned to Dr. Arbuckle in January 2000 with the additional complaint of low back pain radiating into her right leg. The same course of treatment was continued through 2000. By December 2000, the claimant and her physician were concerned about her dependence on opiates and referred the claimant to the North East Pain Management Program for alternative therapies. Through this treatment, which began in January 2001 and included acupuncture, trigger point injections, plus ongoing massage through the Adagio Spa, the claimant was able to withdraw from opiates. Until the summer of 2001, the claimant experienced steady improvement as confirmed by Dr. Slezak and the massage therapy notes, and continued to work full time.

However, beginning in the summer of 2001, two years post-injury, the claimant began to experience new symptoms including left arm pain. At the time, the claimant was also suffering significant stress associated with a divorce and turmoil at work. Further medical work ups in the form of an MRI and a neurological evaluation indicate that the claimant had degenerative disc disease that was contributing to her symptoms. Dr. Slezak stated in his October 2001 note that "Unfortunately recent problems with her neck and left arm seem to have more dense underlying pathology."    Dr. Black in his December 2001 note also refers to underlying degenerative disc disease as the etiology for the claimant's arm symptoms. The carrier's physician, Dr. Hawkins, examined the claimant in November 2001 and July 2002 and concluded that further medical care would be related to the degenerative disc disease, not the June 15, 1999 work injury. Based on this evidence, the Panel concluded that by August 2001, the claimant had recovered from her work related injury and was experiencing symptoms caused by other factors.

## DECISION

Having heard all the testimony and reviewed all the evidence, especially the medical records, the Panel concludes that the claimant has failed to meet her burden of proof that the medical treatment she received after August 2001 was causally related to her June 15, 1999 work related injury. Accordingly, the carrier's denial is upheld.

In all respects, this is a unanimous decision of the Panel.

Anne C. Eaton, Panel Member
Compensation Appeals Board