# EXHIBIT 1

```
 1              COMMONWEALTH OF MASSACHUSETTS
                COMMISSION AGAINST DISCRIMINATION
 2
       JEANNE E. DEGEN                    )
 3                                        )
          VS.                             )  C.A. 02BEM01435
 4                                        )
       GOLDWELL OF NEW ENGLAND, INC.)         ORIGINAL
 5
 6         DEPOSITION OF JEANNE E. DEGEN, taken at the
 7     request of the Respondent pursuant to Rule 30
 8     of the Massachusetts Rules of Civil Procedure
 9     before Karen R. Weldon, a Notary Public and
10     Registered Merit Reporter in and for the
11     Commonwealth of Massachusetts, on July 31, 2003,
12     commencing at 11:30 A.M. at the offices of
13     Rodgers, Powers & Schwartz, 18 Tremont Street,
14     Boston, Massachusetts.
15

16     A P P E A R A N C E S:
       FOR THE PLAINTIFF:
17     RODGERS, POWERS & SCHWARTZ
       18 Tremont Street
18     Boston, Massachusetts  02108
          BY: KEVIN G. POWERS, ESQ.
19     FOR THE DEFENDANT:
       BOWDITCH & DEWEY
20     311 Main Street
       Worcester, Massachusetts  01608
21        BY: JONATHAN R. SIGEL, ESQ.
       Also Present:  Mary M. Garneau, Goldwell
22     ─────────────────────────────────
                BAY STATE REPORTING AGENCY
23         76 MILL STREET (At Park Avenue)
            WORCESTER, MASSACHUSETTS  01603
24                 (508) 753-4121
```

```
 1      Q.     And how do you come to that
 2   understanding?
 3      A.     Susan Pugh kept me abreast of certain
 4   incidents as, like I just said, I was in contact
 5   with David Halgreen, vice president of Goldwell.
 6   His top priority, right off he was hired  --
 7             MR. POWERS:  Slow down.
 8      A.     Sorry.  His top priority was to hire
 9   an Artec brand manager to fill my position.
10             Vicki Bruton, regional sales manager
11   for Artec, stated January 1st of 2002 they began
12   looking to fill the position of Artec brand
13   manager.
14             Lisa Kelly, director of education for
15   Shakour, also stated the fact that they
16   immediately were looking for replacement.
17      Q.     And did you come to find out that a
18   replacement was hired?
19      A.     I don't know.
20      Q.     Did any of these individuals that you
21   have mentioned, Ms. Pugh, Ms. Kelly, Mr.
22   Hallgren or Ms. Bruton, ever inform you that an
23   individual was or was not hired for the Artec
24   brand manager position?
```

```
 1        A.    Yes.  David Halgreen in June of 2002
 2   hired an Artec brand manager, he told me.
 3        Q.    Who was that, the person he hired?
 4        A.    I don't recall her name.
 5        Q.    Were you told her name at the time?
 6        A.    I may have been.
 7        Q.    If I said the name Ellen Burns, does
 8   that ring a bell?
 9        A.    No.
10        Q.    In any event, I'm sorry.  Go on.
11        A.    In any event, that is what he told
12   me, that he did indeed hire a brand manager in
13   June of 2000 that lasted for two weeks.
14        Q.    And did he tell you that person was
15   to be solely an Artec brand manager?
16        A.    We didn't discuss that.
17        Q.    So you're saying he used the word
18   brand manager.  You don't know whether it was
19   Artec or Artec and any other brands or what?
20        A.    When I questioned David Hallgren
21   about what position he was trying to fill, it
22   was a brand manager for Artec, the person that
23   he ended up hiring would, how he put it, they
24   would see if she would work into that position
```

```
 1    diary?
 2        A.    That probably would not constitute
 3    part of my diary.  I just was jotting down some
 4    things of my own.
 5        Q.    Okay.  So I would ask you, again,
 6    just to repeat the request, that you produce any
 7    documents concerning your conversations with Mr.
 8    Hallgren, any notes that you have taken, that
 9    you have just referred to, if you could also
10    produce through your attorney, copies of those
11    to us.
12        A.    Yes.
13        Q.    Thank you.  So during that
14    conversation with Mr. Hallgren, did you call him
15    or did he call you?
16        A.    I called him.
17        Q.    Why did you call him?
18        A.    I wanted to ask him who he had hired
19    as an Artec brand manager.
20        Q.    And who had informed you that he had
21    hired anyone as an Artec brand manager?
22        A.    Susan Pugh.
23        Q.    And did Susan Pugh work with Mr.
24    Hallgren?
```

```
 1        A.      $30 approximately.
 2        Q.      Have you filed any legal claims
 3   against any other employers besides Goldwell?
 4        A.      No.
 5        Q.      And by that I mean ever?
 6        A.      No.
 7        Q.      Now, you became employed at Goldwell
 8   in August of 1998; is that correct?
 9        A.      Correct.
10        Q.      And you were at all times, during
11   your employment at Goldwell, you were the Artec
12   brand manager?
13        A.      Yes.
14        Q.      Okay.  Can you with as much detail as
15   possible describe the duties of the position you
16   held at Goldwell?
17        A.      It changed April 2000.  So shall I
18   give you the first part?
19        Q.      Absolutely.  Go chronologically from
20   the beginning of your employment, please.
21        A.      August 31, 1998 until April 1st of
22   2000, I shared a region with a counterpart
23   Claire Parkhurst.  She had the southern region.
24   I had the northern region.
```

```
 1      Q.    So she was the Artec brand manager
 2   for the southern region and you were the Artec
 3   brand manager for the northern region?
 4      A.    Yes.
 5      Q.    Okay.  What did being the Artec brand
 6   manager entail in general?
 7      A.    I would basically assist the
 8   salespeople in building Artec business in
 9   detailing with them for the day, which means
10   riding in their car all day going to salons and
11   trying to sell Artec into the salons.
12      Q.    What was Artec or what is Artec?
13      A.    Artec is a manufacturer.  No longer
14   owned by Leann Hersch, but at that time.
15      Q.    Who is it owned by now, do you know?
16      A.    Loreal.
17      Q.    I'm sorry.  Go ahead.
18      A.    It's a product line.
19      Q.    What kind of products?
20      A.    Wet line, which means shampoos,
21   styling, finish aids, color line.
22      Q.    So just wet products?
23      A.    Well, the color line is a chemical.
24      Q.    Okay.
```

1  had, the company was concerned about liability
2  in having you do something that would violate
3  those restrictions?
4           Isn't that what she explained to you?
5      A.   No.
6      Q.   So that's not true. That's false?
7      A.   I never had a conversation with Mary
8  about work restrictions. So that is false.
9      Q.   You never had a conversation with Ms.
10 Garneau about work restrictions?
11     A.   Let's go back there. I feel you're
12 putting words in my mouth. Okay. Mary told
13 Renee I was restricted to an hour and a quarter
14 of driving. I don't know where she got that
15 information from.
16     Q.   Not from you?
17     A.   It was an hour and a quarter was a
18 guideline that I was comfortable with, but I did
19 my job.
20     Q.   Well, whether it was a guideline,
21 restriction, whatever --
22     A.   It was not a restriction.
23     Q.   Call it a guideline. Where did that
24 come from?

1  your testimony was.
2     A.   I don't remember saying that.  I
3  remember you just saying that, but I don't
4  remember saying that.
5     Q.   Okay.  Well, did you ever have any
6  conversation with Ms. Garneau about medical
7  restrictions?
8     A.   Not that I can recall.
9     Q.   Okay.  So you're saying you did have
10 a conversation with her about medical
11 guidelines?
12    A.   No.
13    Q.   No?
14    A.   No.
15    Q.   Okay.  What guidelines were you
16 referring to that you informed her of with
17 respect to the driving?
18    A.   The comfort-zone was an hour and a
19 half to be in the car.  That was a comfort zone
20 for me.  That did not come as a restriction.
21    Q.   In other words, it didn't come from
22 any physician you had?
23    A.   Right.  I'm doing my job.  I just am
24 more comfortable when it's less than an hour and

```
 1   a half.
 2              MR. POWERS:  I'm going to take a
 3   break.
 4              MR. SIGEL:  Let's take a break now.
 5              (Recess taken.)
 6              MR. SIGEL:  Back on the record.
 7              (The reporter read the record back as
 8   requested.)
 9         Q.   Okay.  So your testimony is, as far
10   as this driving you referred to as a guideline,
11   as far as how much time you were to be in the
12   car, your testimony is, I just heard it, is that
13   it didn't come from a physician, but rather that
14   is what your comfort level was, correct?
15         A.   The conversation  --
16              MR. POWERS:  Objection.  Compound
17   question.  Go ahead.
18         A.   The conversation I had with Mary was
19   she asked me what, how comfortable, what time
20   limit was I comfortable doing, and I said
21   basically an hour and a half is comfortable.
22   But I do my job.
23         Q.   Okay.  So an hour and a half per day
24   in the car is what you meant?
```

```
 1        A.    An hour and a half at one time.
 2        Q.    Okay.  At one time.  Driving in the
 3   car?
 4        A.    Correct.
 5        Q.    Did that mean you operating the
 6   vehicle or did it also mean you being a
 7   passenger in a vehicle?
 8        A.    Operating.
 9        Q.    And this was, as you testified, this
10   was not any kind of medical restriction, but
11   rather a guideline that you followed?
12        A.    At that point --
13        Q.    Correct.
14        A.    That's all the conversation was.
15        Q.    When you say that's what you were
16   comfortable with, what do you mean?
17              What did you mean at the time when
18   you were saying that to Ms. Garneau?
19        A.    Well, Mary asked me what basically
20   was my daily routine, and I said on the average
21   it's an hour and a half, on an average.  It
22   could be two hours and so on.
23        Q.    Okay.  So what I'm trying to get at,
24   when you say comfort, do you mean physical
```

1   Q.   Okay. Tell me about that. How did
2   that come back where you informed her of that?
3   A.   When I spoke to her about therapy and
4   should I rearrange my schedule, my therapy, she
5   more or less said that she would talk to John
6   and Sheryl because she was unaware of me being
7   in therapy.
8   Q.   She was not unaware of your '99 car
9   accident though, right, or at least she didn't
10  tell you that she was unaware of that, right?
11  A.   No, not that I know of.
12  Q.   Okay.
13  MR. POWERS: What's your question?
14  She answered that. The last question was, she
15  wasn't unaware of your car accident? The answer
16  was no.
17  Q.   I understand. I'm sorry for
18  interrupting, but the question is: You said you
19  had a conversation with her where you informed
20  her of your driving guidelines.
21  You said she was unaware of your
22  therapy, right?
23  A.   Right. Yes.
24  Q.   Okay. And at some point you informed

```
 1   her of these guidelines, right?
 2       A.   She asked me if there were any work
 3   restrictions.
 4       Q.   Okay.
 5       A.   And I said no.  She asked me what I
 6   was driving at this point in the car.  I told
 7   her one and a half hours to two hours a day from
 8   one destination to the other.
 9            One and a half hours was at a comfort
10   zone, was a comfort zone, but I was able to do
11   my job.
12       Q.   So you told her you didn't have
13   medical restrictions?
14       A.   No.  I didn't have medical
15   restrictions.
16       Q.   Did you tell her that at that time?
17       A.   I told her there were no
18   restrictions.
19       Q.   But you had a comfort zone?
20       A.   Well, I answered her question when
21   she asked me how many hours was I driving and
22   was that doable.  And I said one and a half
23   hours is comfortable, but I'm able to do
24   whatever it takes to do my job.
```

Q. Okay. Did you tell her what you meant by comfortable?

A. No.

Q. You didn't relate it to your injury at all?

A. No.

Q. Did she ask?

A. I don't remember.

Q. When you said comfortable to her, you meant comfortable physically, right, not comfortable just what you preferred?

A. Physically.

Q. And what else did she say to you at that time, do you recall?

A. That's all I recall.

Q. Did she say anything to the effect that she didn't recall seeing anything in your file about any kind of driving guidelines or restrictions?

A. That was brought up in our meeting.

Q. But not during the conversation that you're talking about now?

A. Not to my recollection.

Q. Okay. So after that you spoke to Ms.

```
 1        Q.    Your opinion that you were terminated
 2   because you were a handicapped individual to the
 3   company as you said.
 4        A.    You're asking me my opinion?
 5        Q.    I'm asking you what facts you base
 6   that opinion on?
 7        A.    What facts I base that opinion on?
 8        Q.    Correct.
 9        A.    Until the word therapy was brought up
10   in October, I was a very valuable employee and
11   was consistently told so.
12              The minute the word therapy came into
13   the conversation, two months later, I was gone.
14        Q.    Anything else?
15        A.    That's --
16        Q.    That's it?
17        A.    That's pretty much about it.
18        Q.    Your accident was in June of 1999,
19   correct?
20        A.    Correct.
21        Q.    And that was during work?
22        A.    Yes.
23        Q.    The day after the accident, did you
24   return to full duty?
```

```
 1        A.      I believe I did.  I believe I did.
 2        Q.      I'm going to show you a document and
 3   ask you to just look through it and tell me if
 4   you recognize it?
 5               MR. SIGEL:  I would like to mark it
 6   as the next exhibit.
 7               (Deposition Exhibit No. 3 Marked).
 8        A.      Okay.  Yes.  Are you asking me   --
 9   What are you asking me?
10        Q.      I'm asking if you recognize the
11   document?
12        A.      Yes.
13        Q.      What do you recognize it to be?
14        A.      A letter sent from Kevin Powers to
15   me.
16        Q.      Isn't it the complaint that you filed
17   with the Mass. Commission Against
18   Discrimination?
19        A.      Yes.
20        Q.      And we have marked that as Exhibit
21   No. 3.
22        A.      Okay.
23        Q.      I would like to direct your attention
24   to the second page of that exhibit   --
```

```
 1        A.    Uh-huh.
 2        Q.    What was the ultimate result of your
 3  worker's compensation case?
 4        A.    Can you rephrase that?
 5        Q.    Was there ultimately a decision with
 6  respect to whether you should receive benefits?
 7        A.    They approximately paid  -- What was
 8  your question?
 9        Q.    I'm trying to understand whether
10  there was, was there any kind of dispute in this
11  worker's compensation case?
12        A.    Yes.
13        Q.    What was the nature of that dispute?
14        A.    In October I received a letter,
15  October of 2001, I received a letter, October
16  4th, I received a letter from Ronnie Greenaw
17  stating the fact that CNA would stop payment as
18  of August, okay, of 2001.
19              She had stated she had been in
20  contact with Mary Garneau and that was the
21  decision that was made by the company, by CNA.
22        Q.    CNA.  Okay.
23        A.    I then appealed and won.  They
24  appealed.
```

```
 1        Q.    Who did you appeal to?
 2        A.    I appealed to the New Hampshire Board
 3   of Unemployment.
 4        Q.    Worker's comp?
 5        A.    Worker's comp.
 6        Q.    Okay.
 7        A.    And won.  And they appealed back and
 8   I was no longer, they no longer had to pay for
 9   present or future bills.
10        Q.    Was there a hearing?
11        A.    Yes.
12        Q.    Did you testify at that hearing?
13        A.    Yes.
14        Q.    And what was the decision of the
15   board?
16        A.    Which one?
17        Q.    Of that appeal.
18             MR. POWERS:  Objection.
19        Q.    After the hearing that you testified
20   at, was there a decision rendered?
21        A.    Which one are you talking about?
22        Q.    How many times did you testify in the
23   case?
24        A.    Twice.
```

1           Mid October when Mary Garneau, Sheryl
2   Holladay, Lori from resource, human resource and
3   Renee Shakour were in the meeting, mid October,
4   20th, 22nd, maybe, they basically stated the
5   fact that I was going to work every Friday.
6           They were not going to accommodate
7   my, they were not going to give me the
8   accommodations that I had asked for in the prior
9   meeting, two weeks prior with John Foundas, Mary
10  Garneau and Sheryl Holladay.
11      Q.   Okay.  So it was then, October 22nd.
12  That's when it became a medical restriction?
13           MR. POWERS:  Objection.
14      Q.   Do you want me to ask the question
15  again?
16      A.   Go ahead.
17           MR. SIGEL: Can we go back to my last
18  question.
19           MR. POWERS:  October 22nd, is that
20  when it became a medical restriction?
21           MR. SIGEL: No.  The previous one,
22  please.
23           (The reporter read the record back as
24  requested.)

```
 1          A.      Yes.  To stay in my home.  I mean, I
 2   didn't specifically say that it's supposed to be
 3   that way, but it wasn't even an issue.
 4               I mean, Renee wrote it down, you will
 5   still resume Fridays in your home.  So there was
 6   no problem.
 7          Q.      Okay.  What I'm saying, at that time
 8   you're saying when you renegotiated in April
 9   2000, resume Fridays in your home, not to
10   accommodate your therapy, but rather so you
11   could do your paperwork at home in your home
12   office on Fridays as you had been doing, right?
13          A.      To stay at home.
14          Q.      In paragraph 6 of the complaint,
15   which is Exhibit 3, what medical documentation
16   are you referring to?
17          A.      When I was in the office, the first
18   week of October with Mary, John and Sheryl, they
19   said if I didn't get a doctor's excuse stating
20   the fact that I could resume work, they were
21   going to not allow me to work.
22               I got a letter sent to them stating
23   the fact she can resume her regular workday,
24   four days on the road, one day in her office,
```