1  responsibilities did you have to do besides

2  that?

3      A.    A lot of paperwork for myself.  I was

4  constantly writing promotions, creating blitz's

5  and detailings and incentive programs.  And

6  phone calling was Friday, letters sent out to

7  salons, et cetera.

8      Q.    Okay.  Do you recall in August of

9  2001 Artec's director of education, David Bakey,

10  informed Goldwell that Artec believed that you

11  had falsified documents?

12      A.    Yes.

13      Q.    And so in this first sentence of the

14  warning where it says, we have been speaking

15  with you recently with regards to the problem

16  with the paperwork that you're required to

17  complete, is that what, is that your

18  understanding of what that refers to?

19      A.    Yes.

20      Q.    To the best of your memory, what did

21  that issue entail as far as the allegation that

22  you had falsified documents?  What happened?

23      A.    In June David asked me to send him,

24  once again, all the paperwork, which I did.  It

1    Q.    And the next time any issue with that

2    Artec paperwork came up was October 22nd?

3    A.    Yes.

4        MR. SIGEL:  Excuse me.

5        (Mr. Sigel conferring with Mary

6    Garneau.)

7    Q.    Isn't it true that Artec was

8    withholding all of the education credits for six

9    months because of its concerns about your

10   paperwork?

11   A.    I was unaware of that.

12   Q.    You were never informed of that?

13   A.    No.

14   Q.    Your work on Fridays, by the way, at

15   home included doing weekly paperwork for R.G.

16   Shakour and Artec, correct?

17   A.    Yes.

18   Q.    And monthly for R.G. Shakour and

19   Goldwell, correct?

20   A.    Correct.

21   Q.    Can I show you another document here

22   --

23   A.    Sure.

24   Q.    And ask you to take a look at that?

1      Q.     Well, when you met on October 22nd,

2   wasn't this issue brought up at that time?

3      A.     Yes.

4      Q.     So you did discuss it again with the

5   company?

6      A.     Right.  With the whole company.

7      Q.     Well, with --

8      A.     After I was told it's done, it's

9   over, don't think another minute of it, therapy

10  comes up, October 22nd.

11     Q.     This comes up again?

12     A.     This comes up again.

13     Q.     Well, back on October 3rd or the

14  beginning of October, do you recall having a

15  meeting or discussion with Ms. Garneau or any

16  other manager in which you were requested to

17  come to the office to do paperwork on Fridays?

18     A.     I only remember speaking to Mary

19  Garneau in the very beginning about that since

20  no one else got back to me.

21     Q.     Well, on or about October 3rd, do you

22  recall, or the beginning of October, Ms.

23  Holladay requesting that you work in Goldwell's

24  office on Friday, October 5th, so that Goldwell

1    could provide you with clerical assistance and

2    help you with your paperwork?

3         A.    Yes.

4         Q.    Okay.   That was before you had

5    mentioned therapy, wasn't it?

6         A.    October 5th?

7         Q.    No.   October 3rd.

8         A.    Mary and I had spoken before October

9    3rd about therapy.

10        Q.    When was that?

11        A.    Sheryl left me a voice mail end of

12   September to come on down.

13        Q.    Are you sure it was the end of

14   September?

15        A.    It was a time where I had to have a

16   good week to cancel my doctor's appointment and

17   to change it, and that's why they didn't get

18   back to me so I was calling Mary to verify if

19   indeed I needed to come down there on the 5th

20   because they didn't get back to me.

21        Q.    So you got a voice mail from Ms.

22   Holladay saying, we need you to come into the

23   office on Friday to help you with the paperwork?

24        A.    I don't remember.

1        Q.      When you came in on that day, what

2    did you do?

3        A.      Mary and I met for about, oh, I would

4    say, 40 minutes, and she had a lot of problems

5    with the paperwork.  So I went over it with her

6    on a continuous basis trying to help her.

7        Q.      What kind of problems did she have

8    with the paperwork?

9        A.      The reimbursements papers being

10   legible and  --

11       Q.      In other words, you say she had

12   problems.  She was saying something you had

13   written was not legible?

14       A.      No.  It was quite complicated, the

15   reimbursement situation.  60,000 had gotten out

16   of hand, and we were trying to put some kind of

17   consistency in it, and Artec's records weren't

18   very good, and I needed to explain to Mary a

19   lot, many times trying to get her to understand

20   how it worked.

21              So I found myself many times going

22   over the paperwork with Mary, and that was one

23   of the times.

24       Q.      Did Ms. Garneau assist you in any way

1    at that time with your paperwork?

2         A.    I believe we went over it together.

3    I don't know what she would have assisted me in.

4         Q.    She didn't help you correct anything?

5         A.    Not that I can remember.  I just

6    remember me helping her.

7         Q.    What was the reimbursement situation?

8         A.    Artec owed Goldwell a lot of money.

9         Q.    What do you mean by reimbursements

10   though?

11        A.    For the education.

12        Q.    For Goldwell's services they hadn't

13   paid up on, you're saying there was an account

14   receivable of $60,000 that they hadn't paid?

15        A.    At one time it was.

16        Q.    And you're not sure what it was at

17   this time in early October, what the balance of

18   that was?

19        A.    I'm not sure.

20        Q.    At that meeting with Ms. Garneau when

21   you were going over paperwork together, did you

22   inform her that you had an appointment with a

23   physician later that day with an acupuncture

24   treatment?

1          A.     I thought I had canceled that

2     appointment for that day to my memory.

3          Q.     You don't remember leaving early that

4     day so you could attend the appointment?

5          A.     On the 5th?  No.

6          Q.     No?

7          A.     To my recollection.

8          Q.     You canceled it?

9          A.     I canceled it.

10          Q.     Okay.  Do you remember that same day

11     on the 5th attending a meeting with Ms. Garneau,

12     Ms. Holladay and Mr. Foundas?

13          A.     Yes.

14          Q.     Tell me about that meeting, and if

15     it's one that you have referred to already, just

16     tell me, mention that?

17          A.     They told me I needed a doctor's

18     note.  They had no idea I was in therapy.  I

19     needed a doctor's note to get back into work,

20     and I was sent home.

21          Q.     Did they tell you that you could do

22     no work until the company got a doctor's note?

23          A.     No work.

24          Q.     At that meeting didn't Mr. Foundas

1    also explain to you why the company needed you

2    to work on Fridays?

3         A.    For the paperwork, to do

4    administrative paperwork, yes.

5         Q.    And isn't it true that they explained

6    to you that management needed to have more

7    involvement with the paperwork until Artec would

8    agree to accept computerized reports?

9         A.    Yes.

10        Q.    And at that time Mr. Foundas also

11   told you Artec wouldn't pay amounts it owed

12   Goldwell because of paperwork it had received

13   or, I'm sorry, it had not received from you?

14        A.    As of October, everything was

15   received, and I corrected Mr. Foundas by saying

16   it had already been sent in and corrected.

17        Q.    At that time, that's what you

18   corrected?

19        A.    Yes.

20        Q.    What did he say, if anything, in

21   response?

22        A.    He hadn't been aware of it.

23        Q.    Was Ms. Holladay there at the time

24   you said that to Mr. Foundas?

1       A.    Yes.

2       Q.    Did she say anything?

3       A.    Not to my recollection.

4       Q.    Did she know that you had sent it in?

5       A.    No.  I'm not sure.

6       Q.    How about Ms. Garneau?

7       A.    No.  I don't think I told Mary at

8  all.  Mary and I weren't really involved.

9       Q.    So in any event, you told them, you

10  told Mr. Foundas specifically, I've done that

11  already?

12       A.    Yes.

13       Q.    Did you tell him you didn't think you

14  needed to come in on Fridays?

15       A.    No.  I did not tell him that.

16       Q.    Did you tell him you didn't want to

17  come in on Fridays?

18       A.    No.

19       Q.    Did you tell him you preferred to

20  stay at home on Fridays?

21       A.    No.

22       Q.    Isn't it true that you were

23  instructed not to drive to Goldwell for your

24  scheduled meeting on October 8th until Goldwell

1          A.      Necessary situations.

2          Q.      That's what he said, right?

3          A.      Right.

4          Q.      Did you have an understanding of what

5     that meant?

6          A.      For show day.  Fridays I had to go

7     down to the show, like a show day, a special

8     meeting, but not on a regular basis.  Shows were

9     once a year.

10         Q.      That was your understanding of what

11    that meant?

12         A.      That was my, well, that's my

13    understanding, yes.

14         Q.      Now, you mentioned for your

15    recollection of this October 22nd meeting you

16    had in which you, the time you cried twice --

17         A.      Right.

18         Q.      At that time did Ms. Garneau explain

19    to you that the company needed more specific

20    information regarding your medical status?

21         A.      Yes.

22         Q.      And didn't she tell you that it was,

23    you know, the documentation that she had from

24    Dr. Slezak was internally inconsistent and not

1    sufficiently explicit?

2          A.    She had told me it was unclear.

3          Q.    Unclear.  Did she tell you what she

4    thought was unclear about it?

5          A.    No.

6          Q.    And did you respond to that?

7          A.    I told her to please call him.  She

8    had my permission to call him to get verbal,

9    anything that she was not understanding, he

10   would verbally explain it to her.

11         Q.    Did you try to explain it to her?

12         A.    Did I try to explain what?

13         Q.    Whatever she was saying was unclear.

14         A.    I didn't understand what she said was

15   unclear and she did not explain it to me.

16         Q.    So she didn't say, for example, well,

17   the doctor said long periods of time aggravated

18   your neck and back, but we don't know what long

19   periods of driving means?

20         A.    Mary said it was unclear.  I

21   responded, call my doctor and make it clear.

22         Q.    Did you agree or disagree with her at

23   the time that the note or the documentation was

24   unclear?

1    of those?

2        A.      Absolutely.

3        Q.      Now, at this time you were told, two

4    days, two Fridays you were going to be coming to

5    Goldwell, even initially they said they wanted

6    you up there every Friday, right?

7        A.      Can I make a correction?

8        Q.      Sure.

9        A.      I sent all my calendars down to

10   Goldwell when I packed everything.

11       Q.      Okay.

12       A.      All the paperwork and all my

13   calendars and everything was picked up by Mark

14   Fontaine.  He signed a list.  So I do not have

15   them in my possession.

16       Q.      So we should have that?

17       A.      Mary will have it.

18       Q.      Gotcha you.  In any event, initially

19   you were being required to come to Goldwell's

20   facility or you were told you would be required

21   to come to Goldwell's facility every Friday,

22   right?

23       A.      Initially.

24       Q.      And then after the doctor's notes

1    were given to the company, the company said,

2    well, we will only require you to come two

3    Fridays a month to Holliston, right?

4         A.    Correct.

5         Q.    Did you object to that?

6         A.    They were taking me out of therapy.

7    I had to stay in therapy.  Whether I was down in

8    the office or on the road, I would be out of the

9    therapy and driving.

10        Q.    All right.  But my question is:  Did

11   you object to it?

12        A.    Yes.

13        Q.    What did you say?

14        A.    I can resume my regular schedule of

15   being four days on the road and one day in my

16   office and to stay in my therapy sessions for 30

17   minutes once a week and that would keep me

18   functional.  If I swayed from this, I would no

19   longer be functional.

20        Q.    Did you say, you can't make me do

21   this?

22        A.    No.

23        Q.    Did you say, I won't do it?

24        A.    No.

1    their way, get out, and I couldn't afford

2    leaving.

3        Q.    Did anyone besides Ms. Shakour say

4    that to you?

5        A.    Renee was the only one.

6        Q.    I'm going back to the beginning of

7    October when you had your conversation with Ms.

8    Garneau and mentioned the therapy.

9            Isn't it true the company allowed you

10   to leave early, leave work early to attend your

11   treatment sessions whenever you requested?

12       A.    Yes.

13       Q.    Including on the Fridays that you

14   worked at Goldwell, right?

15       A.    Yes.

16       Q.    Did you provide the company with any

17   other documentation, any other medical

18   documentation from that, I'm sorry, after this

19   October 17th letter, but before your FMLA

20   medical documentation, if you recall?

21           MR. POWERS:  Just for the record,

22   after the document which has been marked as

23   Exhibit 11?

24           MR. SIGEL:  Yes.

1       Q.    Did Dr. Slezak write that, can you

2  tell?

3       A.    He filled out the form, so I'm

4  assuming  --

5       Q.    You're assuming it was him?

6       A.    I'm assuming it was him.

7       Q.    It wasn't you?

8       A.    It wasn't me, that I know.

9       Q.    Were you getting psychotherapy at

10  this time?

11       A.    Yes.

12       Q.    And what was the psychotherapy for?

13       A.    Pain management.

14       Q.    As a result of your car accident?

15       A.    Yes.

16       Q.    Were you in a car accident after that

17  1999 accident?

18       A.    Yes.

19       Q.    When?

20       A.    December 15th, 10th, 15th of 2002.

21       Q.    What happened, briefly?

22       A.    I was in Colorado and we got smashed

23  into.

24       Q.    Is that when you were skiing?

1     A.     No.

2     Q.     So you could have done, as far as you

3   understood, paperwork on the fifth day, you just

4   couldn't drive on a fifth day, right?

5     A.     Right.  Yes.

6     Q.     So you could have still done your

7   Friday paperwork at home on that fifth day,

8   right?

9     A.     Correct.

10    Q.     So you weren't really restricted

11  performing any work on that fifth day, right?

12    A.     Correct.

13    Q.     And Goldwell requested a second

14  medical opinion?

15    A.     Correct.

16    Q.     Did the company tell you why?

17    A.     No.

18    Q.     Did you have an opinion as to why?

19    A.     They weren't going to allow me to do

20  the FMLA leave unless their doctor said it was

21  valid.

22    Q.     So they wanted to get another opinion

23  to determine whether Dr. Slezak's medical

24  certification was valid or not?

1          A.      Correct.

2          Q.      Do you think that was legitimate?

3          A.      Yes.

4          Q.      By the way, this medical

5    certification did not indicate that you would

6    need to take the leave on Fridays, right?

7          A.      Correct.

8          Q.      But Goldwell let you do that anyway,

9    didn't they?

10         A.      Yes.

11         Q.      And was it your understanding that

12   this fifth day, you would get the fifth day off,

13   that it would be unpaid?

14         A.      Yes.

15         Q.      And that's why you requested the

16   vacation pay those days, so you would get paid

17   for those days?

18         A.      Yes.

19         Q.      Isn't it true that you voluntarily

20   decided that you would work on Friday, the 14th

21   of December?

22         A.      Yes.

23         Q.      And on the two subsequent Fridays you

24   took vacation days, right?

1     A.    You need to understand that I was on

2  a five day week.  So I was on a five day week

3  Friday.  I was not, I was not given FMLA leave

4  until the second opinion came in.  So  --

5     Q.    That's what you said was your

6  understanding, right?

7     A.    That was my understanding.

8     Q.    Didn't Ms. Garneau sit down and

9  explain in detail that you would be, in

10  December, you could take those Fridays off, that

11  your FMLA was granted pending the outcome of the

12  medical certification issue?

13     A.    Yes.

14     Q.    And it was after you were told that

15  those Fridays would be unpaid that you decided

16  to work on Friday, the 14th, right, of December?

17     A.    I'm not sure.

18     Q.    Okay.  Well, was it your

19  understanding  --  I'm sorry.  Go ahead.

20     A.    My understanding was that I scheduled

21  months ahead of time, and it would have been the

22  person that I was riding with, I believe, was

23  Sara Matthews, and she needed me desperately to

24  work with her, and I agreed to since we had

1      Q.      And what do you recognize that to be?

2      A.      A note to Mary.

3      Q.      Do you remember when you gave this to

4  Mary?

5      A.      I don't remember what exact day, no.

6      Q.      Was it in December?

7      A.      It could very well have been.

8      Q.      And this is when you informed her you

9  would work on Friday, December 14th, right?

10     A.      Due to the fact that I didn't want to

11  cancel.  She had set up many appointments.

12     Q.      Who had set up many appointments?

13     A.      The account executive that I would be

14  working with on December 14th.

15     Q.      And you decided that you didn't want

16  to cancel those, right?

17     A.      Correct.

18     Q.      But you weren't required to work on

19  that Friday, right?

20     A.      No.

21     Q.      And on December 21st and 28th, you

22  weren't required to work those days either,

23  right?

24     A.      Correct.

1      Q.      Wasn't it your understanding that

2    those would be part of your reduced leave?

3      A.      Correct.

4      Q.      And so that you would be paid for

5    those days, you took two days from your vacation

6    bank, right?

7      A.      It could very well have been.

8      Q.      And your plan was, come the first of

9    the year, that's when you would begin your

10   reduced salary based on your four day work week,

11   right, and that's exactly what you were telling

12   Mary here?

13     A.      Yes.

14     Q.      And your testimony is that no one at

15   Goldwell ever raised any issues regarding your

16   performance during your employment, by issues, I

17   mean, problems?

18     A.      Correct.

19     Q.      And you didn't see this whole Artec

20   issue and the paperwork issue as being something

21   related to your job performance?

22     A.      No.

23     Q.      Why is that?

24     A.      The conversation with  -- I did