```
 1              MR. SIGEL:  Back on the record.
 2       Q.     Do you remember the day you were
 3  notified that your employment was being
 4  terminated?
 5       A.     December 27th.
 6       Q.     And who informed you of that?
 7       A.     Sheryl Holladay called me off of
 8  Christmas vacation saying that there was an
 9  important meeting they needed to pick my brain
10  for educational purposes.
11              So I left my Christmas vacation, got
12  there on the 27th.  Mary, Renee Shakour, Sheryl
13  Holladay and Lori from human resources were
14  there, and Renee told me my position was
15  dissolved.
16       Q.     By the way, where was your Christmas
17  vacation?
18       A.     In Vermont.
19       Q.     What were you doing there?
20       A.     My sister lives there.
21       Q.     And so you spoke to Ms. Holladay and
22  she told you the company needed to pick your
23  brain for what?
24       A.     For educational calendar of January.
```

1    Q.    Did you tell Ms. Shakour that that's
2    what you had said to Mr. Fale?
3    A.    No.
4    Q.    Did you tell Ms. Shakour that Mr.
5    Fale had told you that they were thinking of
6    changing from two distributors to one
7    distributor?
8    A.    I don't recall explaining that to
9    her.
10   Q.    Was it at that point when Ms. Shakour
11   informed you of your position being eliminated
12   after you told her about the conversation you
13   had with Mr. Fale?
14   A.    No.
15   Q.    That was before?
16   A.    She fired me first. And then she
17   eliminated my position first. And then that
18   conversation took place.
19   Q.    Were you asked whether you wanted to
20   subcontract for the company as needed for Artec
21   education?
22   A.    I was offered one day a year to do a
23   show.
24   Q.    That's it?

```
 1        A.    That's it.
 2        Q.    And you said no?
 3        A.    I said no.
 4        Q.    Why did you say no?
 5        A.    I then asked, I asked if they would
 6   fill the position that I wasn't able to fill yet
 7   of three days a week, if I could have that one,
 8   and they declined.
 9        Q.    What else, do you remember, if
10   anything, about that meeting as far as the
11   substance of the conversation?
12        A.    Just that they offered me shows.
13   There was only one show a year.  So that would
14   be once a year.
15              I asked if I could please have, fill
16   the position that I was trying to fill for three
17   days a week, and she said no.
18        Q.    Three days a week?
19        A.    Part-time.
20        Q.    And who said no?
21        A.    Renee Shakour.
22        Q.    Okay.  Did she tell you why?
23        A.    No.
24        Q.    Anything else you remember about that
```

```
 1    work on Fridays at Goldwell after you were given
 2    your changed work schedule that Ms. Garneau
 3    provided a desk and a phone for you, in other
 4    words, not necessarily the same desk every time,
 5    but a work space for you?
 6         A.    It was given to me possibly for 15
 7    minutes and I would have to move if a person
 8    needed it.  So I would move to another table.
 9         When that person needed that table, I
10    would have to move to another table.  So I was
11    not specifically given a space for the time that
12    I was there, no, I was not.
13         Q.    And it's your testimony that you
14    weren't given a phone to use when you needed a
15    phone?
16         A.    I was not given office space.  I
17    wasn't given, here is your phone.  Other people
18    are using the phone.  I didn't have a phone to
19    use.  If somebody wasn't using the phone, I
20    could use their phone on their desk.
21         Q.    Immediately prior to the meeting in
22    which you were told that your employment was
23    being terminated, you were on the telephone,
24    weren't you?
```

# EXHIBIT 2

```
                                                            1

                                    Volume I
                                    Pages 1 to 167
                                    Exhibits 1 - 15

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

      - - - - - - - - - - - - - - - -x
                                     :
      JEANNE DEGAN,                  :
               Plaintiff,            :
                                     :
           vs.                       :    Civil Action
                                     :    No. 04-11024 RWZ
      GOLDWELL OF NEW ENGLAND,       :
      INC.,                          :
               Defendant.            :
                                     :
      - - - - - - - - - - - - - - - -x

           DEPOSITION OF RENEE G. SHAKOUR, a witness
      called on behalf of the Plaintiff, taken pursuant to
      the Federal Rules of Civil Procedure, before
      Catherine A. Handel, Registered Professional
      Reporter and Notary Public in and for the
      Commonwealth of Massachusetts, at the Offices of
      Rodgers Powers & Schwartz LLP, 18 Tremont Street,
      Boston, Massachusetts, on Thursday, October 7, 2004,
      commencing at 10:10 a.m.

      PRESENT:

           Rodgers Powers & Schwartz LLP
                (by Kevin G. Powers, Esq.)
                18 Tremont Street, Boston, MA 02108
                for the Plaintiff.

           Bowditch & Dewey, LLP
                (by Jonathan R. Sigel, Esq.)
                311 Main Street, P.O. Box 15156,
                Worcester, MA 01615-0156
                for the Defendant.



                          * * * * *
```

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

1   MR. SIGEL: I misunderstood because I saw a
2   sticker, but, yes.
3     Q.   So if you could look at Plaintiff's
4   Deposition Exhibit No. 14, and specifically the
5   second page, Answer No. 2. Do you see where it
6   says, "Beginning in April of 2000 and continuing
7   through the end of her employment, complainant also
8   provided services as ARTec brand manager to R.G.
9   Shakour"?
10    A.   (Examines document) Yes.
11    Q.   Does that refresh your memory as to when
12  Jeanne Hogan began providing services to R.G.
13  Shakour?
14    A.   Yes.
15    Q.   Was it April 2000?
16    A.   Yes. Am I done with that?
17    Q.   You can put it down. I don't know if
18  you're done with it.
19        When you began at R.G. Shakour -- and I
20  think you placed the date at approximately 1992,
21  1993. Correct me if that's incorrect. But
22  approximately when you started with R.G. Shakour,
23  did R.G. Shakour at that time have any relationship
24  with Goldwell?

```
 1  contributing to Jeanne Hogan's compensation until
 2  the end of her employment, were you the person who
 3  was most responsible for overseeing Jeanne Hogan's
 4  duties as it related to Shakour or ARTec?
 5      A.   Yes.
 6      Q.   Was there anyone else at Shakour that was
 7  responsible for overseeing Jeanne Hogan?
 8      A.   I don't recall.
 9      Q.   And do you know who at Goldwell was
10  responsible -- primarily responsible for overseeing
11  Jeanne Hogan?
12      A.   Primarily Cheryl Holladay.
13      Q.   And Cheryl Holladay during the time that
14  she was overseeing Jeanne Hogan was the director of
15  education at Goldwell?
16      A.   Correct.
17      Q.   Did you ever write a memo or a letter or
18  put anything in writing to Ms. Holladay about Jeanne
19  Hogan's performance?
20      A.   I don't recall.
21      Q.   You don't recall ever doing that?
22      A.   No, I don't recall -- excuse me.  Let me
23  back up.  I don't recall -- I don't remember.
24      Q.   So you don't have a present memory of ever
```

1   A.   Yes, I'm sure at some point I told her the
2   position had been eliminated, yes.
3       Q.   Do you recall what, if anything, Lisa
4   Kelley said to you when you told her that the
5   position was being eliminated?
6       A.   I don't recall.
7       Q.   Is it fair to say that as far as you
8   know -- well, let me back up for a second.  Did you
9   have any input into the decision to eliminate Jeanne
10  Hogan's position?
11      A.   Yes.
12      Q.   Tell me, as best you can recall, all input
13  you had into that decision.
14      A.   I don't remember who was present, but I do
15  remember a conversation with myself, John Foundas,
16  potentially Mary Garneau -- I don't want to guess at
17  that, so I don't know if she was there -- and myself
18  about the ARTec sales slipping and how Jeanne had no
19  effect on the sales and the sales continued to go
20  down, and it wasn't a smart financial business
21  decision to keep funding somebody who wasn't having
22  any impact on the sales.
23      Q.   When was that conversation?
24      A.   I can't recall.

1  A. I remember she said something to that
2  effect.
3  Q. Did she show you the letter?
4  A. I can't recall.
5  Q. You don't recall whether or not she showed
6  you the letter?
7  A. She told me about the letter. I don't
8  recall if I saw the letter or not.
9  Q. Did you tell Ms. Hogan to send the letter
10 or not to send the letter?
11 A. I don't recall.
12 Q. Do you recall that at some point Jeanne
13 Hogan was instructed that on Fridays she had to
14 report to the Goldwell office rather than work at
15 her home?
16 A. Can you repeat the question?
17 Q. Yes. Do you recall that some point in
18 2001, Jeanne Hogan was told that she couldn't work
19 from home, that on Fridays she had to report to the
20 Goldwell office?
21 A. She had to report to the Goldwell office to
22 take care of the paperwork problem with Mary.
23 Q. So you recall that?
24 A. Yes.

135

1    A.    Right.

2    Q.    And you?

3    A.    Okay.

4    Q.    Now, does that refresh your recollection
5 whether Mary Garneau was involved in the decision?

6    A.    I said I didn't know if Mary Garneau was
7 there or not.

8    Q.    So after reading that, does that refresh
9 your memory as to who was at this meeting?

10   A.    I don't know.

11   Q.    So when do you recall the first
12 conversation with anyone at Goldwell about the
13 possibility of terminating Ms. Hogan or eliminating
14 the ARTec brand manager's position?

15   A.    I don't have -- I don't know the dates.

16   Q.    Approximately?

17   A.    I don't know.

18   Q.    The meeting that you testified to a couple
19 of minutes ago, do you recall when that meeting
20 occurred?

21   A.    No.

22   Q.    Was it before or after October of 2001?

23   A.    I don't know.

24   Q.    At the meeting can you tell me all the

1  reasons talked about at the meeting as to why Jeanne
2  Hogan should be terminated or the ARTec sales
3  manager's position eliminated?
4      A.   To the best of my recollection, we
5  discussed sales not increasing.  So it didn't make
6  much sense to have a brand manager if sales weren't
7  on the rise.  So we eliminated the position.
8      Q.   Was that the sole reason why the position
9  was eliminated, i.e., the sales not increasing?
10     A.   Correct.
11     Q.   So is it your understanding that Jeanne
12 Hogan was not terminated because of any failure on
13 her part to properly document issues for ARTec?
14     A.   Could you repeat the question?  I don't
15 understand.
16     Q.   Yes.  Well, I'm getting back to the
17 allegations made by Mr. Bakey.  And is it fair to
18 say that it was your understanding that the
19 allegations by Mr. Bakey played no part in the
20 decision to eliminate the ARTec brand sales manager?
21     A.   Correct.
22     Q.   So it was simply an issue of the numbers
23 just don't justify the position?
24     A.   Correct.

1  don't know.
2      Q.   On or about the time that Jeanne Hogan was
3  terminated, did you tell Jeanne Hogan that she could
4  work shows for Shakour?
5      A.   I told Jeanne Hogan that there was -- she
6  could work as a part-time educator.  I think -- yes,
7  she could work as a part-time educator.  I did not
8  just say "shows."
9      Q.   And was there a part-time educator's
10 position open at the time, that is on or about
11 12/27/01?
12     A.   It's not like there's an opening.  If
13 there's a need, it would be -- we would find
14 somebody.
15     Q.   And as of 12/27/01, was there a need for a
16 part-time educator?
17     A.   I have no idea.
18     Q.   So was your communication to Jeanne Hogan,
19 "If we need a part-time educator at sometime in the
20 future, we will consider you"?
21     A.   No.  It was to be a part-time educator,
22 just like all of our educators are.  We contact them
23 when we need them for classes and such.
24     Q.   So you weren't guaranteeing her any

# EXHIBIT 3

1

Volume I
Pages 1 to 103
Exhibits 16 to 17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
JEANNE DEGAN,                     :
          Plaintiff,              :
                                  :
     vs.                          :  Civil Action
                                  :  No. 04-11024 RWZ
GOLDWELL OF NEW ENGLAND,          :
INC.,                             :
          Defendant.              :
                                  :
- - - - - - - - - - - - - - - - -x

     DEPOSITION OF JOHN G. FOUNDAS, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Ken A. DiFraia, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Bowditch & Dewey, LLP, 161 Worcester Road, Framingham, Massachusetts, on Friday, October 22, 2004, commencing at 10:09 a.m.

PRESENT:

    Rodgers, Powers & Schwartz
        (by Kevin G. Powers, Esq.)
        18 Tremont Street, Suite 500,
        Boston, MA 02108, for the Plaintiff.

    Bowditch & Dewey, LLP
        (by Jonathan R. Sigel, Esq.)
        311 Main Street, P.O. Box 15156,
        Worcester, MA 01615-0156,
        for the Defendant.


                    * * * * *


DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

1   Q.   One conversation or more than one?
2   A.   I think that would be one.
3   Q.   When was that approximately?
4   A.   Had to be sometime probably the end of
5   October of 2001, maybe November. I don't remember
6   exactly.
7   Q.   Can you tell me as best you can recall what
8   the conversation -- what was said in the
9   conversation between you and Ms. Carlson about
10  Jeanne Hogan.
11  A.   To the best of my recollection, it was my
12  concerns of the business trend down instead of up.
13  I was seriously considering to no longer support the
14  position of brand manager for economic reasons and
15  for business being slow or flat.
16  Q.   What did you say to Mr. Carlson?
17  A.   I spoke to my partner. I initiated the
18  conversation to no longer support the expense of a
19  brand manager.
20  Q.   What did Ms. Carlson say, if anything, to
21  you?
22  A.   To the best I can remember, it was my
23  decision.
24  Q.   When you say you spoke to your partner,

79

1   Q.   The question is what, if any, involvement
2   do you know that Renee Shakour had in the decision
3   to terminate Ms. Hogan?
4   A.   Supplying me with the information of the
5   sales activities and to that nature, for me to make
6   the final decision.
7   Q.   Did Renee Shakour ever recommend to you
8   what she thought should happen?
9   A.   No.  I had stated to her and her father of
10  my decision not to continue to employ a brand
11  manager.
12  Q.   Tell me each and every reason why you
13  decided to terminate Jeanne Hogan.
14  A.   Sales were flat, did not want to invest any
15  more money.
16  Q.   Anything else?
17  A.   No.
18  Q.   When did you reach a final decision to
19  terminate her?
20  A.   It would be the last days of November 2001
21  or the early part of December, when we meet with
22  accountants to plan the next year.
23  Q.   When you say the sales number were flat,
24  did you attempt to determine why the sales numbers

86

1    Q.   Did you ever try to figure out why?

2    A.   I don't recall any specific issue.

3    Q.   Do you know if ARTec products or the ARTec
4    products that you were distributing, whether the
5    sales in other regions were flattening out?

6    A.   I have no idea. I have no knowledge of
7    anyone else.

8    Q.   Did you ever direct anyone to try to hire
9    an ARTec brand manager after Jeanne Hogan was laid
10   off?

11   A.   No.

12   Q.   Did you ever talk to Renee Shakour about
13   any efforts she might be making to hire an ARTec
14   brand manager?

15   A.   No, sir.

16   Q.   At some point, did you become aware that
17   Shakour, R.G. Shakour, was seeking to hire an ARTec
18   brand manager?

19   A.   No, sir.

20   Q.   Do you know who Michelle Geremia is?

21   A.   I think she may have been an independent
22   contractor.

23   Q.   For Goldwell?

24   A.   No. I think she was representing ARTec.

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

94

1  December of 2001?
2      A.   Looking at trends, I would have thought it
3  would continue to, and as it turned out, it was, was
4  diminishing.
5      Q.   What caused you to believe that in December
6  of 2001?
7      A.   Trends in sales.
8      Q.   What were the trends that you saw?
9      A.   The trend was that we were under budget
10 somewhere around 25 or 27 percent.
11     Q.   For the year?
12     A.   For the year.
13     Q.   What you say "under budget," what are you
14 referring to?
15     A.   ARTec would set a goal of total purchases
16 divided by who wished to buy what.  When I looked at
17 the numbers probably by October, at that point we
18 were trending about $120,000 some-odd less than the
19 540, or whatever the budget was, for the -- to
20 purchase.
21     Q.   When you refer to budget, are you talking
22 about sales quotas that are set?
23     A.   Purchases from the manufacturer.
24     Q.   Does the manufacturer set what they believe

```
 1   should be the purchase numbers?
 2        A.   Yes.
 3        Q.   So, for instance, ARTec would say, "We
 4   expect you to purchase $200,000 in product next
 5   year," for instance, then that would be the number
 6   you would be expected to purchase and then sell?
 7        A.   Yes.
 8        Q.   Was that in writing?
 9        A.   Yes.
10        Q.   What's it called?
11        A.   I think it was just a budget thing.  I
12   don't know.
13        Q.   Sales budget?
14        A.   Yes, purchases broken down quarterly,
15   monthly.
16        Q.   In 2000, had you met the purchase budget
17   set by ARTec?
18        A.   I believe that we had.
19        Q.   Did you exceed it?
20        A.   We may have.  I don't remember.  I would
21   have to look at the numbers.
22        Q.   When did you first realize in 2001 you were
23   not going to meet the sales budget set by ARTec?
24        A.   Somewhere midyear when I would compare a
```