# EXHIBIT 12

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3       JEANNE DEGAN                    )
                                        )
         VS.                            )  C.A. 04CV11024RWZ
4                                       )
        GOLDWELL OF NEW ENGLAND         )
5                                          [ ORIGINAL ]

6          DEPOSITION OF DAVID R. HALLGREN, taken at the

7       request of the Defendant pursuant to Rule 30

8       of the Massachusetts Rules of Civil Procedure

9       before Karen R. Weldon, a Notary Public and

10      Registered Merit Reporter in and for the

11      Commonwealth of Massachusetts, on September 8,

12      2004, commencing at 10:35 A.M. at the offices of

13      Bowditch & Dewey, 311 Main Street, Worcester,

14      Massachusetts.

15

16      A P P E A R A N C E S:
        FOR THE PLAINTIFF:
17      RODGERS, POWERS & SCHWARTZ, LLP
        18 Tremont Street
18      Boston, Massachusetts  02108
           BY: LINDA EVANS, ATTY.
19      FOR THE DEFENDANT:
        BOWDITCH & DEWEY
20      31 Main Street
        Worcester, Massachusetts  01608
21         BY: JONATHAN R. SIGEL, ESQ.
        Also Present:  John Foundas & Mary Garneau
22      _____
                    BAY STATE REPORTING AGENCY
23            76 MILL STREET (At Park Avenue)
              WORCESTER, MASSACHUSETTS  01603
24                    (508) 753-4121

1      Q.    Okay.  At any time during your

2   employment it was your understanding that there

3   was a need for a full time Artec brand manager?

4      A.    I think there was a need going

5   forward, but the resources didn't warrant it at

6   that point in time.

7      Q.    Was it your understanding that at

8   that point in time that Artec requested that you

9   have a brand manager?

10     A.    I don't think they requested it.  I

11  think it was John's approach to be proactive

12  with developing the Artec brand further.

13     Q.    When you say that Artec did not

14  warrant a full-time brand manager, what do you

15  mean by that?

16     A.    I said at that point in time it

17  didn't, we weren't going to apply a full time

18  body against the Artec business.  That was my

19  impression.

20          It didn't warrant it at that point in

21  time.  It would lead to that as that person

22  became more knowledgeable.

23     Q.    Do you say it didn't warrant it

24  because the Artec sales were not great enough to

1    warrant it?

2        A.    No.   I don't think we had the

3    resources.  We didn't want to apply the

4    resources.

5        Q.    When you say resources  --

6        A.    I could have hired 17 brand managers.

7    I couldn't afford them all.  So there were

8    resources we weren't going to commit full time

9    dollars to a brand at that point in time.

10            But there had been discussions with

11   Artec about moving forward with a full-time

12   position and if we got the right person as the

13   business grew.

14       Q.    When were those discussions?

15       A.    I think it was during the process of

16   interviewing people.

17       Q.    So during your employment?

18       A.    Uh-huh.

19       Q.    You have to answer verbally.

20       A.    Yes, during my employment.

21       Q.    Did you discuss the issue with Artec

22   directly?

23       A.    I can't remember if I had a

24   conversation with Vicki.  She was our -- You

1    go further, we could give her more

2    responsibilities.

3        Q.    Eventually it would become that?

4        A.    To me, that's hiring a brand manager.

5    That's an interpretation.

6        Q.    But she didn't yet have the

7    qualifications to become a brand manager?

8        A.    She didn't have the product knowledge

9    to become a brand manager.

10       Q.    Did you discuss your search for this

11   brand manager position with any other employee

12   or manager during your employment, other than

13   Mr. Foundas?

14       A.    I think we shared it with, for

15   example, Sheryl Holladay and possibly the other

16   regional managers what our long term intentions

17   were.

18       Q.    Were there any other brand manager

19   positions, other than what you're referring to

20   for which you hired someone, for example, as a

21   sales rep with the hopes of them moving into a

22   brand manager role?

23       A.    I didn't hire anybody under that

24   intention.

1      Q.    Mr. Hallgren, I just want to show you

2    a document that I would like to mark as Exhibit

3    No. 3.

4              (Deposition Exhibit No. 3 Marked).

5      Q.    Mr. Hallgren, if I could ask you to

6    review that document  --

7      A.    Uh-huh.  Yes.

8      Q.    And ask you if you recognize it?

9      A.    Yes.

10     Q.    What do you recognize it to be?

11     A.    An offer letter to Lisa Leal.

12     Q.    And is that your signature at the

13   bottom?

14     A.    Yes.

15     Q.    Did you draft this letter?

16     A.    Yes.

17     Q.    So her position was urban territory

18   sales manager?

19     A.    Yes.

20     Q.    And you agree no where in this

21   document does it indicate that she would be or

22   become a brand manager, correct?

23     A.    Not in this document, no.

24     Q.    And did you create the position of

1        A.     Right.  But then it says here that I

2    was told all three companies, so I'll go off

3    this memory.  It's memory because this was a

4    year and a half ago, closer to that.

5               If I was told that all three

6    companies would share the cost, I know Shakour

7    and Goldwell would share, and based on that, I

8    would say that Artec did say they would

9    contribute something.

10       Q.     Okay.  And in this document you

11   didn't say Artec and Bionics brand manager,

12   right?

13       A.     Right.

14       Q.     Why not?

15       A.     I think we were going to want to have

16   a full time Artec position at one point in time.

17       Q.     Didn't you testify earlier that it

18   was supposed to be a dual position of Artec and

19   Bionics?

20       A.     I'm just thinking longer term, we

21   wanted to have one for each.

22       Q.     Long term.  Somewhere in the future?

23       A.     Right.

24       Q.     If sales warranted it; is that

1    correct?

2         A.     In the future.  I'm not saying

3    anything about -- In the future.

4         Q.     Okay.

5         A.     We said we wanted to grow the Artec

6    business and apply resources there.  So we were

7    going to apply resources there.  The brand

8    manager was the capacity to help do that.

9         Q.     I apologize if I asked this earlier,

10   but you read this document carefully before you

11   signed it, right?

12        A.     Uh-huh.

13        Q.     You have to answer verbally.

14        A.     Yes.

15        Q.     Did you sign any other statements

16   sent to you by Ms. Degan or her attorneys in

17   this case?

18        A.     I don't think so.  I think it was

19   just that one page.  And to be honest with you,

20   I forgot about it until you showed it to me.

21        Q.     Okay.  Were there any other drafts of

22   this that you recall?

23        A.     No.

24        Q.     So to your recollection you didn't

# **EXHIBIT 13**

1

Exhibits: 1-4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA. NO. 04-CV-11024 RWZ

JEANNE DEGEN,

Plaintiff

VS.

GOLDWELL OF NEW ENGLAND, INC.

Defendant

DEPOSITION OF SUSAN A. PUGH,
taken at the request of the Defendant,
pursuant to Rule 30 of the Massachusetts
Rules of Civil Procedure before
Kathleen M. Bradley, Notary Public and
Registered Professional Reporter in and for
the Commonwealth of Massachusetts, on
Thursday, May 12, 2005, commencing at
1 p.m. at the offices of Bowditch & Dewey,
311 Main Street, Worcester, Massachusetts.

BAY STATE REPORTING AGENCY
76 MILL STREET (At Park Avenue)
WORCESTER, MASSACHUSETTS  01603
(508)753-4121

101

1    A.    In the beginning when the paper was

2    passed out, yes.  That's when Michelle --

3    like I had stated, Michelle White had asked

4    questions and that's where it got more

5    specific about each position.

6    Q.    Okay.  Fair enough.  Was there any

7    other occasion besides this meeting that

8    you just testified about which Renee

9    Shakour made such an offer regarding a

10   referral fee for any Brand Manager

11   position?

12   A.    I don't recall.

13   Q.    Whether or not you recall

14   specifically, do you have reason to believe

15   that there was another occasion on which

16   you were present in which Ms. Shakour did

17   make such a statement?

18   A.    I'm not aware of any.

19   Q.    Did you have any personal involvement

20   in any effort by Goldwell and/or Shakour to

21   hire an Artec Brand Manager?

22   A.    No, I did not.

23   Q.    And in fact, Ms. Pugh, isn't it fair

24   to say that after Ms. Degen left her

102

1    employment and for the remainder of your

2    employment, whether it be with Goldwell or

3    with Shakour, neither Goldwell or Shakour

4    actually hired an Artec Brand Manager?

5    A.    That is correct.

6    Q.    And other than the job advertisements

7    that you testified about today and the

8    meeting that you just testified about, do

9    you have any other knowledge of a search

10   for an Artec Brand Manager?

11   A.    I do not.

12   Q.    Do you have any personal knowledge of

13   a search for any Brand Manager during that

14   time period other than what you testified

15   about?

16   A.    No, I do not.

17   Q.    Following Ms. Degen's separation from

18   employment and during your employment with

19   Goldwell and/or Shakour did either Goldwell

20   or Shakour hire any Brand Managers?

21   A.    I believe they did.

22   Q.    What's your your best recollection as

23   to which Brand Managers they hired?

24   A.    L'Oreal.

1      Halgren had during his employment by

2      Goldwell?

3      A.    I do not.

4      Q.    Ms. Pugh, did you ever tell anyone

5      that you understood Mr. Halgren had hired a

6      Brand Manager for Goldwell?

7      A.    I do not know about that.

8      Q.    My question to you was did you ever

9      tell anyone that Mr. Halgren hired a Brand

10     Manager?

11     A.    Oh no, no.  I'm sorry, I

12     misunderstood you.

13     Q.    Maybe I wasn't clear. Following Ms.

14     Degen's separation from employment did you

15     have the opportunity to observe that any of

16     her former duties were distributed to other

17     employees?

18     A.    Yes.

19     Q.    And can you describe for me that

20     distribution?

21     A.    Just for the record, I mean I'm a

22     salesperson.  So I'm just observing. Once

23     again, we only would come into the office,

24     you know, approximately twice a month for