# EXHIBIT 14

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2
                       C.A. 04CV11024 RWZ
 3

 4    JEANNE DEGEN,                      )
              Plaintiff,                 )
 5                                       )         ORIGINAL
       VS.                               )
 6                                       )
      GOLDWELL OF NEW ENGLAND, INC.,     )
 7          Defendant.

 8

 9         DEPOSITION OF LISA R. KELLEY, taken at the
      request of the Defendant pursuant to the Federal
10    Rules of Civil Procedure before Julie A. Bates,
      a Notary Public in and for the Commonwealth of
11    Massachusetts, on Thursday, March 24, 2005, at
      the offices of Bowditch & Dewey, One
12    International Place, Boston, Massachusetts.

13

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:
      RODGERS, POWERS & SCHWARTZ, LLP
16    18 Tremont Street
      Boston, MA  02108
17    (617) 742-7010
          BY: LINDA EVANS, ESQ.
18
      FOR THE DEFENDANT:
19    BOWDITCH & DEWEY, LLP
      311 Main Street
20    Worcester, MA  01615
      (508) 791-3511
21        BY:  RENEE E. HACKETT, ESQ.

22

23    _____
             BAY STATE REPORTING AGENCY
24    76 MILL STREET, WORCESTER, MASSACHUSETTS   01603
                    (508) 753-4121
```

```
 1   the helm, there was no need for me to do
 2   anything other than keep the people that could
 3   do it doing those particular classes.
 4        Q.   During the remainder of your tenure
 5   at Shakour, was a brand manager for Artec
 6   hired?
 7        A.   No, no.  They were still juggling
 8   between two, three people doing all of those
 9   tasks.
10        Q.   Do you know whether there had been
11   any advertisements for an Artec brand manager?
12        A.   I had heard that they were looking,
13   and I heard people were, you know, looking for
14   someone to fill those shoes.  But that wasn't
15   a big surprise to me, because I knew that they
16   needed somebody for that job.
17        Q.   Who did you hear that from?
18        A.   Oh, several people.
19        Q.   Who?
20        A.   I mean, it was just in context.  It
21   wasn't like, "Oh, did you know they are
22   looking?"  It was just, "Have they found
23   somebody yet?"  "Is anybody in that position?"
24   "No, not yet."
```

# EXHIBIT 15

an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. G.L. c. 151B, §1(18). Deferring to MCAD's fact-finding role, including its right to assess the credibility of witnesses, draw inferences from the facts found, and reconcile inconsistent and conflicting testimony, see *College-Town. Div. of Interco, Inc.*, 400 Mass. at 170, plaintiffs fail to meet their burden of showing that the evidence in the administrative record was not such evidence that a reasonable mind might accept as adequate to support the conclusion. The facts found by the Single Commissioner and contained in the administrative record support the conclusion that Viveiros was sexually harassed by Braga and Mendonza and that plaintiffs' response to Viveiros complaint aggravated the situation. Consequently, plaintiffs are vicariously liable for its acts and those of Braga and Mendonza. See *College-Town Div. of Interco, Inc.*, 400 Mass. at 165.

Third, plaintiffs contend that the determination that Viveiros was constructively discharged and consequently was entitled to back pay was unsupported by substantial evidence. To establish a claim of constructive discharge, an employee must show that the working conditions became sufficiently intolerable so that a reasonable person would have felt compelled to resign. *GTE Products Corp. v. Stewart*, 421 Mass. 22, 34 (1995). Plaintiffs fail to meet their burden here of showing that the record cannot reasonably support the conclusion that Viveiros was constructively discharged. The facts found by the Single Commissioner and contained in the administrative record are such evidence as a reasonable mind might accept as adequate to support the conclusion that under the relevant legal principles Viveiros was constructively discharged. Upon such a finding of discrimination, the MCAD has broad authority to grant such relief as is appropriate, including lost wages and benefits. See *Lavelle v. Massachusetts Comm'n Against Discrimination*, 426 Mass 332, 337 (1997); *City of Salem v. Massachusetts Comm'n Against Discrimination*, 44 Mass. App. Ct. 627, 645 (1998). The record is devoid of any evidence or argument that Viveiros failed to mitigate. Consequently, plaintiffs' have not met their burden of showing that the award of back pay was unsupported by substantial evidence.

Fourth, plaintiffs contend that the determination that Viveiros suffered emotional distress is unsupported by substantial evidence. In addition, plaintiffs contend that the award was excessive and punitive. The MCAD is authorized to award damages for emotional distress pursuant to G.L. 151B, §5. See *Bournewood Hospital v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 303, 315-316 (1976). An award of emotional distress damages can be sustained even in the absence of physical injury or psychiatric consultation. See *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 824 (1997); *City of Salem*, 44 Mass. App. Ct. at 646. Here, the facts found by the Single Commissioner and contained in the administrative record are that Viveiros suffered from insomnia, weight loss, depression, anxiety, fear and apprehension about returning to work. These facts are such evidence as a reasonable mind might accept as adequate to support the conclusion that under the relevant legal principles Viveiros was entitled to the award of emotional distress damages. As to plaintiffs' argument that the amount is excessive and punitive, this court cannot say that the amount "does not relate reasonably to the emotional distress suffered by [Viveiros]," or otherwise represents a miscarriage of justice. See *City of Salem*, 44 Mass. App. Ct. at 646.

Finally, plaintiffs contend that the award of attorney's fees and costs was not reasonable. Chapter 151B, §5 mandates awarding a prevailing complainant reasonable attorney's fees and costs. A fair market rate for time reasonably spent preparing and litigating a case is the basic measure of attorney's fees under State law. *Fontaine v. Ebtec Corp*, 415 Mass. 309, 326 (1993).

This method of determining attorney's fees, generally referred to as a "lodestar" award, was used by the MCAD here. Plaintiffs' have not met their burden of showing that there was any reason for the MCAD to depart from basic measure amounts attained by using the lodestar method in the present case. Having reviewed the administrative record, it contains such evidence (regarding the length of the pendency of this case, the legal and factual issues involved and the experience of counsel) that Viveiros was entitled to the attorney's fees and costs in the amount awarded as the amount is reasonable.

ORDER

For the foregoing reasons, it is hereby ORDERED that plaintiffs' motion for judgment on the pleadings is DENIED. The decision of the Full Commission of the MCAD is AFFIRMED.

* * * * * *

---

ROBERT RATTIGAN

v.

COPLEY PLAZA HOTEL LIMITED PARTNERSHIP

Docket No. 94-BEM-0085

*May 6, 1999*
*Judith E. Kaplan, Hearing Officer*

---

*Paul E. Levenson, Esq. for the Complainant*
*William B. Koffel, Esq. for the Respondent*

Hearing Officer Judith E. Kaplan dismissed an age-discrimination appeal from a discharged payroll-accounting employee with the Copley Plaza Hotel after hearing evidence that he failed to perform his duties and complete the tasks assigned to him and rejecting the Complainant's assertion that these stated reasons were pretextual.

**DECISION OF THE HEARING OFFICER**

I. PROCEDURAL HISTORY

On January 25, 1994, Complainant Robert Rattigan filed a complaint with this Commission charging Respondent with unlawful termination on the basis of age, in violation of M.G.L. ch. 151B, sec. 4. The Investigating Commissioner issued a probable cause determination.

Attempts to conciliate the matter failed and the case was certified for public hearing. A public hearing was held before me on Sep-

tember 15, 16 and 17, 1998. After carefully considering the entire record and the post-hearing submissions of the parties, I make the following findings of fact, conclusions of law and order.

II. FINDINGS OF FACT

1. Complainant Robert Rattigan was born on June 21, 1936. At the time of his termination, he was 57 years old. Complainant was first employed at the Copley Plaza Hotel on December 11, 1985 as Credit Manager. He later worked as an Operations Analyst and Restaurant Manager. He became Payroll Manager (or "Paymaster") on May 1, 1989. Complainant remained in the Payroll Manager position until his termination on January 18, 1994.

2. As Payroll Manager, Complainant was responsible for generating the weekly payroll for the Copley Plaza's 400 to 500 employees. In addition, Complainant was responsible for coordinating personnel matters with the payroll, such as changes in savings deductions, direct deposits, changes of address, and garnishments. Despite several changes in the management at the Copley Plaza between May, 1989 and July 1993, Complainant's duties remained essentially the same. Complainant's office was located in the basement adjacent to the personnel office and was equipped with two computers, two desks and six to eight file cabinets. The hotel used the ADP company as its outside check processing unit.

3. Complainant had received periodic performance evaluations from his immediate supervisors, in which he was rated either "excellent" or "outstanding". On April 1, 1993, Complainant's immediate supervisor was Gary Sawin, then Respondent's Manager of Human Resources.

4. On April 1, 1993, Wyndham Hotels and Resorts ("Wyndham") assumed the management of the Copley Plaza. Shortly thereafter, the hotel's then Controller resigned and Abbe Walter became the hotel's Controller. Walter managed the Accounting Department and had overall responsibility for a staff of about eighteen people. At about this time, Complainant stopped reporting to Sawin in the personnel office and began reporting to Walter and Claude Brock in the accounting department.

5. Sometime in April, 1993, Gary Sawin met with Brian Goodwin, Wyndham's Vice President of Human Resources. Sawin testified that during the meeting, Goodwin reviewed a document containing the pay rates and positions of each hotel employee. Sawin testified that Goodwin drew a redline under the names of those whom he stated were making too much money. According to Sawin, all of the employees whose names he could recall were over 40 years of age. Sawin testified that Goodwin then said, "We have to do something about these people." I credit this testimony. Sawin also stated that on one occasion he overheard a manager in Wyndham's food and beverages department remark, "We've got to get rid of some of these old people." Sawin could not identify the person who made that remark. At the hearing, he acknowledged that he did not mention overhearing this statement during his deposition. He did state generally in his deposition that "I heard the comments 'some of these old people.' Whether they meant old in age or old because they had been there a long time, I don't know." Sawin tendered his resignation the day after his meeting with Goodwin.

6. Wyndham had a policy in effect in 1993 that applied to certain salaried employees who worked in hotels. According to Wyndham's procedures, a "Red Circled" employee is someone "whose salary exceeds the maximum of the range" that has been established for a particular position. "Red Circled employees are not eligible for salary increases until the position grade is adjusted or the employee moves to another position with a higher salary grade... Red Circled employees may be considered for a salary increase, not to exceed the established cost of living for the current year, on an every other year basis." The policy does not call for Red Circled employees to be terminated or to have their pay decreased. (R-7)

7. Following Sawin's resignation, Wyndham employee Robert Brunson became Human Resources Manager and in May 1993, Claude Brock became Assistant Controller. Brock became Complainant's immediate supervisor.

8. Complainant took two weeks vacation at the beginning of July, 1993. He stated that during this time two people were assigned temporarily to produce the payroll in his absence. According to Complainant, upon his return, Brock told him that the employees who had assumed his duties during his vacation had "really screwed things up". Complainant stated that their errors adversely affected the payroll system, causing him to spend additional time making corrections.

9. In July 1993, after observing operations in the Accounting Department for about 90 days, Abbe Walter prepared a list of "Paymaster Objectives" for Complainant. She met personally with Complainant to discuss each item. The list described several duties, some of which were new. One of the duties was to update the vacation accrual report. Walter estimated it would take Complainant about ten minutes per week to complete this task. Walter also assigned Complainant to complete an audit for a certain deduction code, which would take "a few minutes". Walter asked Complainant to provide a list of terminated employees to the Union, which required Complainant to photocopy a report generated by ADP on a weekly basis. She asked Complainant to maintain a weekly PC journal of payroll activity that would require about one hour of work per week. Walter asked Complainant to reconcile the payroll account and the general ledger, requiring him to make sure that manually issued payroll checks were properly posted, a task requiring little, if any, additional time, if performed on a regular basis, according to Walter. Complainant stated that he was unable to reconcile this account because he was not responsible for issuing manual checks. Walter also required Complainant to document a procedure for issuing meal tickets and to remind department heads to submit information on a timely basis. Walter stated that these were one-time tasks that would not have required much time. Complainant admitted that he never completed either task. Walter also told Complainant to change the way employee tips charged on a credit card were paid. This required only that Complainant enter a different ADP code. Implementing a new release of ADP software was a one-time event. Walter also required Complainant to maintain records and reports in an organized fashion. This was an on-going responsibility that, in her view, Complainant never implemented. Similarly Complainant never implemented the two-line reporting of non-union health insurance, a task Walter asked him to do for the last half of 1993. Complainant testified that ADP was