unable to implement the two-line reporting function, but Walter was certain that ADP had this capability. Walter directed Complainant to establish a new ADP code for implementing IRS regulations on payments for parking, a one-time task that required a single telephone call to ADP. According to Walter, Complainant never performed this task.

10. Complainant conceded that all of the duties outlined by Walter were reasonable paymaster duties. He also agreed that many of these duties were one-time tasks requiring very little time to perform. Complainant later reviewed the list with Claude Brock to clarify the duties.

11. In response to Complainant's request for assistance, in July and August 1993, Brunson and Walter brought in Jim Craig, a Wyndham employee, to assist Complainant in setting up a computerized spread sheet for tracking vacation accruals. Complainant testified that in addition, Brock gave him limited assistance in setting up the PC ledgers.

12. On August 9, 1993, Claude Brock gave Complainant a memorandum regarding five specific payroll problems that had been identified at July's month-end closing of the books. Complainant responded to each of the five problems in a memorandum to Brock on August 11, 1993. The first problem was that the formula for total monthly payroll dollars in July's payroll file was incorrect. Complainant responded that he had not prepared the report, that the formula had been used for some time, but that he would correct the formula. The second problem listed by Brock was that no new hires had been added to the vacation accrual since April 26, 1993. Complainant responded that he had done this report once in May and there very few new people to add, that June's report was produced by someone else in accounting, and that he had updated July's report, and would add new hires for August since that would be their first accrual. The third problem, according to Brock, was "Function pay is showing up as gratuities on the ADP reports". Complainant stated that this was a mistake that occurred while he was on vacation, as a result of the incorrect code being placed in the computer by one of his replacements. Brock also noted that union dues continued to be deducted from non-union employees' payroll. Complainant responded that this mistake occurred while he was on vacation, and was continuing because ADP's master file was different from Wyndham's, but the correction could not be made until an upcoming upgrade from ADP was instituted. The fifth error was that a specific employee received incorrect pay. Complainant acknowledged that this was his error and he corrected it. Complainant also stated that he met with Brock and discussed these matters, believing they had been resolved.

13. Complainant stated that from the time of Wyndham's takeover in April 1993, there was increasing tension, and a great deal of turnover. On or about September 17, 1993 Complainant delivered a handwritten memorandum to Personnel Director Robert Brunson, entitled "Payroll Problems". Complainant wrote, "On September 16th, the largest most complex payroll that I've ever handled was issued. As expected, because of the size (660 records sent) hundreds of banquet entries, etc, errors were anticipated. Some occurred, but only one was my direct input mistake. The request for a manual check from the Controller, Abbe Walter, led to a disciplinary reaction on her part, reprimanding me for not doing an audit..." The letter went on to state that Walter was "overly critical, causing stress and anxiety...contributing to the resignation of [several employees in accounting]..."

14. On August 22, 1993, Complainant prepared a handwritten memorandum regarding "sick leave" addressed to Robert Brunson. Complainant wrote on the memorandum that he did not deliver it to Brunson until September 20, 1993. In the memorandum, Complainant wrote, "Since the April 1st takeover of the Copley Plaza, the level of tension and stress has seemed to intensify affecting all . . . levels of employee job performance. From the front desk, concierge, accounting, the turnover evidences the inability to react to constant auditing and probing."

15. On October 20, 1993, Walter received a memorandum from Patsey Campbell in Wyndham's Corporate Employee Benefits Department, stating that Complainant had failed to arrange for deductions to be taken from an employee's pay in order to repay a 401(k) loan, resulting in the loan being in default.

16. Abbe Walter arranged for Sandy Klinkers, another Wyndham controller, to come to Boston to work with Complainant from October 1993 through January 1994, to assist him in catching up with balance sheet items such as manual paychecks and garnishments.

17. On November 9, 1993, Complainant met with Walter and Brunson to discuss the July 14th task list and ongoing job issues. Complainant said he "felt good" at the meeting. Brunson testified that at the meeting, Complainant asked for additional help to accomplish his tasks and was enthusiastic about doing things correctly. Complainant later told Brunson that "I've got to get it turned around" in order to get the job done. Complainant again requested assistance.

18. On November 11, 1993, Walter wrote a memorandum to Complainant's file regarding the November 11 meeting. In her memorandum, Walter stated, in part, that she: "...again reiterated to [Complainant] that a thorough follow through on all policies procedures and tasks associated with the payroll function is essential...[Complainant] indicated that he felt the workload was too heavy and the (sic) he had not had time to set up the systems. We discussed that yet another Success Team member had been brought to the hotel to address with him one-on-one the various requirements of Payroll Manager, especially as we are embarking on the installation of the Tridata computerized time clock system... I made it quite clear to [Complainant] that...it is required that he complete in a timely manner." (J-5)

19. In November 1993, Complainant's office was moved to a cubicle in the accounting office, his computer access was reduced from two computers to one, and his storage facilities were reduced to one file drawer instead of the six to eight cabinets in his former basement office. Complainant stated that because the accounting office was on a different floor and on the opposite side of the Copley Plaza, it was necessary for him to return to his former office in order to refer to his records. Walter testified that Complainant's office was moved closer to the accounting department and to his imme-

diate supervisor, Claude Brock and the other accounting personnel with whom he regularly interacted.

20. Walter stated that at his new location, Complainant had use of a computer containing software from ADP, the hotel's outside payroll processing service, and Lotus spreadsheet software for preparing vacation accrual reports. When Wyndham installed its new "Tridata" system in November, 1993, the software from that system was also installed on this computer. Walter testified that Complainant also had access to computerized employee personnel records on this computer.

21. In November 1993, a new time clock system, "Tridata", was installed. Before the Tridata system was introduced, Complainant was responsible for weekly entering into the computer the total number of hours worked each week by every employee. When the Tridata system was implemented, Complainant became responsible for entering daily the corrections that department managers made manually on computer-generated printouts of the hours worked each day by the employees in their departments. The information on the computer printout was generated by employees "swiping" their magnetic coded identification cards through the time clock. Each morning, department managers received a printout which they were responsible for reviewing and on which they were to hand-write any corrections or changes. The managers were to return to Complainant the printouts by 10:00 a.m. each day. Complainant was then responsible for inputting the corrections into the computer on a daily basis. By making the corrections on a daily basis, department managers would have a second chance to review the reports to make sure the corrections were done accurately when they received the next day's report. Complainant testified that the Tridata system resulted in a lot of extra work for him.

22. Brunson testified that he made a number of suggestions to Complainant about how to better manage his responsibilities under the Tridata system. He told Complainant that he did not need to input changes of seven minutes or less either before or after an employee's shift because the computer would automatically make those changes. He also recommended that Complainant perform some training for department managers regarding the Tridata system so that neither he nor the manager would perform unnecessary work in using the new system. Complainant did not follow up on either suggestion.

23. Complainant did not input corrections on a daily basis as he had been directed to do. As a result, department managers were re-writing corrections for days that had previously been submitted to Complainant. During the first week of January 1994, Walter testified that she received numerous complaints from department managers about Complainant's failure to enter their corrections on a daily basis.

24. Walter testified that at the beginning of January, 1994, she reviewed the year-end financial statements, at which time she observed that a number of tasks for which Complainant was responsible had either not been performed or had been done incorrectly. After discussions with Brunson and the hotel's general manager, on January 14, 1994, Walter prepared a memorandum detailing Complainant's failure to timely complete his assigned responsibilities and instructing him that his employment was terminated. On January 17, Walter and Brunson met with Complainant and informed him that his employment was terminated. Complainant's response was "Why am I not surprised?"

25. After Complainant's termination, his position was filled by Dolores Worthen, who was then in her 20s. Walter testified that Worthen was assigned the same kinds of duties as Complainant. Walter stated that Worthen was given the title "Payroll Coordinator". Because the function of the position was "predominantly data entry" with no managerial responsibilities, the position was changed from a salaried, managerial position to an hourly position.

26. Between May 14, 1993 and July 18, 1994, sixteen management and accounting employees left the Copley Plaza either voluntarily or involuntarily, including Sawin (then age 43) and Complainant (then age 57). Of the 16, eight were 40 years of age or older.

27. Francis Jonah, whose date of birth is 7/22/34, was employed in the Accounting department when Abbe Walter arrived and continued to be employed at the time of the hearing. Prior to July 1994, Walter hired two people to work in the Accounting Department who were over the age of 40; Stuart Schneiderman, Chief Night Auditor, whose date of birth is 5/15/51 and Stanley Spiegelman, Night Auditor, whose date of birth is 9/15/41.

III. CONCLUSIONS OF LAW

In order to establish a prima facie case of age discrimination, Complainant must show that (1) he was a member of a protected class, (2) that he performed his job at an acceptable level, (3) that he was terminated, and (4) his employer sought to fill his position by hiring another individual not of his protected class. *Wheelock College* v. *MCAD*, 371 Mass. 130, (1976). Once the complainant has established a prima facie case of age discrimination, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reasons for its action, and to produce credible evidence of the underlying facts in support of that reason. *Wheelock College, supra*. Once the employer has articulated legitimate, non-discriminatory reasons for its conduct, the Complainant has the burden of demonstrating that the employer's reason for the termination was not the real reason, but instead was a pretext for unlawful discrimination. *Wheelock, supra*. I conclude that Complainant has established a prima facie case of age discrimination. Complainant was 58 years old when Wyndham took over the management of the hotel and was when he was terminated. Complainant had been performing his job satisfactorily for several years before Wyndham assumed the management of the Respondent. Complainant also established that he was replaced by a woman in her 20s.

Respondent's legitimate, non-discriminatory reasons for terminating Complainant were his failure to perform his duties and complete his tasks as assigned. Respondent presented credible evidence that over a six month period, Complainant failed to adequately perform several of his assigned duties, and that his supervisors met with him several times in an attempt to clarify his duties. Complainant has failed to establish that Respondent's articulated reasons were a pretext for unlawful discrimination. Complainant argues that this increase in duties was an attempt to force him out of his position because of his age. Although Complainant established that his

responsibilities increased under Walter's supervision, these duties were appropriate for the paymaster function, and were assigned consistent with Wyndham's procedures, and in conjunction with the installation of an automated timekeeping system. In addition, over a six-month period, Wyndham assigned two employees from other locations to temporarily assist Complainant with overdue work that had not been completed, and to assist Complainant in making the transition to the new timekeeping system. I do not believe that Wyndham would have put so much time and effort into assisting Complainant with his duties if its plan was to force him out of his job, or to terminate him. Therefore Complainant has failed to persuade me that Respondent's articulated reasons for terminating his employment were a pretext for unlawful age discrimination.

Complainant also presented some direct evidence of age discrimination, that a Wyndham employee circled the names of long-time employees and commented that they had to do something about these people. However, Wyndham presented a credible explanation for "red-lining" employees, that this was a company policy regarding employees receiving over a certain salary. The other statement "we've got to get rid of these old people" or words to that effect, from an unnamed manager in the food and beverages department was vague and isolated. Complainant has failed to persuade me that such comments, if made, evidence the intent to rid the company of employees in the protected class or had any causal connection to his termination. Moreover, it was demonstrated that Walter maintained accounting employees in Complainant's protected class, and hired accounting employees who were in the protected class.

In conclusion, I am not persuaded that the evidence offered by Complainant proves that the reasons articulated for his termination are not the real reasons, and I decline to find that his termination constituted a violation of M.G.L. c 151B.

IV. ORDER

Based on the foregoing findings of fact and conclusions of law, I hereby order the complaint in this matter dismissed.

Any party aggrieved by this order may file a Notice of Appeal to the Full Commission within ten days of receipt of this order and an Petition for Review to the Full Commission within thirty days of receipt of this order.

So ordered this 6th day of May, 1999.

* * * * * *

---

DAVID KLEKOTKA

v.

CARLIN COMBUSTION TECHNOLOGY, INC.

Docket No. 93-SEM-0579

*May 10, 1999*
*Lindsay Byrne, Hearing Officer*

---

*Cynthia J. Turnbull, for the Complainant*
*Steven D. Ostrowsky, for the Respondent*

A gay man employed as an assembler for a technology firm failed to prove his demotion and termination were grounded in unlawful sexual-orientation discrimination where the employer offered valid performance-based defenses and the examples cited of a hostile environment were isolated or not credible.

### DECISION OF THE HEARING OFFICER

I. PROCEDURAL HISTORY

On November 3, 1993, the Complainant, David Klekotka, filed a complaint with this Commission alleging sexual orientation harassment and discrimination in the terms and conditions of employment based on sexual orientation in violation of M.G.L. ch. 151B, Section 4(1). An amended complaint was filed with this Commission on April 11, 1995, adding allegations of sexual orientation harassment regarding homophobic graffiti in the workplace and constructive discharge.

Specifically, the Complainant alleges that he was subjected to sexual orientation harassment in 1993 by a supervisor, Carmen Burroughs, and that even if Carmen Burroughs was not a supervisor, Respondent failed to adequately investigate the harassment; that he was subjected to a discriminatory demotion on 9/3/93; that his employer failed to adequately investigate homophobic graffiti during the summer of 1994, creating a hostile work environment; and that he was subjected to a discriminatory termination/constructive discharge based on his sexual orientation. A Finding of Probable Cause was issued on August 15, 1995. Conciliation efforts were unsuccessful, and the matter was certified for public hearing on September 21, 1995.

A public hearing was held before me on July 29, 1998, July 30, 1998, and October 1, 1998. Both parties were represented by counsel. The parties submitted proposed Findings of Fact and Conclusions of Law on December 7, 1998. To the extent that the proposed findings are consistent with the evidence and in accord with the findings herein, they are accepted; to the extent that they are not, they are rejected. Certain proposed findings and conclusions have been omitted as irrelevant or unnecessary to a proper determination to the material issues presented. To the extent that testimony of various witnesses is not in accord with the findings set out below, such testimony is not credited.

# EXHIBIT 16

Westlaw.

Not Reported in N.E.2d
17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)
(Cite as: 2004 WL 231311 (Mass.Super.))

Page 1

C

Superior Court of Massachusetts.
Charles J. COURTOIS
v.
LEGAL SEAFOODS, INC. and Bruce Cartwright.
No. 03-2752.

Feb. 6, 2004.

MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

JUDITH FABRICANT, Justice.

INTRODUCTION

*1 This action arises from the termination of the plaintiff's employment with the defendant Legal Seafoods, Inc. The plaintiff alleges that his termination was caused by discrimination on the basis of age and handicap, and retaliation for the exercise of his right to claim workers compensation benefits for workplace injuries. Presently before the Court is the defendants' motion for summary judgment as to all counts of the complaint. For the reasons that will be explained, the motion will be allowed.

BACKGROUND [FN1]

FN1. The facts presented derive primarily, although not exclusively, from the parties' statements pursuant to Superior Court Rule 9A(b)(5). The plaintiff has moved to strike the defendants' statement, contending that it does not accurately reflect the evidentiary material offered in support of it, and also raising certain evidentiary objections to certain materials offered. The Court finds the evidentiary objections raised without merit. The Court has examined the entire record, and concludes that the evidentiary material submitted does support the defendants' factual assertions, although in some instances the particular citations provided are not precisely accurate. For those reasons, the motion to strike is denied. The plaintiff's response to the defendants' Rule 9A(b)(5) statement does not identify any evidentiary material contradicting the defendants' assertions of fact. The plaintiff does present certain additional facts on which he relies, although he does not do so in the manner prescribed by the Rule. The facts presented here include those supported by the evidentiary material submitted that the Court deems pertinent to the issues presented by the motion.

The record, considered in the light most favorable to the plaintiff, provides the following factual background. The plaintiff, whose date of birth is March 17, 1958, worked for Legal Seafoods, in its Seafood Operations Department, from 1987 until his termination on June 30, 2000, at age 42. He held various positions over the years; at the time of his termination he was a Fish Department Manager.

Until early 2000, the Seafood Operations Department had responsibility for both purchasing and processing fish, lobster, and other seafood products. The department was headed by the plaintiff's brother-in-law, Arthur Kloack, who held the title of Vice President of Seafood Operations. [FN2] Kloack reported directly to the president of the company, Roger Berkowitz. Kloack supervised three managers: the plaintiff; Noel James, whose date of birth is September 7, 1959; and Bill Holler, whose date of birth is September 17, 1963.

FN2. Kloack's age does not appear in the record. He testified in his deposition that he graduated from high school in 1974, suggesting that he is approximately two years older than the plaintiff, who graduated from high school in 1976.

The record includes somewhat varying versions of the distribution of responsibilities among the plaintiff, James and Holler, and of their skills and performance. Kloack's affidavit gives this version as to the plaintiff:

Chuck primarily handled the office, taking orders from the restaurants, handling the telephones, and doing other paperwork. Chuck also attended seafood auctions once or twice a week over the last year since another employee retired, and he did some buying under my guidance. Chuck also occasionally supervised the production line when Bill Holler was not in. Chuck's performance on office duties was excellent, but he did not have strong leadership skills, needed to improve on

Case 1:04-cv-11024-RWZ   Document 23-8   Filed 07/08/2005   Page 6 of 6

Not Reported in N.E.2d                                                                                                          Page 2
17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)
**(Cite as: 2004 WL 231311 (Mass.Super.))**

decision-making, planning and follow-through, and he had some trouble dealing with managers outside the department. Chuck had opportunities to go to the next level as a manager in terms of handling employees, other managers and business decisions, but did not carry himself well.

Kloack conducted performance evaluations of the plaintiff in March of 1997, 1998, and 1999. He gave the plaintiff ratings rather more generous than the evaluation reflected in his affidavit; in 1997, Kloack rated the plaintiff "excellent" in five performance categories, and "outstanding" in attendance; in the latter two years Kloack rated the plaintiff "outstanding" in all six categories. [FN3]

> FN3. The categories rated on the evaluation form are attendance, job knowledge and performance, teamwork, cost control, hygiene/sanitation, and growth potential.

Regarding Noel James, Kloack's affidavit indicates that he "ran the operation on weekends, and supervised seafood transport and receiving, and the production line on the days he worked during the week. Noel ... has excellent people management skills. He shows particular strength in production and is the best manager to work on weekends given his knowledge of the buildings and systems from having worked in other departments." Bill Holler, according to Kloack's affidavit, "came to the company after five years running his own fish processing business and several years managing the daily operations of another wholesale fish processing business. Bill had primary responsibility to oversee receiving and production.... Bill was self-sufficient in performing his duties and showed leadership qualities."

*2 The plaintiff's deposition testimony casts the roles and qualities of the three in a slightly different light. According to the plaintiff, before James and Holler joined the department, he and Kloack shared functions. The plaintiff testified,

> I was still taking in, receiving lobsters, getting lobster prices, doing a little buying through Bill Conte. If he saw that he wanted something, I would make a phone call and purchase them. I would run the guys on the floor. I would run the guys in the office. Basically, me and Arthur kind of intertwined each other because Arthur was sometimes pulled into the fish pier in the morning, so I would be the guy in charge of the operation while he wasn't there. When he was there, we kind of took on the responsibilities together with Arthur being the lead person.

Later, according to the plaintiff, various other people were hired into the department. The plaintiff's role was "training the new guys that came on and taking care of the daily operation." When Bill Holler was hired, the plaintiff testified, "I had trained Billy to do some of the office paperwork, to do the purchase orders, to answer the phones for the restaurants, write some of the sheets that are filled out for product going to the restaurants. It was a big training procedure ... I was training him and running the daily operation.... After Bill was trained, I went back up to Gloucester and started buying fish again ... and Noel James also worked on the floor. They would both kind of bounce from receiving product and running the floor and the office paperwork."

Kloack's deposition testimony confirms some aspects of the plaintiff's version; Kloack testified that the work involved a lot of "teamwork," that various duties were shared, that the plaintiff had "somewhat" of a role in instructing new employees in the department, and that the plaintiff was capable of performing the tasks that Holler and James performed. The plaintiff, according to Kloack's deposition testimony, did more paperwork than the others "Because Chuck worked primarily in the office.... He was the senior man ... in the management side of it." [FN4]

> FN4. James, it appears, had been with the company longer than the plaintiff, having worked in other departments, but had shorter tenure in the Seafood Department.

The plaintiff experienced certain work-related injuries during his employment with Legal Seafoods, according to his deposition testimony. Sometime early in his years with the company, he had a back injury that kept him out of work for four months. When he returned, Kloack and various co-workers made comments about the burden on others resulting from his absence. From then on, according to the plaintiff's deposition testimony, his co-workers made comments such as " 'Watch out. Don't hurt your back' or 'Watch out. He is going to go out for another couple of months.' " When asked at his deposition whether he suffered any adverse consequences in his employment as a result of the injury, the plaintiff cited only these comments from co-workers. The record provides no documents regarding this injury, or any claim for benefits of any kind arising from it, nor did the plaintiff testify regarding any claim for benefits.

*3 The plaintiff had a second back injury in 1997. He testified that he did not recall whether he lost any