Not Reported in N.E.2d
17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)
**(Cite as: 2004 WL 231311 (Mass.Super.))**

Page 3

time from work. Asked whether he suffered any adverse consequences in his job because of the injury, he responded "no, not really, no." A third back injury occurred in 1998. The plaintiff testified that he did not lose any time from work after the 1998 injury, and did not recall any adverse consequences in the job in connection with that injury. In January 1999, the plaintiff suffered a cut finger at work. He testified that did not lose any time from work, and he did not recall suffering any adverse consequences in his job. He offers documents that appear to reflect workers compensation claims for these three injuries. [FN5]

> FN5. The documents are less than self explanatory, and are not accompanied by any affidavit.

In his deposition testimony the plaintiff recalled two other work-related injuries, one to his rotator cuff and one to the back of his foot. He did not identify the timing of either. He did not lose any work time in connection with either of those injuries. Asked whether he suffered any adverse consequences in the job from the rotator cuff injury, the plaintiff answered "yes," but did not elaborate. As to the foot injury, the plaintiff recounted that his complaints to the effect that the injury had been caused by a lack of training of employees elicited "a little bit of irritability in the management." He offers no documents regarding these injuries, or any claim for benefits arising from them. The plaintiff does not contend, and has not offered any evidence to indicate, that any of his injuries resulted in impairment of any major life activity.

In 1999, the company's independent auditor, Deloitte & Touche, conducted an examination of the company's purchasing and processing operations. The auditor presented the results of its examination in a report dated February, 2000, entitled "Procurement Process Controls Review." The auditor recommended, among other changes, that the company "Segregate purchasing and receiving/operational responsibilities for control purposes." [FN6]

> FN6. The plaintiff has moved to strike this document on hearsay grounds. The document is not hearsay, as it is not offered to prove the truth of any matter asserted. Rather, it is offered, and considered, merely to show that the recommendation was made by the outside auditor. The plaintiff also objects to the defendants having submitted a redacted copy of the document. In response, the defendants have now submitted an unredacted copy. Comparison of the two reveals nothing pertinent to the issues presented by this motion that is excluded from the redacted version.

The company adopted the auditor's recommendation. In April of 2000, Berkowitz informed Kloack that he would no longer have responsibility for processing, but would be responsible only for purchasing. Kloack's title changed to Vice President of Seafood Buying, and he no longer supervised any employees. He assumed responsibility for paperwork related to the purchasing function himself. At about the same time, the company hired William Struzziery as Executive Director of Seafood Production. [FN7] Struzziery was placed in charge of the processing functions, and assigned the role of supervising the three managers who had previously reported to Kloack: the plaintiff, James and Holler. Struzziery reported to Chief Financial Officer Bruce Cartwright, as well as to Roger Berkowitz.

> FN7. The record does not indicate Struzziery's date of birth. He testified at his deposition that he graduated from high school in 1973, suggesting that he is about three years older than the plaintiff.

Soon after assuming his position, Struzziery promoted Bill Holler to the newly created position of Director of Seafood Production. James and the plaintiff remained in their positions as Fish Department Managers, reporting to Struzziery. At some point during this period, according to the plaintiff's deposition testimony, Struzziery inquired about the plaintiff's back, asking "how are you going to check the fish in Gloucester." The plaintiff responded that "they had a driver with me for a while, a driver and a helper." Other than this exchange, the plaintiff testified, no one with supervisory responsibility over the plaintiff made any comments about the plaintiff's back injury.

*4 Struzziery used his first weeks on the job to form impressions of his department and its personnel. He recites in his affidavit:
> Upon observing the seafood processing operations for several weeks during the reorganization, it became apparent to me that the Seafood Production Department did not need a separate employee, and certainly not a highly-paid Fish Department Manager, to handle the office duties. I recommended that we eliminate one of the two Fish Department Manager positions. I had

observed Noel James performing his duties in supervising transport, receiving, and the production line, and I concluded that he has strong leadership skills and a good relationship with the employees on the production line, has good knowledge of the seafood operations and other departments, is efficient and results-oriented. I had observed that Chuck Courtois did not have these same qualifications, and he avoided independent decision making responsibilities, and did not have a good relationship with subordinates or other managers in the Company. I therefore recommended that Noel James be retained and that Chuck Courtois, who had been performing the office duties, be laid off as a result of the reorganization.

Struzziery's deposition testimony is generally consistent with this recitation, although less definitive. He testified that "I felt we were administratively heavy. The duties being handled at that time were more useful to be done out on production floor; and that for the administrative duties a manger may not be necessary to handle whatever administrative duties were inside the operation." In observing the three managers, Struzziery testified, he determined that Holler was "technically as far as dealing with fish, very strong. Results oriented, that he could see fish, know fish, and make a quick, honest decision type of evaluation of what needed to be done next." The plaintiff, in Struzziery's opinion did not "see fish and know fish as well." Holler, according to Struzziery, was an "independent thinker, would make a decision on his own." James, in Struzziery's view, had "overall knowledge of the company and production areas and employees, seemed to have a great rapport with all the employees and a good knowledge of what everything was." The plaintiff's strength, according to Struzziery, was "knowledge of the inside workings of the office, dealing with the restaurants." He also had knowledge of "the work on the floor" and of the fish products, but he had weakness with respect to "independent thinking," in that he "would want to consult with people on certain issues, want to talk it out type of thing."

On Saturday, April 29, 2000, the plaintiff began to experience symptoms of illness. On Monday, May 1, 2000, he was diagnosed with campylobacter J infection, described by Legal Seafood's Director of Quality Control as "a common food-borne illness." The plaintiff remained out of work until Wednesday, June 28, 2000. He applied for and was granted benefits through the company's short-term disability insurance. On the application form, he and his physician checked boxes indicating that the disability arose from "an illness," and did not check boxes indicating that it was work-related. The hospital's billing department, however, attempted to collect from Legal Seafoods, apparently based on information provided by the plaintiff to the effect that his condition was work-related. The company rejected the claim, responding that the condition was "not work related." The plaintiff did not file a worker's compensation claim in connection with the illness.

*5 The plaintiff now takes the position that he contracted the infection from chicken consumed at the company's commissary at lunch on the Friday before his symptoms appeared. His support for this contention is that he ate breakfast and lunch at the cafeteria during the week; although he had dinner at home, no one else in his family became ill; he had pizza out on Saturday, before his illness appeared, but his doctor said pizza could not have been the cause because pizza is cooked at high temperature; and "it is very, I guess known, that chicken product is a cause of campylobacter J." [FN8] The defendant denies this contention, and offers the opinion of its Director of Quality Control, trained in "Food Science," that the plaintiff could not have contracted the illness at work because other employees ate the some food and no others became ill.

> FN8. The plaintiff does not indicate the basis of this belief, which obviously is not competent evidence. The plaintiff's recitation of his doctor's opinion regarding pizza is similarly inadmissible.

Struzziery gave his evaluation of the three managers to Cartwright, along with the recommendation "that we were top-heavy in the department." Struzziery expressed to Cartwright his opinion that the plaintiff's duties could be reassigned without difficulty. When asked by Cartwright who would assume those duties, Struzziery testified, he responded that they would be shared or, if necessary, a part-time administrative person would be hired. According to the deposition testimony of both Cartwright and Struzziery, their conversations about the decision included no reference to the ages of any of the three, or to any injuries or illnesses. [FN9] Kloack was not consulted about the decision to terminate the plaintiff. The decision was, however, consistent with his views of the relative merits of the three managers; he states in his affidavit: "If I were to choose between Chuck, Noel and Bill to run my business, I would choose Bill Holler."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                        Page 5
17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)
(Cite as: 2004 WL 231311 (Mass.Super.))

> FN9. Nothing in the evidence indicates that Cartwright had any knowledge of the plaintiff's injuries or illness.

When the plaintiff returned to work after his illness on June 28, 2000, he found that Struzziery had become a vice president, and that Bill Holler had become a director. According to the plaintiff's deposition testimony, he asked Struzziery if he still had a job. Struzziery replied "yes, you do have a job, and I will just tell you one thing right now, if you fuck with me once, that will be the last time that you ever fuck with me because you won't be there." The plaintiff understood this statement to indicate that Struzziery "was fearful for me, 13 years at Legal, and I'm training him." The plaintiff testified that he was upset that Struzziery had been hired "over" him, in light of his seniority and hard work for the company.

Cartwright informed the plaintiff of his termination on Friday, June 30, 2000, two days after his return to work. The termination took effect that day, although the plaintiff was provided with a severance package, the details of which do not appear in the record. Since the plaintiff's termination, the company has not hired anyone to perform the administrative tasks he previously performed; those duties have been divided among Holler, James, and Struzziery.

*6 At the time of the termination, according to the plaintiff's deposition testimony, Cartwright commented, "At your age you are still very marketable." [FN10] The plaintiff disagrees; his view, as expressed at his deposition, is that "at 43 years old I was all used up [FN11].... I mean, if I had to show all these records to a new employer, do you think they were going to hire me.... All these injuries happened at Legal, and the amount of time that I was out while I was trying to do my job, I was all used up." No evidence indicates that anyone at the company ever said that the plaintiff was "all used up"; as far as the evidence discloses, that phrase is his alone.

> FN10. Cartwright's age does not appear in the record. He testified at his deposition that he graduated from high school in 1966, suggesting that he is about ten years older than the plaintiff.

> FN11. The plaintiff was 42 at the time of his termination.

The plaintiff filed a charge with the Massachusetts Commission Against Discrimination on October 19, 2000, naming both the company and Cartwright. He alleged that his termination resulted from discrimination on the basis of disability and age, in violation of G.L. c. 151B, §§ 4(16) and 4.1B, and retaliation. His charge did not specify the conduct for which he alleged the employer had retaliated. The plaintiff brought this action on June 30, 2003, again naming both the company and Cartwright. His complaint alleges age discrimination (count I), "Knowing Violation of the Age Discrimination Act" (count II), disability discrimination (count III), and "Unlawful Retaliation," (count IV) as to both defendants, and malicious interference with advantageous relations against Cartwright alone. Defendants have moved for summary judgment on all counts of the complaint.

## DISCUSSION

This Court grants summary judgment where there are no genuine issues of material fact and the record entitles the moving party to judgment as a matter of law. See Mass. R. Civ. P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of establishing that there is no dispute of material fact on every relevant issue. See Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a genuine dispute of material fact for trial either by submitting affirmative evidence negating an essential element of the non-moving party's case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

Once the moving party establishes the absence of a triable issue by either of these methods, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson, 404 Mass. at 17. The opposing party may not rest on the allegations of the pleadings, nor may he rely on "bare assertions and conclusions regarding [his own] understandings, beliefs, and assumptions." Key Capital Corp. v. M & S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989). Mere contradictions of factual allegations, without evidentiary support, are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. Madsen v. Erwin, 395 Mass. 715, 721 (1985), quoting Olympic Junior, Inc. v. David

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11024-RWZ    Document 23-9    Filed 07/08/2005    Page 4 of 7

Not Reported in N.E.2d                                                                                                Page 6
17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)
**(Cite as: 2004 WL 231311 (Mass.Super.))**

*Crystal, Inc.*, 463 F.2d 1141, 1146 (3rd Cir.1972) (noting that conclusory statements, denials, and allegations are insufficient to raise material issues of fact). The opposing party's obligation, rather, is to demonstrate the existence of admissible evidence sufficient to meet his burden of proof on the issues raised by the motion.

*7 In deciding motions for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility or find facts. See *Dawes*, 369 Mass. at 553; Mass. R. Civ. P. 56(c); *Colley v. Benson, Young & Downs Insurance Agency, Inc.*, 42 Mass.App.Ct. 527, 528 (1997); see also *Kelley v. Rossi*, 395 Mass. 659, 663 (1985). In cases "where notice, intent, or state of mind questions are at issue" summary judgment is often, but not always, inappropriate. See *Brunner v. Stone & Webster Engineering Corp.*, 413 Mass. 698, 705 (1992) (further citations omitted); compare *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129-135 (1997) (upholding summary judgment for defendant in employment discrimination case, where plaintiff provided no evidence to support a finding of pretext).

**1. Age Discrimination.**

To meet his burden of proof at trial on his claim of age discrimination, the plaintiff must present evidence from which the jury could find four elements: (1) that he was a member of the protected class, in that he was age forty or over; (2) that he was terminated or otherwise subjected to adverse employment action; (3) that the employer held an age-based discriminatory animus; and (4) that the discriminatory animus caused the adverse employment action. See *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 506-508 (2001); *Abramian v. President & Fellows of Harvard College*, 432 Mass.107, 116-118 (2002). In the absence of direct evidence as to the latter two elements, a plaintiff may prove those elements by inference, based on the three-stage analysis initiated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and adopted and applied in a series of Massachusetts cases, most recently in *Knight v. Avon Products, Inc.*, 438 Mass. 413, 420-427 (2003). In the first stage, the plaintiff must establish a *prima facie* case, by presenting evidence that he was forty or over, that he had performed his job at an acceptable level, that he was terminated, and that he was replaced by a similarly or less qualified person who was at least five years younger. See *id.* at 421, 425.

Here, since the record provides no direct evidence of age discrimination, the plaintiff must proceed by way of the pretext analysis. The evidence clearly meets the first three elements of the *prima facie* case: the plaintiff was forty-two, he was terminated, and he was performing acceptably. The fourth element is more problematic. The plaintiff was not replaced in any direct sense; no one was appointed to fill the position he had held. Instead, that position was abolished, and the duties he had performed were parceled out among three people: Struzziery, James, and Holler. [FN12] One of the three, Holler, was five and a half years younger, just barely meeting the substantiality requirement as established in *Knight, supra*. As to qualifications, Holler had less seniority than the plaintiff with Legal Seafoods, but more experience in management, having run his own seafood business and managed another. [FN13] Perhaps more important, Holler had the confidence of his superiors to a degree that the plaintiff did not; both Kloack and Struzziery were of the view that Holler was better able than the plaintiff to make independent decisions and to exercise leadership. The plaintiff has offered nothing to indicate that any supervisor held a contrary view, nor does it appear that the plaintiff had any superiority in objective credentials so as to outweigh these subjective evaluations. [FN14] The plaintiff's effort to make a *prima facie* case is thus tenuous at best; if his initial showing supports any inference at all, the inference is weak. See *Knight, supra,* at 423.

>  FN12. Kloack, according to the evidence, had already assumed some of the duties the plaintiff had performed before the reorganization, since Kloack himself took on the administrative aspects of the fish purchasing function.
>
>  FN13. The plaintiff has not offered evidence that Legal Seafoods made a practice of basing employment decisions on seniority within the company.
>
>  FN14. The performance review forms do not make any specific inquiry regarding leadership and independent decision-making, although these qualities might be thought relevant to the category of growth potential. The record does not contain Holler's performance reviews, so no comparison with the plaintiff's is available.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d  
17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)  
(Cite as: 2004 WL 231311 (Mass.Super.))

Page 7

**\*8** If the plaintiff's evidence is viewed as meeting the requirement of a *prima facie* case, the next step is the employer's effort to rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for the termination. See *Knight, supra,* at 420, n. 4. The defendants here have demonstrated their ability to do that by offering evidence that they terminated the plaintiff to eliminate an unnecessary position, and that they chose the plaintiff for termination, rather than Holler, based on characteristics that, while subjective, are work-related and lawful. To meet this response and preserve the inference of discrimination based on the *prima facie* showing, the plaintiff must present evidence from which a reasonable jury could find that the employer's asserted reason was not the real reason, but a pretext. This the plaintiff cannot do with the evidence offered here. As indicated *supra*, he offers nothing to contest the defendants' evidence that the employer abolished his position, and nothing beyond his own opinion to rebut the defendants' showing of his superiors' judgment of his qualities as compared with those of Holler. [FN15] The plaintiff therefore cannot meet his burden of proof of the elements of discriminatory animus and causation based on a pretext theory, and his claim of age discrimination must be dismissed. See generally, *Bruce v. Town of Wellesley,* 47 Mass.App.Ct. 800, 805 (1999); *Wooster v. Abdow Corporation,* 46 Mass.App.Ct. 665, 673 (1999); *Gregory v. Raytheon Service Company,* 27 Mass.App.Ct. 1170, 1171 (1989).

> FN15. Viewing the organization chart on a somewhat broader time frame, comparing early 2000 with July of that year, one might perceive that the company did not actually reduce the total number of positions performing the fish purchasing and processing functions, but merely substituted Struzziery for the plaintiff. This way of looking at the facts does not assist the plaintiff, because Struzziery is older than the plaintiff.

**2. Handicap Discrimination.**

The elements of a claim of handicap discrimination are similar to those of age discrimination. First among them is that the plaintiff is a member of the protected class--that is, that he is a qualified handicapped person within the meaning of G.L. c. 151B. Under c. 151B, § 1(17) the term "handicap" means, "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; (c) or being regarded as having such impairment." Major life activity is defined in § 1(20) as "functions, including, but not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." See generally, *City of New Bedford v. Massachusetts Commission Against Discrimination,* 440 Mass. 450, 461-466 (2003); *Labonte v. Hutchins & Wheeler,* 424 Mass. 813, 821 (1997). The impairment must be long-lasting or chronic; a temporary disability of short duration does not qualify. See *Hallgren v. Intregrated Financial Corporation,* 42 Mass.App.Ct. 686, 687-689 (1997). Where the claimed impairment is alleged to limit the major life activity of working, the plaintiff must show that his condition significantly restricts him from performing not only a particular job, but "a class of jobs or a broad range of jobs in various classes." *City of New Bedford,* supra, at 464. These requirements apply not only to the first prong of the definition, but to the "record of" and "regarded as" prongs as well; thus, to establish membership in the protected class based on those prongs, a plaintiff must show that he has a record of having a long-term impairment that substantially limited his participation in a major life activity, or that his employer regarded him as having such a condition. See *City of New Bedford,* supra, at 462.

**\*9** The evidence offered here indicates that, over the thirteen years of his employment with Legal Seafoods, the plaintiff suffered several injuries and one infection, that some of these conditions kept him out of work for some period of time, the longest such period being four months early in his tenure with the company, and that he returned to work after each such period. Nothing in the record indicates that any of these conditions ever substantially limited the plaintiff's ability to perform any class of jobs, or to engage in any other major life activity. Nor, despite the plaintiff's arguments, does anything in the record suggest that the defendants ever regarded the plaintiff as having any impairment that substantially limited his performance of any major life activity beyond a short-term period. Compare *Dartt v. Browning-Ferris Industries, Inc.,* 427 Mass. 1, 17 (1998) (evidence was "slight" but sufficient to establish that plaintiff was regarded by his employer as having such impairment, where plaintiff had been unable to work for over two years and required two surgical procedures after work-related injury).

The plaintiff relies on G.L. c. 152, § 75B(1), which provides, in pertinent part:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                                  Page 8
17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)
**(Cite as: 2004 WL 231311 (Mass.Super.))**

> Any employee who has sustained a work-related injury and is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of such job with reasonable accommodations, shall be deemed to be a qualified handicapped person under the provisions of chapter one hundred and fifty-one B.

The plaintiff reads this provision as displacing the definition of handicap set forth in G.L. c. 151B, § 1(17). Under that interpretation, anyone who has ever experienced a work-related injury would be a member of the protected class under c. 151B for all time thereafter, without regard to the requirements set forth in that provision. The plaintiff cites no authority for this interpretation.

The defendants propose a narrower interpretation of c. 152, § 75B(1) that is consistent with the language and purposes of both statutes. Under this interpretation, an employee who sustains a work-related injury is entitled to the protections of c. 151B during the time that he is affected by that injury. Thus, an injured employee is entitled to reasonable accommodation to enable him to return to work, and is protected from discrimination based on the injury during the time he is affected by it. Once the injury has resolved, his status is the same as that of all other employees; to invoke the protections of G.L. c. 151B, he must establish the elements required under that statute.

In the absence of any guiding authority on the point, this Court adopts the narrower interpretation, which harmonizes the two statutes in issue. As so interpreted, c.152, § 75B(1), does not assist the plaintiff in establishing a *prima facie* case of handicap discrimination. At the time of his termination, the plaintiff was not suffering from any work-related injury. [FN16] Moreover, even if the requirements of the *prima facie* case were met, as discussed *supra,* the record reveals the plaintiff's inability to prove pretext. Accordingly, the defendants are entitled to judgment as a matter of law on the claim of handicap discrimination.

> FN16. Chapter 152, § 1, paragraph 7(A) defines "personal injury" to include "infectious or contagious diseases if the nature of the employment is such that the hazard of contracting such diseases by an employee is inherent in the employment." The plaintiff does not suggest that a risk of campylobacter infection was inherent in his employment with Legal Seafoods. Even if it were, the infection had resolved prior to his return to work on June 28, 2000.

**3. Retaliation.**

*10 The plaintiff's retaliation claim invokes G.L. c. 151B, § 4.4A. That statute provides, in pertinent part, that it is unlawful "for any person to coerce, intimidate or threaten to interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter." The complaint alleges, without specificity, that the plaintiff "exercised statutory rights permitted and protected under G.L. c. 151B." The record presented on this motion does not identify any conduct of the plaintiff in the exercise of such rights prior to his termination. Indeed, there is nothing whatever in the record to indicate that the plaintiff ever invoked any rights under c. 151B, or engaged in any conduct protected under that statute, prior to his termination.

What the plaintiff did do, apparently, was exercise rights under G.L. c. 152, by seeking worker's compensation benefits in connection with his various work-related injuries, most recently in January of 1999, some seventeen months before his termination. [FN17] That conduct was protected not by G.L. c. 151B, but by G.L. c. 152, § 75B(2), which makes it unlawful for an employer to "discharge, refuse to hire, or in any other manner discriminate against an employee because the employee has exercised a right afforded by this chapter." Although the plaintiff has not pled a violation of that provision, the Court assumes, for purposes of this motion, that he would be permitted to amend his complaint to do so.

> FN17. The record establishes as undisputed that the plaintiff did not make a claim under c. 152 for the campylobacter infection in May of 2000; rather, he received benefits under the employer's short-term disability insurance policy for his time out of work with that illness.

To prove a violation of c. 152, § 75B(2), the plaintiff would have to show a causal connection between his termination and his exercise of rights under c. 152. See *Piderit v. Siegal & Sons Investments, Ltd.,* 55 Mass.App.Ct. 1, 5-6 (2002); see generally *MacCormack v. Boston Edison Co.,* 423 Mass. 652, 662 (1996) (regarding elements of retaliation claim under G.L. c. 151B). "The mere fact that one event followed another is not sufficient to make out a causal link." *MacCormack,* 423 Mass. at 662, n.11, citing *Prader v. Leading Edge Products,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                          Page 9
17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)
**(Cite as: 2004 WL 231311 (Mass.Super.))**

*Inc.*, 39 Mass.App.Ct. 616, 617 (1996). Any inference from sequence alone would be particularly attenuated here, where the most recent protected activity was seventeen months before the termination. Lacking any direct evidence, the plaintiff relies for his retaliation claim, as for his discrimination claims, on a theory of pretext. That theory fails for the same reasons discussed *supra;* the plaintiff offers no evidence to support it.

**4. Malicious Interference.**

The plaintiff's final claim is that defendant Cartwright maliciously interfered with his employment relationship with Legal Seafoods. To recover on that claim, the plaintiff would have to prove, among other elements, that Cartwright acted for an improper purpose, unrelated to any legitimate interest of the employer. See *Sklar v. Beth Israel Deaconess Medical Center*, 59 Mass.App.Ct. 550, 554-555 (2003); see also *Weber v. Community Teamwork, Inc.* 434 Mass. 761, 781 (2001). The only improper motives the plaintiff identifies are the same ones already discussed: discrimination on the basis of age or handicap, and retaliation for the exercise of statutory rights. For the reasons already discussed, the evidence fails to support these contentions. Accordingly, defendant Cartwright is entitled to judgment as a matter of law on the claim of malicious interference.

### CONCLUSION AND ORDER
*11 For the reasons stated, the Defendants' Motion for Summary Judgment is *ALLOWED.* The Plaintiff's Motion to Strike is *DENIED.*

17 Mass.L.Rptr. 296, 2004 WL 231311 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.