UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHCUSETTS

C.A. No. 04-11024-RWZ

JEANNE DEGAN, )
    Plaintiff )
)
v. )
)
GOLDWELL OF NEW )
ENGLAND, INC. and )
R.G. SHAKOUR, INC., )
    Defendants )
)

## PLAINTIFF JEANNE DEGEN'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Jeanne Degen hereby submits her opposition to the Motion for Summary Judgment filed by Defendants Goldwell of New England, Inc. ("Goldwell"), and R.G. Shakour, Inc. (R.G. Shakour). Degen claims the Defendants failed to accommodate her disability and/or retaliated against her for seeking an accommodation (Count I); discriminated against her on the basis of her disability and/or perceived disability (Count II); and discriminated and/or retaliated against Degen because she sought leave under the Family Medical Leave Act ("FMLA") (Count III). Degen, an exceptional performer, was terminated on December 27, 2001, two months after requesting an accommodation and less than one month after applying for FMLA leave. As will be shown, genuine issues of material fact preclude the entry of summary judgment, and this case should be resolved by the finder of fact. Indeed, because elusive concepts of motive and state of mind are at issue, and the jury must weigh the credibility of conflicting explanations, summary judgment in discrimination cases is disfavored. Blare v. Husky Injection Molding Sys.

Boston, Inc., 419 Mass. 437, 439-440 (1995). Further, there is substantial evidence that the Defendants' proffered reason for Degen's termination was false. Lipchitz v. Raytheon Co., 493, 501, 506-508 (2001) (to create an inference of discrimination a plaintiff need only show that one of the employer's proffered reasons is false).

Degen expressly incorporates her Rule 56.1 Statement of Facts in Dispute ("SOF"), on which there are genuine issues to be tried. A brief summary follows:

## I. STATEMENT OF FACTS

1. Goldwell hired Degen on August 31, 1998, as Goldwell's "Artec Brand Manager." Goldwell is a distributor of hair products, and Artec manufactures a line of hair care products, which Goldwell distributed to hair salons. SOF 1.1.

2. Degen was promoted to Artec Brand Manager for the entire New England Region in April 2000 and reported to Sheryl Holladay at Goldwell and Renee Shakour at R.G. Shakour. SOF 1.3, 1.11.

3. Degen was primarily responsible for coordinating Artec product training. Among other responsibilities, she booked education classes and organized workshops with salons and stores that sold to salons; "detailed" with account executives; that is, accompanied them to meetings with their salon accounts and helped them build their business; recruited, hired, and trained Artec educators; and prepared weekly and monthly paperwork for Artec and Goldwell. SOF 1.4. Account executives, not Degen, were responsible for sales and new placements of Artec products. 1.11, 1.61-1.62.

4. Degen drove on Mondays through Thursdays from her home to an agreed-upon site to meet an account executive in the account executive's territory, and from there,

2

they drove to the account executive's scheduled meetings with her salons. Degen usually drove from 1 to 3 hours each way on Mondays through Thursdays. SOF 1.7.

5.  At the time of hire, Degen, who lives in New Hampshire, a 2 to 2 ½ hour drive from Goldwell's office in Holliston, Massachusetts, negotiated to perform her Friday administrative tasks in her fully-equipped home office. Degen's Friday tasks included communicating with educators, account executives, salons, and Artec staff, as well as planning, scheduling, and recruiting responsibilities. Degen also prepared paperwork for reimbursements to Goldwell and R.G. Shakour from Artec, for education on Artec products, which comprised a small percentage of Degen's Friday tasks. SOF 1.5, 1.8.

6.  On June 15, 1999, Degen was injured in a work-related vehicular accident. Degen sustained back and neck injuries and filed a Workers Compensation claim. Goldwell's compensation insurer, CNA, paid Degen's medical bills. SOF 1.9.

7.  Degen's back and neck pain continued, and she was evaluated and treated by several orthopedic surgeons, underwent physical and massage therapy, and was prescribed Vicodin and/or Tylenol #3, both of which are opioids. Even though driving exacerbated Degen's back and neck pain, with four days of driving and Fridays in her home office, she was able to function in her job. SOF 1.10, 1.13.

8.  Degen became concerned about dependence on opioids and was referred to Jan Slezak, M.D., a physician who practices acupuncture, for evaluation and possible non-opioids therapy. In January 2001, Dr. Slezak evaluated Degen's back and neck injuries, determined they resulted from her June 15, 1999 accident, and prescribed a treatment regime, which included acupuncture treatments and weaning from Tylenol # 3. SOF 1.13.

3

9.     In January 2001, Degen began acupuncture therapy on Fridays with Dr. Slezak. She worked in her home office as usual on Fridays, drove 10 to 15 minutes to her therapy, drove home, and was back in her office in approximately one hour. SOF 1.14.

10.    Dr. Slezak advised Degen that in order to facilitate the healing of her back and neck injuries, it was important that she rest her back after the acupuncture treatments and drive as little as possible on Fridays, Saturdays, and Sundays. SOF 1.15.

11.    Degen's performance is not at issue in this case. SOF 1.16-1.17, 1.20-1.23, 1.26, 2.3; *Defs. 'Mem.*, at 28 (waiving "qualified to perform essential functions of job" prong).

12.    On September 1, 2001, David Bakey of Artec, falsely accused Degen of falsifying reimbursement forms that she had submitted. Holladay and Shakour told Degen that Artec was always in arrears in paying reimbursements that it owed to Goldwell and R.G. Shakour and that Bakey's accusation was a ploy to delay payment. As soon as Degen learned of Bakey's accusation, she reviewed the forms; determined that no paperwork was due for 22 of the 25 dates, for which Bakey claimed forms were missing; and submitted corrected forms for the other 3 dates to Bakey. SOF 1.18-1.19, 1.24, 1.25.

13.    During the last week of September 2001, Degen received a voice message that she should come to Goldwell for *a Friday meeting* in Holliston. Degen called Mary Garneau on October 3, 2001 to learn on which Friday the meeting was to be held. Degen told Garneau that she had acupuncture therapy on Fridays related to back and neck injuries from the vehicle accident, and she needed to know the date so she could adjust her therapy session. Garneau said she would find out the date and get back to Degen. SOF 1.28-1.29.

14.     Garneau called Degen back and told her to come to Holliston that Friday, October 5, 2001.  Garneau then asked Degen if she had any "work restrictions."  Degen said, "No."  Garneau asked how much Degen was driving, and Degen said that she was usually driving 1 to 1 ½ hours one way from one destination to another.  Degen said that 1 ½ hour was her comfort zone, a guideline, but she was able to do her job. SOF 1.30.

15.     With Degen's longstanding schedule of 4 days of travel and 1 day in her home office, along with acupuncture treatments and time for her back to recuperate on Fridays, Degen was able to function and to do whatever her job required. SOF 1.31.

16.     Shakour called Degen on October 4, 2001 and angrily asked her why she had refused to come to Holliston for a meeting the next day.  Degen said that she had not refused.  Shakour then said she never knew Degen was in therapy – "I have a company to protect."  Degen then called Garneau, and Garneau said she had told Shakour that Degen was "a liability to the company" and "restricted in her driving." SOF 1.33-1.34.

17.     Degen met with Garneau, John Foundas, and Holladay on Friday, October 5, 2001.  They said they were "mortified" that Degen was undergoing treatments, and they accused her of hiding the fact. Foundas then told Degen that he wanted her *to drive to the Holliston office every Friday* and do her Artec paperwork there until Artec agreed to accept Goldwell's computerized method for preparing forms.  Foundas said that Artec was withholding money it owed because of paperwork that Artec had not received from Degen.  Degen corrected Foundas and told him that Artec had already received the corrected paperwork, which Foundas did not know.  Foundas admitted at his deposition that other than Bakey's complaint about Artec paperwork, which Degen had subsequently provided to Bakey, Degen had no other problem with paperwork. SOF 1.35-1.36.

5

18.     Foundas then changed the reason for Degen to drive to Holliston on Fridays and said that Degen's handwriting was not legible and that the typing and printing of Artec forms could be done in the Holliston office. At the October 5th meeting, Degen was told not to do any work until Goldwell received medical notification of Degen's "work restrictions" and/or ability to work, and she was told to go home. SOF 1.36.

19.     Dr. Slezak provided two written communications to the Defendants, in which he requested the accommodation that Degen be permitted to work her regular schedule of 4 days of driving and 1 day in her home office and receive her weekly acupuncture treatments, followed by rest from driving for 3 consecutive days, so that she could continue to function in her job. SOF 1.37-1.39. Dr. Slezak specifically advised against adding 16 hours of driving time per month to Degen's schedule. SOF 1.38.

20.     *After Dr. Slezak twice requested that Degen continue on her regular schedule as a reasonable accommodation*, the Defendants *upped the ante*. At a meeting on October 22, 2001, with Holladay, Garneau, Shakour, and an HR person, Shakour said they were *eliminating 2 of Degen's 4 office days per month and putting Degen on the highway to detail with account executives on those 2 Fridays, and Degen would drive to Holliston the other 2 Fridays per month as her office days*. Given that Degen drove from 1 to 3 hours to meet account executives, this newest schedule added more driving time than the four days' travel per month to Holliston, which the Defendants had implemented just two weeks prior. SOF 1.40.

21.     When Degen asked if they had received her physician's recommendations, they responded that Degen would follow the new schedule *regardless of letters from her doctor*. Shakour said that if Degen did not like the schedule, she knew where the door

6

was and could leave at any time. Garneau said Dr. Slezak's documentation was "unclear," and Degen encouraged Garneau to call her doctor, which Garneau failed to do. Ms. Shakour told Degen that they would "abide" Degen going to therapy on Fridays "for the time being." SOF 1.43.

22. All attendees, except Degen, had met prior to the October 22 meeting, and they did not discuss Degen's medical documentation or whether or not an accommodation should be made to Degen's physical condition. SOF 1.44. John Foundas knew "[t]here was some paper that [Degen] had some therapy to do" and that she "was claiming to have some treatments on Fridays," but he could not think of "any particular thing that would be a legitimate reason [not to be in the office on Fridays.]" SOF 1.45.

23. There was no legitimate business reason for Degen to be in the Holliston office on Fridays. SOF 1.48-1.49. Degen was not provided with an office, a telephone, or any office equipment, and she *could not perform* the majority of her administrative tasks *while in Holliston*. SOF 1.48. Artec had already received Degen's corrected paperwork, and any continued delay by Artec in paying Goldwell and/or R.G. Shakour was not caused by Degen's paperwork. Degen could address any alleged difficulty that Goldwell had with the legibility of her handwriting, *more than three years into her employment*, by converting her handwritten entries to typed entries or to computer entries in her home office and printing them out. SOF 1.48. Taking away 2 of Degen's 4 administrative days per month, when Degen was already working weekends and vacation days on administrative tasks that she could not complete on Fridays, was unreasonable and punitive. SOF 1.49.

7

24.     Holladay and Shakour did not return Degen's phone calls, and Degen was excluded from managers' meetings, which she had always attended. SOF 1.47. Further, while Degen had been told that a reason to be in Holliston was that she could meet with other managers to set up business strategies and meet with Foundas and Holladay, either such meetings were never held, or Degen was not invited to participate. SOF 1.39.

25.     Degen's additional weekly drives to and from Holliston on October 22, October 26, and November 2 aggravated her back and neck injuries and caused her a great deal of pain. Dr. Slezak told Degen that if her employers would not provide her with the accommodation of her usual schedule, then he recommended that Degen apply for intermittent leave and/or a reduced work schedule under the FMLA to enable Degen to undergo a more rigorous treatment plan and to abstain from distance driving for 3 consecutive days, over consecutive weeks, in order to heal. SOF 1.51.

26.     On November 9, 2001, Degen requested in writing that Garneau provide her with FMLA forms to apply for a 4-day week during her treatment with Dr. Slezak and Dr. Black, a neurologist, to whom Degen was referred. Garneau did not provide the forms, and Degen had to again request the forms on November 16, 2001. Degen faxed the FMLA forms to Garneau on or about November 30, 2001. SOF 1.52.

27.     From mid-November to December 21, 2001, Degen did not hear from anyone at Goldwell or R.G. Shakour – it seemed to Degen as though she were invisible. SOF 1.57.

28.     In a letter dated December 6, 2001, Goldwell required Degen to get a second medical opinion within 30 days. Degen understood, from the letter and a conversation with Garneau, that she could not begin FMLA leave until Goldwell received the second opinion and made a determination about Degen's FMLA application. SOF 1.55.

29.     Degen had difficulty scheduling the second opinion in December, and in order to reduce her driving on Fridays, prior to Goldwell's determination concerning her FMLA application, Degen informed Garneau that she would take December 21 and December 28 as vacation days and begin intermittent FMLA leave, assuming it was granted, on January 1, 2002. Goldwell's *Employee Policy and Procedure Manual* required any employee who went out on FMLA leave to use any earned, unused vacation time. Degen had unused vacation time, which she used in December 2001. Degen worked Friday, December 7, in Holliston and Friday, December 14, on a detail with an account executive in Vermont. SOF 1.54, 1.56.

30.     Degen was called in from a vacation in Vermont for a December 27th "managers" meeting in Holliston. Only Shakour, Holladay, Garneau, an HR person, and Degen were present. Shakour said Degen's position was being "dissolved." SOF 1.59-1.60.

31.     Degen requested that she fill a part-time Educator, 3-day a week subcontractor, position for which she was hiring and had not filled. Shakour said the position was not a possibility for Degen and gave no reason. SOF 1.66.

32      *Degen's position was not eliminated.* The Defendants unsuccessfully tried to replace Degen, from January 1, 2002 into the Fall of 2002. SOF 1.67-1.75.

## II. LEGAL ARGUMENTS

A.    <u>**Defendants Failed to Accommodate Degen's Disability and Retaliated**</u>

In order to establish her prima facie case of failure to accommodate (Count I), Degen must show that (1) she was a qualified handicapped individual; (2) she needed a reasonable accommodation; (3) the Defendants were aware of Degen's handicap and need for a reasonable accommodation; (4) the Defendants were aware of a means to

reasonably accommodate Degen and/or breached their duty to undertake a reasonable investigation of the means to accommodate Degen; and (5) the Defendants failed to accommodate Degen. *Wynne v. Tufts Univ. Sch. of Med.*, 932 F. 2d 19, 25 (1st Cir. 1992). Degen has alleged that she was a handicapped individual and/or the Defendants perceived her as a handicapped individual.

<u>Degen Was a Qualified Disabled Individual, Pursuant to G.L. ch. 152, § 75B(1)</u>

Chapter 152, § 75B(1) provides:

Any employee who has sustained a work-related injury and is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of such job with reasonable accommodations, *shall be deemed* to be a qualified handicapped person under the provisions of chapter one hundred and fifty-one B. G.L. c. 152, § 75B(1) (emphasis added).

Section 75B(1) expands the definition of "qualified handicapped person" to include employees injured on the job and provides those employees with the right to be free from discrimination, under in c. 151B. *Zarella v. City of Everett*, 5 Mass. L. Rptr. 280, 1996 Mass. Super. LEXIS 467, *6, (1996). The statute contains no limiting language. *MCAD v. Northeast Nursery, Inc.*, 2003 Mass. Comm. Discrim. LEXIS 20, *13 (2003) (receipt of workers compensation benefits renders complainant a "qualified handicapped person"); *Ervin v. A.P.T.S., Inc.*, 2001 Mass. Comm. Discrim. LEXIS 44, *6-7 (2001) (complainant deemed handicapped by virtue of having received workers compensation benefits). The Appeals Court in an unpublished decision discusses section 75B(1) as a "further[]" grounds for relief under which the plaintiff would be "presumed to be a qualified handicapped person." *Everett Indus., Inc.*, 49 Mass. App. Ct. 1116, at n.13 (2000); *Belonni v. Resevoir Nursing Ctr.*, 1995 Mass. Super. LEXIS 345 (holding that where evidence suggested plaintiff injured on the job was not totally disabled, claim

under section 75B(1) survived summary judgment, but plaintiff failed to check "handicap" box at MCAD).

Notwithstanding the plain language of the statute, some courts have applied qualifying "gloss" to G.L. c. 152, § 75B(1). Narrowing the Appeals Court's broad reading of the statute, the court, in *Gilman v. C& S Wholesale Grocers, Inc.*, 170 F. Supp. 2d 77, 84 (D. Mass. 2001), held "that section 75B(1) ought to be read so as to deem individuals suffering work related injuries, without more, to be qualified handicapped persons under 151B, *at least for the period of time that their status under the workers compensation law can fairly be read to influence their treatment by others*." (emphasis added).

*Courtois v. Legal Seafoods, Inc.*, 17 Mass. L. Rptr. 296, 2004 Mass. Super. LEXIS 26, *30 (1994), relied on by the Defendants, held that "an employee who sustains a work-related injury is entitled to the protections of c. 151B *during the time that he is affected by that injury*." (emphasis added); *Defs.' Mem.*, at 22. Degen was a qualified handicapped person under both *Gilman* and *Courtois*. The New Hampshire Board of Appeals decided, more than one year after Degen requested an accommodation, that Degen's medical treatment after August 2001 was not causally related to her 1999 work-related accident, but rather was caused by degenerative disc disease, which had been *aggravated by the 1999 injury*. SOF 1.81, 2.5-2.7. The Board does not state that Degen was no longer "*affected by that* [1999] *injury*," and all of Degen's medical evaluators, including CNA's Dr. Hawkins, found that Degen continued to suffer from back and neck pain, which was caused by the 1999 accident and/or the aggravation that the accident caused to her pre-existing, but theretofore asymptomatic, disc disease. They also agreed

11

that prolonged driving exacerbated Degen's injuries and/or the aggravated preexisting disc disease. SOF 1.81, 2.5-2.7.

Further, Degen's status under the workers compensation law influenced the Defendants' treatment of Degen from early October 2001 to the end of her employment on December 27, 2001. They referred to Degen as having medical "restrictions" and posing "a liability to the company," and they stated they were "mortified" that Degen was receiving acupuncture therapy. SOF 1.32-1.35, 2.11-2.15. The Defendants were so "mortified," that Garneau contacted CNA about withholding payment of Degen's treatments, and the Defendants litigated Degen's medical status for almost one year, after she was terminated. SOF 2.4. *Gilman v. C&S Wholesale Grocers, Inc.*, 170 F. Supp. 2d at 84.

### Degen Was a Qualified Handicapped Person, Under G.L. Chapter 151B

In the alternative, to the extent that Degen is not a qualified handicapped individual under G.L. c. 152, § 75B(1), she is nevertheless a qualified handicapped individual under G.L. c. 151B. Chapter 151B defines a "handicapped person" as any person who "(a) [has] a physical or mental impairment which substantially limits one or more major life activities…(b) [has] a record of such impairment; or (c) [is] regarded as having such impairment." G.L. c. 151B, §§ 1(16), (17). Degen's back and neck injuries, and the resultant chronic pain, substantially impaired her ability to drive.

### Driving Is a Major Life Activity

The Defendants erroneously state that it "is generally settled law" that driving is not a major life activity. *Defs.' Mem.*, at 19. A "major life activity" is an activity "of central importance to daily life." *Toyota Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184,

197 (2002). The Massachusetts Commission Against Discrimination regards driving as a major life activity. *MCAD v. Trans-Lease Group, Inc.*, 2004 Mass. Comm. Discrim. LEXIS 61, *19 (2004) (complainant suffered from an amputation that affected the major life activities of walking and driving). The MCAD has also stated that working in a home office may be an appropriate accommodation for "an employee with chronic back and neck pain," such as Degen, "who could not endure long daily commutes to work." *MCAD Guidelines: Employment Discrimination on the Basis of Handicap*, at 16. The MCAD's suggested accommodation presupposes that driving is a major life activity.

The law of the First Circuit is less settled than the law at the MCAD. *Guzman-Rosario v. United Parcel Serv., Inc.*, 397 F.3d 6, 11 (2005) (not deciding the issue). Other circuits have determined that driving is a major life activity. *See Anderson v. North Dakota State Hosp*, 232 F.3d 634, 636 (8th Cir. 2000) (assuming that both driving and working are major life activities); *Payne v. O'Neil*, 73 Fed. Appx. 144, 146 (6th Cir. 2003) (stating plaintiff is able to "handle her personal affairs, including driving and house chores"); *Whitson v. Union Boiler Co.*, 47 Fed. Appx. 757, 762 (6th Cir. 2002) (including driving in normal daily activities); *Sargent v. Litton Sys., Inc.*, 841 F. Supp. 956, 961 (N.D. Cal. 1994) (refusing to adopt a rule that employers have no duty under the California anti-discrimination statute to accommodate employees such as plaintiff, with a chronic back and neck injury, whose disabilities impede their ability to travel to work).

Chapter 151B is construed liberally, and the Supreme Judicial Court has repeatedly interpreted Chapter 151B to increase the scope of non-discrimination provisions. *Dahill v. Police Dep't of Boston*, 434 Mass. 233, 238 (2001) (protected class of handicapped is determined without regard to consideration of mitigating measures);

*Worcester Housing Auth. V. MCAD*, 406 Mass. 244, 247 (1989) (discrimination prohibition on "marital status" protects unmarried individuals); *LaPierre v. MCAD*, 354 Mass. 165, 174-175 (1968) (protected class of "national origin" broadly interpreted to include ancestry; thus, discrimination against Puerto Rican born in America is nevertheless illegal); Mantell, *The Liberal Interpretation of Chapter 151B*, 4 MBA Sec. Rev. 23 (2002). Chapter 151B should be read to include driving, which is "of central importance to daily life," as a major life activity. *Toyota Motor*, 534 U.S. at 197.

<u>Degen Was Substantially Limited in the Major Life Activity of Driving</u>

Except on the occasion of an irregularly scheduled event, Degen was unable to drive long distances on 3 out of 7 days per week, or 43% of the week. Her physician specifically advised Degen and her employers that Degen should rest after her acupuncture treatments on Fridays and drive as little as possible on Fridays, Saturdays, and Sundays so that she could rest her back and facilitate the healing process. SOF 1.10, 1.14, 1.37-1.39, 2.11-2.23. Degen need only "prove disability by offering evidence that the extent of the limitation [caused by [her] impairment] in terms of [her] own experience...is substantial." *Carrol v. Xerox Corp.*, 294 F.3d 231, 238 (1st Cir. 2002), citing *Toyota Motor, supra*; *Nagle v. City of Boston*, 18 MDLR 221, 221-223 (1996) (where firefighter had 36% hearing loss and speech discrimination impairment, he was substantially limited and a qualified handicapped person).

<u>Defendants Regarded Degen as Substantially Limited in the Major Life Activity of Work</u>

In order to fall within the "regarded as" definition of handicapped, Degen must show that the Defendants regarded her as having an impairment which substantially limited her capacity to work. *Cook v. Rhode Island Dep't of Mental Health, Retardation*

14

& *Hosp.*, 783 F. Supp. 1569, 1575 (D.R.I. 1992). Immediately after Degen told Garneau that she had therapy sessions on Fridays, Garneau asked Degen if she had *any work restrictions*, and both Garneau and Shakour regarded Degen as "a liability to the company." SOF 1.29-1.34, 2.11-2.23. Garneau told Shakour that Degen had a medical condition; the condition required medical documentation; and/or Degen was a liability to the company if she continued to work without medical documentation. SOF 1.32, 2.11. The Defendants projected their perception of Degen as "medically restricted" onto Degen and falsely stated that she told Garneau that she was medically restricted, when, in fact, Degen said she had self-imposed "guidelines." SOF 1.30-1.34, 2.11; *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 144-145 (3rd Cir. 1998) (summary judgment denied where defendants were confused about extent of physical capacity, exaggerated the limitations, and failed to contact physician).

Most telling, the Defendants not only regarded Degen's impairment as foreclosing her job as Artec Brand Manager, as evidenced by her termination under a false pretense, but they also considered Degen unfit for any other job. SOF 1.59-1.75. They denied Degen's request to fill the part-time Educator position, for which Degen was hiring and for which she was more than qualified. Degen. SOF 1.66, 2.33. This position required only 3 days of driving, 1 day less than Degen had requested in her FMLA application, and the Defendants' rejection of Degen's request reveals that they perceived Degen's back injuries as disqualifying her for a broad spectrum of jobs. SOF 1.53, 1.66; *Cook v. Rhode Island Dep't*, 783 F. Supp. at 26. Foundas testified that an employee who was supposed to drive all day, and could not drive all day, was unemployable. SOF 1.77. *Plante v. Shawmut Bank,* 1999 Mass. Super. LEXIS 226, *2 (1999) ("since 'working' is

defined as a 'major life activity'... and since there is evidence that the defendant regarded Plante's lymphoma as a physical impairment that substantially limited his ability to work, Plante is a 'qualified handicapped person' under c. 151B...").

<u>Defendants Were Aware of a Reasonable Accommodation and/or Failed to Investigate</u>

Degen had been successfully performing her job for over 3 years with her schedule of 4 days of driving in the field and 1 day in her home office. SOF 1.5-1.6, 1.11, 1.16-1.17, 1.22-1.23, 2.14. Dr. Slezak specifically requested, on two occasions, that the Defendants allow Degen to continue to work her normal schedule, and not put Degen on the highway a 5th day. SOF 1.37-1.39, 2.17-2.18. The request that Degen work a schedule, which had benefited the Defendants, *for more than 3 years*, was reasonable. *Smith v. Bell Atl.*, 63 Mass. App. Ct. 702, 716 (2005) (ample evidence that allowing Smith to do substantial amounts of her work at home was a reasonable accommodation); *MCAD v. Laidlaw Transit, Inc.*, 2003 Mass. Comm. Discrim. LEXIS 55, *56 (request to leave early was reasonable, especially where Respondent had allowed it previously for years). In this instance, Degen requested only that she continue to work 1 day in her home office, not that she perform "substantial amounts of her work" at home. Further, the Defendants failed to provide Degen with an office, telephone, or equipment to perform her administrative tasks in the Holliston office, and she was excluded from meetings. SOF 1.48-1.49, 2.17, 2.21.

Not only did the Defendants entirely ignore Dr. Slezak's medical documentation and unilaterally decide that Degen would follow the new schedule "regardless of letters from [your] doctor," but they also never even entertained the idea of accommodating Degen; they never sought clarification from Dr. Slezak about his alleged "unclear"

communications; and they never discussed alternative accommodations with Degen. SOF 1.43-1.44, 2.21. *School Comm. of Norton v. MCAD*, 2005 Mass. App. LEXIS 666, *15 (2005) (upholding findings that employer discriminated on the basis of disability by not engaging in dialogue regarding accommodations and not investigating reasonable accommodations); *MCAD v. Laidlaw Transit, Inc.*, 2003 Mass. Comm. Discrim. LEXIS 55, *55 (2003) (company had obligation to discuss possible alternate reasonable accommodations with plaintiff before it unilaterally decided to deny accommodation).

<u>Defendants Retaliated Against Degen for Requesting an Accommodation</u>

In order to show that the Defendants retaliated against her, Degen must show that (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Wyatt v. City of Boston*, 35 F.3d 13, 14 (1st Cir. 1994). Degen's retaliation claim is a "separate and independent cause of action" from her disability claim. *Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107 (2000). Requesting an accommodation is protected activity. *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997). Dr. Slezak requested an accommodation for Degen on October 9, 2001 and on October 17, 2001. SOF 1.37, 1.39, 2.17-2.18. Less than one week after Dr. Slezak's second communication, the Defendants told Degen, on October 22, 2001, that they were eliminating 2 of Degen's 4 office days per month, putting her in the field on those Fridays, and requiring that she drive to Holliston on the other 2 Fridays. The substitution of 2 days in the field for 2 days in the Holliston office *added* more driving than the 4 days of travel to Holliston, which the Defendants had required since October 5, 2001. SOF 1.7, 1.36, 1.41-1.42, 1.54, 2.15-2.23. The

chronological proximity between Degen's request for an accommodation and the Defendants' upping of the ante on her driving time, and eliminating 2 administrative days, highly suggests that the Defendants retaliated against Degen for her request, particularly in light of their subsequent *animus*, including termination for a false reason. SOF 1.52, 1.55, 1.57, 1.60-1.75, 2.17-2.23; *Wright v. CompUSA*, 352 F.3d 472, 478 (1st Cir. 2003) (chronological proximity establishes causality where the larger picture does not undercut plaintiff's claim of causation).

The Defendants' "abiding" of Degen's therapy sessions came at a high price for Degen. She had to drive 4 to 5 hours to and from Holliston for 3 hours in the office; attend her therapy session; and then try to perform more than 8 hours of administrative work during the remaining 3 to 3 ½ business hours, in her home office. 1.46-1.49; 2.29. Degen's additional weekly drives aggravated her back and neck injuries, and Dr. Slezak recommended that Degen apply for intermittent or reduced-schedule leave, under the FMLA, so that she could undergo more aggressive therapy and rest on Fridays for the purpose of healing her injuries and/or reducing/eliminating her chronic pain. SOF 1.50-1.51, 1.53, 2.24. Degen was terminated before she could begin her FMLA leave. SOF 1.55-1.56, 1.58, 2.24-2.28.

**B.      Degendants Discriminated Against Degen on the Basis of Her Disability**

For Degen's prima facie case of discrimination based on handicap (Count II), Degen must show: (1) she is handicapped, pursuant to G.L. c. 152, § 75B(1), and/or Chapter 151B; (2) she is qualified to perform the essential functions of her job with or without an accommodation; (3) she was subject to an adverse action and/or was terminated; and (4) her position remained open after her termination, and her employer

sought to fill the position. *Lukacinsky v. Panasonic Serv. Co.*, 2004 U.S. Dist. LEXIS 25846, *73 (D. Mass. 2004). The defendants have waived the second and third elements of Degen's prima facie case, and instead, they argue that Degen was not handicapped and that she cannot show that her position remained open, and the Defendants tried to replace Degen. *Defs.' Mem.*, at 28. The Defendants incorrectly state that termination is the only discrimination that Degen alleges. *Id.* In addition to failure to accommodate and termination under a pretext, Degen also claims that the Defendants discriminated against her by ostracizing her; requiring her to drive a 5th day in the field or to Holliston; and refusing to hire her for the 3-day Educator position. *Amend. Compl.*, ¶¶ 36-42.

Degen incorporates by reference the arguments, set forth in Section A of this brief, that Degen is a qualified handicapped individual, pursuant to G.L. c. 152, § 75B(1) and/or Chapter 151B (the first element of Degen's prima facie case).

The Defendants' proffered reason for Degen's termination; that is, the position of Artec Brand Manager was eliminated, is a complete fabrication. *Defs. Mem.*, at 6; SOF 1.60, 1.65, 1.67-1.75, 2.32-2.37. There is both direct evidence, SOF 1.67-1.75, 2.32-2.37, and circumstantial evidence, SOF 1.61-1.64, 2.31, that the position was not eliminated. First, shortly after Degen's termination, Shakour told Lisa Kelley, Director of Education at R.G. Shakour, that Degen's position had been "eliminated," using her hands to make the gesture of quotation marks around the word "eliminated," as she spoke; she asked Kelley if Degen was going to take legal action; and Shakour repeatedly asked Kelley which in-house employee could replace Degen. SOF 1.68-1.69, 1.72, 2.32, 2.34. Second, R.G. Shakour advertised for an Artec Brand Manager in the *Boston Globe* and *Beauty Industry Magazine*, in the Spring and Fall of 2002, respectively. SOF 1.70,

2.32, 2.34. Third, John Foundas told David Hallgren, when he was hired by Goldwell as Vice President of Sales & Operations in March 2002, that hiring an Artec Brand Manager was one of Hallgren's top priorities. The Artec Brand Manager was to be shared by Goldwell and R.G. Shakour, just as Degen had been shared. SOF 1.73, 2.35. Fourth, in Fall 2002, after Hallgren left Goldwell in July 2002 without hiring a full-time Artec Brand Manager, Shakour offered $500 to any account executive who could find her an Artec Brand Manager. SOF 1.74, 2.32, 2.35. When Shakour learned that account executive, Susan Pugh, had told Degen about the $500 offer, Shakour told her account executives that Pugh had "gone to the other side;" she said she would deny having made the offer; and she asked for a show of hands of who would testify against Degen and for Shakour. SOF 1.75, 2.37. The Defendants' failure to clone Degen was not for want of trying.

Degen has established that the Defendants' proffered reason, elimination of Degen's position, is false. *Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 118 (2000) (pretext alone is sufficient to support a finding of liability). "[T]he trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000); *Binder v. Long Island Lighting Co.*, 57 F.3d 193, 200 (2nd Cir. 1995) ("Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct."). Summary judgment on Count II should be denied.