## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHCUSETTS

**C.A. No. 04-11024-RWZ**

|  |  |
|---|---|
| **JEANNE DEGAN,** | ) |
| **Plaintiff** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **GOLDWELL OF NEW** | ) |
| **ENGLAND, INC. and** | ) |
| **R.G. SHAKOUR, INC.,** | ) |
| **Defendants** | ) |

## PLAINTIFF JEANNE DEGEN'S RULE 56.1
## STATEMENT OF FACTS IN DISPUTE

Plaintiff Jeanne Degen (hereinafter referred to as "Degen" or "Plaintiff") hereby submits a Rule 56.1 Statement of Facts in Dispute ("SOF") in support of her Opposition to Defendants Goldwell of New England, Inc.'s (hereinafter referred to as "Goldwell") and R.G. Shakour, Inc.'s (hereinafter referred to as "R.G. Shakour") Motion for Summary Judgment. The SOF sets forth Plaintiff's Statements of Facts, under the designation 1.0, and then sets forth Statements of the Defendants in Dispute, under the designation 2.0. Statements in the Defendants' Statement of Undisputed Facts will be referred to as "Defs.' SOF." "Exhibits" refer to attachments to this SOF. "Tabs" refer to attachments to the Defendants' SOF.

### 1.0     DEGEN'S STATEMENT OF FACTS

**Great Performance, Chronic Pain, and the Accidental Accommodation**

1.1     Goldwell hired Degen on August 31, 1998, as Goldwell's "Artec Brand Manager." Goldwell is a distributor of hair care products, and Artec manufactures a line

of hair care products, which Goldwell distributed to hair salons. Degen Aff., ¶ 1, Exhibit
1. At the time of Degen's hire, Artec's products were exclusively "wetline" products,
meaning shampoos, styling aids, and finishing products. Degen MCAD Dep., at 66,
Exhibit 2; Degen Aff., ¶ 26, Exhibit 1.

1.2     Degen came to Goldwell with more than fifteen years' experience in educational
training, marketing, and sales in the hair-care supply industry, as well as experience
managing and working as a cosmetologist in hair salons. She previously attended the
University of Vermont and received a cosmetology degree from the Vermont College of
Cosmetology. Degen Aff., ¶ 1, Exhibit 1; Degen MCAD Dep., at 48, Exhibit 2.

1.3     Goldwell originally hired Degen to share the position of Artec Brand Manager for
the New England Region with Claire Parkhurst. Ms. Parkhurst was responsible for
Southern New England, and Degen was responsible for Northern New England. Degen
MCAD Dep., at 65, Exhibit 2.

1.4     As Artec Brand Manager, Degen was primarily responsible for coordinating Artec
product training. Among other responsibilities, she booked education classes and
organized workshops with salons and stores that sold to salons; "detailed" with account
executives; that is, accompanied them to meetings with their salon accounts and helped
them build their business; recruited, hired, and trained Artec educators; prepared
workshops and training for account executives and educators; and prepared weekly and
monthly paperwork for Artec and Goldwell. Degen Aff., ¶ 5, Exhibit 1.

1.5     It is customary for brand managers to have one day per week to perform
administrative responsibilities. Shakour Dep., at 53, Exhibit 3. Because Friday is the
busiest week day for salons, and salon personnel are preoccupied with clients, brand

managers in the industry usually conduct their administrative (non-field) tasks on Fridays. This was the practice at Goldwell, as well. Degen Aff., ¶ 3, Exhibit 1. Degen resided in New Hampshire and 2 to 2 ½ hours' driving distance from Goldwell's office, which is located in Holliston, Massachusetts. A round trip entails 4 to 5 hours out of the day, depending upon traffic and weather conditions. Id. Prior to her hire, Degen negotiated to conduct her administrative tasks in her home office. Accordingly, she was required to purchase a computer, a fax machine, a copy machine, a desk, two telephone lines, and other miscellaneous items for her home office. Degen Aff., ¶ 3, Exhibit 1.

1.6    Degen conducted her administrative tasks in her home office on Fridays for more than three (3) years, from the time of her hire in 1998 to October 2001. Degen Aff., ¶ 4, Exhibit 1; Degen MCAD Dep., at 136, Exhibit 2.

1.7    The primary responsibilities of brand managers are conducted in the field, where training, education, sales, and trade shows take place. As part of her job, Degen drove on Mondays through Thursdays from her home to an agreed-upon site to meet an account executive in the account executive's territory, and from there, the account executive drove Degen to the account executive's scheduled meetings with her salon accounts. Degen MCAD Dep., at 198-199, Exhibit 2; Degen Aff., ¶ 6, Exhibit 1. Degen usually drove from 1 to 3 hours each way on Mondays through Thursdays to meet account executives, depending on the location of the account executive's New England territory and her accounts. Degen Aff., ¶ 6, Exhibit 1. The distances Degen drove on Monday through Thursdays to meet with account executives could be and frequently were longer than her commute to Holliston for sales meetings. Degen MCAD Dep., at 198, Exhibit 2. For most of Degen's employment, she attended sales meetings in Goldwell's Holliston,

Massachusetts office on two Mondays a month, in lieu of being on the road with account executives. Degen Aff., ¶ 6, Exhibit 1.

1.8    On Fridays, Degen communicated with account executives and educators by telephone to go over scheduling, problem solve, and recap the week; prepared for sales meetings; had conference calls with Artec staff; planned blitz's, in-house promotions, and in-salon promotions and incentives; conducted telephone meetings with senior educators about classes and training; confirmed upcoming classes with salons; planned her next week and implementation strategies; returned telephone calls from salons about Artec products; recruited models; planned shows; wrote thank you notes to salons where classes had been conducted that week; recruited and hired educators to fill territorial needs; and prepared the next month's calendar and paperwork for reimbursement to Goldwell (and later R.G. Shakour) for the educators, based on forms submitted to Degen by the educators. Degen Aff., ¶ 7, Exhibit 1. Degen prepared the reimbursement paperwork once a month, and her non-paperwork tasks consumed, by far, the greater part of her Friday office days. Degen Aff., ¶ 41, Exhibit 1. All of the other Artec staff involved in education used Fridays in their home offices to catch up on business; they resided across the United States; and Degen's only way of communicating with them was by e-mail and telephone conferences on Fridays. Degen Aff., ¶ 41, Exhibit 1.

1.9    On June 15, 1999, Degen was injured in a work-related vehicular accident in Augusta, Maine, while she was a passenger in an account executive's automobile.  The vehicle was hit from behind at a rotary, and Degen's neck snapped back at the time of the collision. Degen Aff., ¶ 8, Exhibit 1.  Degen returned to New Hampshire, and went to her physician, who determined that she had sustained injuries to her back and neck.  Degen

began medical treatment, which helped keep her functional; she filed a Workers

Compensation claim; and she continued to work. CNA, Goldwell's compensation insurer

paid Degen's medical bills. <u>Degen Aff.</u>, ¶ 9, <u>Exhibit 1</u>; <u>Degen MCAD Dep.</u>, at 71,

<u>Exhibit 2</u>.

1.10    Even though driving exacerbated Degen's back and neck pain, with four days of

driving and Fridays in her home office, she was able to function in her job. Being off the

road on Fridays rested her back, and she was able to undergo treatments on Fridays.

With this schedule, she could handle the occasional Friday when she needed to drive

some distance to attend an irregularly-scheduled event. <u>Degen MCAD Dep.</u>, at 196,

<u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶ 10, <u>Exhibit 1</u>.

1.11    On April 1, 2000, Degen was promoted to Artec Brand Manager for the entire

New England Region, and she was made Ms. Parkhurst's supervisor. <u>Degen Aff.</u>, ¶ 11,

<u>Exhibit 1</u>; <u>Shakour Dep.</u>, at 23-24, <u>Exhibit 3</u>. In addition, Degen received a salary

increase, and she now reported to Goldwell, R.G. Shakour, and Artec. Sheryl Holladay,

Director of Education, was Degen's supervisor at Goldwell, and Renee Shakour, Vice

President, was her supervisor at R.G. Shakour. <u>Degen Aff.</u>, ¶ 11, <u>Exhibit 1</u>. Artec paid

$21,000 of Degen's salary, and Goldwell and R.G. Shakour each paid $10,500. <u>Degen</u>

<u>Aff.</u>, ¶ 11, <u>Exhibit 1</u>; <u>Shakour Dep.</u>, at 26-27, <u>Exhibit 3</u>. Degen received bonuses, based

on account executives' sales, for each of the three quarters following her promotion to

Artec Brand Manager for the entire New England Region. <u>Degen Aff.</u>, ¶ 13, <u>Exhibit 1</u>.

The account executives, not Degen, were responsible for sales and for getting new

placements of Artec products, and R.G. Shakour and Goldwell had no sales figures that

specifically related to Degen. <u>Foundas Dep.</u>, at 83, 92, <u>Exhibit 5</u>; <u>Shakour Dep.</u>, at 49,

Exhibit 3. Artec provided Goldwell and R.G. Shakour with sales goals for Artec

products, and if account executives' cumulative sales reached a goal, Degen received a

bonus. Degen Aff., ¶ 13, Exhibit 1. Lisa Kelley, Director of Education at R.G. Shakour

testified that out of all the people she ever worked with, Degen was the best: "I

completely trusted her. She worked like an Army of people...She was wonderful at her

job... ." Kelley Dep., at 67, 82, Exhibit 4.

1.12    Although Ms. Holladay and Ms. Shakour told Degen, at the time they became her

joint employers in 2000, that an administrative assistant would be hired within a few

weeks to assist Degen in scheduling educators, handling miscellaneous paperwork, and

other administrative tasks, her employers never hired an administrative assistant. Degen

was the only manager who had 50 account executives, 10 educators, and 3 companies to

deal with and to manage. Degen Aff., ¶ ¶ 12, 39, Exhibit 1.

1.13    Degen continued to experience chronic cervical and lower back pain as a result of

her work-related accident in 1999, and she received treatments on most Fridays from July

1999 throughout her employment at Goldwell/R.G. Shakour. Degen underwent physical

therapy and massage therapy, and she was prescribed Vicodin and/or Tylenol #3, both of

which are opioids. Degen Aff., ¶ 15, Exhibit 1. When Degen became concerned about

addiction to and dependence on opioids, her orthopedic surgeon, Donald M. Ettelson,

M.D., referred her to Jan Slezak, M.D., a physician who practices acupuncture at

Northeast Pain Consultants in Rochester, New Hampshire, for evaluation and possible

non-opioids therapy. Id. In January 2001, Dr. Slezak evaluated Degen's back and neck

injuries; determined they resulted from her June 15, 1999 vehicle accident; and

prescribed a regime of treatment, which included acupuncture treatments and weaning

from the opioid drug, Tylenol #3, and possible trigger point injections if required. Degen
Aff., ¶ 15, Exhibit 1. Dr. Slezak faxed a copy of his evaluation to Mary Garneau, head of
Human Resources at Goldwell. Degen Aff., ¶¶ 15-16 & Exh. A, Exhibit 1.

1.14     Degen began acupuncture therapy with Dr. Slezak in January 2001. Dr. Slezak
did not normally perform acupuncture on Fridays, but he agreed to treat Degen on
Fridays, the one day of the week when she was not on the road. Accordingly, Degen
worked in her home office as usual on Fridays, drove 10 to 15 minutes to her 30 plus
minutes appointment with Dr. Slezak, drove home, and was back in her office in
approximately one hour. Degen Aff., ¶ 17, Exhibit 1.

1.15     Dr. Slezak advised Degen that in order to facilitate the healing of her back and
neck injuries, it was important that she rest her back after the acupuncture treatments and
drive as little as possible on Fridays, Saturdays, and Sundays. Degen Aff., ¶ 18, Exhibit
1. Fortuitously, Dr. Slezak's treatments and treatment recommendations were compatible
with Degen's long-standing work schedule.

1.16     In May 2001, Renee Shakour told Degen that her salary would increase by $3,000
to $45,000 and that her expense account would also be increased. Ms. Shakour told
Degen that she did an excellent job as Artec Brand Manager, and when Degen asked her
if there were any areas in which she needed to improve, Ms. Shakour said, "No." Degen
Aff., ¶ 19, Exhibit 1.

1.17     Ms. Shakour frequently asked Degen to train brand managers for other product
lines, which Degen agreed to do as a favor to Ms. Shakour, even though Degen was, in
effect, training her competitors. Degen Aff., ¶ 24, Exhibit 1.

1.18    On or about June 23, 2001, Degen received a letter from David Bakey, who

worked in the Artec Education Department, in which Mr. Bakey said that he was missing

25 dates of paperwork for Degen's educators. Artec had had a great deal of turnover, and

as a result, Degen had had to resend paperwork for reimbursements to Goldwell and R.G.

Shakour, which Artec had misplaced, on eight occasions within the previous three years.

Degen Aff., ¶ 20, Exhibit 1. Degen told Sheryl Holladay, her supervisor at Goldwell,

about the most recent communication, and Ms. Holladay became very angry. Ms.

Holladay telephoned Brook Carlson, General Manager of Artec, and told her that she

would not permit Degen to spend any more time on the reimbursement paperwork. Ms.

Holladay then instructed Degen to send in the paperwork to Artec, as is, without taking

the time to check the educators' input, and she told Degen not to spend one more minute

of Goldwell's time on the paperwork. Contrary to her usual custom of exercising care,

Degen followed her supervisor's instruction and sent in the paperwork. Degen Aff., ¶¶

20, 28, Exhibit 1.

1.19    Both Renee Shakour and Sheryl Holladay told Degen on multiple occasions not to

be concerned with Artec's requests for resubmissions of paperwork because it was

Artec's method for avoiding or delaying paying the money that Artec owed to Goldwell

and/or R.G. Shakour for education in its products. Degen Aff., ¶ 21, Exhibit 1. Lisa

Kelley, Director of Education at R.G. Shakour, testified that Ms. Holladay admitted to

her that she had told Degen to "fudge" the resubmission of the paperwork to try and

expedite Artec's payment and that it did not work. Kelley further testified that Artec

never paid its reimbursements from "the very day one" and that Artec "got in financial

trouble" and was subsequently bought out by L'Oreal. Kelley Dep., at 112, Exhibit 4.

1.20    Degen continued to receive accolades for her work performance.  On or about

July 2, 2001, John Foundas, President of Goldwell, announced at a sales meeting that he

loved Degen's ability to motivate the sales team, and he stated that Artec's General

Manager, Brook Carlson, had paid Degen a highly flattering compliment in saying she

wished that she could clone Degen because she was such an asset to Artec.  Mr. Foundas

said that he felt the same way, and the account executives and other managers at the

meeting applauded. Degen Aff., ¶ 22, Exhibit 1.  Mr. Foundas testified that he never

received any criticism of Degen. Foundas Dep., at 57, Exhibit 5.

1.21    In or about July/August 2001, Artec introduced a line of permanent hair color.

Permanent hair color was new to Artec; a huge color line was involved; and the

companies knew that it was going to take off well. Kelley Dep., 83, Exhibit 4; Degen

Aff., ¶ 26, Exhibit 1.  In the industry, a hair color line is "a completely different

language" and a "bigger animal." Kelley Dep., at 66, Exhibit 4.  Degen and her team

were not familiar with teaching this kind of course, and Degen had to be trained on the

new products and then, along with the Directors of Education, train all of Goldwell's and

R.G. Shakour's account executives in how to handle the hair color, how to talk to salons

about hair color, and how to teach hair color. Id.; Degen Aff., ¶ 26, Exhibit 1.  The pre-

launch training in Artec's hair color products was a major undertaking for Degen and her

team, and Degen worked with Ms. Kelley, Director of Education at R.G. Shakour, on this

project, which constituted a completely different direction for Artec. Kelley Dep., at 66,

83, Exhibit 4; Degen Aff., ¶ 26, Exhibit 1.

1.22    On or about August 21, 2001, Ms. Shakour told Degen during a meeting that

Leland Hirsh, the owner of Artec, had asked Ms. Shakour if she would allow Degen to

9

leave R.G. Shakour to work exclusively for Artec as a Regional Sales Manager. Degen
Aff., ¶ 27, Exhibit 1. Ms. Shakour told Degen that she had told Mr. Hirsh, "Absolutely
not," and that Degen was too great of an asset and too valuable for her to let Degen go.
Ms. Shakour said that she hoped Degen did not mind her speaking for Degen, and Ms.
Shakour went on to state, "Let them get their own f-----g staff and leave mine alone."
Degen Aff., ¶ 27, Exhibit 1.

1.23    Degen was very fortunate it that she loved her job, and at all times prior to her
request to continue to perform her administrative tasks in her home office as an
accommodation to her back and neck injuries, she received nothing but praise, accolades,
and positive feedback from her supervisors. Degen Aff., ¶ 22, Exhibit 1.

1.24    Degen received a telephone call from Ms. Shakour, on or about September 1,
2001, in which Ms. Shakour stated that David Bakey was saying that Degen had falsified
paperwork that she had sent him. This was the paperwork that Degen had submitted, as
is, pursuant to Ms. Holladay's instruction. Upon learning of Mr. Bakey's accusation,
Degen immediately went through the paperwork that she had submitted to him and found
that out of 25 dates for which he claimed he was missing paperwork, only 3 of the dates
required paperwork for reimbursement. Degen MCAD Dep., at 162-164, Exhibit 2;
Degen Aff., ¶ 28, Exhibit 1. Degen corrected the paperwork for February 20, 2001,
March 1, 2001, and March 13, 2001 – dates that went back 6 to 7 months and preceded
all subsequent paperwork with which Mr. Bakey had no issue. Degen Aff., ¶ 28, Exhibit
1; Degen MCAD Dep., at 159, 162, Exhibit 2. Those three errors, which Degen would
have caught if she had not followed Ms. Holladay's instruction, were in the amount of
$175-$200, a miniscule fraction of the $14,000, which the defendants now claim Artec

owed at the time and for which the defendants now impute, ingenuously and erroneously, that Degen was somehow responsible. Degen MCAD Dep., at 164, Exhibit 2; Defs.' Garneau Aff., ¶ 5.

1.25     Both Ms. Shakour and Ms. Holladay told Degen that they did not like the tone of Mr. Bakey's letter and that once again, Artec was attempting a ploy to delay its reimbursement payments. Degen MCAD Dep., at 161, Exhibit 2. With the approval of Ms. Holladay and Ms. Shakour, Degen sent Mr. Bakey a memorandum, dated September 14, 2001, in which she expressed dismay at Mr. Bakey's false accusation, and she attached an itemization of the events that did not require any paperwork and the corrections for the three dates in Winter 2001. Degen Aff., ¶ 28 & Exh. B, Exhibit 1; Degen MCAD Dep., at 162-164, Exhibit 2 .

1.26     Degen and Ms. Kelley met with Jon Shakour, President of R.G. Shakour, in late September 2001, to plan a *6-month* promotional agenda for the huge new hair color line that Artec had just launched. Their plan required that Degen spend most of her time promoting the color line. It is impossible to promote color without an extensive educational program with which to back the line. Degen Aff., ¶ 30, Exhibit 1. The investment of Degen's time on the color line was agreed to with Artec prior to the launch. Renee Shakour and Jon Shakour had forecasted that the color line would take about a year to start making money, and they felt it was necessary for Degen to devote 75% of her time to promoting the color line. Id. Ms. Kelley was to assist Degen in the 6-month promotional campaign, but she was not expected to devote a large percentage of her time to the Artec color line, as Degen was. Artec corporate repeatedly told Degen that she was a major component of their support for the launch. Degen Aff., ¶ 30, Exhibit 1.

1.27    Ms. Kelley testified that prior to Degen's termination she had not been told and/or

had not heard anything about Degen being terminated or about the Artec Brand Manager

position being eliminated. Kelley Dep., at 71, Exhibit 4. She further testified: "[S]he and

I were in the middle of this huge training campaign with this new color line…that we

were about to, you know, hit the streets with. I mean, it was an absolute shock to me…I

was just shocked." Id. at 71-72.

### Use of the Word "Therapy" and Paradise Lost

1.28    During the last week of September 2001, Degen had a voice message from Ms.

Holladay, in which she said that Mr. Foundas wanted Degen to come to the Holliston

office for a Friday meeting. Ms. Holladay did not specify the date of the Friday involved,

and Degen was not able to reach Ms. Holladay for clarification. Degen MCAD Dep., at

95, Exhibit 2; Degen Aff., ¶ 31, Exhibit 1.

1.29    On or about October 3, 2001, Degen called Mary Garneau, Controller and head of

HR at Goldwell, and asked her what Friday she was supposed to come to the Holliston

office. Degen told Ms. Garneau that she had therapy on Fridays related to back and neck

injuries from the vehicle accident, and she needed to know the date so that she could

adjust her therapy session. Degen MCAD Dep., at 95-96, Exhibit 2; Degen Aff., ¶ 32,

Exhibit 1. Ms. Garneau said she did not know Degen was in therapy, and she said that

she would speak with Ms. Holladay and Mr. Foundas and get back to Degen with the

date. Degen MCAD Dep., at 99, Exhibit 2; Degen Aff., ¶ 32, Exhibit 1.

1.30    Ms. Garneau called Degen back and told her that she should come to the Holliston

office that Friday, October 5, 2001. Ms. Garneau then asked Degen if she had any "work

restrictions." Degen said, "No." Ms. Garneau asked Degen how much she was driving at

that point in time, and Degen responded that she was usually driving 1 to 1 ½ hours one

way from one destination to another.  Degen said that 1 ½ hours of driving at one sitting

was her comfort zone, a guideline, but she was able to do her job. <u>Degen MCAD Dep.</u>, at

100, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶ 32, <u>Exhibit 1</u>.

1.31    With Degen's longstanding schedule of 4 days of travel and 1 day in her home

office, along with her acupuncture treatments on Fridays, Degen was able to do whatever

her job required, as evidenced by her salary increase in May 2001; recent praise of her

performance by John Foundas of Goldwell, Brook Carlton and Leland Hirsh of Artec,

and Renee Shakour of R.G. Shakour; and her lead position in the launching of Artec's

permanent color line. <u>Degen Aff.</u>, ¶¶ 19, 22-24, 26-27, 30, <u>Exhibit 1</u>.

1.32    Although Degen, within the context of the schedule she had worked for over 3

years, regarded the optimal 1 ½ hours of driving as a guideline, Ms. Garneau immediately

regarded Degen as having a "work restriction." <u>Degen Aff.</u>, ¶ 34, <u>Exhibit 1</u>.  Ms. Shakour

testified that she had conversations with Ms. Garneau in which Ms. Garneau stated that

Degen had a medical condition; the condition required medical documentation; and/or

Degen was a liability to the company if she continued to work without medical

documentation. <u>Shakour Dep.</u>, at 112-115, <u>Exhibit 3</u>.  Defendants falsely projected, onto

Degen, Ms. Garneau's perception that Degen had a "work restriction," after Degen used

the word "therapy" on October 3, 2001.  In their Answer to the Amended Complaint, the

defendants erroneously state that "Plaintiff informed Ms. Garneau she had *medical*

*restrictions* [during that conversation];" Goldwell also claims in answers to

interrogatories that, prior to any note from Degen's physician seeking an accommodation,

Degen "indicated she was…medically restricted from" driving. <u>Defs.' First Amend. Ans.</u>,

¶ 12; <u>Goldwell Court. Int. Ans.</u>, No. 27, <u>Exhibit 9</u>; <u>Degen Aff.</u>, ¶¶ 32, 34, <u>Exhibit 1</u> .

After Degen requested her regular schedule as an accommodation for her injury, pain, and treatment regime, which was denied, and then applied for FMLA leave and was terminated, Degen testified that she thought she was terminated because she "was a handicapped person *to the company*, based on her rapid descent and termination 2 months after she used the word "therapy." <u>Degen MCAD Dep.</u>, at 102-103, <u>Exhibit 2</u>.

1.33    On or about October 4, 2001, Renee Shakour called Degen and, in an angry tone, she asked Degen why she had refused to come to the Holliston office for a meeting on Friday, October 5. <u>Degen MCAD Dep.</u>, at 88, 102, <u>Exhibit 2</u>.  Degen told Ms. Shakour that she had not refused to come down on October 5th and that she would be happy to be there. <u>Degen Aff.</u>, ¶ 33, <u>Exhibit 1</u>.  Ms. Shakour stated that she never knew that Degen was in [acupuncture] therapy, and she went on to say, "I have a company to protect." <u>Degen MCAD Dep.</u>, at 77, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶ 33, <u>Exhibit 1</u>.  Ms. Shakour sounded very wound up, and Degen told her that Ms. Garneau must have blown things out of proportion. <u>Degen Aff.</u>, ¶ 33, <u>Exhibit 1</u>.

1.34    Degen then called Mary Garneau and asked her what she had said to Ms. Shakour to get her so upset.  Ms. Garneau answered: "I told her that you were a liability to the company." <u>Degen MCAD Dep.</u>, at 78, 86-87, <u>Exhibit 2</u>.  Degen said that she had never refused to come down on Friday, and Ms. Garneau agreed that it all was blown out of proportion. <u>Degen Aff.</u>, ¶ 34, <u>Exhibit 1</u>.  Ms. Garneau indicated that she had also told Ms. Shakour that Degen was restricted in her driving to 1 to 1 ¼ hours, which was not true and was not what Degen had told Ms. Garneau. <u>Degen MCAD Dep.</u>, at 79, <u>Exhibit 2</u>. Degen again informed Ms. Garneau that while it was more comfortable for her to drive

less than 2 hours in one sitting, she had always done what her job had required in the
New England Region. Degen Aff., ¶ 34, Exhibit 1.

1.35    On Friday, October 5, 2001, Degen attended a meeting in the Holliston office
with Mary Garneau, John Foundas, and Sheryl Holladay.  At the start of the meeting, Mr.
Foundas said there was "not one negative thing" that he could say about Degen's job
performance. Degen Aff., ¶ 35, Exhibit 1.  Then, all three stated that they had no idea that
Degen was undergoing treatments; they were mortified; and they accused Degen of
hiding the fact that she was undergoing acupuncture treatments.  Degen recounted
conversations she had had with Ms. Garneau about her medical treatments and
conversations with Ms. Shakour about the addictive properties of Vicodin.  Degen also
stated that she assumed that Ms. Garneau had kept them up to date, since her physician
had been sending reports and invoices to Goldwell's compensation insurance carrier,
CNA. Degen Aff., ¶¶ 15-16, 35-36, 62 & Exh. A, Exhibit 1.

1.36    *After Degen used the term "therapy" on October 3*, Mr. Foundas now stated on
October 5, that he wanted Degen to *drive to the Holliston office every Friday* and do her
Artec paperwork there, instead of in her home office, until Artec agreed to accept
Goldwell's computerized method for preparing reimbursement forms. Mr. Foundas said
that Artec was withholding money it owed to Goldwell because of paperwork it had not
received from Degen.  Degen corrected Mr. Foundas and told him that the paperwork had
already been corrected and received by Artec, which Mr. Foundas did not know. Degen
MCAD Dep., at 184, Exhibit 2.  Mr. Foundas admitted at his deposition that other than
David Bakey's complaint about Artec paperwork, which Degen had subsequently
provided to Mr. Bakey, Degen had no other problems with paperwork. Foundas Dep., at

15

72, Exhibit 5. After Degen informed Mr. Foundas that the Artec paperwork had, in fact, already been corrected and received by Artec, Mr. Foundas then shifted the rationale for Degen to drive to Holliston on Fridays and said that the reason was that Degen's handwriting was not legible and that the typing and printing of the Artec forms could be done at the Holliston office. Degen Aff., ¶ 35, Exhibit 1; Foundas Dep., at 65, Exhibit 5. At the end of the October 5th meeting, Degen was instructed not to do any work until Goldwell received medical notification of Degen's "work restrictions" and/or ability to work, and she was told to go home. Degen MCAD Dep., at 185-186, Exhibit 2; Degen Aff., ¶ 35, Exhibit 1. Ms. Shakour testified that Ms. Garneau told her that Degen had become a liability to the company if she was working without medical documentation. Shakour Dep., at 114, Exhibit 3.

1.37    Degen's treating physician, Jan Slezak, M.D., provided a handwritten note, dated October 9, 2001, to Mary Garneau, John Foundas, and Sheryl Holladay, in which he stated that he had been treating Degen since January 2001, and that she was capable of resuming her regular schedule [4 days in the field and 1 day in her home office], but that it was not advisable at that time to add 16 hours of driving time per month to Degen's schedule. Degen MCAD Dep., at 134-136, Exhibit 2; Defs.' SOF, Tab 6. .

1.38    Degen's regular schedule of 4 days of driving in the field; working 1 day in her home office; and receiving her weekly acupuncture treatments, followed by rest from driving for 3 consecutive days, became the accommodation that she and her physician necessarily sought in order for Degen to continue to function in her job. Degen MCAD Dep., at 110, 191, 203, Exhibit 2. Faced with 4-5-hours of driving on Fridays, into the indefinite future, Degen now sought an accommodation for her injury, pain, and

treatment plan. Degen testified that "work restrictions," as opposed to her own driving

guidelines, only came into play when her employers wanted to take Degen out of her

home office and out of her therapy and add 16 hours a month to her driving time,

indefinitely. At that point, her doctor told her that such a schedule would complicate the

healing process; he imposed his "restrictions or advice;" and he wrote his note, dated

October 9, 2001. Degen MCAD Dep., at 127-130, 134-136, Exhibit 2; Defs.' SOF, Tab 6.

Goldwell held out in its "Employee Policy and Procedure Manual" that Goldwell

provides "reasonable accommodation for the known physical...limitations of

qualified...employees with disabilities to enable them to perform the essential functions

of the position held...and to enjoy equal benefits of employment unless such

accommodation would impose an undue hardship on the Company." Degen Aff., ¶ 37 &

Exh. F, at 2, Exhibit 1. Clearly, Degen's schedule of 4 days of travel and 1 day in her

home office, which she had worked for over 3 years, to the benefit of Goldwell, did not

"impose an undue hardship on the Company." Kelley Dep., at 66-67, 82, Exhibit 4;

Foundas Dep., at 57, Exhibit 5.

1.39    Dr. Slezak provided a letter, dated October 17, 2001, to Mary Garneau with

copies to Sheryl Holladay and John Foundas, in which he stated that while Degen was

receiving weekly therapy, she was fully functional and that there were no restrictions on

Degen's job tasks. He also stated that to take Degen away from her weekly acupuncture

therapy and add another day of driving, of approximately 4 hours, was not advisable

because long periods of driving aggravated Degen's condition, and three consecutive

days off the road to recuperate were necessary at that time. Degen MCAD Dep., at 125-

126, 193, Exhibit 2; Defs.' SOF, Tab 7. Pursuant to Dr. Slezak's note, Degen could

perform the functions of her job with the accommodation of continuing on her regular

schedule, receiving treatments, and having the opportunity to recuperate after the

treatments. Defs.' SOF, Tab 7.

1.40    Subsequent to Dr. Slezak's October 9th note and his October 17th letter, Degen

was called into a meeting on Monday, October 22, 2001, at 4:00 p.m., in Goldwell's

Holliston office.  Renee Shakour, Laurie Viapiano, R.G. Shakour's HR director, Mary

Garneau, Goldwell's HR director, and Sheryl Holladay were present. Degen Aff., ¶ 39,

Exhibit 1.  Ms. Shakour, with whom Degen had always had an excellent relationship,

conducted the meeting, and it was immediately apparent to Degen that Ms. Shakour's

demeanor and attitude towards her had drastically changed.  Ms. Shakour spoke to Degen

in a condescending tone and rolled her eyes at everything Degen said. Degen Aff., ¶ 39,

Exhibit 1; Degen MCAD Dep., at 140-141, Exhibit 2.

1.41    *After Degen's physician twice requested the continuation of Degen's regular*

*schedule as a reasonable accommodation*, the defendants *upped the ante*, and Ms.

Shakour told Degen at the October 22nd meeting that (1) they were *eliminating 2 of*

*Degen's 4 office days per month and putting Degen on the highway to detail with account*

*executives on those 2 Fridays*, and (2) *Degen would drive to Holliston the other 2 Fridays*

*per month as her office (administrative) days*. Degen Aff., ¶ 39, Exhibit 1; Degen MCAD

Dep., at 199-200, Exhibit 2.  Given that Degen had to drive to and from an account

executive's territory to meet and then travel to the account executive's salons, and the

meeting sites ranged from 1 to 3 hours' distance from Degen's residence, the two Fridays

in the field added more driving time than four days' travel to Holliston. Degen Aff., ¶¶ 3,

6, Exhibit 1; Degen MCAD Dep., at 198, Exhibit 2.  Degen responded that 4 office days

were not enough as it was to handle all of her administrative work and now she would

have only 2 office days a month, 8 to 10 hours of which she would be in the car traveling

to Holliston instead of being effective in her home office. Degen Aff., ¶ 39, Exhibit 1.

She said that she felt like she was being set up to fail and that she was the only manager

who had 50 account executives, 10 educators, and 3 companies to manage. Id.; Degen

MCAD Dep., at 205, Exhibit 2.  The taking away of 2 of Degen's administrative days and

putting her in the field constituted both an administrative hardship and a physical

hardship. Degen Aff., ¶ 39, Exhibit 1; Degen MCAD Dep., at 200-201, Exhibit 2.

Because Degen had never been provided with an administrative assistant, as Ms. Shakour

and Ms. Holladay had promised when she was promoted in 2000, Degen was already

working weekends to catch up on administrative work and using vacation days to finish

what she could not complete on Fridays. Degen Aff., ¶ 41, Exhibit 1.

1.42    There was never any suggestion at the October 22nd meeting that Degen's travels

in the field on Fridays would be geographically limited to her residential area, and Degen

made Friday field trips that Fall that involved more driving time than Degen's trips to

Holliston on Friday. Degen Aff., ¶ 39, Exhibit 1; Degen MCAD Dep., at 199-200,

Exhibit 2.

1.43    During the October 22nd meeting, Degen asked if they had received her

physician's recommendation, and Degen stated that he had advised against putting her on

the road an additional day per week.  Degen's supervisors said that Degen would follow

the new schedule regardless of letters from her doctor. Degen Aff., ¶ 39, Exhibit 1;

Degen MCAD Dep., at 132, Exhibit 2.  Ms. Shakour said that if Degen did not like the

new schedule, Degen knew where the door was and could leave at any time. Degen

MCAD Dep., at 204, Exhibit 2; Degen Aff., ¶ 39, Exhibit 1.  Degen was forced to either

sign a document agreeing that she understood her new schedule or lose her job.  Ms.

Garneau said she thought Dr. Slezak's documentation was unclear, and Degen

encouraged Ms. Garneau to call Dr. Slezak for clarity. Degen MCAD Dep., at 196-197,

Exhibit 2.  Neither Dr. Slezak nor Ms. Garneau ever indicated to Degen that Ms. Garneau

had contacted Dr. Slezak for clarification. Degen Aff., ¶ 43, Exhibit 1.  Ms. Shakour told

Degen that they would "abide" Degen going to therapy on Fridays "for the time being."

Degen Aff., ¶ 39, Exhibit 1.

1.44    Ms. Shakour testified that prior to the October 22nd meeting with Degen, she, Ms.

Holladay, Ms. Viapiano (HR), and Ms. Garneau (HR) met and discussed the need for

Degen to come to the office on Fridays.  She admitted that they did not discuss medical

documentation of Degen's need for therapy and that there was no discussion of whether

any accommodation could or should be made. Shakour Dep., at 124-125, Exhibit 3.  Ms.

Shakour, the Vice President of R.G. Shakour, also testified that she regarded the issue of

whether or not an accommodation should be made to Degen's physical condition to be an

HR determination and not a determination in which she should be involved. Shakour

Dep., at 114, Exhibit 3.

1.45    John Foundas, President of Goldwell, testified that "[t]here was some paper that

[Degen] had some therapy to do" and that he learned from Ms. Garneau that Degen "was

claiming to have some treatments on Fridays." Foundas Dep., at 74, Exhibit 5.  Mr.

Foundas further testified that he "could not remember any particular thing that would be a

legitimate reason [not to be in the office on Fridays];" he felt that as an employer he had