the right to require Degen to come into the Holliston office; and he did not have knowledge about Degen's physical condition nor inquire about her condition. Id. at 75.

**There Was No Reasonable Business Reason for Degen to Be in Holliston**

<u>Discriminatory and Hostile Treatment</u>

1.46    After the October 22, 2001 meeting, Goldwell required that Degen drive to the Holliston office on October 26, 2001, and both Goldwell and R.G. Shakour required that she drive to the Holliston office on November 2, 2001. Degen Aff., ¶ 40, Exhibit 1. Degen was not provided with a desk or telephone, and she was shuffled from one space to another because the space(s) she was occupying were needed by other employees. Degen MCAD Dep., at 231, 261, Exhibit 2; Degen Aff., ¶ 40, Exhibit 1. The other managers were provided with office space, and Degen was not. Degen Aff., ¶ 40, Exhibit 1.

1.47    Degen spent 4 to 5 hours driving to and from Holliston to be in the office for approximately 3 hours, during which she was ostracized and disparately and negatively treated by management. Degen Aff., ¶ 40, Exhibit 1. Although Ms. Shakour had told Degen that they would "abide" her going to therapy on Fridays, "for the time being," Ms. Shakour, Mr. Foundas, and Ms. Holladay would not speak with Degen, and they treated her negatively. Degen MCAD Dep., at 139, Exhibit 2; Degen Aff., ¶ 40, Exhibit 1. Ms. Holladay and Ms. Shakour did not return Degen's telephone calls, and Degen was excluded from managers' meetings, which she had always attended. Id.

<u>Pretextual Reasons</u>

1.48    The reasons given for Degen's new schedule were pretexts for the defendants' failure to accommodate her disability, discriminatory conduct towards her, and retaliation

21

for requesting the accommodation of her regular schedule. There was no reasonable business reason to require Degen to be in the Holliston office on Fridays, instead of in her home office, to perform her administrative tasks. First, because Degen was not provided with space and equipment, she *could not perform* the majority of her administrative tasks *while in Holliston*. Without a computer, a fax, a copier, and a telephone, she could not prepare for sales meetings; prepare workshops and training for account executives and educators; plan blitz's, in-house promotions, and in-salon promotions; conduct telephone meetings with Education Director, Lisa Kelley, about Artec color-line classes, trainings, and mandatory meetings for Artec educators; confirm upcoming classes with salons; return telephone calls to salons about Artec products; recruit models and new educations; or plan and schedule future meetings, trainings, and events. Degen Aff., ¶ 41, Exhibit 1. Second, Artec had already received Degen's corrected paperwork for the three dates in Winter 2001, and any continued delay by Artec in paying Goldwell and/or R.G. Shakour the monies it owed was not caused by Degen's paperwork. Degen MCAD Dep., 162-164, 184, Exhibit 2; Foundas Dep., at 72, Exhibit 5. Third, Degen could address any alleged difficulty that Goldwell had with the legibility of her handwriting, *more than three years into her employment*, by converting her handwritten entries to typed entries or to computer entries in her home office and printing them out. Degen Aff., ¶ 41, Exhibit 1. The travel time to Holliston seriously eroded Degen's business hours, at the same time that the defendants eliminated at least 2 administrative Fridays per month by putting Degen in the field. Id. Fourth, although Degen was told that if she came to the Holliston office on Fridays, she could meet with other managers to set up business strategies, as well as meet with Mr. Foundas and Ms. Holladay, either such meetings were never held,

or Degen was not invited to participate. Degen Aff., ¶ 41, Exhibit 1; Degen MCAD Dep., at 139, Exhibit 2.

1.49    There was no reasonable business reason to require Degen to be in the field with account executives on two (2) Fridays a month, instead of performing her administrative tasks in her home office. First, it is the custom and practice in the hair products industry for brand managers to have one day per week to perform their administrative responsibilities, and Degen was the only manager who had responsibilities for 50 account executives, 10 educators, and 3 companies. Shakour Dep., at 53, Exhibit 3; Degen Aff., ¶ 39, Exhibit 1. Second, Fridays, the day on which Degen had her therapy sessions, was the day when most brand managers conducted their administrative tasks because salon personnel were busy with their customers. Id.; Degen Aff., ¶ 3, Exhibit 1. Third the arbitrary elimination of 50% of Degen's administrative days made absolutely no sense given that she performed the work of at least two people, Shakour Dep., at 22, Exhibit 3; Kelley Dep., at 64, 66, Exhibit 4, and although Ms. Shakour and Ms. Holladay acknowledged that Degen needed an administrative assistant, they never provided an assistant. Fourth, Degen was already working overtime on weekends to catch up on administrative work and using her vacation days to complete tasks, so any decrease in her administrative time had to be a set-up for Degen to fail, which could only diminish her employers' legitimate business purposes. Degen Aff., ¶¶ 39, 41, Exhibit 1; Degen MCAD Dep., at 205, Exhibit 2.

### The Need for Family Medical Leave Act Leave

1.50    Degen's additional weekly drives to and from Holliston on October 22, October 26, and November 2, 2001, aggravated her back and neck injuries and caused her a great

23

deal of pain. Degen Aff., ¶ 42, Exhibit 1. Degen left home at 6:30 a.m. to get to Holliston, and then she left at 11:30 a.m. to return to New Hampshire for her acupuncture appointment. Degen MCAD Dep., at 211, Exhibit 2. Degen then had 3 to 3 ½ hours of business hours left during which she could perform the administrative tasks in her home office, which she had been unable to perform in Goldwell's Holliston office. Degen Aff., ¶ 42, Exhibit 1. Driving 5 days per week was wearing down Degen, and she was in more pain than previously. Degen MCAD Dep., at 211, Exhibit 2; Degen Aff., ¶ 42, Exhibit 1.

1.51   Degen saw Dr. Slezak on November 6, 2001. Dr. Slezak told Degen that if her employers would not provide her with the accommodation of her normal schedule, then he recommended that Degen apply for intermittent leave and/or a reduced work schedule under the Family Medical Leave Act to enable Degen to undergo a more rigorous treatment plan and to abstain from distance driving for three consecutive days, over consecutive weeks, in order to heal. Degen Aff., ¶ 44, Exhibit 1; Degen MCAD Dep., at 110-111, 211-213, Exhibit 2. During this meeting, Dr. Slezak told Degen that based on MRI results, he was referring her to Douglas Black, M.D., a neurologist, for evaluation. Dr. Slezak said that he would be working diligently with Dr. Black to identify a specific treatment program that would more aggressively and directly address the injury that she had suffered, such as trigger point injections, so that Degen could return to work full-time from FMLA leave, as soon as possible. Degen Aff., ¶ 44, Exhibit 1.

1.52   On or about November 9, 2001, Degen requested in writing that Ms. Garneau provide her with FMLA forms so that she could give them to Dr. Slezak to complete. Degen informed Ms. Garneau in her letter that Dr. Slezak had advised that Degen work a 4-day week during her treatment with him and Dr. Black, and Degen requested receipt of

the forms as soon as possible so that she could commence the reduced schedule leave. Degen Aff., ¶ 45 & Exh. C, Exhibit 1. Ms. Garneau did not respond, and Degen had to again request FMLA forms on November 16, 2001. Degen Aff., ¶ 46 & Exh. D, Exhibit 1. Degen finally received the forms in late November; she took them to her primary care physician, Dr. McCarthy, in Gilford, New Hampshire, who approved the leave; Degen had Dr. Slezak complete the forms on November 30, 2001; and Degen then faxed the FMLA forms to Ms. Garneau. Degen Aff., ¶ 46, Exhibit 1.

1.53    Pursuant to Dr. Slezak's recommendation, Degen requested intermittent leave and/or a reduced schedule, under the FMLA, whereby she would work 4 days a week and undergo therapy and rest on Fridays, for the purpose of healing her back and neck injuries and/or reducing/eliminating her chronic pain. Degen MCAD Dep., at 110-111, Exhibit 2; Degen Aff., ¶¶ 8, 46 & Exh. E, Exhibit 1. Degen testified that she requested FMLA leave after her employers refused to comply with her doctor's recommendation that she continue to work in her home office and receive therapy on Fridays, and her doctor then recommended that she work a 4-day week to keep her off the road and in her therapy. Degen MCAD Dep., at 110-111, Exhibit 2.

1.54    As Degen's employers required and as was Degen's custom, she traveled wherever she was needed in October, November, and December 2001, notwithstanding her request for the accommodation of resuming her normal schedule, and in the absence of an accommodation, her compelled application for FMLA leave. Degen MCAD Dep., at 200-201, Exhibit 2; Degen Aff., ¶ 47, Exhibit 1. For example, Goldwell's Regional Manager, Mark Fontaine, notified Degen that Deb Cates, a new account executive in Vermont needed Degen to train her on Artec, and Degen traveled to Burlington,

Vermont, on Friday November 9th to train Ms. Cates. Degen MCAD Dep., at 207, Exhibit 2; Degen Aff., ¶ 47, Exhibit 1. Degen had scheduled this trip, which involved about 2 ½ hours driving time each way, in her monthly calendar, which pursuant to their business practice, she sent to Goldwell and R.G. Shakour one week prior to November 2001. Degen Aff., ¶ 47, Exhibit 1. Degen also worked with account executive, Sara Matthews, in the field on Friday, December 14, 2001, on a detail that had been scheduled a month earlier and reviewed by Goldwell and R.G. Shakour. Degen Aff., ¶ 47, Exhibit 1.

1.55  On or about December 7, 2001, Degen was in Holliston for her office day, and Ms. Garneau gave her a letter, dated December 6, 2001, advising Degen that she was required to get a second opinion about FMLA leave from the company's doctor in Franklin, Massachusetts. Degen Aff., ¶ 48, Exhibit 1; Degen MCAD Dep., at 111, Exhibit 2. The letter stated that "[p]ending our receipt of the Health Care Provider form enclosed herein, you are provisionally entitled to take the requested FMLA intermittent leave," and the second opinion was due within 30 days. Defs.' SOF, Tab 10. Degen understood this to mean that Goldwell would not make a determination about her application for FMLA leave until Goldwell received the second opinion. Degen MCAD Dep., at 111, 113, Exhibit 2. Degen testified:

> Q. Pending that, they tentatively granted your FMLA leave; isn't that true?
>
> A. Not to my understanding, No. Not until I had the second opinion was I allowed.
>
> Q. But you're saying at some point you were allowed to work only four days a week?
>
> A. I never got to that point. I never got to where I could do that.

Degen MCAD Dep., at 112, Exhibit 2.

26

. . . . . . . . . . . . . . . . . .

Q. [Regarding Ms. Garneau's letter about a second opinion] And in this document, it's true that you were informed by the company that, in fact, you were provisionally entitled to take the requested FMLA leave, right?
....

A. My understanding is that I could have it, pending on the receipt of the full medical forms enclosed that I [was] to have signed by their doctor.

I could not have it until they got the papers back. And I had 30 days. Pending on a receipt of a health care provider form enclosed that I had to go to their doctor, they had to fill it out, then I could receive FMLA leave, not any sooner.

And Mary explained this to me, and it's right here in black and white.

Q. What's your understanding of provisionally entitled as it's stated in that paragraph?

A. Provisionally entitled on the receipt of their doctor's. So I never got to be on leave because none of their doctors would take me. Along with that letter...there were medical forms that I [was] to bring and had 30 days to bring them back, and then my FMLA leave, if their doctor indeed saw it fit, I could go on it. That's what was explained to me.

Q. But not until then?

A. Not until then.

Q. Until then you had to work five days a week?

A. That was my understanding.

Q. Who told you that?

A. Mary and I spoke. And it would have been her telling me that.

Degen MCAD Dep., at 114-116, Exhibit 2.

Further, Goldwell's "Employee Policy and Procedure Manual" provided that any employee who went out on FMLA leave was required to use any earned, unused vacation or sick/personal time. Degen Aff., ¶¶ 37, 48 & Exh. F, at 9-10, Exhibit 1.

27

1.56   Degen had difficulty scheduling a second opinion in December, and in order to reduce her driving on Fridays, prior to Goldwell's determination concerning her FMLA application, Degen informed Ms. Garneau that she would take December 21st and December 28th as vacation days and begin intermittent FMLA leave, assuming it was granted, on January 1, 2002. Degen Aff., ¶¶ 48 & Exh. G, Exhibit 1; Degen MCAD Dep., at 117, Exhibit 2. Degen testified:

> Q.   Wasn't it vacation pay that you were just using for the day that you were just using for the day that you were not working, as you requested, a four day work week?
>
> A.   A vacation day is a vacation day.
>
> Q.   When did you request those vacation days?
>
> A.   To my understanding, because I couldn't get in to see a doctor, I did not want to keep going down to the office, driving two and a half hours down, staying three hours, two and a half hours back, so to my understanding it was I could not have the FMLA leave until I got the doctor's forms filled out.
>
> So I took my vacation days in Friday, on those two Fridays and would start in January with the assumption that I would have this back in time for January. I used my vacation days up due to the fact...that my understanding was that wasn't going to start until I got the forms back, the medical forms from their doctor. That was my understanding.

Degen MCAD Dep., at 117-118, Exhibit 2.

1.57   From mid-November to December 21, 2001, Degen did not hear from anyone at Goldwell or R.G. Shakour – it seemed to Degen as though she had become invisible or did not exist. Degen Aff., ¶ 50, Exhibit 1.

1.58   Degen never got the opportunity to go out on FMLA leave. She was terminated before her appointment with Goldwell's doctor for a second opinion about her request for leave, before the 30-day due date for the second opinion had passed, and before a

28

determination about her FMLA application was made. Degen MCAD Dep., at 111, 116, Exhibit 2; Degen Aff., ¶ 54, Exhibit 1. Degen had requested the accommodation of remaining on her long-standing schedule of 4 days of travel in the field and 1 day in her home office so that she could remain functional in her job, and instead her employers increased her travel time by adding a 5th day of driving every week, indefinitely, and reducing her days for conducting administrative work. Degen then requested FMLA leave to work a 4-day week, and instead, her employers terminated her employment. Degen Aff., ¶ 54, Exhibit 1.

### Degen's' Termination

1.59    On December 21, 2001, Sheryl Holladay called Degen and told her that Degen should leave her Christmas vacation in Vermont, on December 27, 2001, because Ms. Shakour wanted to meet with managers and educators about new educational programs for the New Year, and they really needed Degen's input. Degen MCAD Dep., at 234, Exhibit 2.

1.60    Degen drove to Holliston on December 27, 2001 for the "brainstorming" meeting. Only Ms. Shakour, Ms. Holladay, Ms. Garneau, and an individual from Human Resources were present. Ms. Shakour said they were dissolving Degen's position and that it had nothing to do with Degen's performance. Degen MCAD Dep., at 235, Exhibit 2. She said that Artec sales numbers had not been as high as they would like. Degen Aff., ¶ 52, Exhibit 1. Degen was in a state of shock. Degen MCAD Dep., at 245, Exhibit 2.

### Degen's Abrupt Termination Made No Business Sense

1.61    No one at Goldwell, R.G. Shakour, or Artec had ever hinted, let alone discussed the possibility that Degen's position might be eliminated. Degen Aff., ¶ 52, Exhibit 1.

29

Ms. Shakour testified that she could recall no conversation with Degen regarding Artec sales figures being flat or discussing Degen's views about how sales might be increased. Shakour Dep., at 139-140, Exhibit 3. Ms. Shakour admitted that R.G. Shakour had no sales figures that specifically related to Degen, and R.G. Shakour never sent any written communications to Goldwell about slipping or flat sales in Artec products. Id. at 49, 68. Mr. Foundas testified that sales people, not educators, are responsible for sales and that it was not Degen's responsibility to get new placements of Artec products. Foundas Dep., at 83, 92, Exhibit 5. Notably, Degen was the only employee laid off by Goldwell or R.G. Shakour at that time, notwithstanding the fact that she was not responsible for new placements of Artec products. Goldwell MCAD Int. Ans., No. 8, Exhibit 10.

1.62   Ms. Shakour told Degen on occasion that Artec set sales goals for its products that were unattainable for R.G. Shakour and Goldwell to reach – a practice sometimes used by a manufacturer to try and motivate the distributor to sell. Degen Aff., ¶ 13, Exhibit 1. Just as Ms. Holladay had instructed Degen to "fudge" her paperwork for Artec, Goldwell and R.G. Shakour knew how to "fudge" sales numbers. Kelley Dep., at 112, Exhibit 4. Goldwell and R.G. Shakour "fudged" the sales numbers that they provided to Degen throughout her employment. The numbers they provided were frequently below the sales figures that Degen had recorded and/or received from the sales staff in the field. Degen Aff., ¶ 14, Exhibit 1. Bonuses were based on sales figures, and by deflating the actual sales numbers, Degen's employers were able to save money and increase their profits. Id. On those occasions when Mark Fontaine, Regional Manager for Goldwell, shared his sales numbers with Degen, the numbers were always thousands of dollars higher than the numbers that corporate presented to Degen. Id. Mr. Fontaine made no comment as to

30

why the numbers differed – he only said that he knew nothing, heard nothing, and said nothing, and that that was the way it will stay. Degen Aff., ¶ 14, Exhibit 1.

1.63    Ms. Shakour had told Degen in August 2001 that she had just told Leland Hirsh, owner of Artec, that she would not permit Artec to hire Degen as an Artec Regional Manager because Degen was too valuable to R.G. Shakour to let go. Degen Aff., ¶ 27, Exhibit 1. If, as the defendants now claim, the decision to eliminate the position of Artec Brand Manager was discussed as early as August 2001, then Ms. Shakour's statements to Degen that *same month*; that is, Degen was such an asset and too valuable for R.G. Shakour to permit Leland Hirsch to hire away to Artec, was disingenuous at best and otherwise, malicious. Goldwell MCAD Int. Ans., No. 5, Exhibit 10; Goldwell Court Int. Ans., No. 8, Exhibit 9

1.64    Degen was also in the middle of the huge *6-month Artec* hair color launch and promotional campaign, which she, Jon Shakour, and Lisa Kelley had planned in late September 2001. Kelley Dep., at 71-72, Exhibit 4; Degen Aff., ¶ 30, Exhibit 1; Foundas Dep., 58-59, Exhibit 5. Ms. Kelley, who had no advance knowledge that Degen would be terminated, was "obviously very surprised." She testified that she and Degen were "in the middle of this huge training campaign with this new color line and that we were about to, you know, hit the streets with. I mean it was an absolute shock to me...I was just shocked." Kelley Dep., at 69, 71-72, Exhibit 4.

**The Defendants Cannot Agree on Who Decided to Terminate Degen**

1.65    Goldwell and R.G. Shakour have given five (5) different accounts of who made the decision to "eliminate" Degen's position: (1) John Foundas, Sheryl Holladay, and Renee Shakour, Goldwell Court Int. Ans., No. 8, Exhibit 9; (2) Renee Shakour and

31

Sheryl Holladay, Goldwell Court Int. Ans., at Exh. 2, Exhibit 9; (3) John Foundas, Foundas Dep., at 33, Exhibit 5; (4) Renee Shakour, John Foundas, and maybe Mary Garneau, Shakour Dep., at 65, Exhibit 3; (5) Renee Shakour, Jon Shakour, and maybe Mary Garneau, Shakour Dep., at 133, Exhibit 3. John Foundas testified that he alone made the decision in late November/early December 2001, and the defendants elsewhere claim the decision was formulated in August 2001. Foundas Dep., at 33, Exhibit 5; Goldwell's MCAD Int. Ans., No. 5, Exhibit 10; Goldwell Court Int. Ans., No. 8, Exhibit 9.

**Degen Was Refused a 3-Day a Week Position She Requested to Fill**

1.66    Degen had not yet filled a position she was hiring for; that is, a part-time Educator, subcontractor position for a guaranteed 3 days work per week, and she requested at the December 27th termination meeting that she fill this part-time position, which was still open and for which she was obviously qualified. Degen MCAD Dep., at 239, Exhibit 2. Ms. Shakour said that the part-time Educator position was not a possibility for Degen, and she did not provide any reason. Degen Aff., ¶ 52, Exhibit 1; Degen MCAD Dep., at 239, Exhibit 2. Ms. Holladay then stated that Degen could do shows when needed. Id. Given there was only one show per year, Degen could not make a living and declined. Degen MCAD Dep., at 239, Exhibit 2. They asked Degen to sign a release form, which she declined to do, and then they took Degen's company car and sent her home in a taxi. Degen Aff., ¶ 52, Exhibit 1.

32

**Degen's Position Was Not Eliminated**

<u>Goldwell and R.G. Shakour Began to Try and Fill the Position on January 1, 2002</u>

1.67    Degen spoke with Vicki Bruton, Artec's Regional Sales Manager for the Northeast, on the day she was terminated, December 27, 2001, and Ms. Bruton had no knowledge that Degen's Brand Manager position, *for which Artec paid one-half (1/2) the salary*, had been "eliminated." <u>Degen Aff.</u>, ¶ 53, <u>Exhibit 1</u>. Ms. Bruton told Degen that her own job would now be very difficult due to the fact that Degen took a lot of the responsibilities off of Ms. Bruton. <u>Id</u>; <u>Degen MCAD Dep.</u>, at 33-34, <u>Exhibit 2</u>. Ms. Bruton said that she felt certain that Artec would demand a replacement in Degen's position, and Ms. Bruton subsequently told Degen that R.G. Shakour and Goldwell did, in fact, start to look to fill the position of Artec Brand Manager, on January 1, 2002. <u>Degen Aff.</u>, ¶ 53, <u>Exhibit 1</u>; <u>Degen MCAD Dep.</u>, at 21, 34, <u>Exhibit 2</u>.

<u>Renee Shakour Described the Position as "Eliminated," Quote-Unquote</u>

1.68    Lisa Kelly testified that very shortly after Degen's termination, Renee Shakour came into Ms. Kelley's office and told Ms. Kelley that Degen's position had been "eliminated," using her hands to make the gesture of quotation marks around the word, "eliminated," as she spoke. Ms. Shakour told Ms. Kelley, "I don't think this is the last we've heard from her, though." <u>Kelley Dep.</u>, at 96, <u>Exhibit 4</u>. Ms. Kelley told Degen that Ms. Shakour asked her whether or not Ms. Kelley knew if Degen was going to take any legal action. <u>Degen Aff.</u>, ¶ 56, <u>Exhibit 1</u>.

<u>Renee Shekour Asked Ms. Kelley If an Artec Educator Could Replace Degen</u>

1.69    Ms. Kelley also testified that immediately after Degen's termination, Ms. Shakour asked Ms. Kelley if she thought Michelle Geremia, an Educator for Artec, could perform

33

Degen's Artec Brand Manager job. Ms. Kelley told Ms. Shakour that Ms. Geremia was not trained in hair color; she was not qualified to ride around with sales representatives; and she could not handle Degen's job. Kelley Dep., at 78, 100-101, Exhibit 4.

### R.G. Shakour Advertised for an Artec Brand Manager

1.70    R.G. Shakour advertised for and attempted to fill Degen's position. Susan Pugh, who was an account executive for Goldwell and then for R.G. Shakour, kept Degen apprised, in Spring through Fall 2002, of R.G. Shakour's efforts to fill Degen's position, by sending Degen advertisements that R.G. Shakour placed in the Boston Globe and a flyer for an advertisement in Beauty Industry Magazine, which Ms. Shakour distributed at a sales meeting in Fall 2002 when she offered $500 to anyone who could find Ms. Shakour an Artec Brand Manager. Degen MCAD Dep., at 18-19, Exhibit 2; Pugh Dep., at 77-78, 80-81, 94-96, Exhibit 6; Degen Aff., ¶ 57 & Exhs. J, K, Exhibit 1. Ms. Pugh testified that R.G. Shakour's use of the phrase, "Brand Managers," in the advertisements, with an "s" "are needed to promote specific products such as Artec, L'Oreal, or Nexxus," meant the ads sought a separate brand manager in each of those product lines. She explained that based on her experience in the industry, it would not make sense for a single person to be a Brand Manager for Artec, L'Oreal, and Nexxus because (1) manufacturers want their products in a salon, and there would be a conflict of interests to have one person representing more than one brand; (2) Goldwell had an Artec Brand Manager, a L'Oreal Brand Manager, and a Nexxus Brand Manager during Degen's employment; and (3) during Pugh's employment at either Goldwell or R.G. Shakour, there was never anyone who held the Brand Manager title for more than one product line. Pugh Dep., at 87, 127-129, Exhibit 6; Degen Aff. ¶ 25, Exhibit 1. Ms. Shakour's use of

34

the disjunctive "or" in the ad also evidences that R.G. Shakour sought a brand manager for Artec, a brand manager for L'Oreal, and a brand manager for Nexxus, respectively. Degen Aff., at Exh. K, Exhibit 1.

Goldwell and R.G. Shakour Tried "A Quick Fix" Until a Replacement Could Be Found

1.71   Lisa Kelley testified that Goldwell and R.G. Shakour tried to get two to three individuals in each company trained in various aspects of Degen's job to function as Degen, as "a quick fix," until there was a full-time replacement who could handle the position. Kelley Dep., at 102, Exhibit 4.

Renee Shakour Continued to Try to Replace Degen from Within the Company

1.72   Ms. Kelley also testified that Ms. Shakour would ask her who Ms. Kelley thought would be a good candidate for Degen's job. Kelley Dep., at 103, Exhibit 4. At one point, Ms. Kelley suggested an Educator on her Nexxus sales team, Kendra Harrell, who was very good with color and did an excellent job at education, but when Ms. Kelley told Ms. Shakour that Ms. Harrell was a single mother who would have to come in late and leave early, Ms. Shakour shook her head and said that "it won't work." Kelley Dep., at 107-108, Exhibit 4.

David Hallgren Failed in His Mandate to Hire an Artec Brand Manager

1.73   David Hallgren, who was hired by Goldwell as Vice President of Sales & Operations in March 2002, testified that at the time he was hired, Goldwell's President, John Foundas, told him that hiring an Artec Brand Manager was to be one of Mr. Hallgren's top priorities. Mr. Hallgren testified that, in fact, hiring an Artec Brand Manager was one of Mr. Hallgren's top priorities. Hallgren Dep., at 54, Exhibit 7. Mr. Hallgren testified at his deposition that he had discussions with both Ms. Shakour and

Mr. Foundas about hiring an Artec Brand Manager who could support both R.G. Shakour and Goldwell; that is, about "refilling" Degen's position. Hallgren Dep., at 54, 96-97, 114-116, Exhibit 7. He further testified that because no one with Artec Brand experience applied, they had to hire an account executive, Lisa Leal, to promote Bionics and Artec in the short-run, until a full-time Artec Brand Manager could be hired and/or Ms. Leal could develop into an Artec Brand Manager. Hallgren Dep., at 96-97, 104, Exhibit 7. The intention of John Foundas, Renee Shakour, and Mr. Hallgren, at all times, was to fill a full-time Artec Brand Manager position, and the individual would be shared by both R.G. Shakour and Goldwell, just as Degen had been shared. Id. at 55. Apparently Ms. Leal did not show promise to take over Degen's position; Mr. Hallgren testified that she was terminated after two weeks on the job. Id. at 88-89.

Renee Shakour Offered $500 to Find an Artec Brand Manager

1.74   In September 2002, *after Mr. Hallgren failed in his mandate to hire an Artec Brand Manager, Ms. Shakour*, not one to be deterred, *offered $500 to any account executive who could find someone to fill the Artec Brand Manager position.* Ms. Pugh testified at her deposition that Ms. Shakour passed out to the account executives, during a sales meeting, a copy of an advertisement that R.G. Shakour placed in Beauty Industry Magazine for brand managers, which stated: "Brand managers are responsible for promoting a specific product line such as ARTEC, L'Oreal, or Nexxus." Pugh Dep., at 90, 93, 95, Exhibit 6; Degen Aff., ¶¶ 57, 60 & Exh. K, Exhibit 1. Ms. Pugh testified that Michelle White, a senior account executive, asked Ms. Shakour at the meeting, "Does this mean $500 for each manager?" Ms. Shakour said, "Yes." Ms. White asked for clarification and said, "Is this just for one position like L'Oreal?" Ms. Shakour answered,

"Yes, it's $500 for each position that you can fill." Ms. White said, "Great. I can make lots of money off of this." Pugh Dep., at 95-96, Exhibit 6.

Renee Shakour Stated She Would Deny She Offered $500 for an Artec Brand Manager

1.75    Tansey Plourde, who was an account executive at R.G. Shakour, called Degen in July 2004. Ms. Plourde was on the job market, and she asked Degen for a reference. Degen Court Dep., at 79, 84, Exhibit 8; Degen Aff., ¶ 61 & Exh. L (Exhibit 6 of Degen's Court Dep.), Exhibit 1. Ms. Plourde told Degen that prior to Ms. Plourde's separation from R.G. Shakour, Ms. Shakour called all senior account executives into a meeting and discussed Degen's lawsuit. Ms. Plourde said that Ms. Shakour told the account executives that Ms. Pugh had "gone to the other side;" Ms. Shakour was going to deny that she ever announced at a sales meeting that she would give $500 to anyone who could find her an Artec Brand Manager; and Ms. Shakour asked for a show of hands of who would testify against Degen and for Ms. Shakour. Degen Court Dep., at 81-82, 84, Exhibit 8; Degen Aff., ¶ 61 & Exh. L, Exhibit 1. Ms. Plourde said that even though she thought that if the account executives did not lie for Ms. Shakour they would lose their jobs, Ms. Plourde and another account executive stood up, said they wanted no part of the scam, and left the room. Degen Court Dep., at 82, Exhibit 8; Degen Aff., ¶ 61, Exhibit 1.

**The "Elimination" of Tansey Plourde's Job While She Was Out on FMLA Leave**

1.76    Tansey Plourde told Degen in July 2004 that three months after she and another account executive refused to raise their hands to show support for Ms. Shakour's denial that she offered $500 to anyone who could find her an Artec Brand Manager, Ms. *Plourde's job was "eliminated" while she was out on FMLA leave.* Degen Court Dep., at 84, Exhibit 8; Degen Aff., ¶ 61 & Exh. L, Exhibit 1.

### The Defendants' Unusual Sensitivity to the Issue of Disabilities

1.77   Former employee of Goldwell, Sarah Duffy, claimed that Goldwell discriminated against her on the basis of her disability. Goldwell Court Int. Ans., No. 19, Exhibit 9. John Foundas testified that Ms. Duffy was "challenged with MS…she was able to only work three hours a day or something…[and] [s]he was a salesperson that was to drive all day." Foundas Dep., at 77, Exhibit 5; see Pl.'s SOF 1.45, supra.

1.78   When Ms. Shakour, Vice President of R.G. Shakour, who signs documents as "President" of R.G. Shakour, was asked at her deposition whether R.G. Shakour had employed any individuals within the last three years who have a disability, she mentioned Lisa Cavanaugh, who is "mentally disabled" and "makes boxes in the warehouse." Shakour Dep., at 77, 163-164, Exhibit 3. When asked whether R.G. Shakour employed anyone else with a disability, Ms. Shakour responded that that was an HR question and that Ms. Cavanaugh is the only employee she knows about with a disability. Id. at 164-165; see Pl.'s SOF 1.44, supra.

### Post-Termination Resolution of a Dispute and the Diminishment of Pain

1.79   Goldwell's compensation carrier, CNA, paid for Degen's acupuncture treatments in 2001 until Degen used the term "therapy" in October 2001. On October 3, 2001, Degen mentioned to Mary Garneau that she had therapy sessions on Fridays and that 1 ½ hours of driving at one sitting was her optimal comfort zone. Degen MCAD Dep., at 95-96, 100, Exhibit 2. Degen received a letter with the next day's date, October 4, 2001, from CNA, referencing Ms. Garneau and stating that CNA would stop payment of Degen's medical treatments as of August 2001. Id. at 106. Degen's physicians, who regarded Degen's continued back and neck pain as the result of her June 15, 1999 vehicle

accident, billed CNA for Degen's treatments throughout her employment and into 2002. Degen Aff., ¶¶ 9, 35, 62, Exhibit 1.

1.80   CNA got a second opinion from Richard B. Hawkins, M.D., an orthopedic surgeon, who diagnosed cervical strain, bilateral trapezius muscle strain and thoracolumbar strain. Degen Aff., ¶ 62 & Exh. H, Exh. 1. Dr. Hawkins opined that (1) Degen's symptoms were causally related to the vehicle accident on June 15, 1999; (2) the recent cervical MRI that Dr. Slezak had ordered, showed extensive degenerative disc disease from C3-C7; (3) the motor vehicle accident on June 15, 1999 aggravated the underlying disc disease of the cervical spine, which had theretofore been asymptomatic, and thereby prolonged the nature of Degen's treatment after the June 15, 1999 accident; (4) Degen is bothered by prolonged driving; (5) Degen's current treatment program is palliative rather than curative; and (6) further treatment; that is, beyond the date of his examination, November 16, 2001, would be related to the underlying degenerative disc disease [which was aggravated by the June 15, 1999 accident] and not the motor vehicle accident of June 15, 1999. Degen Aff., ¶ 62 & Exh. H, Exhibit 1.

1.81   Degen challenged CNA's withholding of payments for treatments subsequent to August 2001, and the dispute was not resolved until almost one year after she was terminated on December 27, 2001. The dispute was first resolved in Degen's favor. In a decision dated May 21, 2002, the Hearing Officer of the New Hampshire Department of Labor, concluded that the preponderance of the evidence showed that Degen's "ongoing medical treatment is reasonable and medically necessary as well as causally related to her original accident of June 15, 1999." Degen Aff., ¶ 62 & Exh. I, at 3, Exhibit 1. On November 21, 2002, more than one year after Degen had requested the accommodation

of continuing to work in her home office and had then requested an application form for FMLA leave, the Appeals Board issued a decision, which overturned the Hearing Officer's decision, on the grounds that preexisting degenerative disc disease, which was aggravated by the 1999 accident, was the cause of a new symptom in the arm that Degen developed in Summer 2001. <u>Defs.' Garneau Aff.</u>, at Exh. B. All of Degen's medical evaluators, including CNA's Dr. Hawkins, found that Degen continued to suffer from back and neck pain, which was caused by the June 15, 1999 work-related accident and/or the aggravation that the accident caused to her pre-existing degenerative disc disease, and they all agreed that prolonged driving exacerbated Degen's injuries and/or the preexisting disease. <u>Degen Aff.</u>, ¶¶ 15, 62 & Exhs. A, H, I, <u>Exhibit 1</u>; <u>Defs.' Garneau Aff.</u>, at Exh. B.

1.82    Degen received trigger point injections in 2002, pursuant to Dr. Slezak's original treatment plan, dated January 5, 2001, and these injections provided Degen with substantial relief from the chronic pain that she suffered as the result of her June 15, 1999 accident, as well as from the aggravation that the accident caused to her theretofore asymptomatic degenerative disc disease. <u>Degen Aff.</u>, ¶¶ 15, 62 & Exh. A, <u>Exhibit 1</u>.

## 2.0    STATEMENTS OF DEFENDANTS IN DISPUTE

> Defs.' SOF 4   As ARTec Brand Manager, Plaintiff was responsible for developing sales of ARTec products, conducting training classes about ARTec products at various salons, and managing the Goldwell and Shakour subcontractors who also conducted such training. One of Plaintiff's job duties was the production and administration of various paperwork required by ARTec. (*Ex. 1*, Degen Dep. at 66.)

2.1    **Denied in part:**    See Pl.'s SOF 1.4, 1.7-1.8, <u>supra</u>. As Artec Brand Manager, Degen was primarily responsible for coordinating Artec product training. <u>Degen Aff.</u>, ¶ 5, <u>Exhibit 1</u>. Although Artec set sales goals for its distributors, Goldwell and R.G. Shakour, which Renee Shakour considered to be unattainable goals, sales

40