personnel; that is, account executives, were responsible for sales, not Degen. <u>Degen Aff.</u>,
¶ 13, <u>Exhibit 1</u>; <u>Foundas Dep.</u>, at 83, 92, <u>Exhibit 5</u>. Mr. Foundas testified that sales
people, not educators, were responsible for sales and that it was not Degen's
responsibility to get new placements for Artec products. <u>Foundas Dep.</u>, at 83, 92, <u>Exhibit
5</u>. Ms. Shakour admitted that R.G. Shakour had no sales figures specifically related to
Degen. <u>Shakour Dep.</u>, at 49, <u>Exhibit 3</u>. Further, the primary responsibilities of brand
managers are conducted in the field, where training, education, sales, and events take
place. While Degen prepared calendars and paperwork for Artec, she prepared the
reimbursement paperwork for her educators once a month, and her non-paperwork tasks
consumed, by far, the greater part of her Friday office days. <u>Degen Aff.</u>, ¶ 41, <u>Exhibit 1</u>.
Degen spent Mondays through Thursdays out in the field, and on Fridays she spent most
of her time communicating with account executives and educators by telephone to go
over scheduling and to problem solve; prepared for sales meetings; had conference calls
with Artec staff; planned blitz's, in-house promotions and incentives; recruited models;
recruited and hired educators to fill territorial needs; and conducted phone meetings with
senior educators about training and with salon owners with questions about Artec
products, among a host of other administrative tasks. <u>Id.</u> at ¶¶ 6-7.

> Defs.' SOF 5  Plaintiff generally visited salons and attended training classes
> Monday through Thursday each week; during calendar year 2001 (and even
> earlier in her employment) Plaintiff regularly worked at her home on Fridays to
> perform some of her duties, including her paperwork. Plaintiff's working at home
> on Fridays was not because of any medical condition or therapy. (<u>*Ex.1*</u>, Degen
> Dep. at 137 & 166.)

2.2    **Disputed:**    <u>See</u> Pl.'s SOF 1.5, 1.10, 1.14-1.15, 1.31, 1.38, <u>supra</u>. Degen's
ability to work on Fridays in her home office was a precondition to her acceptance of the
job of Artec Brand Manager in August 1998. Degen resides in New Hampshire and more

than 2 hours' driving distance from Goldwell's office in Holliston, Massachusetts. A round trip entails 4 to 5 hours out of the day, depending upon traffic and weather conditions. Degen Aff., ¶ 3, Exhibit 1. Degen negotiated to conduct her administrative tasks, which are customarily conducted on Fridays in the hair-care supply industry, in her home office. Id. Accordingly, she was required to purchase a computer, a fax machine, a copy machine, a desk, two telephone lines, and other miscellaneous items for her home office. Id. In order to try and minimize the pivotal role that Degen's home office played in her employment, Goldwell falsely claimed in its position statement to the MCAD that Degen began to use her home office only after she was promoted to Artec Brand Manager for the entire New England territory and became an employee of R.G. Shakour, as well as an employee of Goldwell, in 2000. Goldwell MCAD Pos. State., ¶ 6, Exhibit 11. After Degen had the work-related vehicle accident on June 15, 1999, she scheduled her medical treatments on Fridays so that she could conveniently complete them and expeditiously return to her home office and to her administrative tasks. Degen Aff., ¶¶ 8-10, Exhibit 1. Given that distance driving exacerbated Degen's back and neck injuries and caused additional pain, her ability to work in her home office on Fridays, which in turn enabled her to receive treatments and rest her back after the treatments, for three consecutive days off of the highway, effectively became an "accidental" accommodation and enabled Degen to function in her job. Degen Aff., ¶¶ 8-10, 15-19, Exhibit 1.

> Defs.' SOF 6   On or about June 15, 1999, Plaintiff was involved in a work-related automobile accident. Plaintiff returned to work at full duty on the day after the accident and did not request any accommodations in connection with the accident. (*Ex.1*, Degen Dep. at 103-104.)

2.3   **Denied in part:**     See Pl.s' SOF 1.9-1.10, 1.13-1.15, 1.17, 1.20, 1.22, 1.67, 1.79-1.81, supra. To the extent the defendants seek to minimize the seriousness of the

injuries that Degen sustained in her work-related accident, Degen denies this statement.

Degen's neck snapped back at the time the vehicle she was riding in was hit from behind,

and the police were called.  The accident occurred in Augusta, Maine, and Degen was

able to get back to New Hampshire and then see her own doctor, who determined that

Degen had sustained injuries to her back and neck. Degen Aff., ¶ 8, Exhibit 1.  Degen

was a workaholic who performed her job as Artec Brand Manager in an exceptionally

conscientious and competent manner, and she took every measure she could to prevent

her injuries from interfering with her job performance, including taking opioid

painkillers, which she did not like to take. Id. at ¶¶ 9-10, 15-18.  Lisa Kelley, Director of

Education at R.G. Shakour, testified:  "[Degen] was a blessing because I never worried

about anything she did.  The job was always done.  I didn't have problems to clean up or

things to go after.  I completely trusted her.  She worked like an Army of people." Kelley

Dep., at 67, Exhibit 4.  Renee Shakour asked Degen to train other brand managers; John

Foundas said he "loved Degen's ability to motivate the sales team;" Brook Carlson,

Artec's General Manager, wanted to clone Degen because she was such an asset to Artec;

Leland Hirsh, the owner of Artec, wanted to hire Degen as an Artec Regional Manager;

Vicki Bruton, Artec's Regional Manager, told Degen after she was terminated that Ms.

Bruton's job had just become more difficult due to the fact that Degen took a lot of the

responsibilities off her shoulders. Degen Aff., ¶¶ 22, 24, 27, 53, Exhibit 1; Degen MCAD

Dep., at 33-34, Exhibit 2.  The defendants, who were the beneficiaries of Degen's

workaholism and stoicism about her injuries and pain, are estopped from implying that

because Degen immediately returned to work and did not complain, she was not injured.

All of Degen's myriad of health care providers acknowledged that Degen was injured in

the June 15, 1999 accident and that the accident aggravated a preexisting degenerative disease that was not discovered until an MRI was performed in November 2001, which prolonged Degen's pain and treatments. Degen Aff., ¶ 62 & Exhs. H, I, Exhibit 1; Defs.' Garneau Aff., at Exh. B.

> Defs.' SOF 8   Goldwell's workers' compensation insurer, CNA Insurance ("CNA"), compensated Plaintiff for some treatment related to the June 1999 accident. (*Ex.1*, Degen Dep. at 106.) However, CNA refused to pay for acupuncture and other treatments Plaintiff received in 2001, claiming that such treatments were not reasonable, necessary or causally related to any work-related accident. (*Garneau Affidavit*, Attachment B.)(*Ex.1*, Degen Dep. at 106.)

2.4   **Disputed:**   See Pl.'s SOF 1.35, 1.79-1.82 and 2.3, supra. This statement is erroneous. Goldwell's compensation carrier, CNA, paid for Degen's acupuncture treatments in 2001 until Degen used the term "therapy" in October 2001. Degen MCAD Dep., at 106, Exhibit 2. On October 3, 2001, Degen mentioned to Mary Garneau that she had therapy sessions on Fridays. Degen received a letter, dated the next day, October 4, 2001, from CNA, which referenced Ms. Garneau and stated that CNA would stop payment of Degen's medical treatments as of August 2001. Id. at 95-96, 100, 106. Degen's physicians, who regarded Degen's continued back and neck pain as the result of her June 15, 1999 vehicle accident, billed CNA for Degen's treatments throughout her employment and into 2002. Degen Aff., ¶ 62, Exhibit 1. Degen's and her health care providers' dispute with CNA was not resolved until almost one year after Degen was terminated, and in the interim, a Hearing Officer at the New Hampshire Department of Labor ordered CNA to pay Degen's medical bills subsequent to August 1, 2001. Id. & Exh. I.

> Defs.' SOF 9   Plaintiff appealed CNA's decision to the Compensation Appeals Board of the State of New Hampshire. (*Ex.1*, Degen Dep. at 106-107.) Plaintiff testified at an evidentiary hearing in connection with the appeal.

2.5    **Disputed:**    See Pl.'s SOF 1.13, 1.80-1.82, supra. Defs.' SOF 9 in combination

with Defs.' SOF 10 falsely connotes that immediately after Degen's appeal and "an

evidentiary hearing," the Appeals Board upheld CNA's withholding of payment. Degen

did appeal CNA's withholding of post-August 2001 payments; she testified at an

evidentiary hearing; and *the Hearing Officer found in Degen's favor; that is, Degen's*

*"ongoing medical treatment is reasonable and medically necessary as well as causally*

*related to her original accident of June 15, 1999."* Degen Aff., ¶ 62 & Exh. I, Exhibit 1;

Degen MCAD Dep., at 107-108, Exhibit 2. CNA then appealed the Hearing Officer's

decision, and the Appeals Board found in CNA's favor, in a decision dated November 21,

2002 – *more than a year after Degen had requested an accommodation*, and failing to be

accommodated, had then requested FMLA application forms. Id.; Degen Aff., ¶¶ 37-38,

45-46, 62, Exhibit 1; Defs.' Garneau Aff., at Exh. B. All of Degen's medical evaluators,

including CNA's Dr. Hawkins, found that Degen continued to suffer from back and neck

pain which was caused by the June 15, 1999 accident and/or the aggravation that the

accident caused to a preexisting degenerative disc disease, which had been asymptomatic

prior to the accident and was not revealed until an MRI in November 2001. Degen Aff.,

¶62 & Exh. H, I, Exhibit 1; Defs.' Garneau Aff., at Exh. B. Degen received trigger point

injections in 2002, pursuant to Dr. Slezak's original treatment plan, dated January 5,

2001, and these injections provided Degen with substantial relief from the chronic pain

that she suffered as the result of her June 15, 1999 accident, as well as from the

aggravation that the accident caused to her theretofore asymptomatic degenerative disc

disease. Degen Aff., ¶¶ 16, 62, & Exh. A, Exhibit 1.

      Defs.' SOF 10   After the hearing, the Appeals Board held that, by August 2001,
      Plaintiff "had recovered from her work related injury and was experiencing

symptoms caused by other factors." (*Garneau Affidavit*, Attachment B.) Accordingly, the Appeals Board affirmed CNA's denial of benefits, holding that Plaintiff could not demonstrate that "the medical treatment she received after August 2001 was causally related to her June 15, 1999 work related injury." (*Garneau Affidavit*, Attachment B.)

2.6    **Disputed:**    See Pl.s SOF 1.13, 1.79-1.82 and 2.5, supra. Degen disputes this statement, in combination with Defs.' SOF 9, because jointly, the statements omit material facts and falsely suggest that CNA linearly prevailed in its dispute with Degen and Degen's physicians. Further, the Appeals Board based its decision on its conclusion that the new, additional symptom Degin experienced in Summer 2001; that is, pain in her arm, was causally related to Degen's degenerative disc disease, which had been aggravated by the 1999 accident. Defs.' Garneau Aff., at Exh. B. Therefore, throughout Degen's employment, the pain that she suffered in her back, neck, and at a later point, arm, was at all times directly and/or indirectly caused by her work-related accident.

Defs.' SOF 11   The final judgment of the Appeals Board was that, as of August 2001, Plaintiff "had recovered from her work-related injury." (*Garneau Affidavit*, Attachment B.)

2.7    **Denied in part:**    See Pls.' SOF 1.37-1.39, 1.50-1.51-1.54, 2.5, 2.6, supra. To the extent that the defendants impute that Degen was no longer negatively affected by the June 15, 1999 accident, after August 2001, or that her status under the workers compensation law did not influence the defendants' treatment of Degen, after August 2001, Degen denies this statement. As Dr. Slezak indicated in both his note, dated October 9, 2001, and his letter, dated October 17, 2001, *so long as* Degen was able to work in her home office on Fridays, receive pain relief therapy, and abstain from driving long distances three days in a row, to rest and recuperate, Degen could function in her job. Degen Aff., ¶¶ 37-38, Exhibit 1; Defs.' SOF, Tabs 6, 7. The addition of a 5th day of

driving to Degen's schedule aggravated her back and neck injuries and caused her a great

deal of pain. Degen Aff., ¶ 42, Exhibit 1. Degen testified: "My body was just falling

apart doing that." Degen MCAD Dep., at 211, Exhibit 2. The fact that Degen, who

"worked like an Army of people," felt compelled to request a 4-day work schedule and

lose income, because her back and neck could not withstand 5 days of long-distance

driving, is testimony that she *had not recovered* from her work-related injury and/or the

effects of that injury on a preexisting disc disease. Kelley Dep., at 67, Exhibit 4; Degen

MCAD Dep., at 110, Exhibit 2.

> Defs.' SOF 12    In August 2001, ARTec's Director of Education, David
> Bakey, informed Defendants that ARTec believed Plaintiff had "falsified"
> documents that she had submitted to ARTec by "changing the dates" on
> the documents. (*Ex.4.*)(*Ex.1*, Degen Dep. at 153.)

2.8    **Denied in part:**    See Pl.'s SOF 1.18-1.19, 1.24, 1.25, supra. To the extent

the defendants impute that they took Mr. Bakey's false accusation seriously; deny that

Sheryl Holladay caused Degen's submission of incorrect information for three dates;

and/or attempt to causally link Mr. Bakey's false accusation with Artec's chronic

withholding of reimbursement monies, Degen denies the statement. When Ms. Shakour

and Ms. Holladay received Mr. Bakey's letter in early September 2001, they engaged

Degen in a conference call during which Ms. Shakour and Ms. Holladay stated (1) they

did not like the tone of the letter; (2) they thought Mr. Bakey was "out of line writing the

letter;" (3) they thought the letter was a joke; and (4) they thought the accusation was

Artec's way of not wanting to pay what Artec owed. Degen MCAD Dep., at 172-173,

Exhibit 2. Lisa Kelley testified that Artec never paid its reimbursements, from "the very

day one," and that subsequent to Degen's employment, Artec "got into financial trouble"

and was bought out by L'Oreal. Kelley Dep., at 112, Exhibit 4. Ms. Holladay had

47

triggered Mr. Bakey's false accusation in June 2001, when Mr. Bakey asked Degen to

resubmit paperwork that had already been submitted, and Ms. Holladay ordered Degen to

send in the paperwork to Artec, "as is," and not to spend one more minute of Goldwell's

time on the paperwork. Degen MCAD Dep., at 154-155, Exhibit 2; Degen Aff., ¶ 20,

Exhibit 1. The paperwork at issue was comprised of submissions from educators to

Degen concerning the days that they had worked in the field on behalf of Artec's

products. Id. at 154. Degen's usual practice was to recheck the educators' paperwork

with her calendar before submitting it to Artec. Degen MCAD Dep., 154, Exhibit 2. The

paperwork Mr. Bakey was complaining about in September was the same paperwork Ms.

Holladay had told Degen to submit "as is." Degen Aff., ¶ 28, Exhibit 1. Upon learning

about Mr. Bakey's accusation, Degen immediately went through the paperwork she had

submitted and determined that the paperwork that Mr. Bakey alleged was missing for 25

dates was non-existent for all but 3 of the 25 dates; that is, no training was conducted on

the other 22 dates for which any paperwork was required. Degen MCAD Dep., at 162-

164, Exhibit 2. With the approval of Ms. Shakour and Ms. Holladay, Degen sent a

memorandum to Mr. Bakey expressing her dismay at his false accusation and attached

the corrected paperwork for February 20, 2001, March 1, 2001, and March 13, 2001—

dates that preceded Mr. Bakey's letter by six months. These three errors, which Degen

would have caught if she had not followed Supervisor Holladay's instruction not to check

the educators' paperwork, amounted to only $175 to $200, a miniscule fraction of the

$14,000 that the defendants now claim Artec owed at the time. Degen MCAD Dep., at

164, Exhibit 2; Degen Aff., ¶ 28, Exhibit 1; Defs.' Garneau Aff., ¶ 5. Lisa Kelly,

Director of Education at R.G. Shakour, testified that Ms. Holladay admitted to her that

she had told Degen to "fudge" the resubmission of the paperwork to try and expedite

Artec's payment and that it did not work. Kelley Dep., at 112, Exhibit 4.

> Defs.' SOF 13   ARTec informed Defendants that it was withholding monies
> that it owed to Defendants because of its dissatisfaction with Plaintiff's
> paperwork and its conclusion that Plaintiff had falsified documents. (*Garaneau
> Affidavit*, ¶ 5.)

2.9   **Denied in part:**     See Pl.'s SOF 1.18-1.19, 1.24-1.25 and 2.8, supra.  To the

extent that the defendants suggest that Degen's paperwork for Artec was the cause of

Artec withholding monies that it owed and/or that Ms. Shakour or Ms. Holladay believed

that the paperwork was the cause of Artec's witholding of monies, Degen denies the

statement. See 2.8.  Artec had had a great deal of turnover, and as a result, Degen had to

resend paperwork for reimbursements to Goldwell and R.G. Shakour, which Artec had

misplaced, on eight occasions within the previous three years. Degen Aff., ¶ 20, Exhibit

1.  Both Renee Shakour and Sheryl Holladay told Degen on multiple occasions not to be

concerned with Artec's requests for resubmissions of paperwork because it was Artec's

method for avoiding or delaying paying the money that Artec owed to Goldwell and/or

R.G. Shakour for education in its products. Id. at ¶ 21.  Defendants admit in Defs.' SOF

14 that Artec, at one point, was "in arrears by approximately $60,000." Defs.' SOF 14.

The defendants' imputation in this action that Degen's three errors, *in the amount of $150

to $200*, were somehow responsible for Artec's chronic withholding of monies that it

chronically owed, is ingenuous, fallacious, and laughable.

> Defs.' SOF 15   In late September or early October of 2001, Defendants
> requested Plaintiff to work in Goldwell's Holliston office on Friday,
> October 5, 2001. (*Ex.3*, Foundas Dep. at 101.)(*Ex.2*, Shakour Dep. at
> 103.)(*Ex.1*, Degen Dep. at 175-176.)

2.10  **Denied in part:**    <u>See</u> Pl.'s SOF 1.28-1.29, <u>supra</u>.  Degen received a voice

mail message from Sheryl Holladay, in which Ms. Holladay stated that Mr. Foundas

wanted Degen to come to the Holliston office for "a Friday meeting."  Ms. Holladay did

not specify the date of the Friday involved, and Degen was unable to reach her for

clarification.  For that reason, Degen called Mary Garneau on October 3, 2001, to inquire

about the date of the meeting so that Degen could adjust her acupuncture therapy session.

<u>Degen Aff.</u>, ¶¶ 31-32, <u>Exhibit 1</u>; <u>Degen MCAD Dep.</u>, at 95-96, <u>Exhibit 2</u>.

> Defs.' SOF 16   Following Defendants' request that Plaintiff report to the
> Goldwell office on Friday, October 5, 2001, Plaintiff reported to
> Defendants for the first time that, because of pain she attributed to her
> June 15, 1999 car accident, she was receiving therapy and maintained a
> "guideline" of driving a car for no more than 1.5 hours at a time.
> (<u>*Garneau Affidavit*</u> ¶9.)(<u>*Ex.1*</u>, Degen Dep. at 81-82, 99-101.)

2.11  **Denied in part:**    <u>See</u> Pl.s' SOF 1.29-1.35, <u>supra</u>.  Degen had discussed her

medical treatments and therapies previously with Ms. Garneau and Ms. Shakour, and her

health care providers had been billing Goldwell's compensation insurer, CNA, for her

treatments. <u>Degen Aff.</u>, ¶ 35, <u>Exhibit 1</u>.  With Degen's longstanding schedule of 4 days

of travel and 1 day in her home office, along with her acupuncture treatments on Fridays,

and rest afterwards, Degen was able to do whatever her job required, and she therefore

regarded her comfort zone of 1 ½ hours of driving as a "guideline." <u>Degen MCAD Dep.</u>,

at 81-82, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶ 32, <u>Exhibit 1</u>.  Ms. Garneau immediately construed

what for Degen was a guideline, as a "work restriction," and she told Ms. Shakour that

Degen was restricted in her driving. <u>Degen MCAD Dep.</u>, at 79, <u>Exhibit 2</u>.  Ms. Shakour

testified that she had conversations with Ms. Garneau in which Ms. Garneau stated that

Degen had a medical condition; the condition required medical documentation; and/or

Degen was a liability to the company if she continued to work without medical

50

documentation. Shakour Dep., at 112-115, Exhibit 3. The defendants falsely projected, onto Degen, Ms. Garneau's perception that Degen had a "work restriction," after Degen used the word "therapy" on October 3, 2001. The defendants have falsely pled and stated in answers to interrogatories that during the conversation *Degen said that she had "medical restrictions" or indicated that she was "medically restricted from" driving.* Defs.' First Amend. Ans., ¶ 12; Goldwell's Court Int. Ans., No. 27, Exhibit 9. Both Ms. Shakour and Ms. Garneau regarded Degen as "a liability to the company," and Mr. Foundas, Ms. Holladay, and Ms. Garneau stated that they were mortified that Degen was undergoing treatments. Degen Aff., ¶¶ 33-35, Exhibit 1; Degen MCAD Dep., at 78, 86-87. After the defendants consistently and falsely projected *their perceptions* of Degen as "medically restricted" and a "liability," onto Degen, they *now* attempt to depict Dr. Slezak's requests for an accommodation for a medical restriction as a *guideline.* See Defs.' SOF 29. Within the context of Degen's regular schedule, she could function with self-imposed guidelines. After the defendants punitively placed Degen on a schedule that required 5 days of long-distance driving, Degen's prior "guidelines" became a "medical limitation," which required accommodation. Through their discriminatory and retaliatory conduct towards Degen, the defendants successfully turned their false prophecy about Degen's condition into a true prophecy. See Pl.'s SOF 1.28-1.39.

> Defs.' SOF 17    Travel from Plaintiff's home to Goldwell's Holliston office required Plaintiff to drive two hours each way. (*Ex.5*, Degen Dep. II at 47.)

2.12    **Disputed:**    See Pl.'s SOF 1.5, supra. A round trip from Degen's residence in New Hampshire to Goldwell's office in Holliston, Massachusetts, entailed 4 to 5 hours, depending upon traffic and weather conditions. Degen Aff., ¶ 3, Exhibit 1.

>Defs.' SOF 18   Ms. Garneau informed Plaintiff that Goldwell was unaware
>Plaintiff was receiving therapy and there was no documentation of any medical
>restrictions in her personnel file. (_Garneau Affidavit_ ¶9.)

2.13    **Disputed:**    See Pl.'s SOF 1.13, 1.35, 1.79, supra. Degen admits that Ms.

Garneau claimed that she was unaware that Degen was receiving therapy and that there

was no documentation of any medical restrictions in her personnel file. Degen disputes

Ms. Garneau's claim that she was unaware that Degen was receiving therapy. Dr. Slezak

faxed a copy of his medical evaluation and recommended treatments for Degen to Ms.

Garneau, in January 2001, and Degen's physicians billed CNA throughout 2001. Degen

Aff., ¶¶ 16, 35, 62 & Exh. A, Exhibit 1.

>Defs.' SOF 20   Plaintiff agreed to provide medical documentation; however,
>Plaintiff told Ms. Garneau that she did not have any work restrictions and the 1.5
>hour driving limitation was merely a "guideline" that she followed. (_Ex.1_, Degen
>Dep. at 81-82, 100.)

2.14    **Disputed:**    See Pl.'s SOF 1.29-1.35, and 2.11, supra. Although the defendants

repeatedly projected their own perception that Degen had a medical limitation onto

Degen, Degen regarded her comfort zone of driving 1 ½ hours at one sitting as a

guideline, _so long as she worked her regular schedule_ of more than 3 years; that is, 4

days of travel in the field and 1 day in her home office. Degen MCAD Dep., at 81-82,

Exhibit 2; Degen Aff., ¶¶ 37-38, Exhibit 1. Degen's regular schedule enabled Degen to

receive acupuncture treatments on Fridays, recuperate for three consecutive days

following the treatments, and remain functional in her job. Degen MCAD Dep., at 110,

Exhibit 2; Defs.' SOF, Tabs 6, 7. As long as Degen worked her regular schedule, she had

no need to request the accommodation of working her regular schedule. Id.

>Defs.' SOF 23   On October 5, 2001, Mr. Foundas informed Plaintiff that
>Defendants wanted her to work at Goldwell's Holliston office (instead of her

home) on each Friday because management needed to have more involvement with Plaintiff's ARTec paperwork. (*Ex.1*, Degen Dep. at 183-184.)

2.15    **Disputed:**    See Pl.'s SOF 1.35-1.36, supra. The agenda at the October 5th meeting was not as streamlined as the defendants claim. Mr. Foundas prefaced the discussion by stating that he could not say "one negative thing" about Degen. Then Mr. Foundas, Ms. Holladay, and Ms. Garneau proceeded to discuss Degen's medical condition, and they all stated that they were "mortified" that Degen was undergoing treatments; they accused Degen of hiding the fact that she was undergoing acupuncture treatments. Degen Aff., ¶ 35, Exhibit 1. Degen had been told to come to the Holliston office for "*a Friday meeting*," on October 5, 2001. Now, at the October 5th meeting, and subsequent to Degen's use of the term "therapy" on October 3, Mr. Foundas said that he wanted Degen to drive to the Holliston office *every Friday* and do her Artec paperwork there, instead of in her home office, until Artec agreed to accept Goldwell's computerized method of preparing reimbursement forms. Id. Mr. Foundas said that Artec was withholding money it owed to Goldwell because of paperwork it had not received from Degen. Degen corrected Mr. Foundas and told him that the paperwork had been corrected and received by Artec, which Mr. Foundas did not know. Degen MCAD Dep., at 184, Exhibit 2. Mr. Foundas admitted at his deposition that other than David Bakey's complaint about Artec paperwork, which Degen had subsequently provided to Mr. Bakey, Degen had no other problems with paperwork. Foundas Dep., at 72, Exhibit 5. After learning that the Artec paperwork had, in fact, already been corrected and received by Artec, Mr. Foundas came up with a new rationale for why Degen should drive to Holliston on Fridays; that is, Degen's handwriting was not legible and the typing and printing of Artec forms could be done in the Holliston office. Degen Aff., ¶ 35, Exhibit 1;

Foundas Dep., at 65, Exhibit 5.  The meeting ended as it had begun – with a discussion of

Degen's medical condition.  Degen was instructed not to do any work until Goldwell

received medical notification of Degen's "work restrictions" and/or ability to work, and

she was told to go home. Degen MCAD Dep., at 185-186, Exhibit 2; Degen Aff., ¶ 35,

Exhibit 1.

> Defs.' SOF 24   On October 5, 2001, Plaintiff did not state an objection to
> reporting to Goldwell on Fridays.  (*Ex.1*, Degen Dep. at 185.)

2.16   **Denied in part:**        Plaintiff testified that she did not say to Mr. Foundas: I

don't think I need to come in; I don't want to come in on Fridays; or I prefer to stay at

home on Fridays. Degen MCAD Dep., at 185, Exhibit 2.  It is not accurate, however, to

say that Degen did not state an objection, in that she reminded Mr. Foundas of their

agreement when she was hired that she could have a home office due to the fact that

Holliston was a 2 plus-hours trip one way for Degen and a less than 1-hour trip for other

managers. Degen Aff., ¶ 35, Exhibit 1.  Mr. Foundas knew that Degen performed her

office work at home. Foundas Dep., at 52, Exhibit 5.

> Defs.' SOF 25   Plaintiff provided Defendants with correspondence from her
> physician, Dr. Jan Slezak, dated October 9, 2001.  (*Ex.6*) The note provided, in
> pertinent part, as follows:   "She is capable of resuming her regular schedule, but
> to take her out of her Friday therapy and add 16 hours/month of driving would not
> be advisable at this time."  (*Ex.6*)

2.17   **Denied in part:**        See Pl.'s SOF 1.37-1.38, supra.  To the extent that the

defendants impute that Dr. Slezak's note, dated October 9, 2001, was not a request for an

accommodation for Degen's back and neck injuries and/or the resultant pain, Degen

denies this statement.  Dr. Slezak was clearly seeking the accommodation that Degen be

permitted to continue working her regular schedule and not be required to drive an

additional 16 hours each month. Defs.' SOF, Tab 6.  Degen had been able to perform all

of the functions of her job, while injured, *so long as* she spent only 4 days driving in the field , worked 1 days in her home office, and received weekly acupuncture treatments, followed by rest from driving for 3 consecutive days. <u>Degen MCAD Dep.</u>, at 110, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶¶ 17-18, 37, <u>Exhibit 1</u>.  Faced with 4-5 hours of driving on Fridays, into the indefinite future, Degen now sought an accommodation for her injury, pain, and treatment plan. Degen testified that "work restrictions," as opposed to her own driving guidelines, only came into play when her employers wanted to take Degen out of her home office and out of her therapy and add 16 hours a month to her driving time, indefinitely.  At that point, Dr. Slezak told her that such a schedule would complicate the healing process; he imposed his "restrictions or advice;" and he wrote his note, dated October 9, 2001. <u>Degen MCAD Dep.</u>, at 127-130, 134-136, <u>Exhibit 2</u>; <u>Defs.' SOF</u>, <u>Tab 6</u>. Further, Goldwell held out in its "Employee Policy and Procedure Manual" that Goldwell provides "reasonable accommodation for the known physical...limitations of qualified...employees with disabilities to enable them to perform the essential functions of the position held...and to enjoy equal benefits of employment unless such accommodation would impose an undue hardship on the Company." <u>Degen Aff.</u>, ¶ 37 & Exh. F, <u>Exhibit 1</u>.  Clearly, Degen, who performed her job exceptionally well on her regular schedule, was a "qualified" employee, and clearly, Degen's schedule of 4 days of travel and 1 day in her home office, which *she had worked for over 3 years*, to the benefit of Goldwell, did not "impose an undue hardship on the Company." <u>Kelley Dep.</u>, at 66-67, 82, <u>Exhibit 4</u>; <u>Foundas Dep.</u>, at 57, <u>Exhibit 5</u>.

> Defs.' SOF 26    Plaintiff provided Defendants with correspondence from Dr. Slezak, dated October 19, 2001.  (*Ex.7*)  The correspondence stated, in pertinent part, as follows:

"There are no restrictions for [Plaintiff] and she is fully functional. [Plaintiff] would like to comply with her company's wishes concerning her work schedule on Fridays. However, to take her away from her weekly therapy and add another day of driving (approximately per day 4 hours) to her schedule would not be advisable at this time.

Although [Plaintiff] has not restrictions and is fully functional, long periods of driving at a time aggravates her condition causing her neck and her back to be stiff and very uncomfortable. I would advise only in necessary situations should [Plaintiff] add a 5th day a week of driving instead of 4 days a week to her schedule."

2.18    **Disputed:**    See Pl.'s SOF 1.38-1.39, and 2.17, supra. Dr. Slezak's letter was

dated October 17, 2001. Defs.' SOF, Tab 7. Notably, the defendants have omitted the

last paragraph of Dr. Slezak's letter, which states: "*Three consecutive days* off the road

seem to give her the *time* needed *to recuperate* which *is necessary at this time*." Defs.'

SOF, Tab 7 (emphasis added). Dr. Slezak, once again, indicated in this letter that Degen

is "fully functional" *so long as* Degen works her regular schedule and that she is at risk of

aggravating her neck and back injuries and of not healing, if she is compelled to

consistently drive 5 days a week and not have three consecutive days off the road to

recuperate. Id. Dr. Slezak again sought the accommodation of Degen continuing on her

regular schedule, and he states that it is medically *necessary* that Degen *not* drive long

distances for 3 consecutive days, with the understanding that an exceptional situation

may occasionally arise in Degen's job, which requires a 5th day of long-distance driving.

Defs.' SOF, Tab 7 (emphasis added).

Defs.' SOF 27    On October 22, 2001, Plaintiff attended a meeting with Ms. Garneau, Ms. Holladay and an R.G. Shakour Human Resources representative. (*Ex.1*, Degen Dep. at 132.)

2.19  **Disputed:**    See Pl.'s SOF 1.40, supra. This statement is erroneous.  Renee

Shakour was not only also in attendance, she conducted the meeting. Degen MCAD

Dep., at 132, 141, Exhibit 2; Degen Aff., ¶ 39, Exhibit 1.

> Defs.' SOF 28  On October 22, 2001, Ms. Garneau explained to Plaintiff that
> Defendants needed more specific information regarding her medical status
> because the documentation from Dr. Slezak was unclear.  (Ex.1, Degen Dep. at
> 196-197.)

2.20  **Disputed:**    See Pl.'s SOF 1.43, supra. The discussion of Dr. Slezak's requests

for an accommodation for Degen took place at the end of the meeting *after* Degen was

told that she now had to drive to Holliston 2 Fridays a month and drive in the field the

other 2 Fridays a month.  *After* Degen asked those present if they had received her

physician's recommendation and stated that he had advised against putting her on the

road an additional day per week, Degen was told that she would follow their new

schedule regardless of the letters from her doctor, and they did not think he had been

specific enough, anyway. Degen Aff., 39, Exhibit 1.  Ms. Shakour said that if Degen did

not like the new schedule, Degen knew where the door was and could leave at any time.

Degen MCAD Dep., at 204, Exhibit 2; Degen Aff., ¶ 39, Exhibit 1.  Ms. Garneau said she

thought Dr. Slezak's documentation was "unclear," and Degen encouraged Ms. Garneau

to call Dr. Slezak for clarification. Degen MCAD Dep., at 196-197, Exhibit 2.  Neither

Dr. Slezak nor Ms. Garneau ever indicated to Degen that Ms. Garneau, in fact, contacted

Dr. Slezak for clarification. Degen Aff., ¶¶ 43, Exhibit 1.

> Defs. SOF 29  On October 22, 2001, Defendants informed Plaintiff at that time
> that, pending receipt of clarified medical documentation, they would attempt to
> accommodate her "guidelines" by requiring her to drive to Goldwell's facility on
> only two Fridays each month. (Ex.1, Degen Dep. at 202-203.)

2.21   **Disputed:**   See Pl.'s SOF 1.12, 140-147, supra. This statement is entirely

fallacious. *First,* the defendants *never* used the term "accommodate" during this meeting,

and they by no means attempted to "accommodate" Degen with the new schedule they

imposed during the meeting, and which is falsely depicted in the statement. Ms. Shakour

testified that prior to the October 22nd meeting with Degen, she, Ms. Holladay, Ms.

Viapiano (HR), and Ms. Garneau (HR) met and discussed the need for Degen to come to

the office on Fridays. *She admitted that they did not discuss medical documentation of*

*Degen's need for therapy and that there was no discussion of whether any*

*accommodation could or should be made.* Shakour Dep., at 124-125, Exhibit 3. Ms.

Shakour, the *Vice President* of R.G. Shakour, also testified that she regarded the issue of

whether or not an accommodation should be made to Degen's physical condition to be an

HR determination and not a determination that she needed to be involved in. Id. at 114,

Exhibit 3. Further, when asked at her deposition whether R.G. Shakour had employed

any individuals within the last three years who have a disability, the only employee she

could name was Lisa Cavanaugh, who is "mentally disabled" and "makes boxes in the

warehouse." Shakour Dep., at 77, 163-165, Exhibit 3. John Foundas, who was not

present at the October 22nd meeting, but as President of Goldwell, no doubt had input to

the substance of the meeting, testified that "[t]here was some paper that [Degen] had

some therapy to do" and that he learned from Ms. Garneau that Degen "was claiming to

have some treatments on Fridays." Foundas Dep., at 74, Exhibit 5. Mr. Foundas further

testified that he "could not remember any particular thing that would be a legitimate

reason [not to be in the office on Fridays];" as an employer he had the right to require

Degen to come to the Holliston office; and he did not have knowledge about Degen's

58

physical condition nor inquire about her condition. <u>Foundas Dep.</u>, at 75, <u>Exhibit 5</u>.

*Second, after Degen's physician had twice requested* the continuation of Degen's regular

schedule as *a reasonable accommodation, the defendants upped the ante at this meeting.*

Specifically, they told Degen that (1) they were eliminating 2 of Degen's 4 office days

per month and putting Degen on the highway to detail with account executives on those 2

Fridays, and (2) Degen would drive to Holliston the other 2 Fridays per month as her

office (administrative) days. <u>Degen MCAD Dep.</u>, at 199-200, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶

39, <u>Exhibit 1</u>.  Given that Degen had to drive to and from an account executive's territory

to meet with the account executive and then travel to the account executive's salons with

the account executive, and the meeting sites ranged from 1 to 3 hours' distance from

Degen's residence, the *two Fridays in the field added more driving* than four days' travel

to Holliston. <u>Degen MCAD Dep.</u>, at 198, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶ 39, <u>Exhibit 1</u>.  Degen

responded that 4 office days were not enough to handle all of her administrative work,

and now she would have only 2 office days a month, 8 to 10 hours of which would be in

the car traveling to Holliston instead of being effective in her home office. <u>Degen Aff.</u>, ¶

39, <u>Exhibit 1</u>.  Degen said that she felt like she was being set up to fail and that she was

the only account executive who had 50 account executives, 10 educators, and 3

companies to manage. <u>Id.</u>; <u>Degen MCAD Dep.</u>, at 205, <u>Exhibit 2</u>.  The taking away of 2

of Degen's administrative days and putting her in the field constituted both an

administrative hardship and a physical hardship. <u>Degen Aff.</u>, ¶ 39, <u>Exhibit 1</u>; <u>Degen</u>

<u>MCAD Dep.</u>, at 200-201, <u>Exhibit 2</u>.  Because Degen had never been provided the

administrative assistant that Ms. Shakour and Ms. Holladay promised when Degen was

promoted in 2000, Degen was already working weekends to catch up on administrative

work and using vacation days to finish what she could not complete on Fridays. Degen

Aff., ¶ 41, Exhibit 1.  There was never any suggestion at the October 22nd meeting that

Degen's travels in the field on Fridays would be geographically limited to her residential

area, and Degen made Friday field trips that Fall that involved more driving time than

Degen's trips to Holliston on Fridays. Degen Aff., ¶ 39, Exhibit 1; Degen MCAD Dep.,

at 199-200, Exhibit 2.  There was no legitimate business reason for Degen's new

schedule, and the new schedule was punitive and intended to pose a hardship for Degen.

The defendants' claim that the new schedule was an "accommodation" is both brazen and

false. Degen Aff., ¶¶ 40-42, 47, Exhibit 1; see Pl.'s SOF 1.46-1.49.  Not only was Degen

not provided with an office while in Holliston, where she could perform her

administrative tasks, but she also endured ostracism from Ms. Shakour and Ms. Holladay,

who did not return her telephone calls, and Degen was excluded from managers'

meetings, which she had always attended. Degen MCAD Dep., at 139, Exhibit 2; Degen

Aff., ¶¶ 40-41, Exhibit 1.

> Defs.' SOF 30   On October 22, 2001, Defendants provided Plaintiff with
> a document, entitled "Written Warning," which discussed problems with
> ARTec paperwork and confirmed that Plaintiff would be required to report
> to the Goldwell office on two Fridays per month. (*Ex.11*)

2.22   **Disputed:**      See Pl.'s SOF 1.18-1.19, 1.24-1.25, 1.36, 1.40-1.43 and 2.8, 2.9,

supra.  Once again, the defendants distort the content of a document – what this

document "confirmed" was that Degen was required to drive to the Holliston office on 2

Fridays a month and to drive throughout the New England territory on all of the other

Fridays.  The written warning provides in part: "Effective immediately, you are to spend

two Fridays a month in the Goldwell office.  The Fridays are to coincide with the due

date of paperwork to ARTec and to be pre-scheduled. *All other Fridays you are to be out*