*in the field detailing with the Sales Consultants.*" <u>Defs.' SOF</u>, <u>Tab 11</u> (emphasis added). Further, the written warning reflects the defendants' attempt to create "a paper trail" concerning an exemplary employee, *after* Degen's physician twice requested a reasonable accommodation for Degen; that is, that she continue with the same schedule that she had worked from the beginning of her employment. <u>Defs.' SOF</u>, <u>Tabs 6, 7</u>. Degen had already corrected the 3 reimbursement forms from Winter 2001 and had submitted them to Mr. Bakey at Artec. <u>Degen MCAD Dep.</u>, at 184, <u>Exhibit 2</u>. Thus, Mr. Bakey's issue with Degen's paperwork had passed; Degen had no other paperwork issues; and Degen could address Mr. Foundas' concerns about the legibility of her handwriting and the typing and printing of forms more easily in her home office than in Holliston, where she was not provided office space or office equipment. <u>Foundas Dep.</u>, at 65, 72, <u>Exhibit 5</u>; <u>Degen Aff.</u>, ¶ 41, <u>Exhibit 1</u>.

> Defs.' SOF 31   Plaintiff's alleged "restrictions" or "guidelines" limited her ability to "operate" a vehicle, but did not limit her ability to ride as a passenger in a vehicle. (Ex.1, Degen Dep. at 83.)("Q: Did that mean you operating the vehicle or did it also mean you being a passenger in a vehicle? A: Operating.")

2.23   **Disputed:**   <u>See</u> Pl.'s SOF 1.41-1.42, 1.46-1.47, 1.50, 1.54 and 2.21, <u>supra</u>. The defendants appear to erroneously imply that Degen's required field work on Fridays, with her account executives, which, tellingly, the defendants omitted from their SOF 29 and SOF 30, did not require Degen to drive long distances. Degen testified that she had to drive to and from the destination within her New England Region, where she was to meet her account executive, and then after she reached the destination, the account executive would drive both of them to the salons where the account executive had appointments. <u>Degen MCAD Dep.</u>, at 199-200, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶ 47, <u>Exhibit 1</u>.

Degen's destinations in meeting her account executives were often at greater distances from her residence in New Hampshire than Goldwell's office in Holliston, Massachusetts. Degen MCAD Dep., 198, Exhibit 2. Degen reiterates the fact that her new schedule, as of October 22, 2001, after Dr. Slezak had twice requested the reasonable accommodation of Degen's regular schedule, was even more onerous and punitive than the original "new" schedule she was given on October 5, 2001, which required Degen to be in the Holliston office every Friday.

> Defs.' SOF 32   In November 2001, Plaintiff requested "reduced schedule" FMLA Leave in the form of a 4-day workweek. (*Ex. 8*)

2.24   **Denied in part:**   See Pl.'s SOF 1.46-1.47, 1.50-1.53, supra. Degen did apply for FMLA leave, at the recommendation of her physician, Dr. Slezak, but Degen's request to work a reduced schedule and to earn less income was not volitional. Degen was very fortunate in that she loved her job, and at all times prior to her request to continue to perform her administrative tasks in her home office, as an accommodation to her back and neck injuries, she received nothing but praise, accolades, and positive feedback from her supervisors. Degen Aff., ¶ 22, Exhibit 1; Degen MCAD Dep., at 103, 110-111, Exhibit 2. Degen testified that she only applied for FMLA leave "[a]fter they refused the doctor's orders...his advice of not...taking me out of my therapy and adding 16 hours of driving per month[.] I was told I was going to do it their way or I could leave." Degen MCAD Dep., at 110, Exhibit 2. Dr. Slezak told Degen, that based on MRI results, he was referring her to Dr. Black, a neurologist for evaluation, and that he and Dr. Black would concur on a treatment program that would more aggressively and directly address the injury that Degen had suffered, such as trigger point injections, so that Degen could return to work full-time from FMLA leave, as soon as possible. Degen

Aff., ¶ 44, Exhibit 1. In addition to the defendants' hostility to Dr. Slezak's requests for a reasonable accommodation, the defendants also evidenced hostility to Degen's request for FMLA leave. Degen had to make two written requests to Mary Garneau for FMLA leave application forms, on November 9, 2001 and November 16, 2001, before Ms. Garneau provided Degen with the forms. Degen Aff., ¶¶ 45-46 & Exhs. C, D, Exhibit 1. In her November 9, 2001 letter, Degen informed Ms. Garneau that Dr. Slezak had advised that she work a 4-day week during her treatment regime with Drs. Slezak and Black. Degen Aff., ¶ 45, Exhibit 2.

> Defs.' SOF 34    Plaintiff admitted at her deposition that she was not actually restricted from performing any work on a fifth day of the week. (*Ex.1*, Degen Dep. at 218-19)("Q: So you weren't really restricted [from] performing any work on that fifth day, right? A: Correct.")

2.25    **Disputed:**    See Pl.'s SOF 1.37-1.54 and 2.10-2.24, supra. Degen did not "admit" to anything that her employers did not already know. Degen and her physician repeatedly requested that Degen be permitted to work her regular schedule of 4 days of travel in the field and 1 day in her home office per week. The issue was never whether Degen could work 5 days a week – Degen worked more than 5 days a week. Degen Aff., ¶ 41, Exhibit 1. When the defendants refused to provide Degen with the reasonable accommodation of her regular schedule and thereby remove Degen from the highway on Fridays, Degen necessarily applied for reduced schedule FMLA leave so that she would again *be off the highway one business day a week*, continue to receive acupuncture treatments, as well as any other treatments that Drs. Slezak and Black recommended, and rest her back and neck for three consecutive days following the treatments. All the defendants had to do to continue to receive a full-time plus work week from Degen was

to allow her to work Fridays in her home office, as she had been hired to do and as she had done for over three years. Degen Aff., ¶¶ 3-4, Exhibit 1.

> Defs.' SOF 35   Defendants informed Plaintiff that they questioned the validity of the FMLA Certification. (*Ex.10*)

2.26   **Disputed:**   Ms. Garneau's letter to Degen, dated December 6, 2001, to which the defendants cite, does not inform Degen of a "validity" problem with Degen's FMLA Certification. Defs.' SOF, Tab 10. First, the defendants omit material sentences from documents; that is, in SOF 26 and SOF 30, and now they "add" a non-existent sentence to Ms. Garneau's letter. Degen testified that she was verbally informed that her employers wanted to get another opinion to determine that the FMLA leave was valid. Degen MCAD Dep., at 218, Exhibit 2.

> Defs.' SOF 37   On December 6, 2001, Defendants informed Plaintiff both verbally and in writing that she was permitted to work a 4-day week (and could take the Fridays off) pending receipt of the second medical opinion. (*Ex.10*)("Pending our receipt of the Health Care Provider form enclosed herein, you are provisionally entitled to take the requested FMLA intermittent leave"). (*Ex.1*, Degen Dep. at 220.) ("Q: Didn't Ms. Garneau sit down and explain in detail that you would be, in December, you could take those Fridays off, that your FMLA was granted pending the outcome of the medical certification issue? A: Yes.")

2.27   **Denied:**   See Pl.'s SOF 1.55-1.56, supra. The defendants have impermissibly "cherry picked" one line from Degen's deposition, which completely distorts Degen's testimony about when her FMLA leave was to begin. Immediately prior to the "cherry-picked" line, Degen testified: "You need to understand that I was on a five day week. So I was on a five day week Friday. I was not, I was not given FMLA leave until the second opinion came in." Degen MCAD Dep., at 220, Exhibit 2. Ms. Garneau may have sat down with Degen and she may have told Degen that Goldwell could allow intermittent leave of the type that Degen requested, but Degen came away from the

64

conversation with the understanding that FMLA leave could not, and would not, begin until after Goldwell received the second opinion. Degen MCAD Dep., at 111-116, Exhibit 2. Further, Goldwell's "Employee Policy and Procedure" required that any Goldwell employee who went out on FMLA leave use any earned, unused vacation or sick/personal time. Degen Aff., ¶ 1.55 and Exh. F, at 9-10, Exhibit 1. Degen had unused vacation, which she had to use and she did use in December 2001, prior to when her FMLA leave could begin. Degen testified:

> Q. Pending that, they tentatively granted your FMLA leave; isn't that true?
>
> A. Not to my understanding, No. Not until I had the second opinion was I allowed.
>
> Q. But you're saying at some point you were allowed to work only four days a week?
>
> A. I never got to that point. I never got to where I could do that.

Degen MCAD Dep., at 112, Exhibit 2.

. . . . . . . . . . . . . . . . . . . . . .

> Q. What's your understanding of provisionally entitled as it's stated in that paragraph?
>
> A. Provisionally entitled on the receipt of their doctor's. So I never got to be on leave because none of their doctors would take me. Along with that letter...there were medical forms that I [was] to bring and had 30 days to bring them back, and then my FMLA leave, if their doctor indeed saw it fit, I could go on it. That's what was explained to me.
>
> Q. But not until then?
>
> A. Not until then.
>
> Q. Until then you had to work five days a week?
>
> A. That was my understanding.

65

> Q.  Who told you that?
>
> A.  Mary and I spoke. And it would have been her telling me that.

Degen MCAD Dep., at 114-116, Exhibit 2.

Degen had difficulty scheduling a second opinion, and in order to reduce her driving on Fridays, prior to Goldwell's determination concerning her FMLA application, and in order to use vacation days, Degen informed Ms. Garneau that she would take December 21st and December 28th as vacation days and begin intermittent FMLA leave, assuming it was granted, on January 1, 2002. Degen MCAD Dep., at 117-118, Exhibit 2; Degen Aff., ¶ 48 & Exh. G, Exhibit 1. Given (1) Degen's consistent testimony that Ms. Garneau led her to understand that her FMLA request could not be granted until Goldwell received the second opinion; (2) Degen's repeated testimony that she worked a 5-day week until her termination, except for the vacation days she took, Degen MCAD Dep., at 111, 220, Exhibit 2; (3) Ms. Garneau's reluctance even to provide Degen with the FMLA forms, Degen Aff., ¶¶ 45-46 & Exhs. C, D, Exhibit 1; and (4) the defendants' failure to communicate with Degen from mid-November to December 21, 2001, Degen Aff., ¶ 50, Exhibit 1, the defendants' claim that they provided Degen with FMLA leave in December 2001 is neither credible nor true.

> Defs.' SOF 38  After December 6, 2001, during every week of Plaintiff's employment, Defendants permitted her to take every Friday off. To the extent Plaintiff worked on any Friday after December 6th, such work was not required by Defendants. (*Ex.1*, Degen Dep. at 219 & 222.)

2.28  **Disputed:**   See Pl.'s SOF 1.54 and 2.27, supra. The defendants did not "permit" Degen "to take every Friday off" after December 6, 2001, and Degen took two Fridays as vacation days, because otherwise, she was required to be in Holliston. Degen was in Holliston for her office day on December 7, 2001, when Ms. Garneau gave Degen

66

the letter, dated December 6, 2001, in which Ms. Garneau informed Degen that she must obtain a second medical opinion. <u>Degen Aff.</u>, ¶ 48, <u>Exhibit 1</u>. Sometime between December 7 and December 14, 2001, Degen wrote Ms. Garneau a note in which Degen stated that (1) she would work December 14; (2) she was going to take December 21 and December 28 as vacation days; and (3) Degen would begin her FMLA leave/reduced salary on January 1, 2002, assuming it was approved upon Goldwell's receipt of the second opinion. <u>Degen Aff.</u>, ¶ 48 & Exh. G, <u>Exhibit 1</u>; <u>Degen MCAD Dep.</u>, at 116-118, <u>Exhibit 2</u>. Degen took the vacation days because she had unused vacation days; Goldwell required any employee who took FMLA leave to use earned, unused vacation days; and *she did not want to have to drive 2 ½ hours to and from Holliston on Friday December 21 and December 28, as she was required to do*, before Goldwell received the second opinion and made a determination about Degen's request for FMLA leave. <u>Degen MCAD Dep.</u>, at 111, 116-118, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶ 48 & Exh. F, at 9-10, <u>Exhibit 1</u>. Degen was terminated on December 27, 2001. <u>Degen Aff.</u>, ¶ 52, <u>Exhibit 1</u>. Degen worked on Friday, December 7, in Holliston, as required by the defendants for her office day, and she worked on Friday, December 14, in the field on a detail with account executive, Sara Matthews, which had been scheduled a month earlier. <u>Degen MCAD Dep.</u>, at 220-221, <u>Exhibit 2</u>; <u>Degen Aff.</u>, ¶ 47, <u>Exhibit 1</u>. Pursuant to Goldwell's and R.G. Shakour's usual business practice, Degen sent her December calendar, with the December 14th appointment, to both companies, one week prior to December 2001. Thus, both companies knew that Degen would be out in the field on Friday, December 14, and neither Ms. Garneau nor anyone else ever indicated to Degen, after December 6, that Degen's detail on that day had become "optional." <u>Degen Aff.</u>, ¶ 47, <u>Exhibit 1</u>. If

67

Degen had been told that she was already on intermittent FMLA leave, which she was not, then she would not have come to Holliston on December 7 for an office day nor taken December 21 and December 28 as vacation days.

> Defs.' SOF 39   Defendants allowed Plaintiff to leave early to attend her treatment sessions whenever she requested, including on the Fridays she worked at Goldwell. (*Ex.1*, Degen Dep. at 208.)

2.29   **Denied in part:**   See Pl.'s SOF 1.43-1.51, supra. Renee Shakour told Degen at the October 22, 2001, meeting that they would "abide" Degen's therapy sessions "for the time being." Degen Aff., ¶ 39, Exhibit 1. During this same meeting, Ms. Shakour, with whom Degen had always had an excellent relationship, spoke to Degen in a condescending tone and rolled her eyes at everything Degen said. Id. Degen spent 4 to 5 hours driving to and from Holliston to be in the office for approximately 3 hours, during which she was ostracized, denied office space where she could perform her administrative functions, and excluded from managers' meetings that she previously attended. Id. at ¶¶ 40-42. Degen left home at 6:30 a.m. to get to Holliston, and then left at 11:30 p.m. to return to New Hampshire for her acupuncture treatment. She then had only about 3 to 3 ½ business hours left during which she could perform the administrative tasks in her home office, which she had been unable to perform in Goldwell's office. Degen Aff., ¶ 42, Exhibit 1. Driving 5 days per week wore down Degen; she was in more pain than previously; and she sought relief by applying for intermittent and/or reduced schedule FMLA leave. Degen MCAD Dep., 211, Exhibit 2; Degen Aff., ¶¶ 42-45, ¶Exhibit 1. The defendants did "abide" Degen's therapy sessions "for the time being" of two months, before they terminated her employment on December 27, 2001.

> Defs.' SOF 40   In August 2001, Defendants began to discuss the possibility of eliminating the ARTec Brand Manager position. (*Garneau Affidavit* ¶6.)

68

2.30   **Disputed:**   See Pl.'s SOF 1.20-1.23, 1.26-1.27, 1.64-1.65, 1.67-1.76, supra. This statement is false for several reasons. First, John Foundas contradicted this statement when he testified that he alone made the decision to eliminate the position of Artec Brand Manager in late November/early December 2001. Foundas Dep., at 33, Exhibit 5. Second, the defendants could not have contemplated eliminating a position, which they, in fact, did not eliminate. Subsequent to Degen's termination, the defendants unsuccessfully tried to recruit candidates for the Artec Brand Manager position from within their companies; through advertisements in the Boston Globe and trade publications; and by offering $500 to any account executive who could find an Artec Brand Manager. See Pl.'s SOF 1.67-1.76; Degen Aff., ¶¶ 53-61 & Exhs. J, K, L, Exhibit 1. The defendants' failure to fill Degen's position was not for want of diligent efforts to replace Degen. Third, Renee Shakour told Degen in August 2001, the same month that the defendants allege they were discussing the elimination of Degen's position, that Leland Hirsh, the owner of Artec asked Ms. Shakour if he could hire Degen away from R. G. Shakour and into a Regional Manager position at Artec. Ms. Shakour told Mr. Hirsh, "Absolutely not," that Degen was "such an asset" and "too valuable" for R.G. Shakour to lose. Degen Aff., ¶ 27, Exhibit 1. With any foresight that Degen's position might be eliminated, Ms. Shakour, no doubt, would have magnanimously referred Degen to Mr. Hirsh, instead of stating to Degen, "Let them get their own f-----g staff and leave mine alone." Degen Aff., ¶ 27, Exhibit 1. Fourth, Artec was paying one-half of Degen's salary, and Artec's New England Regional Manager, Vicki Bruton, had absolutely no inkling that Degen's job was going to be eliminated. Degen Aff., ¶ 53, Exhibit 1; Degen MCAD Dep., at 21, 33-34, Exhibit 2. Fifth, at the time Degen was terminated, she and

69

Lisa Kelley, Director of Education at R.G. Shakour, were in the middle of a huge 6-month Artec hair color launch and promotional campaign, which involved an enormous amount of training of account executives and was about to "hit the streets." Kelley Dep., at 69, 71-72, Exhibit 4. Jon Shakour, Lisa Kelley, and Degen developed the 6-month promotional agenda in late September 2001 – one month after the defendents claim to have discussed eliminating Degen's position. Their plan required Degen to spend most of her time promoting the color line, which is impossible to do without an extensive educational program with which to back the line. Degen Aff., ¶ 30, Exhibit 1. Jon Shakour, President of R.G. Shakour, would not have assigned Degen to a 6-month plan, which was to require 75% of her time, if there were discussions of eliminating Degen's position. Further, Artec corporate repeatedly told Degen that she was a major component of their support for the launch of the Artec color line. Id.

> Defs.' SOF 41   During May through November 2001, ARTec sales leveled-off and Defendants were not meeting their ARTec sales goals. (*Garneau Affidavit* ¶ 4.)(*Bartfield Affidavit* ¶4.)(*Ex.3*, Foundas Dep. at 94-95.)

2.31   **Disputed:**   See Pl.'s SOF 1.21, 1.26, 1.61-1.62, supra. If sales of Artec wet line products leveled off, which Degen disputes, the leveling was not related to Degen's job as it was constituted at the time of her termination. Further, the defendants *did not eliminate Degen's position*, which renders moot their attempt to link the alleged position elimination with an alleged leveling in sales. See Pls.' SOF 1.67-1.76. Renee Shakour testified that she could recall no conversation with Degen regarding Artec sales figures being flat or discussing Degen's views about how sales might be increased. Shakour Dep., 139-140, Exhibit 3. Ms. Shakour admitted that R.G. Shakour had no sales figures that specifically related to Degen and that R.G. Shakour never sent any written

70

communications to Goldwell about slipping or flat sales in Artec products. Id. at 49, 68. John Foundas testified that sales people, not educators, are responsible for sales and that it was not Degen's responsibility to get new placements for Artec products. Foundas Dep., at 83, 92, Exhibit 5. Notably, Degen was the only employee laid off by Goldwell or R.G. Shakour at that time, notwithstanding the fact that she was not responsible for new placements of Artec products. Goldwell MCAD Int. Ans., No. 8, Exhibit 10. Also, it is impossible to know what the figures set forth in Attachment A to Mary Garneau's affidavit mean. Defs.' Garneau Aff., at Exh. A. Ms. Shakour told Degen on occasion that Artec set sales goals for its products that were "unattainable" for R.G. Shakour and Goldwell to reach – a practice sometimes used by a manufacturer to try and motivate the distributor to sell. Degen Aff., ¶12, Exhibit 1. To the extent that Artec's "unattainable" goals were increased by 12 % from 2000 to 2001, the differences between actual sales and goals, set forth in Ms. Garneau's Attachment A, do not reflect a "leveling off," that is a decrease, in sales, but rather, the non-attainment of "unattainable" goals for 2001. The fact that R.G. Shakour and Goldwell "fudged" the sales numbers that they provided to Degen throughout her employment also casts doubt on the meaning of the defendants' numbers. The numbers they provided Degen were frequently thousands of dollars lower than the numbers corporate presented to Mark Fontaine, Regional Manager for Goldwell. Degen Aff., ¶ 14, Exhibit 1. Because Artec was in the midst of launching its new color line at the time of Degen's termination, the defendants' alleged sales numbers necessarily reflct the sale of wet products, not hair color products, which had not yet "hit the streets." Kelley Dep., 71, Exhibit 4. Further, as of August/September 2001, Degen was spending 75% of her time training, educating, and promoting the hair color line, not the wet line;

Renee Shakour and Jon Shakour had forecasted that the color line would take about a year to start to make money; and sales in the hair color line were expected to be brisk, once launched. Degen Aff., ¶¶ 26, 30, Exhibit 1; Kelley Dep., at 83, Exhibit 4. The defendants, who unsuccessfully tried to replace Degen and had to patch together "a quick fix" of her job functions while they conducted their search, *lost* sales by terminating Degen. Kelley Dep., at 101-104, Exhibit 4.

> Defs.' SOF 42   On December 27, 2001, Defendants informed Plaintiff that her employment was terminated because the ARTec Brand Manager position had been eliminated. (*Ex.1*, Degen Dep. at 234.)

2.32   **Denied in part:**   See Pl.'s SOF 1.59, 1.67-1.78, supra. Degen admits that the defendants told Degen at a meeting on December 27, 2001, that her position of Artec Brand Manager was being "dissolved" and that it had nothing to do with Degen's performance. Degen denies that the reason the defendants provided for her termination; that is, elimination of the Artec Brand Manager position, was true, and, therefore, Degen contends that she was terminated because she requested a reasonable accommodation and/or requested FMLA leave. Foundas Dep., at 75, Exhibit 5; Shakour Dep., 77, 163-164, Exhibit 3; Degen Aff., ¶¶ 54, 61, Exhibit 1. The defendants cannot even agree on who made the decision to terminate Degen, and the alleged reason has been totally discredited by the testimony of Degen, Lisa Kelley, Susan Pugh, and David Hallgren, who testified about the defendants' efforts to replace Degen. Degen Aff., ¶¶ 55-61 & Exhs. J, K, L, Exhibit 1; Degen MCAD Dep., at 18-19, 21, 33-34, Exhibit 2; Degen Court Dep., at 79, 81-82, 84, Exhibit 8; Kelley Dep., at 78, 96, 100-103, 107-108, Exhibit 4; Pugh Dep., at 77-78, 80-81, 87, 90, 93-96, 127-129, Exhibit 6; Hallgren Dep., at 54-55, 88-89, 96-97, 104, 114-116, Exhibit 7.

> Defs.' SOF 43   On December 27, 2001, Defendants offered Plaintiff a position as an educator, which Plaintiff declined. (*Ex.2*, Shakour Dep. at 146.)(*Ex.1*, Degen Dep. at 238-239.)

2.33   **Denied:**   See Pl.'s SOF 1.66, supra. This statement is a complete fabrication to cover the fact that there was absolutely no reason, except for the defendants' discriminatory and retaliatory motives in terminating Degen, why Degen could not have assumed the 3-day a week Educator position, as she requested during the termination meeting on December 27, 2001. Degen *hired and trained* educators; Renee Shakour relied on Degen to *train* managers of other brands; and Degen was *more than qualified* for the part-time Educator position. Degen Aff., ¶¶ 7, 24, 52, Exhibit 1. Degen sufficiently recovered from her shock during the termination meeting to request that she fill a part-time Educator position, a subcontractor position for a guaranteed 3 days work per week, for which she was hiring at the time. Id. at ¶ 52. Ms. Shakour stated that the part-time Educator position was not a possibility for Degen, and she did not provide any reason. Id.; Degen MCAD Dep., at 238-239, Exhibit 2. What the defendants *actually offered* to Degen was one day a year doing a show. Degen MCAD Dep., at 238-239, Exhibit 2.

> Defs.' SOF 44   Defendants did not hire anyone to replace Plaintiff in the position of ARTec Brand Manager. (*Ex.3*, Foundas Dep. at 86.)(*Garneau Affidavit* ¶8.)(*Bartfield Affidavit* ¶6.)

2.34   **Denied in part:**   See Pl.'s SOF 1.66-1.75 and 2.30-2.33, supra. Degen admits that the defendants failed in their efforts to replace her in the Artec Brand Manager Position. To the extent that the defendants' statement is intended to impute that Degen's position was "eliminated," Degen denies the statement. Immediately after Degen's termination, Ms. Shakour told Ms. Kelley that the Artec Brand Manager position

73

was "eliminated," using her hands to make quotation marks around the word "eliminated," as she spoke the word. Kelley Dep., at 96, Exhibit 4. Ms. Shakour also asked Ms. Kelley if Michelle Geremia, an Educator for Artec, could fill Degen's Brand Manager position. Ms. Kelley told Degen about Ms. Shakour's inquiry and testified that she made a joke about it because Ms. Geremia was so unqualified for Degen's position. Kelley Dep., at 78-79, Exhibit 4. From January 1, 2002, well into Fall 2002, the defendants attempted to fill the Artec Brand Manager position with an insider, through advertisements in the Boston Globe and trade publications; and through account executives, who would receive $500 if they could recruit an Artec Brand Manager for Renee Shakour. See Pl.'s SOF 166-175.

> Defs.' SOF 45   At his deposition, David Hallgren testified that he hired Lisa Leal to work as an Urban Territory Sales Manager (not a Brand Manager), though he believed the companies wanted an ARTec Brand Manager "in the future." (*Ex.12*, Hallgren Dep. at 80, 82, 104-105.) Mr. Hallgren also testified that ARTec sales had been decreasing prior to his hire and that there were not sufficient resources to hire a full-time ARTec Brand Manager. (*Ex.12*, Hallgren Dep. at 60-61.)

2.35   **Denied in part:**   See Pl.'s SOF 1.73 and 2.32, 2.34, supra. Artec sales had been decreasing because the defendants terminated Degen; the training in hair color "pretty much came to a halt" when Degen left; and "the quick fix" of parsing out Degen's job responsibilities, which Goldwell and R.G. Shakour attempted while looking for a replacement for Degen, was not effective. Kelley Dep., at 101-104, Exhibit 4. The intention of John Foundas, Renee Shakour, and Mr. Hallgren, at all times, was to fill a full-time Artec Brand Manager position, and the individual would be shared by both R.G. Shakour and Goldwell, just as Degen had been shared. Hallgren Dep., at 55, Exhibit 7. It is not the industry practice nor the practice of the defendants to have a brand manager

represent more than one product line, because manufacturers do not want the conflict of interest of which product line is being promoted more. Pugh Dep., at 127-129, Exhibit 6; Degen Aff., ¶ 25, Exhibit 1. *Because no one with Artec experience applied*, they had to hire an account executive, Lisa Leal, to promote Bionics and Artec in the short-run, until a full-time Artec Brand Manager could be hired and/or Ms. Leal could develop into an Artec Brand Manager. Id. at 96-97, 104. Ms. Leal did not show promise to take over Degen's position – Mr. Hallgren testified that she was terminated after two weeks on the job. Id. at 88-89. At the time Mr. Hallgren was hired by Goldwell as Vice President of Sales & Operations in March 2002, John Foundas told Mr. Hallgren that hiring an Artec Brand Manager was one of Mr. Hallgren's top priorities. Hallgren Dep., at 54, Exhibit 7. Mr. Hallgren had discussions with both Ms. Shakour and Mr. Foundas about hiring a full-time Artec Manager who could support both R.G. Shakour and Goldwell; that is, about "refilling" Degen's position. Id. at 54, 96-97, 114-116. If someone with Artec experience and/or who was appropriate to grow the Artec business applied or could be recruited, then Artec would pay part of the salary, as Artec did during Degen's tenure as Artec Brand Manager. Hallgren Dep., at 62, Exhibit 7. Mr. Hallgren left Goldwell on July 1, 2002. Id. at 23. *After Mr. Hallgren failed to hire a full-time Artec Brand Manager, Ms. Shakour*, in September 2002, *offered $500 to any account executive who could fill the Artec Brand Manager position*. Pugh Dep., at 90, 93, 95-96, Exhibit 6; Degen Aff., ¶¶ 57, 60 & Exh. K, Exhibit 1. Thus, the defendants were still searching for a full-time Artec Brand Manager in Fall 2002.

> Defs.' SOF 46    Susan Pugh testified at her deposition that an ARTec Brand Manager was not hired during her employment with Defendants. (*Ex.13*, Pugh Dep. at 101-02 and 105.)

2.36   **Denied in part:**   See Pl.'s SOF 1.66-1.75 and 2.32, 2.34-2.35, supra. Again, to the extent that the defendants intend to impute that Degen's Artec Brand Manager position was "eliminated," Degen denies this statement. Any failure by the defendants to fill Degen's position before Ms. Pugh left her account executive position at R.G. Shakour was not for want of trying. See Pl.'s SOF 1.66-1.78.

> Defs.' SOF 47   Lisa Kelly testified at her deposition that, as of her own separation from employment at Shakour in March 2002, an ARTec Brand Manager had not been hired. (*Ex.14*, Kelly Dep. at 105.)

2.37   **Denied in part:**   See Pl.'s SOF 1.66-1.75, 232, 234-2.36, supra.

To the extent the defendants imply that because Degen's position had not been filled by March 2002, the position of Artec Brand Manager had been "eliminated," Degen denies this statement. David Hallgren was hired by Goldwell the same month that Ms. Kelley left R.G. Shakour, and Mr. Foundas told Mr. Hallgren at the time of his hire that hiring an Artec Brand Manager was one of Mr. Hallgren's job priorities. Hallgren Dep., at 54, Exhibit 7. When no one with Artec experience applied, and Mr. Hallgren failed to hire a full-time Artec Brand Manager by July 2002, when he left Goldwell, Renee Shakour continued the search for an Artec Brand Manager. Hallgren Dep., at 74, Exhibit 7; Pugh Dep., at 90, 93, 95-96, Exhibit 6. Ms. Shakour offered $500 in September 2002 to any account executive who could find someone to fill the Artec Brand Manager position. Ms. Shakour subsequently discussed Degen's lawsuit at a sales meeting with account executives and announced that Ms. Pugh had "gone to the other side;" Ms. Shakour was going to deny that she ever offered $500 for an Artec Brand Manager; and Ms. Shakour asked the account executives for a show of hands of who would testify against Degen and for Ms. Shakour. During her deposition, Ms. Shakour, indeed, denied that she had

offered $500 for an Artec Brand Manager. Pugh Dep., at 90, 93, 95-96, Exhibit 6; Degen Court Dep., at 81-82, 84, Exhibit 8; Degen Aff., ¶ 61 & Exh. L, Exhibit 1; Shakour Dep., at 157, Exhibit 3.

                        Respectfully submitted,

                        Jeanne Degen
                        By her Attorneys,

                        */s/ Linda Evans*
                        Kevin G. Powers, BBO #405020
                        Linda Evans, BBO #635078
                        Rodgers, Powers & Schwartz LLP
                        18 Tremont Street
                        Boston, MA 02108
                        (617) 742-7010

DegenSOF