UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEANNE DEGAN,<br><br>   Plaintiff,<br><br>v.<br><br>GOLDWELL OF NEW ENGLAND,<br>INC. and R.G. SHAKOUR, INC.,<br><br>   Defendants. | CIVIL ACTION NO. 04CV11024 RWZ<br><br>Jonathan R. Sigel<br>BBO# 559850<br><br><br><br>Kevin Powers<br>BBO# 405020 |

**JOINT PRETRIAL MEMORANDUM**

I. **CONCISE STATEMENT OF THE EVIDENCE TO BE OFFERED BY THE PARTIES WITH RESPECT TO LIABILITY AND DAMAGES.**

 A. **Plaintiff's Statement.**

 Goldwell hired Degan on August 31, 1998, as Goldwell's "Artec Brand Manager." Goldwell is a distributor of hair products, and Artec manufactures a line of hair care products, which Goldwell distributed to hair salons. Degan was promoted to Artec Brand Manager for the entire New England Region in April 2000 and reported to Sheryl Holladay at Goldwell and Renee Shakour at R.G. Shakour.

 Degan was primarily responsible for coordinating Artec product training. Among other responsibilities, she booked education classes and organized workshops with salons and stores that sold to salons; "detailed" with account executives; that is, accompanied them to meetings with their salon accounts and helped them build their business; recruited, hired, and trained Artec educators; and prepared weekly and monthly paperwork for Artec and Goldwell. Account executives, not Degan, were responsible for sales and new placements of Artec products.

 Degan drove on Mondays through Thursdays from her home to an agreed-upon site to meet an account executive in the account executive's territory, and from there, they drove to the account executive's scheduled meetings with salons. Degan usually drove from 1 to 3 hours each way on Mondays through Thursdays. At the time of hire, Degan, who lives in New Hampshire, a 2 to 2 ½ hour drive from Goldwell's office in Holliston, Massachusetts, negotiated to perform her Friday administrative tasks in her fully-equipped home office. Degan's Friday tasks included communicating with educators, account executives, salons, and Artec staff, as well as planning,

scheduling, and recruiting responsibilities. Degan also prepared paperwork for reimbursements to Goldwell and R.G. Shakour from Artec, for education on Artec products, which comprised a small percentage of Degan's Friday tasks.

On June 15, 1999, Degan was injured in a work-related vehicular accident. Degan sustained back and neck injuries and filed a Workers Compensation claim. Goldwell's compensation insurer, CNA, paid Degan's medical bills. Degan's back and neck pain continued, and she was evaluated and treated by several orthopedic surgeons, underwent physical and massage therapy, and was prescribed Vicodin and/or Tylenol #3, both of which are opioids. Even though driving exacerbated Degan's back and neck pain, with four days of driving and Fridays in her home office, she was able to function in her job.

Degan became concerned about dependence on opioids and was referred to Jan Slezak, M.D., a physician who practices acupuncture, for evaluation and possible non-opioid therapy. In January 2001, Dr. Slezak evaluated Degan's back and neck injuries, determined they resulted from her June 15, 1999 accident, and prescribed a treatment regime, which included acupuncture treatments and weaning from Tylenol # 3. In January 2001, Degan began acupuncture therapy on Fridays with Dr. Slezak. She worked in her home office as usual on Fridays, drove 10 to 15 minutes to her therapy, drove home, and was back in her office in approximately one hour. Dr. Slezak advised Degan that in order to facilitate the healing of her back and neck injuries, it was important that she rest her back after the acupuncture treatments and drive as little as possible on Fridays, Saturdays, and Sundays.

Degan's performance is not at issue in this case. On September 1, 2001, David Bakey of Artec, falsely accused Degan of falsifying reimbursement forms that she had submitted. Holladay and Shakour told Degan that Artec was always in arrears in paying reimbursements that it owed to Goldwell and R.G. Shakour and that Bakey's accusation was a ploy to delay payment. As soon as Degan learned of Bakey's accusation, she reviewed the forms; determined that no paperwork was due for 22 of the 25 dates, for which Bakey claimed forms were missing; and submitted corrected forms for the other 3 dates to Bakey.

During the last week of September 2001, Degan received a voice message that she should come to Goldwell for *a Friday meeting* in Holliston. Degan called Mary Garneau on October 3, 2001 to learn on which Friday the meeting was to be held. Degan told Garneau that she had acupuncture therapy on Fridays related to back and neck injuries from the vehicle accident, and she needed to know the date so she could adjust her therapy session. Garneau said she would find out the date and get back to Degan. Garneau called Degan back and told her to come to Holliston that Friday, October 5, 2001. Garneau then asked Degan if she had any "work restrictions." Degan said, "No." Garneau asked how much Degan was driving, and Degan said that she was usually driving 1 to 1 ½ hours one way from one destination to another. Degan said that 1 ½ hours was her comfort zone, a guideline, but she was able to do her job.

With Degan's longstanding schedule of 4 days of travel and 1 day in her home office, along with acupuncture treatments and time for her back to recuperate on Fridays, Degan was able to function and to do whatever her job required.

Shakour called Degan on October 4, 2001 and angrily asked her why she had refused to come to Holliston for a meeting the next day. Degan said that she had not refused. Shakour then said she never knew Degan was in therapy – "But I have a company to protect." Degan then called Garneau, and Garneau said she had told Shakour that Degan was "a liability to the company" and "restricted in her driving." Degan met with Garneau, John Foundas, and Holladay on Friday, October 5, 2001. They said they were "mortified" that Degan was undergoing treatments, and they accused her of hiding the fact. Foundas then told Degan that he wanted her *to drive to the Holliston office every Friday* and do her Artec paperwork there until Artec agreed to accept Goldwell's computerized method for preparing forms. Foundas said that Artec was withholding money it owed because of paperwork that Artec had not received from Degan. Degan corrected Foundas and told him that Artec had already received the corrected paperwork, which Foundas did not know. Foundas admitted at his deposition that other than Bakey's complaint about Artec paperwork, which Degan had subsequently provided to Bakey, Degan had no other problem with paperwork.

Foundas then changed the reason for Degan to drive to Holliston on Fridays and said that Degan's handwriting was not legible and that the typing and printing of Artec forms could be done in the Holliston office. At the October 5th meeting, Degan was told not to do any work until Goldwell received medical notification of Degan's condition.

Dr. Slezak provided two written communications to the Defendants, in which he requested the accommodation that Degan be permitted to work her regular schedule of 4 days of driving and 1 day in her home office and receive her weekly acupuncture treatments, followed by rest from driving for 3 consecutive days, so that she could continue to function in her job. Dr. Slezak specifically advised against adding 16 hours of driving time per month to Degan's schedule. *After Dr. Slezak twice requested that Degan continue on her regular schedule as a reasonable accommodation*, the Defendants *upped the ante*. At a meeting on October 22, 2001, with Holladay, Garneau, Shakour, and an HR person, Shakour said they were *eliminating 2 of Degan's 4 office days per month and putting Degan on the highway to detail with account executives on those 2 Fridays, and Degan would drive to Holliston the other 2 Fridays per month as her office days*. Given that Degan drove from 1 to 3 hours to meet account executives, this newest schedule added more driving time than the four days' travel per month to Holliston, which the Defendants had implemented just two weeks prior. When Degan asked if they had received her physician's recommendations, they responded that Degan would follow the new schedule *regardless of letters from her doctor*. Shakour said that if Degan did not like the schedule, she knew where the door was and could leave at any time. Garneau said Dr. Slezak's documentation was "unclear," and Degan encouraged Garneau to call her doctor, which Garneau failed to do. Ms. Shakour told Degan that they would "abide" Degan going to therapy on Fridays "for the time being." All attendees, except Degan, had met prior to the October 22 meeting, and they did not discuss Degan's medical documentation or whether or not an accommodation should be made to Degan's physical condition. John Foundas knew "[t]here was some paper that [Degan] had some therapy to do" and that she "was claiming to have some treatments on Fridays," but he could not think of "any particular thing that would be a legitimate reason [not to be in the office on Fridays.]" Degan was not provided with an office, a telephone, or any office

equipment and she *could not perform* the majority of her administrative tasks *while in the Holliston office*. Artec had already received Degan's corrected paperwork, and any continued delay by Artec in paying Goldwell and/or R.G. Shakour was not caused by Degan's paperwork. Degan could address any alleged difficulty that Goldwell had with the legibility of her handwriting, *more than three years into her employment*, by converting her handwritten entries to typed entries or to computer entries in her home office and printing them out. Taking away 2 of Degan's 4 administrative days per month, when Degan was already working weekends and vacation days on administrative tasks that she could not complete on Fridays, was unreasonable and punitive.

Holladay and Shakour did not return Degan's phone calls, and Degan was excluded from managers' meetings, which she had always attended. Further, while Degan had been told that a reason to be in Holliston was that she could meet with other managers to set up business strategies and meet with Foundas and Holladay, either such meetings were never held, or Degan was not invited to participate. Degan's additional weekly drives to and from Holliston on October 22, October 26, and November 2 aggravated her back and neck injuries and caused her a great deal of pain. Dr. Slezak told Degan that if her employers would not provide her with the accommodation of her usual schedule, then he recommended that Degan apply for intermittent leave and/or a reduced work schedule under the FMLA to enable Degan to undergo a more rigorous treatment plan and to abstain from distance driving for 3 consecutive days, over consecutive weeks, in order to heal. On November 9, 2001, Degan requested in writing that Garneau provide her with FMLA forms to apply for a 4-day week during her treatment with Dr. Slezak and Dr. Black, a neurologist, to whom Degan was referred. Garneau did not provide the forms, and Degan had to again request the forms on November 16, 2001. Degan faxed the FMLA forms to Garneau on or about November 30, 2001. From mid-November to December 21, 2001, Degan did not hear from anyone at Goldwell or R.G. Shakour – it seemed to Degan as though she were invisible. In a letter dated December 6, 2001, Goldwell required Degan to get a second medical opinion within 30 days. Degan understood, from the letter and a conversation with Garneau, that she could not begin FMLA leave until Goldwell received the second opinion and made a determination about Degan's FMLA application.

Degan had difficulty scheduling the second opinion in December, and in order to reduce her driving on Fridays, prior to Goldwell's determination concerning her FMLA application, Degan informed Garneau that she would take December 21 and December 28 as vacation days and begin intermittent FMLA leave, assuming it was granted, on January 1, 2002. Goldwell's *Employee Policy and Procedure Manual* required any employee who went out on FMLA leave to use any earned, unused vacation time. Degan had unused vacation time, which she used in December 2001. Degan worked Friday, December 7, in Holliston and Friday, December 14, on a detail with an account executive in Vermont. Degan was called in from a vacation in Vermont for a December 27th "managers" meeting in Holliston. Only Shakour, Holladay, Garneau, an HR person, and Degan were present. Shakour said Degan's position was being "dissolved". Degan requested that she fill a part-time Educator, 3-day a week subcontractor, position for which she was hiring and had not filled. Shakour said the position was not a possibility for Degan and gave no reason. *Degan's position was not eliminated.* The Defendants unsuccessfully tried to replace Degan, from January 1, 2002 into the Fall of 2002.

B.    **Defendants' Statement.**

Defendants Goldwell of New England, Inc. ("Goldwell") and R.G. Shakour, Inc. ("Shakour") (collectively herein "Defendants") distribute hair care products to hair salons throughout New England and parts of New York. ARTec Systems Group, Inc. ("ARTec") was a manufacturer of certain hair care products distributed by Defendants. On or about August 31, 1998, Goldwell hired Plaintiff to perform the position of "ARTec Brand Manager," which position she held throughout her employment by Goldwell. Beginning in April 2000 and continuing through the end of her employment, Plaintiff also provided services as ARTec Brand Manager to Shakour.

As ARTec Brand Manager, Plaintiff was responsible for developing sales of ARTec products, conducting training classes about ARTec products at various salons, and managing the Goldwell and Shakour subcontractors who also conducted such training. One of Plaintiff's most important job duties was the production and administration of various paperwork required by ARTec. Plaintiff generally visited salons and attended training classes Monday through Thursday each week; during calendar year 2001 (and even earlier in her employment) Plaintiff regularly worked at her home on Fridays to perform some of her duties, including her paperwork. (Such work at home was Plaintiff's preference - it was not because of any medical condition or treatment.)

Plaintiff's Work-Related Accident

On or about June 15, 1999, Plaintiff was involved in a work-related automobile accident. Plaintiff returned to work at full duty on the day after the accident and did not request any accommodations in connection with the accident. Plaintiff filed a Workers' Compensation claim in connection with neck and back pain that she attributed to the accident, and Goldwell's workers' compensation insurer, CNA Insurance ("CNA"), compensated Plaintiff for some treatment related to those injuries. However, CNA refused to pay for acupuncture and other treatments Plaintiff received in 2001 because it concluded that such treatments were not reasonable, necessary or causally related to any work-related accident. Plaintiff appealed CNA's decision to the Compensation Appeals Board of the State of New Hampshire. After an evidentiary hearing on the merits, the Appeals Board held that, by August 2001, Plaintiff "had recovered from her work related injury and was experiencing symptoms caused by other factors." Accordingly, the Appeals Board affirmed CNA's denial of benefits because Plaintiff could not demonstrate that "the medical treatment she received after August 2001 was causally related to her June 15, 1999 work-related injury."

Complaint By ARTec

In August 2001, ARTec's Director of Education, David Bakey, informed Defendants that ARTec believed Plaintiff had "falsified" documents that she had submitted to ARTec by "changing the dates" on the documents. Based upon ARTec's dissatisfaction with Plaintiff's paperwork and its conclusion that she had falsified documents, ARTec withheld payment of $14,000 which it owed to Goldwell. As a result of these issues, on or about October 3, 2001,

Defendants requested that Plaintiff work in Goldwell's Holliston office on Friday, October 5, 2001, so that she could use Goldwell's clerical assistance and ensure correct processing of ARTec paperwork.

### Plaintiff's Request for Accommodation and/or FMLA Leave

Following Defendants' request that Plaintiff report to the Goldwell office on Friday, October 5, 2001, Plaintiff reported to Goldwell for the first time that, because of pain she attributed to her June 15, 1999 car accident, she was receiving therapy and maintained a "guideline" of driving a car for no more than 1.5 hours at a time. Travel from Plaintiff's home to Goldwell's office required Plaintiff to drive two hours each way and, therefore, would violate this guideline. Ms. Garneau informed Plaintiff that Goldwell was unaware that Plaintiff was receiving therapy and that there was no documentation of any medical restrictions in her personnel file. Ms. Garneau then instructed Plaintiff to provide Goldwell with medical documentation regarding any work limitations or restrictions. Plaintiff agreed to do so, but told Ms. Garneau that she did not, in fact, have any work restrictions, and the 1.5 hour driving limitation was merely a "guideline" that she followed.

Plaintiff reported to Goldwell's facility on October 5th as requested, and Ms. Garneau reviewed ARTec paperwork with her. That same day, Plaintiff also attended a meeting with Ms. Garneau, Sheryl Holladay (Plaintiff's supervisor regarding her work for Goldwell), and John Foundas, Goldwell's President and Owner. Mr. Foundas informed Plaintiff that Goldwell wanted her to work at Goldwell's offices (instead of at home) on each Friday because, in view of the problems that had arisen, management needed to have more involvement with Plaintiff's ARTec paperwork. Plaintiff did not object to the revised schedule at that time. Following this meeting, Plaintiff twice provided Defendants with correspondence from her physician, Dr. Jan Slezak. Those notes generally stated that Plaintiff was "fully functional" but also contained conflicting information about her ability to drive.

On October 22, 2001, Plaintiff attended a meeting with Ms. Garneau, Ms. Holladay and a Shakour Human Resources representative. At that meeting, Ms. Garneau explained to Plaintiff that Goldwell needed more specific information regarding her medical status because the documentation from Dr. Slezak was unclear. Defendants informed Plaintiff that, pending receipt of clarified medical documentation, they would attempt to accommodate her "guidelines" by requiring her to drive to Goldwell's facility on only two Fridays each month; that is, Defendants agreed to reduce the expected additional driving from 16 to 8 hours per month. On the other Fridays of each month, Plaintiff would be required to travel with salespeople to salons. For travel on those days, the salespeople – not Plaintiff - could drive the cars, if necessary.

In November 2001, Plaintiff (for the first time) requested "reduced schedule" FMLA Leave in the form of a 4-day workweek. In connection with this request, Plaintiff submitted a "Certification of Health Care Provider" which stated both that: (1) the only limitation on Plaintiff's ability to perform the essential functions of the position was to "limit driving to 4 days per week"; and (2) Plaintiff should be on a 4-day workweek. Defendants informed Plaintiff that they questioned the validity of this Certification because, *inter alia*, it was internally inconsistent

as to whether Plaintiff was limited in her ability to work *at all* on a fifth workday or was limited only in her ability to *drive* on a fifth workday.

On December 6, 2001, Defendants requested Plaintiff to obtain a second opinion regarding the medical necessity of working a 4-day week. Defendants expressly informed Plaintiff that she was permitted to work a 4-day week pending receipt of the second medical opinion. Thereafter, during every week of Plaintiff's employment, Defendants permitted her to take every Friday off. To the extent Plaintiff worked on any Friday after December 6th, such work was Plaintiff's *voluntary choice* and was *not required* by Defendants. Moreover, Defendants allowed Plaintiff to leave early to attend her therapy whenever she requested, including on the Fridays she worked at Goldwell.

Elimination of the ARTec Brand Manager Position

In August 2001, at or about the time that ARTec first asserted its claims of "falsification" against Plaintiff, Defendants began to discuss the possibility of eliminating the ARTec Brand Manager position. At that time Defendants were concerned that ARTec education costs (including the cost of maintaining a Brand Manager) were increasing, while product sales were not. During May through November 2001, ARTec sales leveled-off and Defendants were not meeting their ARTec sales goals. After discussing their concerns with ARTec representatives in December 2001, Defendants decided to eliminate the position because the lack of sales did not justify the expense of maintaining an ARTec Brand Manager.

On December 27, 2001, Defendants informed Plaintiff that her employment was terminated because the ARTec Brand Manager position had been eliminated. At that meeting, Defendants offered Plaintiff a part-time educator position, which Plaintiff declined. Defendants did not hire anyone to replace Plaintiff in the position of ARTec Brand Manager.

II.   **STATEMENT OF FACTS ESTABLISHED BY THE PLEADINGS, BY ADMISSIONS OR BY STIPULATIONS.**

1.   Goldwell and Shakour distribute hair care products to various hair salons. ARTec Systems Group, Inc. ("ARTec") was a manufacturer of certain hair care products distributed by Defendants.

2.   On or about August 31, 1998, Goldwell hired Plaintiff to perform the position of "ARTec Brand Manager," which position she held throughout her employment by Goldwell; beginning in April 2000 and continuing through the end of her employment, Plaintiff also provided services as ARTec Brand Manager to Shakour.

3.   On or about June 15, 1999, Plaintiff was involved in a work-related automobile accident; Goldwell's Workers' Compensation insurer compensated Plaintiff for some treatment related to that accident.

4.  On December 27, 2001, Defendants informed Plaintiff that her employment was terminated because the ARTec Brand Manager position had been eliminated.

### III. CONTESTED ISSUES OF FACT.

A.  Whether Defendants terminated Plaintiff's employment on the basis of her alleged disability (or perceived disability) or requested FMLA leave.

B.  Whether Defendants terminated Plaintiff's employment for legitimate, non-discriminatory reasons having nothing to do with her alleged disability (or perceived disability) or requested FMLA leave.

### IV. JURISDICTIONAL QUESTIONS.

None at this time.

### V. QUESTIONS RAISED BY PENDING MOTIONS.

None at this time.

### VI. ISSUES OF LAW, INCLUDING EVIDENTIARY QUESTIONS.

A.  Whether Plaintiff's claims under the FMLA are time-barred.

B.  Whether Defendants terminated Plaintiff's employment in violation of the FMLA.

C.  Whether Plaintiff was "handicapped" within the meaning of M.G.L. c.151B ("Chapter 151B") and/or the Americans With Disabilities Act ("ADA").

D.  Whether M.G.L. c. 152 §75B(1) is applicable to Plaintiff's claims under Chapter 151B and the ADA.

E.  Whether Defendants had any duty under Chapter 151B and/or the ADA to accommodate Plaintiff's requested accommodations and, if so, whether Defendants failed to satisfy any such duty.

F.  Whether the termination of Plaintiff's employment constituted any violation of Chapter 151B and/or the ADA.

VII. REQUESTED AMENDMENTS TO THE PLEADINGS.

None at this time.

VIII. ADDITIONAL MATTERS TO AID IN DISPOSITION OF CASE.

None at this time.

IX. PROBABLE LENGTH OF TRIAL.

The parties estimate that the trial of this matter will require five (5) days.

X. WITNESSES TO TESTIFY AT TRIAL AND THE PURPOSE OF THEIR TESTIMONY.

   A. **Plaintiff's Witnesses.**

   1. The Plaintiff
   2. Jan Slezak M.D.
   3. David Hallgren
   4. Susan Pugh
   5. Lisa Kelly
   6. Tansi Plourde
   7. Debra Wilson
   8. Sara Duffy

   B. **Defendant's Witnesses.**

1. David Bakey
   *last known*
   c/o ARTec Systems Group, Inc.
   99 Seaview Boulevard
   Port Washington, New York  11050-4632

2. Andrew Bartfield
   *last known*
   c/o ARTec Systems Group, Inc.
   99 Seaview Boulevard
   Port Washington, New York  11050-4632

3. Brooke Carlson

        *last known*
        c/o ARTec Systems Group, Inc.
        99 Seaview Boulevard
        Port Washington, New York  11050-4632

4. Jeanne Degan, Plaintiff

5. John Foundas
    c/o Goldwell of New England, Inc.
    375 Hopping Brook Road
    Holliston, Massachusetts 01746-1475
    (508) 429-8158

6. Mary M. Garneau
    c/o Goldwell of New England, Inc.
    375 Hopping Brook Road
    Holliston, Massachusetts 01746-1475
    (508) 429-8158

7. Rhonda Greenough
    *last known*
    CNA, New England Claims Service Center
    1250 Hancock Street
    Quincy, Massachusetts 02269-9167

8. Sheryl Holladay
    *(contact information currently unknown)*

9. Renee Shakour
    c/o R. G. Shakour, Inc.
    254 Turnpike Road
    Westboro, Massachusetts 01581
    (508) 366-8282

10. Laurie Viapiano
    *last known*
    8 Laurel Lane
    Spencer, Massachusetts  01562

11. Jon Shakour
    c/o R.G. Shakour, Inc.
    254 Turnpike Road
    Westboro, Massachusetts 01581
    (508) 366-8282

The Parties reserve their right to amend this list. The Parties also reserve the right to call any witness listed by the other party.

## XI. PROPOSED EXHIBITS.

The parties agree to meet two weeks before the date of the trial for the purpose of exchanging proposed exhibits and exhibit lists.

| JEANNE DEGAN | GOLDWELL OF NEW ENGLAND, INC. and R.G. SHAKOUR, INC. |
|---|---|
| By her attorney, | By their attorneys, |
| /s/ Kevin G. Powers by SRS | /s/ Jonathan R. Sigel |
| Kevin G. Powers, BBO# 405020<br>Rodgers, Powers & Schwartz, LLP<br>18 Tremont Street<br>Boston, MA 02108<br>(617) 742-7010 | Jonathan R. Sigel, BBO# 559850<br>Renee E. Hackett, BBO# 640841<br>Bowditch & Dewey, LLP<br>311 Main Street, P.O. Box 15156<br>Worcester, MA 01615-0156<br>(508) 791-3511 |

Dated: March 28, 2006